No. 22-6086

# In the
# United States Court of Appeals
# for the Tenth Circuit

───────────────────────────────

WHYTE MONKEE PRODUCTIONS, LLC, TIMOTHY SEPI,

*Plaintiffs-Appellants,*

v.

NETFLIX, INC., ROYAL GOODE PRODUCTIONS, LLC,

*Defendants - Appellees.*

───────────────────────────────

On Appeal from the United States District Court
for the Western District of Oklahoma (No. Civ-20-933-D),
Hon. Timothy D. Degiusti, Judge Presiding.

───────────────────────────────

**SUPPLEMENTAL BRIEF OF *AMICI CURIAE* INTERNATIONAL DOCUMENTARY ASSOCIATION, FILM INDEPENDENT, KARTEMQUIN EDUCATIONAL FILMS, INC., WOMEN IN FILM, AND THE UNIVERSITY FILM AND VIDEO ASSOCIATION IN SUPPORT OF DEFENDANTS-APPELLEES ON REHEARING**

───────────────────────────────

Jack I. Lerner
UCI Intellectual Property, Arts, and
  Technology Clinic
University of California, Irvine School
  of Law
401 E. Peltason Dr.
Irvine, CA 92697
Telephone: 949-824-7684
Email: jlerner@law.uci.edu

Rom Bar-Nissim
Heah Bar-Nissim LLP
1801 Century Park East, Ste. 2400
Los Angeles CA 90067
Telephone: 310-432-2836
Email: Rom@HeahBarNissim.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. ARGUMENT .......................................................................................................2

   A. Documentary Practices Are Paradigmatic "Preamble" Fair Uses .....................2

   B. Factor One Favors Fair Use When Material Is Used As A "Historical Marker" In Commercial Documentaries ...............................................................3

III. CONCLUSION ..................................................................................................7

CERTIFICATE OF COMPLIANCE ......................................................................9

CERTIFICATE OF DIGITAL SUBMISSION ...................................................10

CERTIFICATE OF SERVICE .............................................................................11

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Bouchat v. Baltimore Ravens L.P.*,
  737 F.3d 932 (4th Cir. 2013) ..................................................................1, 2, 5, 6

*Bouchat v. NFL Properties LLC*,
  910 F.Supp.2d 798 (D. Md. 2012)......................................................................2

*Brown v. Netflix, Inc.*,
  462 F.Supp.3d 453 (S.D.N.Y. 2020)...............................................................5, 6

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) .......................................................................................5, 6, 7

*Cramer v. Netflix, Inc.*,
  2023 WL 6130030 (W.D. Pa. Sept. 18, 2023)..............................................2, 3, 5

*Elvis Presley Enters., Inc. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003) ...................................................................2, 4, 5, 6

*Google LLC v. Oracle America, Inc.*,
  593 U.S. 1 (2021) ................................................................................................6

*Hofheinz v. A&E Television Networks*
  146 F. Supp. 2d 442 (S.D.N.Y. 2001).................................................2, 3, 5, 6

*Hofheinz v. AMC Prods., Inc.*,
  147 F.Supp.2d 127 (E.D.N.Y. 2001)...............................................................5, 6

*Hofheinz v. Discovery Commc'ns*,
  2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) ............................................3, 5, 6

*Kelley v. Morning Bee, Inc.*,
  2023 WL 6276690 (S.D.N.Y. Sept. 26, 2023)................................................5, 6

*Lennon v. Premise Media Corp.*,
  556 F.Supp.2d 310 (S.D.N.Y. 2008) .............................................................3, 5, 6

*Monbo v. Nathan*,
  623 F.Supp.3d 56 (E.D.N.Y. 2022)................................................................2, 5, 6

*Monster Commc'ns, Inc. v. Turner Broad. Sys.*,
  935 F.Supp. 490 (S.D.N.Y. 1996) ............................................................... 2, 5, 6

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
  904 F.2d 152 (2d Cir. 1990) ............................................................................ 2

*Red Label Music Publ'g, Inc. v. Chila*,
  388 F.Supp.3d 975 (N.D. Ill. 2019) ............................................................. 5, 6

*Salinger v. Random House, Inc.*,
  811 F.2d 90 (2d Cir. 1987) .............................................................................. 2

*Warhol Foundation for the Visual Arts v. Goldsmith*,
  598 U.S. 508 (2023) ........................................................................................ 7

**Statutes**

17 U.S.C. § 107 ............................................................................... 1, 2, 5, 6

**Other Authorities**

Caty Borum Chattoo & William Harder, Ctr. for Media & Soc. Impact, *The State of the Documentary Field: 2020 Study of U.S. Documentary Professionals* (2021) ................. 7

I. **INTRODUCTION**

The first question in the Court's May 13, 2024 Order asks: "[t]o what extent are the predominant principles of fair use jurisprudence that relate to documentary use for 'preamble' purposes (17 U.S.C. § 107) of film clips without paying licensing fees—including, but not limited to, the use of such clips as historical markers—apposite here to Petitioners-Appellees' commercial use of the Funeral Video?" Docket No. BL-100.

*Amici* seek to assist the Court's consideration of this question by providing additional guidance on "the law and practice of documentary filmmaking."[1] *Id.* Documentarians make paradigmatic fair uses, including criticism, commentary, research, and news reporting, that Congress recognized and enshrined in the "preamble" to Section 107 of the Copyright Act.

The practice of using clips as "historical markers"—including when such uses are considered "commercial"— is part and parcel of documentary practice and long supported by the law. Critically, documentary filmmakers rely on the well-settled legal principle that the key question regarding commerciality is "the degree to which the new user exploits the copyright for commercial gain—as opposed to [being] incidental to the larger commercial enterprise of creating historical videos for profit." *Bouchat v.*

---

[1] As representatives of the documentary filmmaking community, *Amici* are ideally suited to provide additional information on the impact of the Court's filed opinion on documentary filmmaking. See Brief *Amici Curiae* by International Documentary Association et al. (May 2, 2024), Docket No. BL-94 ("Documentary Filmmakers' Brief"). No party or its counsel authored this brief in whole or in part. No person other than *Amici* contributed any money to fund the preparation or submission in this brief.

1

*Baltimore Ravens L.P.* ("*Bouchat*"), 737 F.3d 932, 942 (4th Cir. 2013) (quoting *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 627 (9th Cir. 2003)).

## II.  ARGUMENT

### A.  Documentary Practices Are Paradigmatic "Preamble" Fair Uses

Documentary practice directly serves the "preamble" purposes set forth in Section 107 of the Copyright Act by combining commentary, criticism, scholarship and research.[2] The Fourth Circuit spoke directly to this point in *Bouchat v. Baltimore Ravens L.P.*, 737 F.3d 932, 944 (4th Cir. 2013). Documentaries, the court noted, "feature three key components: archival footage, commentary, and interviews." *Id.* These components are "crucial to the creation of any historically accurate film" and "align" documentaries "with the examples in § 107's preamble: 'criticism, comment, news reporting, teaching[,] scholarship, or research." *Id.* (quoting 17 U.S.C. § 107).

*Hofheinz v. A&E Television Networks* provides further insight. In that case, a biographical documentary about actor Peter Graves used a short clip from an early film in his career. 146 F.Supp.2d at 446. The Court found the use of the clip did "not merely

---

[2] Documentary Filmmakers' Brief at 7, 7 n.6. The long line of case law supporting this proposition is tethered to the fair use jurisprudence concerning "biographies in general and critical biographies in particular." *Hofheinz v. A&E Television Networks* ("*A&E*"), 146 F. Supp. 2d 442, 446 (S.D.N.Y. 2001) (first quoting *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 156 (2d Cir. 1990); and then quoting *Salinger v. Random House, Inc.*, 811 F.2d 90, 96 (2d Cir. 1987)); *Monster Commc'ns, Inc. v. Turner Broad. Sys.*, 935 F.Supp. 490, 493-94 (S.D.N.Y. 1996); *Monbo v. Nathan*, 623 F.Supp.3d 56, 100 (E.D.N.Y. 2022); *Bouchat v. NFL Properties LLC*, 910 F.Supp.2d 798, 811 (D. Md. 2012); *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 628 (9th Cir. 2003); *Cramer v. Netflix, Inc.*, 2023 WL 6130030, *6 (W.D. Pa. Sept. 18, 2023).

purport to supersede the original movie at issue, but . . . create[d] a new copyrightable film biography." *Id.* The clip was used "to show the kind of motion picture roles Graves took when he first began his acting career and what his perception of them was." *Id.* The use "served to enrich the biography through the actor's perspective of his own work" and not "to recreate the creative expression" of the original. *Id.* Rather, the clip was used "for the transformative purpose of enabling the viewer to understand the actor's modest beginnings in the film business." *Id.* at 446-47. It was irrelevant that the documentary happened to "entertain audiences" because the documentary used the clip "for the purpose of commenting on Graves and what he thought about a picture he appeared in." *Id.* at 447.[3]

### B. Factor One Favors Fair Use When Material Is Used As A "Historical Marker" In Commercial Documentaries

It is well-established that filmmakers use archival materials as "historical reference points" to situate the subject of a documentary in historical context, or to

---

[3] Many other courts have discussed documentary filmmaking activities similarly. *See, e.g., Hofheinz v. Discovery Commc'ns* ("*Discovery*"), 2001 WL 1111970, *4 (S.D.N.Y. Sept. 20, 2001) (documentary's transformative use of feature film clips was "(1) to illustrate the theme of the government cover-up; (2) to demonstrate how, and with what special effects technology, aliens have been represented in film; and (3) to provide contrasts between the early science fiction films like 'Saucerman' and more recent films"); *Cramer*, 2023 WL 6130030, *6 ("The purpose and character of Defendants' use of the Tattoo is as part of a visual and auditory compilation depicting the public's overwhelming fascination with and reaction to Joe Exotic in the early days of the pandemic, and thus falls into the 'criticism,' 'comment,' or 'reporting' that is expressly defined as 'fair use' under the Copyright Act."); *Lennon v. Premise Media Corp.*, 556 F.Supp.2d 310, 323 (S.D.N.Y. 2008) ("The movie thus uses the excerpt of 'Imagine' to criticize what the filmmakers see as the naivete of John Lennon's views.").

demonstrate a point. Documentary Filmmakers' Brief at 6, 6 n.3. The Ninth Circuit examined the contours of such use—including its relationship to commercial use—in *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d at 627-29, 630-31, which involved a 16-hour "exhaustive" documentary about the life and work of Elvis Presley. 349 F.3d at 625.

In *Elvis Presley*, the Ninth Circuit held that the first factor was "a close issue." *Id.* at 629. On the one hand, many clips used in the documentary were transformative because they were "cited as historical reference points" in the life of Elvis. *Id.* at 628. In many instances, the clips played for a short time and were "used for reference purposes while a narrator talk[ed] over them or interviewees explain[ed] their context in Elvis' career." *Id.* After all, observed the court, it "would be impossible to produce a biography of Elvis without showing some of his most famous television appearances for reference purposes." *Id.* at 629. In such instances, the material was used as "historical reference points in the life of a remarkable entertainer," which was "distinct from the purpose of the original." *Id.* Ultimately, the documentary's "nature as a biography transform[ed] the purpose of showing these clips from pure entertainment to telling part of the story of Elvis['s] life." *Id.* at 625.

On the other hand, found the court, the use of some clips "would more properly be characterized as 'filler'" because the points being made bore little relationship to the material in question. *Id.* Also, some clips were "played without much interruption, if

4

any" or at great length.[4] *Id.* at 629. Those clips were held to be not transformative.

As to commercial use, the Ninth Circuit held that the focus of the inquiry is "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise." *Id.* at 627. Where the defendant "simply rebroadcast [the clips] for entertainment purposes," the use "serve[d] the same intrinsic entertainment value … protected by Plaintiffs' copyrights," undermining their commercial viability. *Id.* The Ninth Circuit also found it relevant that defendants promoted the non-transformative clips' presence in the documentary as a draw for prospective viewers. *Id.* at 625, 631.

*Elvis Presley* provides useful guidance for documentarians and this Court should consider its reasoning and adopt a similar rule. First, using a copyrighted work as a

---

[4] The Ninth Circuit appears to have imported the analysis of the third fair use factor— "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"—into its transformative use analysis in that case. 17 U.S.C. § 107(3); *Elvis Presley*, 349 F.3d at 629-30. Courts regularly uphold documentary fair uses when they make criticism and commentary and use "no more than necessary to serve as a historical reference point in the commentary." *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F.Supp.3d 975, 986 (N.D. Ill. 2019). This rule comports with the Supreme Court's directive that the "portion used in relation to the copyrighted work as a whole" must be "reasonable in relation to the copying's purpose" and—critically—the rule ensures the use in question will not compete with legitimate commercial exploitation of the original work. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 570 (1994). *See Bouchat*, 737 F.3d at 940; *A&E*, 146 F.Supp.2d at 446; *Hofheinz v. AMC Prods., Inc.* ("*AMC*"), 147 F.Supp.2d 127, 139 (E.D.N.Y. 2001); *Monbo*, 623 F.Supp.3d at 103; *Monster*, 935 F.Supp. at 495; *Discovery*, 2001 WL 1111970, *4; *Brown v. Netflix, Inc.*, 462 F.Supp.3d 453, 462 (S.D.N.Y. 2020); *Cramer*, 2023 WL 6130030, *8; *Kelley v. Morning Bee, Inc.*, 2023 WL 6276690, *12 (S.D.N.Y. Sept. 26, 2023); *Lennon*, 556 F.Supp.2d at 325.

"historical reference point" does not serve the same purpose as the original.[5] Second, so long as the use is "incidental to the larger commercial enterprise of creating historical videos for profit," the unlicensed material's "role in facilitating [commercial] gain [is] unquestionably minimal." *Bouchat*, 737 F.3d at 942 (quoting *Elvis Presley*, 349 F.3d at 627); *Red Label*, 388 F.Supp.3d at 985 (same); *see also Monbo*, 623 F.Supp.3d at 101 (an earlier work was not "used to advertise" a documentary or "to enhance the commercial value of the . . . documentary").

This approach follows the Supreme Court's mandate that courts "take into account the public benefits the copying will likely produce," such as "copyright's concern for creative production of new expression."[6] *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 35-36 (2021). Consequently, documentarians know that purported commercial use will be given relatively less weight because "nearly all of the illustrative uses listed in the preamble paragraph of § 107" are "generally conducted for profit in this country."[7]

---

[5] *See also Bouchat*, 737 F.3d at 940; *A&E*, 146 F.Supp.2d at 446-447; *AMC*, 147 F.Supp.2d at 137-38, 138 n.10; *Red Label*, 388 F.Supp.3d at 984-85; *Monbo*, 623 F.Supp.3d at 100; *Kelley*, 2023 WL 6276690, *12.

[6] *Kelley*, 2023 WL 6276690, *12 ("If documentarians had to obtain licenses for every fleeting, incidental capture of a copyrighted work in the background of any given scene, the incentive to create biographical documentaries that accurately represent a subject's life and movements would be severely curtailed."); *Lennon*, 556 F.Supp.2d at 322 ("defendants have established for purposes of this motion that the movie contributes to the broader public interest by stimulating debate on an issue of current political concern.")

[7] *AMC*, 147 F.Supp.2d at 138; *A&E*, 146 F.Supp.2d at 447 n.2; *Monster*, 935 F.Supp. at 493-94; *Discovery*, 2001 WL 1111970, *5; *Brown*, 462 F.Supp.3d at 461.

*Campbell*, 510 U.S. at 584.[8]

*Amici* also urge this Court to consider that, while documentarians aspire for their films to be financially successful, the reality is that most documentaries never recover their production costs. Nearly all documentaries are self-produced. The vast majority of documentaries are made to completion without knowing whether the film will be accepted by a film festival—let alone successfully secure a distribution deal with a streaming service. Well-funded and/or profitable documentaries are the exception and not the rule.[9]

## III.   CONCLUSION

*Amici* respectfully urge this Court to affirm the trial court's decision for the reasons stated above and in the Documentary Filmmakers' Brief.

---

[8] This approach also comports with the Supreme Court's guidance in *Warhol Foundation for the Visual Arts v. Goldsmith*, 598 U.S. 508 (2023), which involved a use that directly competed with a well-established licensing market for which the original work was created. Even in such cases, the Court held, commerciality must be "weighed against the degree to which the use has a further purpose or different character," and courts must further ask if the new purpose "is justified because it furthers the goal of copyright . . . without diminishing the incentive to create." 598 U.S. at 531.

[9] Caty Borum Chattoo & William Harder, Ctr. for Media & Soc. Impact, *The State of the Documentary Field: 2020 Study of U.S. Documentary Professionals* (2021), https://cmsimpact.org/report/the-state-of-the-documentary-field-2020-study-of-u-s-documentary-professionals/.

Dated: June 3, 2024  Respectfully submitted:

*/s/ Jack I. Lerner*
Jack I. Lerner CA #220661
UCI Intellectual Property, Arts, and Technology Clinic
University of California, Irvine School of Law
401 E. Peltason Dr.
Irvine, CA 92697
Telephone: 949-824-7684
Email: jlerner@law.uci.edu

*Counsel for Amici Curiae*

# **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g) and the Court's May 13, 2024 Order, the undersigned counsel certifies that this document complies with: (1) the word limit of Federal Rule of Appellate Procedure 29(b)(4) because it contains less than seven and a half (7 ½) pages, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f), totaling 2,087 words according to the word-processing system used to prepare the document; and (2) the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5-6) because it has been prepared with proportionally spaced typeface using 13-point Times New Roman.

Dated: June 3, 2024            Respectfully submitted:

*/s/ Jack I. Lerner*
Jack I. Lerner CA #220661
UCI Intellectual Property, Arts, and
   Technology Clinic
University of California, Irvine School of
   Law
401 E. Peltason Dr.
Irvine, CA 92697
Telephone: 949-824-7684
Email: jlerner@law.uci.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing: (1) all required privacy redactions have been made per Tenth Circuit Rule 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus-scanning program, Windows Defender Version 1.413.76.0 last updated on June 3, 2024, and according to the program are free of viruses.

Dated: June 3, 2024    Respectfully submitted:

*/s/ Jack I. Lerner*
Jack I. Lerner CA #220661
UCI Intellectual Property, Arts, and
  Technology Clinic
University of California, Irvine School of
  Law
401 E. Peltason Dr.
Irvine, CA 92697
Telephone: 949-824-7684
Email: jlerner@law.uci.edu

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 3, 2024, the foregoing motion for leave to file *amicus curiae* brief and its accompanying *amicus curiae* brief was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system and served on all counsel of record via CM/ECF.

Dated: June 3, 2024                    Respectfully submitted:

*/s/ Czarina Ellingson*
Czarina Ellingson, Law Clinics Coordinator