**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 30, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

WHYTE MONKEE PRODUCTIONS, LLC; TIMOTHY SEPI,

    Plaintiffs - Appellants,

v.

NETFLIX, INC.; ROYAL GOODE PRODUCTIONS, LLC,

    Defendants – Appellees,

-------------------------------------

JONATHAN ASKIN; MARK BARTHOLOMEW; BARTON BEEBE; MICHAEL A. CARRIER; MICHAEL W. CARROLL; ZACHARY CATANZARO; DALE COHEN; JORGE L. CONTRERAS; STACEY DOGAN; BRIAN L. FRYE; SHUBHA GHOSH; JAMES GIBSON; ELLEN P. GOODMAN; JAMES GRIMMELMANN; LAURA A. HEYMANN; PETER JASZI; STACEY M. LANTAGNE; LEE ANN WHEELIS LOCKRIDGE; MARK A. LEMLEY; YVETTE JOY LIEBESMAN; ORLY LOBEL; GLYNN LUNNEY; TIMOTHY J. MCFARLIN; MARK P. MCKENNA; VIVA MOFFAT; TYLER T. OCHOA; VICTORIA PHILLIPS; BETSY ROSENBLATT; ZAHR K. SAID; PAMELA SAMUELSON; JASON M. SCHULTZ; JESSICA SILBEY; ERIK STALLMAN; REBECCA TUSHNET; INTERNATIONAL DOCUMENTARY

No. 22-6086

ASSOCIATION; FILM INDEPENDENT; KARTEMQUIN EDUCATIONAL FILMS, INC.; WOMEN IN FILM; THE UNIVERSITY FILM AND VIDEO ASSOCIATION,

      Amici Curiae.

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:20-CV-00933-D)**

_____

Gregory Keenan, Digital Justice Foundation, Floral Park, New York (Andrew Grimm of Digital Justice Foundation, Omaha, Nebraska, with him on the briefs), for Plaintiffs-Appellants.

Robert H. Rotstein, Mitchell, Silberberg & Knupp LLP, Los Angeles, California (Emily F. Evitt of Mitchell, Silberberg & Knupp LLP, Los Angeles, California; and Mack J. Morgan, III, of MJMLAW PLLC, Nichols Hills, Oklahoma, with him on the brief), for Defendants-Appellees.

Philip R. Malone, Nina K. Srejovic, and Alex S. Cohen, Juelsgaard Intellectual Property and Innovation Clinic, Mills Legal Clinic at Stanford Law School, Stanford, CA, filed an Amici Curiae brief on behalf of 34 Copyright and Media Law Professors in support of Defendants-Appellees.

Jack I. Lerner, UCI Intellectual Property, Arts, and Technology Clinic, University of California, Irvine School of Law, Irvine, CA, and Rom Bar-Nissim, Heah Bar-Nissim LLP, Los Angeles, CA, filed an Amici Curiae brief on behalf of International Documentary Association, Film Independent, Kartemquin Educational Films, Inc., Women In Film, and The University Film and Video Association in support of Defendants-Appellees.

_____

Before **HOLMES**, Chief Judge, **HARTZ**, and **CARSON**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

2

Plaintiffs-Appellants, Whyte Monkee Productions, LLC ("Whyte Monkee Productions") and Timothy Sepi, appeal from the District Court for the Western District of Oklahoma's order granting summary judgment to Defendants-Appellees, Netflix, Inc. ("Netflix") and Royal Goode Productions, LLC ("Royal Goode") (collectively, "Defendants"). In March 2020, Defendant Netflix released *Tiger King: Murder, Mayhem and Madness* ("*Tiger King*"), a seven-part documentary-style series produced by Defendant Royal Goode. Included in the series are short clips from eight videos ("the Videos") that Mr. Sepi filmed. Mr. Sepi filmed seven of the videos while he was working for the Gerald Wayne Interactive Zoological Park ("the Park").

The eighth video—Travis MM Funeral Ceremony ("Funeral Video")—was shot after Mr. Sepi terminated his employment relationship with the Park. Following the release of *Tiger King*, Mr. Sepi registered the eight videos for copyright protection, either under his own name or the name of Whyte Monkee Productions. Plaintiffs then sued Netflix and Royal Goode for copyright infringement, contending that Plaintiffs owned the copyrights in the Videos and that Defendants had used clips of those videos without permission.

On April 27, 2022, the district court granted summary judgment to Defendants. First, the district court held that seven of the videos were works made for hire under § 201(b) of the Copyright Act, and thus Mr. Sepi did not own the copyrights in the works. Second, the district court held that Defendants' use of the eighth video was fair use that did not infringe upon Mr. Sepi's copyright.

On appeal, Plaintiffs argue that the district court erred in concluding that the first seven videos were works made for hire, as "Mr. Sepi's line of work was tour photography and videography, but the works in question are not related to tours, are not videography but cinematography, were not made during working hours, and were made at his home as well as his workplace." Aplts.' Opening Br. at 16. Plaintiffs also argue that the district court erred on fair use, as "all four statutory factors" weighed against such a finding. *Id.* In support of their position, Plaintiffs point to the Supreme Court's decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), which allegedly "supports reversal of the fair-use decision below." Aplts.' Am. Suppl. Br. at 11.

With respect to the first seven videos, we conclude that Plaintiffs have asserted a new theory on appeal—which was not raised in the district court—and have failed to argue for plain error. As such, we hold that Plaintiffs have waived this argument for purposes of this appeal. And, consequently, we uphold the district court's judgment as it pertains to the first seven videos.

We also uphold the district court's conclusion that Defendants' use of the Funeral Video qualifies as fair use. We agree with the district court that all four statutory factors favor Defendants. We therefore uphold the district court's grant of summary judgment as to the Funeral Video.

In sum, we **affirm** the district court's judgment.

**I**

**A**

**1**

Joseph Maldonado-Passage, also known as Joe Exotic ("Mr. Exotic"),[1] founded the Gerald Wayne Interactive Zoological Park in Wynnewood, Oklahoma. The Park housed tigers, lions, and other exotic animals and was open to the public for tours. The Park also maintained a studio that was used to produce a web series called *Joe Exotic TV*. *Joe Exotic TV* was primarily an unscripted series featuring video footage from around the Park and skits that Mr. Exotic invented. In early 2015, *Joe Exotic TV* was produced by Rick Kirkham, who oversaw the studio operations with a team of four people.

In March 2015, Mr. Sepi discussed working for *Joe Exotic TV* with Mr. Kirkham and Mr. Exotic. From these discussions, Mr. Sepi understood that part of what he would be doing was working on *Joe Exotic TV*, that he would be paid $150 per week, and that he would be allowed to live on Park property for free. Only a week after starting his employment, however, a fire destroyed the studio and camera equipment. Mr. Kirkham quit, leaving Mr. Sepi as the sole videographer at the Park.

With the studio and camera equipment destroyed, *Joe Exotic TV* went on hiatus. During this time, Mr. Sepi continued to photograph Park tours and assist with

---

[1]    We refer to Mr. Exotic using his chosen name because both parties do so.

animal care around the Park. Within a couple of months, however, a new production studio had been built, new camera equipment had been obtained, and *Joe Exotic TV* resumed production.

Mr. Sepi admits that during the day, while using the studio's equipment, "he split time taking tour photographs, filming, and editing for *Joe Exotic TV*, and filming campaign videos for [Mr.] Exotic,[2] but denies that these were all part of his workday duties for the Park." Aplts.' App., Vol. IV, ¶ 17, at 19 (Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J., filed Feb. 28, 2022). Instead, he alleges on appeal that he was solely employed to take photography and videography of park *tours*. As such, he claims that he "was making footage" for *Joe Exotic TV* "on his own time," because "Joe Exotic was content gold," and the footage would allow him to achieve success in the media. Aplts.' Opening Br. at 10.

*Joe Exotic TV* returned to streaming on May 7, 2015. Each episode was preceded by a disclaimer stating that the footage was owned by Whyte Monkee Productions. Whyte Monkee Productions is an Oklahoma limited liability company that was established on May 5, 2015. The Articles of Organization include Mr. Exotic's email address, the Park's street address, and "Tim Sepi" as the signatory. Although Mr. Sepi's degree of control over Whyte Monkee Productions was contested below, he now concedes that "[f]or the purposes of this appeal, the

---

2       While Mr. Sepi was working with him, Mr. Exotic undertook a campaign for President of the United States.

Court should assume that Mr. Sepi was unaware of [Whyte Monkee Productions] at the time of formation." *Id.* at 63.

**2**

Until his resignation in August 2016, Mr. Sepi continued to film and produce videos for *Joe Exotic TV*. During and after Mr. Sepi's tenure at the Park, filmmakers associated with Defendant Royal Goode were shooting footage at the Park and editing what would eventually become the *Tiger King* series. In addition to its own footage, Royal Goode licensed film clips from Mr. Exotic and Jeffrey Lowe—the Park's new owner as of approximately February 2016—including the works that Mr. Sepi now claims to own.

While creating *Tiger King*, Royal Goode emailed Mr. Sepi to obtain his assistance in accessing video footage that was apparently located at the Park. Royal Goode also offered to compensate Mr. Sepi for his efforts. Mr. Sepi responded to Royal Goode's email, telling them to contact Mr. Exotic because he no longer worked there. He also did not assert any ownership interest in any footage at that time.

In March 2020, Netflix released *Tiger King*. The seven-episode series runs approximately 312 minutes. The series included clips from the following seven videos that were filmed by Mr. Sepi *while he was an employee* of the Park:

1.    Disrespectful Tomato Thrower Trouble

2.    Joe – Getting Dragged by Lion

3.    Joe – Presidential PSA

4.      Mobile Trailer Inspections for Volunteers

5.      Country Music Artist Joe Exotic – Bring It On

6.      Joe Exotic Country Music "Here Kitty Kitty"

7.      Joe Exotic TV – Tornado on the Ground

These videos were all filmed by Mr. Sepi between May 2015 and August 2016.

Mr. Sepi shot the eighth video—Travis MM Funeral Ceremony—after he terminated his employment relationship with the Park.  The video is approximately twenty-three minutes and fifty-two seconds long and documents the funeral of Mr. Exotic's husband, Travis Maldonado.  The Funeral Video depicts guests arriving at the funeral, Mr. Exotic giving a eulogy, brief remarks by others—including Cheryl Maldonado, Travis's mother—and the showing of a memorial video.  Mr. Sepi testified that he shot the video by placing the camera on a tripod and leaving it running.  The camera lens is aimed primarily at the area around a tabletop lectern, where the guests arrived and the remarks were later offered.  For brief periods, the camera lens pans to a video monitor where the memorial video is shown and to capture certain funeral guests facing the lectern.  The video was livestreamed on the *Joe Exotic TV* YouTube page and remained there after the funeral.

Royal Goode included in *Tiger King* a clip from the Funeral Video showing portions of Mr. Exotic's eulogy interspersed with other footage, including comments from Mr. Maldonado's mother that are critical of Mr. Exotic.  At times Ms. Maldonado's comments are played directly over visuals of Mr. Exotic's remarks, with her stating, "He has to do dramatics, you know, drama," and "He was even

acting there." Aplts.' App., Vol. IX, Multimedia Ex. 5, at 27:07–27:18.  The clip appears in Episode Five of *Tiger King* and lasts approximately one minute and six seconds.  Episode Five runs for forty-two minutes and forty-three seconds. Therefore, the clip of the Funeral Video amounts to approximately 2.58% of Episode Five and 0.35% of the *Tiger King* series.

Following the release of *Tiger King*, Mr. Sepi obtained copyright registrations for the eight videos.  Mr. Sepi has never licensed any of his work.

**3**

In a separate lawsuit, Carole Baskin—a big-cat enthusiast and Mr. Exotic's longstanding rival—obtained a $1 million judgment against Mr. Exotic.  To collect this judgment, Ms. Baskin initiated garnishment proceedings against Mr. Exotic in Oklahoma.  On September 13, 2016, approximately one month after leaving the Park, Mr. Sepi gave a deposition as a fact witness in connection with the garnishment proceedings.  During the course of his 2016 deposition, Mr. Sepi testified (1) that he had been hired by and worked for the Park as a videographer and photographer, and (2) that he had no involvement in the creation of the entity known as Whyte Monkee Productions, nor any knowledge of that entity's activities.

However, Mr. Sepi's testimony on these points changed significantly by the time he filed this lawsuit.  In 2021, he gave a deposition in connection with this litigation in which he directly contradicted his earlier testimony and admitted to committing perjury during his 2016 deposition.  Specifically, at his 2021 deposition, Mr. Sepi testified that he came up with the idea to form Whyte Monkee Productions

after the studio fire and gained permission from the Park to film videos using the entity. Mr. Sepi also testified that he was being paid $150 per week for his photography work at the Park, which did not include *any* videography. Specifically, he testified that when he described himself as a "cameraperson" in his 2016 deposition, he did not properly elaborate to indicate that he only meant photography. *See* Aplts.' App., Vol. V, at 44, Tr. 30:6–19 (Dep. of Timothy Sepi, dated May 13, 2021).

**B**

On September 14, 2020, Plaintiffs sued Netflix—and later Royal Goode—for copyright infringement, contending that Plaintiffs owned the copyrights in the Videos and that Defendants had used clips of those Videos without permission. They sought a permanent injunction against Defendants' alleged infringement, an award of monetary damages, litigation costs, and other legal and equitable relief as appropriate. On January 27, 2022, Defendants moved for summary judgment on the grounds that (1) Mr. Sepi had shot seven of the Videos within the scope of his employment such that those videos were works made for hire; and (2) the remaining video—i.e., the Funeral Video—is not subject to copyright protection at all because it is lacking in originality. Alternatively, Defendants argued that their use of the eighth video qualified as a fair use such that no copyright infringement had occurred.

On April 27, 2022, the district court granted Defendants' motion for summary judgment, holding that seven of the videos were works made for hire under § 201(b) of the Copyright Act, and thus Mr. Sepi did not own the copyrights in those videos.

10

In reaching that conclusion, the district court also determined that Mr. Sepi's 2021 testimony should be "excluded as a transparent attempt to create a sham issue of fact." Aplts.' App., Vol. VIII, at 264 (Order, filed Apr. 27, 2022).

The district court then determined that "a reasonable juror could conclude that the Travis MM Funeral Ceremony video contains elements of originality that are subject to copyright." *Id.* at 271. Nonetheless, the district court concluded that Defendants' use of the Funeral Video was fair use that did not infringe upon Mr. Sepi's copyright because it determined that each of the four statutory fair-use factors weighed in Defendants' favor. The same day, the district court entered judgment in favor of Defendants. On May 26, 2022, Plaintiffs filed a timely notice of appeal from the district court's order granting summary judgment.

We originally heard oral arguments in the case on March 22, 2023. Approximately one year later, we published our decision. In the opinion, we affirmed the district court's judgment as to the first seven videos but reversed the court's judgment as to the Funeral Video and remanded to the court for further proceedings. However, following Defendants' limited petition for partial panel rehearing and rehearing en banc, we vacated that opinion and granted in part the petition for panel rehearing.

We directed the parties to file supplemental briefs on three limited questions pertaining to the relevance of "predominant principles of fair use jurisprudence that relate to documentary use for 'preamble' purposes (17 U.S.C. § 107) of film clips" and the impact of *Warhol* on our analysis. *Whyte Monkee Prods., LLC v. Netflix,*

11

*Inc.*, 101 F.4th 787, 787 (10th Cir. 2024). The parties, and several amici curiae—including the International Documentary Association, Film Independent, Kartemquin Educational Films, Inc., Women in Film, the University Film and Video Association, and a group of copyright and media law professors—filed supplemental briefs on these questions, and we heard a second round of oral arguments, this time focused on our three questions. We now address the parties' arguments anew, with the benefit of their additional exposition on these questions and with the helpful briefing of the amici, to whom we express our gratitude.

## II

Plaintiffs raise two issues on appeal. First, they argue that the seven videos Mr. Sepi filmed while employed at the Park were not works made for hire. Specifically, Plaintiffs contend—for the first time on appeal—that "Mr. Sepi's scope of employment as a tour videographer did not extend to cinematography and film editing conducted on his own time outside of tours." Aplts.' Opening Br. at 66. Second, Plaintiffs argue that the district court erred in its fair-use analysis of Defendants' use of the Funeral Video. In particular, Plaintiffs contend that "[u]nder the statutory fair-use factors, the [Defendants'] streaming use . . . is unfair and contrary to the purposes of copyright." *Id.* at 23. In support of their position, Plaintiffs point to the Supreme Court's recent decision in *Warhol*, which allegedly "supports reversal of the fair-use decision below." Aplts.' Am. Suppl. Br. at 11.

With respect to the first seven videos, we conclude that Plaintiffs have asserted a new theory on appeal—which was not raised in the district court—and have failed

to argue for plain error. As such, we hold that Plaintiffs have waived this theory. And, because this theory constitutes their sole ground for challenging the district court's entry of judgment against them regarding the first seven videos, we uphold that judgment.

With respect to the Funeral Video, we agree with the district court that Defendants were entitled to summary judgment on their fair-use defense. Even at the summary judgment stage, all of the fair-use factors favor Defendants. We therefore affirm the district court's grant of summary judgment as to the Funeral Video.

### III

"We review the district court's summary judgment decision de novo, applying the same standards as the district court." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1046 (10th Cir. 2017). "Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013). However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

To determine whether a "genuine issue" as to a material fact exists, we consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." *Anderson*, 477 U.S. at 251–52; *accord SEC v. GenAudio, Inc.*, 32

F.4th 902, 920 (10th Cir. 2022). Furthermore, "[m]ere allegations unsupported by

further evidence . . . are insufficient to survive a motion for summary judgment."

*James v. Wadas*, 724 F.3d 1312, 1319–20 (10th Cir. 2013) (omission in original)

(quoting *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005)); *accord Potts v. Davis*

*Cnty.*, 551 F.3d 1188, 1192 (10th Cir. 2009).

**IV**

Plaintiffs first argue that the district court erred in concluding that Mr. Sepi

was acting within the scope of his employment when filming the first seven videos at

issue in this appeal because "Mr. Sepi's scope of employment as a tour videographer

did not extend to cinematography [or] film editing *conducted on his own time outside*

*of tours*." Aplts.' Opening Br. at 66 (emphasis added). Rather, Plaintiffs claim that

"Mr. Sepi was employed to take photography and videography of park *tours*." *Id.* at

67. Plaintiffs assert that the seven videos were created while Mr. Sepi was engaged

in "the production and editing of music videos"—a task far afield from recording

park tours—and were thus not made within the scope of Mr. Sepi's employment. *Id.*

Defendants note that Plaintiffs assert a new theory on appeal. *See* Aplees.'

Resp. Br. at 2 ("On appeal, Plaintiffs have invented a new theory—that, yes,

[Mr.] Sepi was hired as a videographer, but only to record visitors during Park tours.

Plaintiffs failed to raise this argument below, such that it is waived."). Our review of

the district court proceedings confirms Defendants' contention concerning this

theory.

"We have held that an appellant waives an argument if she fails to raise it in the district court and has failed to argue for plain error and its application on appeal." *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1306 (10th Cir. 2017) (quoting *Campbell v. City of Spencer*, 777 F.3d 1073, 1080 (10th Cir. 2014)). "And our forfeiture-and-waiver rule applies even 'when a litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial.'" *Id.* (quoting *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013)).

In the proceedings below, Plaintiffs argued that Mr. Sepi's "duties for the Park were separate from his duties for Whyte Monkee Productions, LLC." Aplts.' App., Vol. IV, at 28. Specifically, Plaintiffs argued that he did photography for the Park, that he filmed and produced *Joe Exotic TV* for Whyte Monkee, and that he was a manager and owner of Whyte Monkee at the time, citing his 2021 deposition testimony. Although some of Mr. Sepi's arguments were in direct contravention to his 2016 deposition testimony, Mr. Sepi asserted that his 2021 position was the correct one.

Defendants replied that the 2021 deposition testimony should be excluded under the sham-affidavit doctrine, which provides that courts should "disregard a[n] affidavit [contrary to prior sworn statements] when they conclude that it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). The vast majority of the district court's analysis centered on this sham-affidavit issue. The court concluded that Mr. Sepi's 2021 testimony should be "excluded as a transparent attempt to create a sham issue of fact." Aplts.' App.,

15

Vol. VIII, at 264. With the sham-affidavit issue resolved and the 2021 testimony excluded, the district court determined (1) that Mr. Sepi did not solely perform photography services and (2) that he did not create Whyte Monkee Productions as a separate venture for his videography work. Taken together, the district court concluded that Mr. Sepi's works were created within the scope of his employment.

On appeal, Plaintiffs have reversed course. They now concede, for purposes of this appeal, that (1) "Mr. Sepi was involved in *both* videography and photography," and (2) "that Mr. Sepi was unaware of [Whyte Monkee Productions] at the time of formation." Aplts.' Opening Br. at 63. However, Plaintiffs now assert, for the first time, that "Mr. Sepi's scope of employment as a tour videographer did not extend to cinematography [or] film editing conducted on his own time *outside of tours*." *Id.* at 66 (emphasis added).

This line of argument for seeking reversal of the district court's judgment regarding the seven videos is meaningfully different from the argument that Plaintiffs raised below. Mr. Sepi first argued that he recorded the videos for Whyte Monkee rather than the Park and that he controlled Whyte Monkee. Now he argues that he recorded the videos for *neither* the Park nor Whyte Monkee. The new theory is not a refinement of the old one; the theories are factually incompatible. Because this new theory is incompatible with the theories presented below, the district court necessarily had no occasion to consider it.

Stated another way, Plaintiffs' argument on appeal was not raised below and is forfeited for purposes of appeal. Moreover, Plaintiffs' failure to now argue for plain-

error review waives the issue; in other words, Plaintiffs have no entitlement to be heard on this line of argument for reversal. *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) ("When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise."); *United States v. Lamirand*, 669 F.3d 1091, 1099 n.7 (10th Cir. 2012) ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court . . . ." (first omission in original) (citation omitted) (quoting *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011))). And, because this line of argument constitutes Plaintiffs' sole basis for challenging the district court's entry of judgment against them regarding the first seven videos, we uphold that judgment.

## V

Next, Plaintiffs assert that the district court "erred with respect to each of the statutory fair-use factors" when determining whether Defendants' use of the Funeral Video was fair use. Aplts.' Opening Br. at 23. Specifically, Plaintiffs claim that the first statutory factor counsels in their favor because Defendants' "streaming use is as commercial as it gets and is not transformative because the use makes no commentary upon the work [(i.e., the Funeral Video)] itself." *Id.* at 16. Furthermore, Plaintiffs argue that the second and third statutory factors point in their favor, as "the work was not published, is not factual," and "the heart of the work was taken." *Id.* Finally, Plaintiffs allege that the fourth factor counsels in their favor, as "there was

17

no showing below, on this affirmative defense, of a lack of market harm." *Id.*

Plaintiffs contend that this conclusion is only bolstered by the Supreme Court's

recent decision in *Warhol*, which allegedly "supports reversal of the fair-use decision

below." Aplts.' Am. Suppl. Br. at 11.

We disagree. All four factors weigh in favor of fair use, so we affirm the

district court's grant of summary judgment as to the Funeral Video.

A

Although copyright holders generally retain exclusive rights to reproduce,

display, and license their works, *see* 17 U.S.C. §§ 106–106A, these rights are not

absolute. Through the Copyright Act, Congress has carved out certain exceptions to

a copyright holder's control over their works, including, as relevant here, the fair-use

doctrine. *See* 17 U.S.C. § 107. Under § 107 of the Copyright Act, "a copyright

holder cannot prevent another person from making a 'fair use' of copyrighted

material." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021). This doctrine

embodies "an 'equitable rule of reason' that 'permits courts to avoid rigid application

of the copyright statute when, on occasion, it would stifle the very creativity which

that law is designed to foster.'" *Id.* (quoting *Stewart v. Abend*, 495 U.S. 207, 236

(1990)).

The doctrine acts as an affirmative defense by someone who has used a

copyrighted work in a secondary work without the permission of the copyright

holder. *See Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 320 (5th

Cir. 2022) ("In the copyright realm, fair use is an affirmative defense . . . .").

18

The Copyright Act sets out four nonexclusive factors that courts must consider in determining whether the use of a protected work is a fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  When evaluating fair use, all of the factors "are to be explored, and the results weighed together, in light of the purposes of copyright."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994); *accord Warhol*, 598 U.S. at 551.  "The purpose of copyright is to create incentives for creative effort."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984).  The central concern is "the problem of substitution—copyright's bête noire."  *Warhol*, 598 U.S. at 528.

"Fair use is a mixed question of law and fact."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985).  However, "the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues."  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

"As with all affirmative defenses . . . the defendant bears the burden of proof" on demonstrating fair use.  *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012).

**B**

In assessing whether Defendants' use of the Funeral Video is a fair use, each of the four statutory factors must be considered and the results weighed together. *See Campbell*, 510 U.S. at 578; *Warhol*, 598 U.S. at 551.  In weighing the factors, none may "be treated in isolation, one from another."  *Campbell*, 510 U.S. at 578; *see also* RESTATEMENT OF THE LAW, COPYRIGHT § 6.12 cmt. p (Am. L. Inst. Tentative Draft No. 6, 2025) ("[E]ach of the four statutory factors bears on, at least in part, essentially the same question—the prospect of market substitution—but from a different vantage.").

We agree with the district court that all four factors favor fair use.  We therefore affirm the district court's grant of summary judgment as to the Funeral Video.

**1**

**a**

The first factor concerns "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).  This factor "focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism." *Warhol*, 598 U.S. at 525; *see id.* at 528 ("Whether a use shares the purpose or character of an original work, or instead has a further purpose or different character, is a matter of degree."); *see also* Shyamkrishna Balganesh & Peter S. Menell, *Going*

20

*"Beyond" Mere Transformation:* Warhol *and Reconciliation of the Derivative Work Right and Fair Use*, 47 COLUM. J.L. & ARTS 413, 442 (2024) ("In the *Warhol* formulation then, commerciality is both highly relevant to the inquiry and operationalized by balancing the justification or distinct purpose against the extent of the commerciality, which too was a matter of degree.").

"This [first] factor considers the reasons for, and nature of, the copier's use of an original work." *Warhol*, 598 U.S. at 527–28. However, "[w]hether the purpose and character of a use weighs in favor of fair use is . . . an objective inquiry into what use was made, *i.e.*, what the user does with the original work." *Id.* at 545; *see also id.* at 554 (Gorsuch, J., concurring) ("It's a comparatively modest inquiry focused on how and for what reason a person is using a copyrighted work in the world, not on the moods of any artist or the aesthetic quality of any creation.");[3] *Romanova v. Amilus Inc.*, 138 F.4th 104, 118–19 (2d Cir. 2025) ("The test turns on whether *the copying of the original* communicates a message that differs from the message of the original – not whether the copier separately declares such a message."); *see also* Balganesh & Menell, *supra*, at 440 (noting that the *Warhol* "Court disallowed assertions of subjective purpose based on the copier's intention at the time of the

_____

[3]    Elaborating on this thought, Justice Gorsuch noted that "[n]othing in the copyright statute calls on judges to speculate about the purpose an artist may have in mind when working on a particular project." 598 U.S. at 544 (Gorsuch, J., concurring). In other words, the creator's subjective intent when making the secondary work is inapposite in assessing whether the *use* being made of a copyrighted work is a fair one.

borrowing" and, instead, adopted the view that the "purpose was to be a purely objective assessment").

The fundamental inquiry concerns "whether the new work merely 'supersede[s] the objects' of the original creation . . . ('supplanting' the original), or instead adds something new, with a further purpose or different character." *Warhol*, 598 U.S. at 528 (alteration in original) (omission in original) (quoting *Campbell*, 510 U.S. at 579); *see Harper & Row Publishers*, 471 U.S. at 550 (quoting an opinion by Justice Story for the proposition that "the fair use doctrine has always precluded a use that 'supersede[s] the use of the original'" (alteration in original) (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 344–45 (No. 4,901) (C.C.D. Mass. 1841)). A secondary use that achieves the exact same or "highly similar" purpose as "the original work is more likely to substitute for, or '"supplan[t],"'" the [original] work." *Warhol*, 598 U.S. at 528 (first alteration in original) (quoting *Campbell*, 510 U.S. at 579); *see Harper & Row Publishers*, 471 U.S. at 550. If a secondary use poses a risk of substituting for or supplanting the original work, the first factor ordinarily will weigh against fair use.

Importantly, courts must consider the "the specific 'use' of [the] copyrighted work" in the cases before them. *Warhol*, 598 U.S. at 533 (quoting 17 U.S.C. § 107); *see also* Balganesh & Menell, *supra*, at 439 ("The distinct purpose requirement . . . examines the purpose to which the defendant puts the work to use, recognizing that the appropriate unit of analysis for fair use is the defendant's 'use' rather than just copying."). "The same copying may be fair when used for one purpose but not

another." *Warhol*, 598 U.S. at 533. A secondary work may risk impermissibly supplanting the copyrighted work when used in one manner; but, when used in a different way, may have a distinct purpose and character. *See id.* at 534 n.10 ("Had AWF's [i.e., the Andy Warhol Foundation's] use been solely for teaching purposes, that clearly would affect the analysis, and the statute permits no other conclusion."). The Supreme Court has noted that the Copyright Act's drafters purposely "eschewed a rigid, bright line approach to fair use." *Sony Corp. of Am.*, 464 U.S. at 448 n.31; *see* Balganesh & Menell, *supra*, at 416 ("Ever since its origins, the fair use doctrine has posed a line-drawing challenge."). In *Sony Corporation of America*, for example, the Court explained that the same secondary work—a recording of a copyrighted television program made using a Betamax video tape recorder—may be used in different ways, some of which may not be fair use (e.g., selling those tape recordings for profit) but others (viewing the tapes in one's home) may be fair use. *See* 464 U.S. at 449–50.

Similarly, as Justice Gorsuch highlighted in *Warhol*, at issue in the fair-use analysis is the particular use of the secondary work contested in the litigation, not the secondary work itself. *See* 598 U.S. at 558 (Gorsuch, J., concurring) ("[E]ach challenged use must be assessed on its own terms."); *id.* at 557–58 (noting that if "the Foundation had sought to display Mr. Warhol's image of Prince[, the same secondary work,] in a nonprofit museum or a for-profit book commenting on 20th-century art, the purpose and character of that use might well point to fair use."); *see also* Karen Shatzkin & Dale Cohen, *Picture This: Applying the Fair Use Doctrine to*

23

*Documentary Films After* Google/Oracle *and* Warhol, 30 UCLA ENT. L. REV. 1, 4 (2023) ("[T]he Court limited its holding solely to competitive commercial licensing of the Warhol [allegedly infringing] image, not . . . its use in other contexts, even potentially different commercial uses.").

Before listing the four fair-use factors, § 107 in its preamble provides a set of "illustrative"—though "not limitative"—examples of "the sorts of copying that courts and Congress most commonly ha[ve] found to be fair uses." *Campbell*, 510 U.S. at 577–78 (quoting 17 U.S.C. § 101); *accord Warhol*, 598 U.S. at 528; *see also Harper & Row Publishers*, 471 U.S. at 561 ("[T]he examples enumerated in § 107 . . . 'give some idea of the sort of activities the courts might regard as fair use under the circumstances.'" (quoting S. REP. NO. 94-473, at 61 (1975)). Those examples include "criticism, comment, news reporting, teaching . . . , scholarship, [and] research." 17 U.S.C. § 107. The determination that a secondary work is using the copyrighted original for a preamble purpose "may guide the first factor inquiry." *Warhol*, 598 U.S. at 528. However, the determination that a secondary use involves a preamble purpose is neither dispositive nor accorded talismanic effect in favor of fair use. *See Harper & Row Publishers*, 471 U.S. at 561 ("[W]hether a use referred to in the first sentence of section 107 is a fair use in a particular case will depend upon the application of the determinative factors, *including* those mentioned in the [preamble]." (emphasis added) (quoting S. REP. NO. 94-473, at 62 (1975))); H.R. REP. NO. 102-836, at 2555 (1992) ("The preamble . . . uses are not, however, presumptively fair. . . . All claims of fair use must be judged on the totality of the

facts in the particular case by balancing all the factors."); *see also Pac. & S. Co., Inc. v. Duncan*, 744 F.2d 1490, 1495 (11th Cir. 1984) ("The statute uses mandatory language to the effect that in a fair use determination, the 'factors to be considered *shall* include' (emphasis added) the four listed. The preamble merely illustrates the sorts of uses likely to qualify as fair uses under the four listed factors." (footnote omitted)); 4 Melville B. Nimmer & David Nimmer NIMMER ON COPYRIGHT, § 13F.05[A][1] (2025) ("The preamble to Section 107 furnishes important—but scarcely dispositive—guideposts . . . .").

That a "secondary work[] add[s] something new . . . alone does not render such [a] use[] fair." *Warhol*, 598 U.S. at 529. More specifically, that a secondary work's use imbues the copyrighted original with "new meaning or message [i]s not sufficient. . . . Instead, meaning or message [are] simply relevant to whether the new use serve[s] a purpose distinct from the original, or instead supersede[s] its objects." *Id.* at 542; *cf.* Balganesh & Menell, *supra*, at 437 ("[A] mere emphasis on changes and modifications to the protected work . . . . fall[s] squarely within the coverage of the derivative work right." (footnote omitted)).

The germane inquiry under the first factor is "'whether *and to what extent*' the use at issue has a purpose or character different from the original [work]." *Warhol*, 598 U.S. at 529 (quoting *Campbell*, 510 U.S. at 579); *see* Balganesh & Menell, *supra*, at 440 ("[T]he distinct purpose requirement necessitates isolating the allegedly fair use in specific terms and assessing its similarity to uses that are typical of a given category of works. That assessment is made with an eye toward the potential

substitutability of the two (i.e., whether one might supersede the other and thus undermine the copyright owner's market).").

If a secondary use "has a further purpose or different character," that use may be—but is not necessarily—"transformative." *Warhol*, 598 U.S. at 529 (quoting *Campbell*, 510 U.S. at 579). In *Warhol*, the Court explained:

> [A]n overbroad concept of transformative use, one that includes *any* further purpose, or *any* different character, would narrow the copyright owner's exclusive right to create derivative works. To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative.

*Id.* (emphases added).[4] In other words, the analytical focus is on whether a use transforms an original work to such a degree that it ceases to be simply a derivative use of that work and becomes truly transformative. *See* Balganesh & Menell, *supra*, at 415 ("The Supreme Court's recent decision in [*Warhol*] is a watershed moment in the story of copyright jurisprudence . . . . *Warhol* answers the decades long question of how to reconcile the working of the statute's derivative work right [which includes 'transformations'] with the breadth and reach of the 'transformative use' version of

---

4    Elaborating on the contrast with derivative works, the Court stated:

> The statute defines derivative works, which the copyright owner has "the exclusive righ[t]" to prepare, § 106(2), to include "any other form in which a work may be recast, transformed, or adapted," § 101. In other words, the owner has a right to derivative transformations of her work. Such transformations may be substantial, like the adaptation of a book into a movie.

*Warhol*, 598 U.S. at 529.

the fair use doctrine." (footnote omitted)); *see also id.* at 418 ("Fair use focuses on the use of a work, requires more than mere transformation, and considers commerciality along with a host of other factors."). And even then, there is a continuum of transformativeness—it is "a matter of degree." *Warhol*, 598 U.S. at 529.

Importantly, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. On the other hand, the commerciality of the use tends to "loom larger" in importance when the use is less transformative. *Id.* at 580.

One significant consideration that comes into play in the first-factor analysis is the secondary work's justification for using the original work. *See Warhol*, 598 U.S. at 531; *see also* Balganesh & Menell, *supra*, at 436 ("The key to operationalizing the first fair use factor . . . lies in examining the *justification* offered by the copier for the use."); Shatzkin & Cohen, *supra*, at 15 n.72 ("Justification is apparently the ultimate first-factor litmus test."). The *Warhol* Court explained that a secondary work's use of a copyrighted work may be "justified" in two senses: a "broad sense," and a "narrower sense." 598 U.S. at 531–32. Whether justified in the broad or narrower sense, "the question of justification is one of degree." *Id.* at 532; *cf.* Balganesh & Menell, *supra*, at 437 ("The question remains how powerful, or persuasive, is the justification, because the court must weigh the strength of the secondary user's

27

justification against factors favoring the copyright owner." (quoting Pierre N. Leval, *Toward A Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990))).

In the "broad sense," a secondary work that "*has a distinct purpose* is justified because it furthers the goal of copyright"—*viz.*, "to promote the progress of science and the arts, without diminishing the incentive to create." *Warhol*, 598 U.S. at 531 (emphasis added). The Second Circuit previously expressed a similar point:

> The more the [secondary work] is using the [original work] for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge and the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives, shrinking the protected market opportunities of the copyrighted work.

*Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015). In other words, the greater the degree to which a secondary use may be deemed transformative the more likely that use will be deemed justified in the broad sense.

On the other hand, a secondary use that shares the same or similar purpose as the original work is more likely to be a "substantial substitute" for the copyrighted work—"which undermines the goal of copyright"; accordingly it is unlikely to be deemed justified in the broad sense. *Warhol*, 598 U.S. at 531–32. If such a use is to be justified at all, it likely must be in a "narrower sense." *Id.* at 532. In this sense, "a use may be justified because copying is reasonably necessary to achieve the user's new purpose." *Id.* at 532; *cf.* Balganesh & Menell, *supra*, at 437 ("[T]he mere identification of a justification is insufficient. It needs to be 'compelling' and is thus a matter of degree and assessment.").

28

The *Warhol* Court elaborated by pointing to parody as an example where the secondary use of the copyrighted work may be justified in this narrower sense because of the essence of that use: that is, the essence of parody is to target the original work for imitation to achieve some comic effect—specifically, in order for the user to effectuate its parody purpose, the user *needs to* target the original work. *See Warhol*, 598 U.S. at 532; *see also Campbell*, 510 U.S. at 580–81 ("Parody *needs to* mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination . . . ." (emphasis added)).[5] Thus, as

---

[5]    The foundation for this discussion in *Warhol* was the Court's earlier analysis in *Campbell*. *See Warhol*, 598 U.S. at 530–31. In *Campbell*, the Court "emphasized the centrality of justification through its discussion of the parody/satire distinction. As *Campbell* explained, a parody seeks to comment on the works that it is parodying; a satire on the other hand seeks to offer comic relief on a broader or different topic." Balganesh & Menell, *supra*, at 438. Thus, as to parody, the independent justification for the copying is inherent in the secondary use itself. In the case of satire, a particular secondary use of satire may still be found fair, but its independent justification is not inherent in the art form of satire itself and must be found elsewhere: that is, "satire can stand on its own two feet and so requires justification for the very act of borrowing." *Campbell*, 510 U.S. at 581; *see Authors Guild*, 804 F.3d at 215 ("A taking from another author's work for the purpose of making points that have no bearing on the original may well be fair use, but the taker would need to show a justification.").

However, reflecting the spirit of copyright law, which eschews bright lines, the *Campbell* Court offered the following caution:

> The fact that parody can claim legitimacy for some appropriation does not, of course, tell either parodist or judge much about where to draw the line. Like a book review quoting the copyrighted material criticized, parody may or may not be fair use . . . . The Act has no hint of an evidentiary preference for parodists . . . Accordingly, parody, like any other use, has to work its way

to parody, the independent justification for copying the original work is baked into the secondary use itself.  "Similarly," the Court reasoned, "commentary or criticism that targets an original work may have compelling reason to "'conjure up'" the original by borrowing from it." *Warhol*, 598 U.S. at 532 (quoting *Campbell*, 510 U.S. at 588).  More specifically, the Court noted that a book review needs to draw from originally copyrighted material (i.e., the book being reviewed) "because the review targets the material for comment or criticism." *Id.* at 532 n.7.

However, it bears underscoring that a secondary use that involves copying from an original work may be justified in a narrower sense in a way that does not involve targeting or directly invoking the original work through parody, commentary, or the like.  *See Google*, 593 U.S. at 30–31 (noting that the use was justified because it copied the original software code "only insofar as needed" to "provide[] a new collection of tasks . . . in a distinct and different computing environment"); *cf. Warhol*, 598 U.S. at 547 n.21 (noting that "targeting is not always required"); *id.* at 533 & n.8 (discussing the "example" of *Google* as providing "some other justification for copying").

Elaborating on the concept of justification in this narrower sense, the Supreme Court has stated:  "An independent justification . . . is particularly relevant to assessing fair use where an original work and copying use share the same or highly

---

through the relevant factors, and be judged case by case, in light of the ends of the copyright law.

*Id.*

similar purposes." *Id.* at 532.  That is because in such circumstances the secondary

use is more likely to be a "substantial substitute" for the copyrighted work—"which

undermines the goal of copyright." *Warhol*, 598 U.S. at 531–32.  On the other hand,

it seems to logically follow that an independent justification in the narrower sense is

less likely to be relevant when the purpose of the secondary use is so distinct from

the original copyrighted work that it is transformative—at least when it is

transformative to a significant degree.  That is because such a secondary use is more

likely to be justified in the broad sense because its transformativeness itself advances

the goals of copyright.  *See Authors Guild*, 804 F.3d at 214 ("[T]ransformative uses

tend to favor a fair use finding because a transformative use is one that communicates

something new and different from the original or expands its utility, thus serving

copyright's overall objective of contributing to public knowledge.").[6]

---

[6]    Certain uses may be justified in both a broad and narrower sense.  The types of justification are not mutually exclusive.  For example, in discussing a hypothetical book review, the *Warhol* Court explained that it would be justified *not just in the narrower sense* by its need to comment on or target the original work but *also in the broad sense* by its different purpose from that of the copyrighted original. *See id.* at 532 n.7.  The Court also discussed another piece of Warhol art, the famous Campbell's Soup Cans series, that could similarly lay claim to *both* a broad justification because it is significantly transformative in that it has a "completely different purpose" of "comment[ing] on consumerism rather than . . . advertis[ing] soup," but it also has an independent, narrower justification because the "use targets Campbell's logo" (i.e., directly invokes the specific logo) to "'she[d] light' on the work itself." *Id.* at 539–41 & n.16.  Further, in *Google*, the Court held that the secondary use of the copyrighted code was transformative by virtue of the use's different purpose and therefore justified in the broad sense by advancing the goals of copyright *and* simultaneously observed that the use was justified in the narrower sense because it was *necessary* to use the original code so that users could apply their preexisting knowledge.  *Compare* 593 U.S. at 32 ("[T]he 'purpose and character' of Google's copying was transformative"), *with id.* at 40 ("Google . . . t[ook] only what

One other significant consideration that is weighed in the evaluation of the first factor is whether the secondary use is commercial or lacking in commercial purpose (i.e., a not-for-profit purpose). *See Warhol*, 598 U.S. at 531; *Campbell*, 510 U.S. at 584; *Google*, 593 U.S. at 32. Specifically, a secondary use's commercial character must be weighed against the degree to which the use is transformative, and "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579; *accord Griner v. King*, 104 F.4th 1, 9 (8th Cir. 2024), *cert. denied sub nom. King for Cong. v. Griner*, 145 S. Ct. 1124 (2025); *see* Balganesh & Menell, *supra*, at 441 ("*Campbell* had been very clear that the commerciality of the putative fair use was to be weighed against its claim of transformativeness . . . . Commerciality and transformativeness were thus to be seen on a sliding scale fulcrum." (footnote omitted)).[7]

Indeed, the Supreme Court has time and again stated that the "undisputed commercial character of [a] use, though not dispositive, 'tends to weigh against a

---

was needed to allow users to put their accrued talents to work in a new and transformative program").

[7]    The Supreme Court has noted that there is "a positive association between the [first and fourth fair-use] factors." *Warhol*, 598 U.S. at 536 n.12; *see Campbell*, 510 U.S. at 591. The logic is palpable: "[a] secondary use that is more different in purpose and character is less likely to usurp demand for the original work or its derivatives." *Warhol*, 598 U.S. at 536 n.12. Nevertheless, the Court cautioned "the relationship is not absolute." *Id.* It explained that at times "[t]he first factor may still favor the copyist, even if the fourth factor is shown not to." *Id.*

finding of fair use.'"  *Warhol*, at 537 (quoting *Harper & Row Publishers*, 471 U.S. at 562).  But, it would be legal error for a court to "giv[e] virtually dispositive weight to the commercial nature of the" the work.  *Campbell*, 510 U.S. at 584.  The Court in *Campbell* elaborated on the point:

> [T]he mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness.  If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities "are generally conducted for profit in this country."  Congress could not have intended such a rule . . . .

*Id.* (quoting *Harper & Row*, 471 U.S. at 592 (Brennan, J., dissenting)).

Importantly, the focus is on the commercial exploitation of the copyrighted work *itself*, not on the commercial nature of the secondary work as a whole.  *See Harper & Row Publishers*, 471 U.S. at 562 ("The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from *exploitation of the copyrighted material* without paying the customary price." (emphasis added)); *Bouchat v. Balt. Ravens Ltd. P'ship*, 737 F.3d 932, 942 (4th Cir. 2013) ("The key inquiry is the extent to which the [copyrighted work] itself—and not the videos as a whole—provides commercial gain . . . .").

***

To summarize, the first fair-use factor first considers whether the secondary use is transformative by virtue of its different purpose or character, and, if so, the degree to which it is transformative. *See Warhol*, 598 U.S. at 528, 532. If the secondary use is transformative in this broad sense, then no independent justification is likely to be necessary, and the use will be justified by furthering the goals of copyright. *See Authors Guild*, 804 F.3d at 214. On the other hand, if a secondary use does not have a sufficiently distinct purpose or character, then the use is likely to require an independent justification—that is, to require justification in a narrower sense. *See Warhol*, 598 U.S. at 532. Finally, the degree of transformativeness is then weighed against the commerciality of the secondary use. *See id.* "If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Id.* at 532–33.

**b**

We now turn to discuss the category of secondary use at issue here—documentaries. Documentaries frequently incorporate snippets of copyrighted materials. *See* Shatzkin & Cohen, *supra*, at 7 ("Third-party copyrighted material is an important element of many documentaries . . . ."). Nevertheless, in cases involving such documentaries, courts frequently have concluded that the first factor weighed in favor of fair use. *See, e.g.*, *Bouchat*, 737 F.3d at 943–44 (concluding that two documentaries "share[d] the qualities of other historical documentaries" in a way

34

that "align[ed] the videos with the examples in § 107's preamble" and that they ultimately "qualifie[d] as fair use").[8]

This outcome does not stem from the fact that documentaries are categorically favored. They are not. There is no presumption in favor of fair use that flows from attaching the label "documentary" to a secondary work. *See Bill Graham Archives*, 448 F.3d at 609 ("[T]here are no categories of presumptively fair use . . . ."). Rather, insofar as the scales often have tilted in favor of fair use in the area of documentaries, it likely is a function of the fact that documentaries frequently reflect preamble purposes—by commenting on social ills, criticizing industrial developments, or educating viewers regarding notable personalities and world events. *See* Nimmer, *supra*, § 13F.15[E] (2025) ("[D]ocumentaries are transformative because they excerpt materials from extant works . . . to relate historical events in context . . . But the logic . . . stops short of giving biographers *carte blanche* . . . ."); Shatzkin & Cohen, *supra*, at 5 ("Like alternative uses of Warhol's work that the Court suggested could be fair use, documentary films typically use archival content to achieve the purposes specified in section 107's preamble: criticism, comment, news reporting, scholarship, and research. Documentaries do not threaten to supersede or supplant the third-party materials they incorporate, the harm the majority identified in *Warhol*." (footnote omitted)); *see also Comerica Bank & Tr., N.A.*

---

[8]     *See also Monbo v. Nathan*, 623 F. Supp. 3d 56, 100–01 (E.D.N.Y. 2022); *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 985 (N.D. Ill. 2019); *Hofheinz v. A & E Television Networks*, 146 F. Supp. 2d 442, 446–47 (S.D.N.Y. 2001); *Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 493–94 (S.D.N.Y. 1996).

*v. Habib*, 433 F. Supp. 3d 79, 92–93 (D. Mass. 2020) ("Typically, such 'verbatim' copying may only be considered transformative when the copying serves 'a purpose separate and distinct from the original artistic . . . purpose for which the [works] were created,' like news reporting or documentary filmmaking." (alteration and omission in original)); *cf. Bouchat*, 737 F.3d at 944 (explaining the valuable role that documentarians play in creating "new depictions of historical subjects and events" and providing "[s]ocial commentary as well as historical narrative").

Documentaries frequently use snippets of copyrighted works incidentally in furthering their own creative purposes. *See Bouchat*, 737 F.3d at 940, 949 (describing how the use of the logo for "less than ten seconds," which was "take your pick—fleeting, incidental, de minimis, [or] innocuous," supported the documentary's new use); *see also Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (noting that the defendant's "use of many of the television clips is transformative because they are cited as historical reference points in the life of a remarkable entertainer"), *overruled on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); *Brown v. Netflix, Inc.*, 855 F. App'x 61, 63 (2d Cir. 2021) (concluding that a documentary film "incidentally" used a song during "brief background accompaniment [in a scene depicting a] burlesque act");[9] *see also Kelley v. Morning Bee, Inc.*, No. 1:21-CV-8420-GHW, 2023 WL 6276690, at *12 (S.D.N.Y. Sept. 26, 2023) (unpublished) ("If

---

[9]    "We deem the reasoning of the unpublished decisions cited herein to be persuasive and instructive.  We do not accord them controlling weight and recognize that they are not binding on us." *United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

documentarians had to obtain licenses for every fleeting, incidental capture of a copyrighted work in the background of any given scene, the incentive to create biographical documentaries that accurately represent a subject's life and movements would be severely curtailed.").  Such incidental or insubstantial use of copyrighted materials is not likely to run afoul of the evil of substituting or superseding copyrighted works.  *See Bouchat*, 737 F.3d at 946–47; *Brown*, 855 F. App'x at 63–64.

A deeper look at two cases from our sister circuits cited *supra* helpfully illustrates these principles.  Both cases illustrate how fair use often protects documentaries' use of copyrighted material because they are frequently animated by preamble purposes and transformative—copying only on limited snippets in pursuit of significantly distinct purposes.  However, the second case also highlights that the fair-use doctrine may not favor works that bear the documentary label, if they do not exhibit those characteristics frequently associated with documentaries.

First, in *Bouchat v. Baltimore Ravens Limited Partnership*, the Fourth Circuit considered the use of the first logo of the Baltimore Ravens from its inaugural season in a series of commercial videos produced by the National Football League ("NFL").  *See* 737 F.3d at 932, 939.  The logo was featured, *inter alia*, in archival footage that recounted the 1996 draft, "the team's strategy for the 1996 draft, and the impressive result of its efforts," and the game-time successes and failures of two players.  *Id.* at 939.  The court observed that one of the uses of the logo was for "a fraction of a second" and another was "for a longer stretch."  *Id.*

The *Bouchat* court concluded that "[t]he use of the . . . logo in each of the[] videos differ[ed] from its original purpose"—*viz.*, the use was transformative. *Id.* at 940.  Whereas the logo originally "served as the brand symbol for the team," the logo in the videos served to "tell stories of past drafts, major events in Ravens history, and player careers." *Id.*  The court reasoned that the logo was being used for its factual content rather than its expressive content and noted that it "d[id] not matter that the . . . logo [was] unchanged in the videos, for '[t]he use of a copyrighted work need not alter or augment the work to be transformative in nature.'" *Id.* (third alteration in original) (quoting *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009)).

The court noted that its conclusion that the use was transformative was "reinforced" by the "exceptionally insubstantial" use of the copyrighted work. *Id.* Specifically, the *Bouchat* court explained that the logo was used "only fleetingly and insignificantly"—thus obscuring the original purpose and allowing for the conclusion that it was part of a creative, transformative new purpose. *Id.* at 941.

The court recognized that the videos were doubtlessly commercial in nature. *See id.* at 942.  But the court focused its commerciality inquiry on the exploitation of the copyrighted material "itself"—not the commercialization of the secondary work of which it was a part. *Id.*  The court determined that the "incidental" use of the copyrighted work bolstered the conclusion that the commercial gain associated with that work itself was "unquestionably minimal." *Id.*  Accordingly, the court found that the first factor weighed heavily in favor of fair use. *Id.*

The second case that we examine is *Elvis Presley Enterprises, Inc. v. Passport Video*.  There, the Ninth Circuit considered whether the use of television clips—without permission from or payment to the copyright owners—in a biographical documentary about Elvis Presley constituted fair use.  *See* 349 F.3d at 628–29.  As an example of eschewing the "rigid, bright line approach to fair use," *Sony Corp. of Am.*, 464 U.S. at 448 n.31, the court concluded that the allegedly infringing uses were not "consistently transformative," *Elvis*, 349 F.3d at 628.

On one hand, the court observed that the documentary's use of some of the clips appeared transformative because the clips were used only for reference purposes and played for mere seconds.  *See id.* at 629 (noting "use of many of the television clips is transformative because they are cited as historical reference points in the life of a remarkable entertainer").  However, on the other hand, the court observed that the use of other clips—which were "played without much interruption" and constituted "significant portions" of the original works—went beyond the "benign purpose" of "telling part of the story" of Elvis's life and "instead serve[d] the same intrinsic entertainment value that [was] protected by [the] [p]laintiffs' copyrights." *Id.*  Additionally, the court explained that the documentary was "clearly commercial in nature"; more importantly, the court observed that the documentarian sought to "profit directly from the copyrights it use[d] without a license." *Id.* at 628.

Likely because of these mixed-purpose uses, the *Elvis* court viewed the question concerning the first fair-use factor as presenting a "close issue"; however, it was not obliged to resolve it under de novo review (as we are here) because the

appeal was the product of the grant of a preliminary injunction. *Id.* at 629. Therefore, the court simply determined that the court did not abuse its discretion in deciding that "the first factor weighs against fair use." *Id.*

In sum, in cases involving documentaries, courts frequently have determined that the first factor weighs in favor of fair use. Those outcomes stem from certain characteristics discussed *supra* that are frequently associated with documentaries; absent such characteristics, factor one is unlikely to weigh in favor of fair use.

**c**

Turning to the case at hand, the district court found Defendants' use to be transformative. In finding that the first factor weighed in Defendants' favor, the district court stated that "the core of [the] inquiry is 'whether the new work merely "supersede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" Aplts.' App., Vol. VIII, at 273 (second alteration in original) (quoting *Campbell*, 510 U.S. at 579).

Plaintiffs contend that the district court applied the incorrect standard when assessing the first factor. More specifically, Plaintiffs assert that the district court "misconstrued the meaning of 'transformative' in ruling that Defendants' use was a transformative use." Aplts.' Opening Br. at 27. They argue that the district court "overlooked that 'a mere *difference in purpose is not* quite the same thing as *transformation*.'" *Id.* at 28 (quoting *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1225 (9th Cir. 2022)). Plaintiffs claim that the first statutory factor counsels in their favor

(i.e., against fair use) because Defendants' "streaming use is as commercial as it gets and is not transformative because the use makes no commentary upon the work itself." Aplts.' Opening Br. at 16.

We conclude, however, that Defendants' use of sixty-six seconds of the Funeral Video fits comfortably within the mold of those documentary cases in which courts have found that the first factor weighs in favor of fair use.

We summarize our reasoning here. As an initial matter, Defendants used the Funeral Video excerpt as part and parcel of a work reflecting preamble purposes—to further a larger narrative that, among other things, commented on and educated viewers about Mr. Exotic and the "big cat world." Aplts.' App., Vol. I, at 63 (Decl. of Rebecca Chaiklin) ("a director and executive producer of the documentary" *Tiger King*, using the term "big cat world" and noting *Tiger King* "tells the story of big cat breeders, and centers on" Mr. Exotic). Additionally, the excerpt of the Funeral Video is transformative to a significant degree. The excerpt was used by Defendants to illustrate Mr. Exotic's purported megalomania, highlight his showmanship, and, more generally, comment on specific factors influencing the world of big cat breeders. This is a distinctly different purpose from the purpose animating the Funeral Video— which was created to remember Mr. Maldonado.[10] Further, Defendants' use was

---

[10]     Mr. Sepi argues that his "subjective intent" in making the video is not relevant to determining whether *Tiger King*'s use has a different purpose. Aplts.' Am. Suppl. Br. at 4 (quoting *Warhol*, 598 U.S. at 544). That is true; we instead look to "objective indicia" of a work's purpose. *Warhol*, 598 U.S. at 549. But the objective purpose of the Funeral Video as a remembrance is clear from the video itself.

insubstantial and cannot be said to risk superseding or substituting for the copyrighted work or its derivative uses.

Accordingly, we conclude that Defendants' use of the copyrighted material finds strong justification in a broad sense through its alignment with and advancement of the purposes of copyright—that is, to promote the arts through education and commenting on notable personalities and societal concerns.  As such, under these circumstances, Defendants were not obliged to rely on an independent justification in a narrower sense, like parody—that necessitated targeting (that is, directly commenting on the original)—to justify its use of an excerpt of the Funeral Video.  *See Authors Guild*, 804 F.3d at 214.  Moreover, given that the transformative effect of Defendants' use of the excerpt of the Funeral Video is significant, and given the insubstantial percentage of the Funeral Video incorporated in Episode 5 and in *Tiger King*, more generally, there is no indication that Defendants gained materially from the commercial exploitation of the copyrighted material itself.  Accordingly, the commerciality factor does not materially tilt the balance away from a finding in favor of fair use.

**i**

At the threshold, our analysis of the first factor is guided by *Tiger King*'s very limited use of the Funeral Video in a manner animated by one or more preamble purposes—a mode of use frequently found in documentaries.  *See Bouchat*, 737 F.3d at 944; *Brown*, 855 F. App'x at 62–63; *see also* Shatzkin & Cohen, *supra*, at 11 ("Most documentaries . . . often fulfill several of these [preamble] purposes.")

42

Specifically, *Tiger King*'s use of the Funeral Video clips is classic documentary-style borrowing.  Its use reflects the preamble purposes associated with many documentaries through its commentary on Mr. Exotic's purported megalomania and on the "big cat world."  Aplts.' App., Vol. I, at 63.  In particular, Episode Five raises questions about Mr. Exotic's behavior at the funeral of his husband, Travis Maldonado, and includes an interview of Mr. Maldonado's mother who expresses skepticism regarding Mr. Exotic's behavior.  At times Ms. Maldonado's comments are played directly over visuals of Mr. Exotic's remarks, with her stating, "He has to do dramatics, you know, drama," and "He was even acting there."  Aplts.' App., Vol. IX, Multimedia Ex. 5, at 27:07–27:18.

To be clear, however, our fair use determination does not turn on classifying *Tiger King* as a documentary or on shoehorning Defendants' use of the Funeral Video excerpt into any of the enumerated preamble categories; we do not give such classifications and categories talismanic effect.  *See Harper & Row Publishers*, 471 U.S. at 561 (explaining that the "examples enumerated in § 107 . . . 'give some idea of the sort of activities the courts *might* regard as fair use under the circumstances'" but that the "listing was not intended . . . to single out any particular use as presumptively a 'fair' use." (quoting S. REP. NO. 94-473, at 61 (1975))); *see also Bill Graham Archives*, 448 F.3d at 609 ("[T]here are no categories of presumptively fair use . . . ."); *cf. McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1160 (9th Cir. 2022) (noting that the first-factor determination is "not based on a blanket conclusion about [a] documentary as a whole," but a "fine-grained analysis of each use" (citing *Elvis*,

349 F.3d at 629)).  We must assess "'whether *and to what extent*' the use at issue has a purpose or character different from the original"—*viz.*, we need to determine whether Defendants' use was transformative and to what degree.  *Warhol*, 598 U.S. at 529 (quoting *Campbell*, 510 U.S. at 579).

**ii**

Defendants' use of the excerpted material from the copyrighted Funeral Video has a "purpose or character different from the original [work]."  *Warhol*, 598 U.S. at 529.  Unlike Mr. Sepi's original work, Defendants do not use the excerpt of the Funeral Video as a "remembrance" of Mr. Maldonado.  Aplts.' App., Vol. VII, at 151, Tr. 426:21 (Remote Video-Recorded Dep. of Timothy Sepi, dated Oct. 5, 2021).  As noted *supra*, to the contrary, Defendants' use seeks to illustrate Mr. Exotic's purported megalomania, even in the face of tragedy, and to provide contextual fodder for commenting on Mr. Exotic's showmanship and, more generally, the milieu of big-cat breeders.  In this regard, Defendants juxtaposed clips of Mr. Exotic giving a eulogy with clips of the deceased's mother criticizing Mr. Exotic.  The difference between the purposes animating Defendants' use of the excerpted material and Mr. Sepi's use of the Funeral Video is significant.  That is, the difference is significant in degree.  More specifically, we conclude that Defendants' use of the Funeral Video is so transformative that, as explained below, the first factor weighs in favor of fair use even after weighing the degree of transformativeness against commerciality and even without an independent (narrower) justification for copying.

In *Campbell*, the Supreme Court described a transformative use as one that "adds something new, with a further purpose or different character, altering the first [(i.e., the original copyrighted work)] with new expression, meaning, or message." 510 U.S. at 579. However, in *Warhol*, the Court clarified that "*Campbell* cannot be read to mean that § 107(1) weighs in favor of *any* use that adds some new expression, meaning, or message." 598 U.S. at 541 (emphasis added); *see* Balganesh & Menell, *supra*, at 436 ("Much of the majority opinion [in *Warhol*] rectified the misunderstanding and oversimplification of *Campbell* that many lower courts—and the plaintiff in *Warhol*—sought to rely on. Justice Sotomayor could not have been clearer on this: Her opinion reiterated the need to recognize *Campbell*'s 'nuance' and complexity, and unambiguously jettisoned prior readings . . . .").

Although new meaning may be relevant to the inquiry into the objective purpose of the secondary use, they are distinct concepts, and the latter—i.e., the objective purpose—is the focus of the transformativeness inquiry. *Warhol*, 598 U.S. at 542 ("[N]ew meaning or message was not sufficient. If it had been, the Court could have made quick work of the first fair use factor. Instead, meaning or message was simply relevant to whether the new use served a purpose distinct from the original, or instead superseded its objects."). Here, we agree with the district court that Defendants "altered [the Funeral Video's] message." Aplts.' App., Vol. VIII, at 274. But they also did more: as *Warhol* clarified was necessary after the district court ruled here, they used the excerpt of the Funeral Video for an objectively different purpose and to a significant degree.

In this regard, it is important that Defendants copied the Funeral Video only to a limited extent and "only insofar as needed" to effectuate their different documentary-like purpose, *Google*, 593 U.S. at 30—using it, for example, to display Mr. Exotic's purported megalomania and showmanship, even in the tragic circumstances of a funeral, and to set the stage for the negative reaction of Mr. Maldonado's mother to that behavior.  Such a limited use belies the notion that Defendants' use risked superseding or supplanting Plaintiffs' original use for the Funeral Video.  *See Warhol*, 598 U.S. at 528 (indicating that the fundamental inquiry of the first factor is "whether the new work merely 'supersede[s] the objects' of the original creation . . . ('supplanting' the original), or instead adds something new, with a further purpose or different character" (alteration in original) (omission in original) (quoting *Campbell*, 510 U.S. at 579)); *Romanova*, 138 F.4th at 110–11 (noting that the first inquiry focuses on the question of whether the secondary use serves to supersede or supplant the original use and noting that "[t]ransformative uses are favored over those that risk to serve as substitutes for the original"); *see also* 34 Copyright & Media L. Professors' Supp. Amicus Br. at 5 (noting that "borrowing can be justified as transformative [when] it deployed the borrowed material as necessary to achieve a different purpose").  The snippet of the Funeral Video that Defendants used only lasts approximately one minute and six seconds of a Funeral Video of almost twenty-four minutes long.

As in documentary and analogous settings, the use of such an insubstantial amount of the copyrighted work helps tip the first factor in favor of fair use.  *See*

*SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1276, 1278 (9th Cir. 2013) (holding in "a copyright infringement suit over a seven-second clip of Ed Sullivan's introduction of the Four Seasons on *The Ed Sullivan Show*," which was used by Broadway producers "in their musical about the Four Seasons, *Jersey Boys*, to mark a historical point in the band's career" that the plaintiff's "argument that the clip was used for *its own entertainment value* is not supported by the record" (emphasis added)); *Elvis*, 349 F.3d at 629 (contrasting the two ways in which the defendant used snippets, where the "use of many of the television clips is transformative because they are cited as historical reference points in the life of a remarkable entertainer," whereas "many of the film clips seem to be used in excess of this benign purpose, and instead are *simply rebroadcast for entertainment purposes* that [p]laintiffs rightfully own" (emphasis added)); *see also Bouchat*, 737 F.3d at 947 ("The [copyrighted work]'s comparative insignificance as an element of the three displays thus confirms their transformative quality, and militates in favor of a finding of fair use."); *Kelley*, 2023 WL 6276690, at *13 ("[T]he use of Plaintiff's photographs in the Film—ranging from seven to fourteen seconds per photograph, out of a 140-minute documentary—was so trivial that this factor decisively tips in favor of Defendants.").

Because Defendants' use of the Funeral Video is strongly justified by its objectively different purpose to a significant degree, and that use was insubstantial, we conclude that Defendants' use was significantly transformative.

Plaintiffs make much of the fact that Defendants did not comment on—or, to use *Warhol*'s language regarding such action, "target," 598 U.S. at 530—Mr. Sepi's work. Indeed, *Tiger King* does not speak about Mr. Sepi's video at all, neither the video's ostensibly creative decisions nor its intended meaning. But, contrary to Plaintiffs' reading of *Warhol*, Defendants did not need to comment on or target the Funeral Video for the first factor to militate in favor of fair use. Such a view reflects a misreading of governing precedent, and we reject it.

Although the Supreme Court recognized in *Warhol* that targeting can be important, the Court crucially stated that "targeting is not always required." 598 U.S. at 547 n.21. This observation is firmly rooted in the Supreme Court's prior pronouncements and also the decisions of other courts. *See Google*, 593 U.S. at 31 (holding that there was fair use of a copyrightable software program without targeting because "shared interfaces are necessary for different programs to speak to each other" and because "reimplementation of interfaces is necessary if programmers are to be able to use their acquired skills"); *Bill Graham Archives*, 448 F.3d at 609– 11 (deciding that the "use of the disputed images is transformative both when accompanied by referencing commentary and when standing alone" and "disagree[ing] with [a]ppellant's limited interpretation of transformative use," under which appellant believed copyrighted images needed to be "accompanied by comment or criticism related to the artistic nature of the image" (emphasis added)).

Targeting may be one means of effectuating an "independent justification" in a narrower sense for copying the original work—such as parody, literary commentary,

or criticism.  *Warhol*, 598 U.S. at 532 ("In a narrower sense, a use may be justified because copying is reasonably necessary to achieve the user's new purpose.  Parody, for example, 'needs to mimic an original to make its point.'  Similarly, other commentary or criticism that targets an original work may have compelling reason to '"conjure up"' the original by borrowing from it." (quoting *Campbell*, 510 U.S. at 580–81, 588)); *see also id.* at 547 n.21 ("The dissent wonders: Why does targeting matter? . . . The reason, as this opinion explains, is the first factor's attention to justification.").  Such an "independent justification" may be "particularly relevant . . . where an original work and copying use share the same or highly similar purposes." *Id.* at 532.

As the *Warhol* Court characterized it, such was the situation, at least in part, in *Campbell*.  *See id.* at 530–32.  "The use at issue in *Campbell* was 2 Live Crew's copying of certain lyrics and musical elements from Roy Orbison's song, 'Oh, Pretty Woman,' to create a rap derivative titled 'Pretty Woman.'" *Id.* at 530.  The *Warhol* Court acknowledged 2 Live Crew had transformed the original song "by adding new lyrics and musical elements, such that 'Pretty Woman' had a new message and different aesthetic." *Id.*  "Indeed," the Court observed, "the whole genre of music changed from rock ballad to rap." *Id.*  But, critically, the Court concluded "[t]hat was not enough for the first factor to weigh in favor of fair use." *Id.*

That outcome seems understandable to us in light of the analytical framework of *Warhol* because—irrespective of the differences that 2 Live Crew engrafted on "Oh, Pretty Woman"—the group's "rap derivative" still "share[d] same or highly

similar purposes" to Orbison's original song—that is, to musically entertain listeners. *Id.* at 530, 532; *see* Balganesh & Menell, *supra*, at 439 ("[T]he appropriate unit of analysis for fair use is the defendant's 'use' rather than just copying. . . . The rationale underlying the distinct purpose requirement—which the *Warhol* Court drew from *Campbell*—was the obvious substitutionary effect of a use that exhibited a purpose similar to that of the copyright owner's.")

However, the Court ultimately concluded that 2 Live Crew's use militated in favor of a fair use determination because, in a narrower sense, that "use may be justified because copying is reasonably necessary to achieve the user's new purpose"—that is, parody. *Warhol*, 598 U.S. at 532. In other words, parody provided an "independent justification" under circumstances "where an original work and copying use share the same or highly similar purposes," and parody, by its nature, "targets an author or work for humor or ridicule."[11] *Id.* at 530, 532; *see also*

---

[11] In contrast, under analogous circumstances in *Warhol* itself—where the secondary use and the original use "share[d] substantially the same purpose," 598 U.S. at 537–38, and therefore the secondary use could not be said to be transformative in a broad sense—the Court reached a different outcome. And a significant key to understanding that different outcome is the concept of justification. "[T]he absence of a justification in the factual record was crucial." Balganesh & Menell, *supra*, at 438. The plaintiff foundation in *Warhol* could not marshal an independent justification for its copying—like 2 Live Crew's parodic use, which reasonably necessitated targeting: instead, it could merely argue that it sought to "convey a new meaning or message," *Warhol*, 598 U.S. at 547, and that was not enough, *see id.* ("Copying might have been helpful to convey a new meaning or message. It often is. But that does not suffice under the first factor."). "Like satire that does not target an original work, [the foundation's] asserted commentary 'can stand on its own two feet and so requires justification for the very act of borrowing.'" *Id.* (quoting *Campbell*, 510 U.S. at 581). And the foundation had no such justification. But, as we explain *infra*, Defendants here are not similarly situated to

*Romanova*, 138 F.4th at 112 ("[T]he Supreme Court's ruling in *Warhol* made clear that *Campbell*'s requirement of justification is not applicable only in cases of claimed parody, but applies generally to all claims of fair use.").

However, under the circumstances here—as we have demonstrated—the secondary use of the excerpt of the Funeral Video in *Tiger King* and the use of the original Funeral Video do not involve the same or similar purpose. And, consequently, in our view, an "independent justification"—like parody, that relies on targeting is not "particularly relevant to assessing fair use." *Warhol*, 598 U.S. at 532. Rather, without regard to targeting at all, Defendants' use of the copyrighted material in *Tiger King* was significantly transformative. It therefore finds strong justification—like the use of analogous snippets in many other documentaries—in *Warhol*'s "broader sense," that is, through its alignment with and advancement of the purposes of copyright, to promote the arts through education and by commenting on notable personalities and societal concerns. *See Romanova*, 138 F.4th at 119 (noting that "justification is often found when the copying serves to critique, or otherwise comment on, the original, or its author, but can *also be found* in *other circumstances*, such as when the copying provides useful information about the original, *or on other subjects*" (emphasis added)); *Griner*, 104 F.4th at 9 ("Transformativeness 'relates to

---

either 2 Live Crew or the plaintiff foundation in Warhol: the purpose of its secondary use of the excerpt of the Funeral Video was not the same or similar to Plaintiff's use of the Funeral Video; it was distinctly different and significantly transformative. As such, Defendants' use was justified in a broad sense by furthering the purposes of copyright, and did not require an independent justification that relied on targeting.

51

the justification for the use.'" (quoting *Warhol*, 598 U.S. at 531)); Shatzkin & Cohen, *supra*, at 17 ("But 'targeting' is not the only distinct purpose that should satisfy the first factor under *Warhol*.").

Stated otherwise, under these circumstances, Defendants were not obliged to rely on an independent justification in a narrower sense, like parody—the effectuation of which was reasonably dependent on targeting—to justify their use of the excerpt of the Funeral Video. *See Griner*, 104 F.4th at 9; *Authors Guild*, 804 F.3d at 214.

### iii

Having concluded that Defendants' use of the excerpt of the Funeral Video was significantly transformative and justified in the broad sense, we next address the commerciality of the use. "The commercial nature of the use is not dispositive." *Warhol*, 598 U.S. at 531. Indeed, the commercial character of a secondary use carries no "presumptive force against a finding of fairness"; if it did, "the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107." *Campbell*, 510 U.S. at 584. The commerciality of a secondary use nevertheless "tends to weigh against a finding of fair use." *Harper & Row Publishers*, 471 U.S. at 562.

We must balance the commerciality of Defendants' use against the transformative effect of the use. *See Warhol*, 598 U.S at 532–33. More specifically, as *Warhol* put it, "the first fair use factor considers whether the use of a copyrighted work has a further purpose or different character, which is a matter of degree, and the

degree of difference must be balanced against the commercial nature of the use." *Id.* at 532. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism . . . ." *Campbell*, 510 U.S. at 579; *see* Balganesh & Menell, *supra*, at 441 ("*Campbell* had been very clear that the commerciality of the putative fair use was to be weighed against its claim of transformativeness . . . . Commerciality and transformativeness were thus to be seen on a sliding scale fulcrum." (footnote omitted)).

We have concluded that Defendants' use was significantly transformative, causing the balance of the first factor to tip toward Defendants. And, as we see it, the commercialism of Defendants' use here does not materially alter that balance in favor of fair use. That is, the significance of the commerciality factor does not "loom" as large in this context. *Campbell*, 510 U.S. at 580.

To be sure, it is undisputed that Defendants profited from their streaming of the *Tiger King* series because viewers must pay to access Netflix's content. *See* Aplts.' App., Vol. I, ¶ 17, at 128 (Second Am. Compl. for Copyright Infringement, filed Dec. 13, 2021) ("Netflix released the Tiger King documentary miniseries[,] and [it] was reportedly watched by over 34 million viewers in the U.S. during the first 10 days."); *see also* Aplts.' Am. Suppl. Br. at 5 n.5 ("Publicly performing a work over a for-profit*, pay-walled* streaming platform to millions of customers is about as commercial as it gets." (emphasis added)). However, the commerciality of *Tiger King* per se is not the proper focus of the inquiry. Recall that our attention should be on the commercial exploitation of the copyrighted work *itself*, not on the commercial

nature of the secondary work as a whole. *See Harper & Row Publishers*, 471 U.S. at 562 ("The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from *exploitation of the copyrighted material* without paying the customary price." (emphasis added)); *Bouchat*, 737 F.3d at 942 ("The key inquiry is the extent to which the [copyrighted work] itself—and not the videos as a whole—provides commercial gain . . . .").

In that regard, it is important that Defendants' use of the Funeral Video is insubstantial—either as compared to Episode Five or the entire season of *Tiger King* The snippet comprises a mere 2.58% of Episode Five and less than one percent of the *Tiger King* series. This insubstantial use discourages us from placing "significant weight" on the commerciality factor. *Bouchat*, 737 F.3d at 942 ("[T]he limited nature of the uses counsels against placing significant weight on their commercial nature."); *see Elvis*, 349 F.3d at 627 ("[T]he degree to which the new user exploits the copyright for commercial gain—*as opposed to incidental use as part of a commercial enterprise*—affects the weight we afford commercial nature as a factor." (emphasis added)); *see also* Shatzkin & Cohen, *supra*, at 21–22 ("Most particular archival uses in documentaries are largely insignificant to the commercial purposes of the filmmakers. Each piece of archive in itself generally constitutes only a small element of the film that is combined with other sources . . . .").

We simply cannot conclude here that the commercial success of *Tiger King* stemmed in any considerable degree from Defendants' exploitation of the excerpt of the Funeral Video. *See Bill Graham Archives*, 448 F.3d at 612 (recognizing that the

secondary work was "a commercial venture" but nonetheless finding the first factor

weighed in favor of fair use by determining that the secondary work "does not exploit

[the copyrighted original] as such for commercial gain" because, for example, the

secondary work did not use the copyrighted images "in its commercial advertising or

in any other way to promote the sale of the" work).  Thus, on balance, we conclude

that the commerciality of Defendants' use does not tip the balance away from a

finding that the first factor supports the fair-use defense.

***

We hold that Defendants' use of an excerpt of the Funeral Video fits

comfortably within the mold of the use of snippets of archival material in

documentaries.  Such uses frequently reflect preamble purposes and have been held

by courts to support a finding of fair use at the first factor.  And that is true here.

Defendants' documentary-style use of the excerpt of the Funeral Video is

transformative to a significant degree and justified in a broad sense by its

advancement of the purposes of copyright.  And the commerciality factor here does

not "loom" large.  *Campbell*, 510 U.S. at 580.  In sum, we hold that the first factor

tilts in Defendants' favor.

**2**

The second fair-use factor focuses on "the nature of the copyrighted work."

17 U.S.C. § 107(2).  Specifically, the Supreme Court has recognized that "some

works are closer to the core of intended copyright protection than others, with the

consequence that fair use is more difficult to establish when the former works are

55

copied." *Campbell*, 510 U.S. at 586. The inquiry under the second factor generally focuses on two criteria. First, the law generally "recognizes a greater need to disseminate factual works than works of fiction or fantasy," and hence it is more likely that the use of a factual or informational work will be fair use. *Harper & Row Publishers*, 471 U.S. at 563; *see Hustler Mag., Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1153–54 (9th Cir. 1986) ("The scope of fair use is greater when 'informational' as opposed to more 'creative' works are involved." (quoting *Marcus v. Rowley*, 695 F.2d 1171, 1176 (9th Cir. 1983))).

Second, whether a work has been published is also of importance, as "the scope of fair use is narrower with respect to unpublished works." *Harper & Row Publishers*, 471 U.S. at 564. In this regard, "[w]hile even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public or disseminated to the press, the author's right to control the first public appearance of his expression weighs against such use of the work before its release." *Id.* (citation omitted).

Importantly, "[t]he second factor may be of limited usefulness where," as here, "the [secondary] work . . . is being used for a transformative purpose." *Bouchat*, 737 F.3d at 943; *accord Bill Graham Archives*, 448 F.3d at 612.

**a**

Plaintiffs claim that the second statutory factor militates in their favor. Specifically, Plaintiffs first argue that the district court "erroneously considered the Funeral [Video] a factual work because it captures images of reality, *i.e.*, of a funeral

56

that actually happened." Aplts.' Opening Br. at 35. Instead, Plaintiffs contend that the "depiction of real events via the camera doesn't make a work factual." *Id.* at 36. Plaintiffs assert that "[i]nsofar as Mr. Exotic is compelling creative content[,] by an actor, [the video is] artistic and expressive—not factual." *Id.* We are unpersuaded.

A paradigmatic example of a creative work, the use of which will disfavor fair use under the second factor, is "[a] motion picture based on a fictional short story." *Stewart*, 495 U.S. at 238. On the other—factual—end of the continuum, a secondary use of a "bare factual compilation[]" favors fair use under the second factor. *Campbell*, 510 U.S. at 586. However, "[e]ven within the field of fact works, there are gradations as to the relative proportion of fact and fancy. One may move from sparsely embellished maps and directories to elegantly written biography." *Harper & Row Publishers*, 471 U.S. at 563 (quoting Robert A. Gorman, *Fact or Fancy? The Implications for Copyright*, 29 J. COPYRIGHT SOC. 560, 563 (1982)).

Additionally, "[w]hen determining the thickness of a [video's] copyright, a court weighs the 'range of creative choices available in selecting and arranging the [video's] elements,' examining aspects like 'lighting, camera angle, depth of field, and selection of foreground and background elements.'" *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 266 (4th Cir. 2019) (quoting *Rentmeester v. Nike Inc.*, 883 F.3d 1111, 1120–21 (9th Cir. 2018), *overruled on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc)). "The ultimate task is to separate the 'facts or ideas set forth in a work,' which are not protected, from the 'author's manner of expressing those facts and ideas,' which is protected." *Id.* at

266–67 (quoting *Authors Guild*, 804 F.3d at 220); *Authors Guild*, 804 F.3d at 220

("[W]hile the copyright does not protect facts or ideas set forth in a work, it does

protect that author's manner of expressing those facts and ideas.").

Here, the Funeral Video is factual, containing only footage of actual events

which Mr. Sepi did not direct or arrange. Put another way, nothing in the video

could be categorized as a work of fiction or a creative work of the imagination. The

fact that Mr. Exotic—a purportedly showman-like and charismatic individual—

attended and spoke with arguable flair at the funeral does not suddenly transform an

otherwise factual depiction into a fictional work or a creative work of the

imagination. Furthermore, Mr. Sepi's creative vision or "manner of express[ion]" in

the Funeral Video was extremely limited. *Brammer*, 922 F.3d at 267 (quoting

*Authors Guild*, 804 F.3d at 220). Mr. Sepi shot the video by placing a camera on a

tripod and leaving it running, occasionally zooming or panning to capture funeral

attendees or the video screen depicting the memorial video. He did not edit the

Funeral Video. Indeed, Plaintiffs do not even attempt to argue that Mr. Sepi

exercised creative decision-making when filming this video. As such, the district

court correctly concluded that the "video is more factual than creative." Aplts.'

App., Vol. VIII, at 275.

**b**

Next, Plaintiffs argue that the district court erred in holding that "the Funeral

[Video] was 'previously *published*' because it was 'livestreamed via YouTube and

remained there afterwards.'" Aplts.' Opening Br. at 32 (quoting Aplts.' App.,

Vol. VIII, at 275). Specifically, Plaintiffs contend that the Funeral Video "was not published in a copyright sense: 'in this area of the law the word "publication" is a "legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term."'" *Id.* (emphasis omitted) (quoting *Est. of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211, 1214 n.3 (11th Cir. 1999)). They point to the Copyright Act's definition of "publication":

> "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101. Plaintiffs argue that posting a video on YouTube is merely a public performance or display and not a distribution of copies. They state that "YouTube restricts downloads" and that "[d]ownloads from YouTube often involve illegal stream ripping." Aplts.' Opening Br. at 34.

Defendants respond that "[t]he second factor focuses on an author's prior *disclosure* and *dissemination* of the copyrighted work to the public, not the statutory definition of publication." Aplees.' Resp. Br. at 39. By this metric, Defendants argue, Mr. Sepi published the Funeral Video by streaming and posting it on YouTube.

We agree with Defendants. The Copyright Act defines "publication," which appears in various parts of the Act. 17 U.S.C. § 101. The second fair-use factor is not one of those parts. 17 U.S.C. § 107(2) ("the nature of the copyrighted work").

59

Interpreting the second factor, the Supreme Court has stated that "[t]he fact that a work is unpublished is a critical element of its 'nature.'" *Harper & Row Publishers*, 471 U.S. at 564. But this question does not focus on the statutory definition of publication. We are not aware of any Supreme Court opinions even citing the statutory definition of publication in discussing the second factor. The Court instead focuses on whether a work has been made public. In *Harper & Row Publishers*, the Court explained the relevance of a work's unpublished status:

> While even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public or disseminated to the press, the author's right to control *the first public appearance of his expression* weighs against such use of the work before its release.

*Id.* (emphasis added). Although a "public performance or display of a work" is not formal publication, 17 U.S.C. 101, it is a public appearance. The Second Circuit has held that the statutory definition does not control this aspect of the second factor. *Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 756 F.3d 73, 88 (2d Cir. 2014) ("Limiting our consideration of a work's publication status to the statutory definition . . . would obscure the different purposes served by the statutory definition and the judicial gloss on 'the nature of the copyrighted work' in the context of fair use." (quoting 17 U.S.C. § 107(2)).[12]

---

[12]     Nimmer makes the same general point, distinguishing "confidential" works from merely unpublished ones:

> A work's confidential status aligns factor two against fair use. . . .
> The scope of the fair use doctrine is . . . supposed to be
> considerably narrower with respect to unpublished works that are

Here, Defendants' use of the clip of the Funeral Video did not infringe on Mr. Sepi's "right to control the first public appearance of his expression." *Harper & Row Publishers*, 471 U.S. at 564. Specifically, Mr. Sepi was able to exercise his right of control as to the first appearance of the Funeral Video by choosing to livestream and post the Funeral Video on YouTube for the public's consumption. Only after Mr. Sepi exercised this right did Defendants use a clip of the Funeral Video for their *Tiger King* series. As such, Plaintiffs cannot now contend that Defendants' use of the clip impeded their right of first publication.[13]

Accordingly, the district court did not err in its analysis on the second factor. This factor also tilts in favor of the fair-use defense.

---

held confidential by their copyright owners. Note that 'confidential' differs subtly from 'unpublished.' If the author does not exercise 'deliberate choice' to keep the work out of the public eye, the fact the author has not formally published or commercialized it carries less weight.

Nimmer, *supra*, § 13F.06[B][1] (2025) (footnotes omitted).

[13]    Plaintiffs also argue that the district court "overlooked that the Funeral [Video] was deeply personal in nature." Aplts.' Opening Br. at 37. As such, Plaintiffs contend that "[w]hile not dispositive, the private nature of this work— footage of a funeral of a friend—weighs against a finding of fair use." *Id.* However, Plaintiffs cite no authority demonstrating that such a consideration is relevant to the fair-use analysis. Even if such a consideration were relevant, Mr. Sepi's own conduct would belie the notion that the video was of a "private nature." *Id.* Mr. Sepi livestreamed and posted the video on YouTube for the undifferentiated public's consumption. As such, this contention has no merit.

**3**

We next turn our attention to the third statutory factor.  The third factor concerns the amount and substantiality of the material used and is reviewed "with reference to the copyrighted work, not the infringing work."  *Bill Graham Archives*, 448 F.3d at 613; *see* 17 U.S.C. § 107(3) (noting that the third factor concerns "the amount and substantiality of the portion used in relation to *the copyrighted work as a whole*" (emphasis added)).  This factor requires courts to consider not only "the quantity of the materials used," but also "their quality and importance."  *Campbell*, 510 U.S. at 587.  So long as "the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her."  *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003); *see also Brammer*, 922 F.3d at 267–68 ("The key question is 'whether "no more was taken than necessary"' to accomplish the secondary user's purpose." (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014))).

Plaintiffs argue that the district court erred in assessing this factor, as it "failed to appreciate that quantity is not dispositive" of the inquiry.  Aplts.' Opening Br. at 38.  Instead, Plaintiffs contend that a "proper analysis of this factor demands a qualitative analysis."  *Id.*  Plaintiffs claim that "the qualitative value of the works copied in this case is quite high."  *Id.* at 40.  Specifically, they assert that "the clip here was taken *precisely* because it was unusual—*i.e.*, was notable, compelling, captivating footage."  *Id.*  We are unconvinced.

As a threshold matter, Defendants used a quantitatively insubstantial amount of the Funeral Video—a total of approximately sixty-six seconds out of a video lasting nearly twenty-four minutes. Plaintiffs are correct: this consideration is not dispositive. But courts have generally found the use of such an insubstantial amount of a copyrighted work, as here, weighs in favor of fair use. *See SOFA*, 709 F.3d at 1279 ("SOFA does not challenge the conclusion that the seven-second clip is quantitatively insignificant . . . ."); *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986) ("We agree with the district court that [the defendant's] inclusion of 4.3 percent of the words in [the copyrighted work] in his own book is not incompatible with a finding of fair use."); *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 158 (2d Cir. 1990) ("Here, the book uses overall a small percentage of [the copyrighted] works. Appellant calculates that the book quotes only a minuscule amount of 25 of the 48 works that appellee claimed were infringed, 5–6% of 12 other works and 8% or more of 11 works . . . . In the context of quotation from published works, where a greater amount of copying is allowed, this is not so much as to be unfair." (citation omitted)). We join in the reasoning of these courts in concluding that Defendants' use of such an insubstantial amount of the Funeral Video counsels in favor of a finding of fair use.

Furthermore, contrary to Plaintiffs' assertion, the district court did assess the qualitative value of the clips used from the Funeral Video. Specifically, the district court noted:

63

> The portions of the video used by Defendants show [Mr.] Exotic speaking at the funeral. Qualitatively, these clips are some of the more unusual portions of the video, although they are not necessarily the most important. The comments by Mr. Maldonado's mother, for example, may be just as significant as the comments by [Mr.] Exotic to a person wanting to view the funeral.

Aplts.' App., Vol. VIII, at 276. In both their Opening and Reply briefs, Plaintiffs fail to meaningfully engage with the district court's analysis and demonstrate why that qualitative analysis is mistaken or unpersuasive. In itself, that is a fundamental problem for Plaintiffs. *See Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong."); *accord GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1213 (10th Cir. 2022).

But even if we were inclined to overlook this significant deficiency in Plaintiffs' argument and assume that Defendants used the most qualitatively important scenes from the Funeral Video, Plaintiffs' claim would still lack merit.[14]

---

[14]    Plaintiffs separately contend that the district court erred by not "consider[ing] the possibility that Defendants could have created their own film of the funeral, instead of stealing Mr. Sepi's Funeral Film." Aplts.' Opening Br. at 41. According to Plaintiffs, this possibility of independent acquisition of the same scene is important to the "core" inquiry of the third factor, which "asks whether the Defendant 'only copies as much as is necessary for his or her intended use.'" *Id.* (quoting *Kelly*, 336 F.3d at 821). The primary authority that Plaintiffs cite in support of this proposition, however, is *Brammer v. Violent Hues Productions*. At least without more, we are not persuaded. In particular, we read the language in *Brammer* that Plaintiffs rely on—in which the Fourth Circuit hypothesizes that the defendant could have independently secured a depiction of the same scene, *id.* at 268—as tangential to the court's holding. *Brammer*'s holding did not turn on whether the defendant could have independently acquired a depiction of the same scene that the plaintiff captured in the original work. *See id.* at 267–68. Rather, *Brammer* turned

Defendants appear to have used no more of the Funeral Video than necessary for their transformative purpose. *See Kelly*, 336 F.3d at 820–21; *see also Brammer*, 922 F.3d at 267–68 ("The key question is 'whether "no more was taken than necessary"' to accomplish the secondary user's purpose." (quoting *HathiTrust*, 755 F.3d at 98)). More specifically, what Defendants used was reasonably necessary for the purpose of commenting on Mr. Exotic's megalomania and showmanship and the milieu of big-cat breeders. *See Kelly*, 336 F.3d at 820–21; *see also Threshold Media Corp. v. Relativity Media, LLC*, No. CV 10-09318, 2013 WL 12331550, at *12 (C.D. Cal. Mar. 19, 2013) (unpublished) ("Although one might quibble whether the filmmakers could have cut a second or two from their uses of [plaintiff's] song in order to further reduce its overall exposure, the overall amount used was reasonable in light of their purpose."); *cf. Bill Graham Archives*, 448 F.3d at 613 ("[E]ven though the copyrighted images are copied in their entirety, the visual impact of their artistic expression is significantly limited because of their reduced size. We conclude that such use by [defendant] is tailored to further its transformative purpose . . . . Accordingly, the third fair use factor does not weigh against fair use." (citation omitted)). Stated another way, for Defendants to make their point about Mr. Exotic's character and traits and his big-cat environment, they reasonably used clips that focused on his unusual behavior at Travis Maldonado's funeral. As such, Defendants copied only as much as was necessary for their intended transformative use.

---

on the amount and substantiality of the defendant's use of the original, which the court determined under the circumstances was "not justified." *Id.* at 268.

In our view, based on the foregoing, the third statutory factor also weighs in favor of fair use.

**4**

We turn to the fourth factor, "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). In finding that the fourth factor weighed in Defendants' favor, the district court concluded that "*Tiger King* is not a substitute for the . . . Funeral Ceremony video." Aplts.' App., Vol. VIII, at 277. Specifically, the district court reasoned that it was "not likely that a person interested in viewing the funeral would consider viewing *Tiger King* as a replacement." *Id.* Plaintiffs argue that the district court failed to consider harm to markets for derivative uses of the Funeral Video and that the district court failed to place the burden of proof on Defendants.

Our review of the district court's summary judgment order is of course de novo. *See, e.g.*, *Punt*, 862 F.3d at 1046. And, for reasons explicated below, we conclude that the fourth factor weighs in Defendants' favor because Plaintiffs do not dispute the district court's conclusion that *Tiger King* is not a substitute for the original Funeral Video, because Plaintiffs do not identify any protectible derivative markets that may be harmed, because Defendants' use of the Funeral Video is significantly transformative, and because the available evidence tends to confirm that there is not harm to any derivative markets.

**a**

Plaintiffs do not challenge the district court's conclusion that Defendants' use is not a market substitute for the original Funeral Video. Instead, they only argue that the district court failed to consider the possibility of harm to derivative markets. *See* Aplts.' Opening Br. at 43 ("[T]he District Court declared that 'Tiger King is not a substitute for the' Funeral Film. Yet, that's the wrong question. The proper question is whether Tiger King is a substitute for a *derivative use* of the Funeral Film." (citation omitted)); Aplts.' Am. Suppl. Br. at 10 ("Here, Defendant didn't introduce any evidence for the derivative rights market."). As to the issue of derivative markets, Plaintiffs argue that "any lack of evidence about market harms cuts against [Defendants'] fair use and means [Defendants,] as the movant[s] on an affirmative defense[,] have failed to carry their burden on the fourth factor[]." Aplts.' Reply Br. at 26. Plaintiffs note that "the Supreme Court and other Circuits 'have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use.'" Aplts.' Opening Br. at 43 (quoting *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020)).

Defendants respond that the "fourth factor weighs in the defendant's favor when the plaintiff provides no evidence demonstrating a market impact." Aplees.' Resp. Br. at 43. As such, Defendants argue that "[i]n attacking the district court's order, Plaintiffs merely assert—without a shred of evidence—that [*Tiger King*] is an unfair 'derivative use' of Plaintiffs' work." *Id.* at 44 (quoting Aplts.' Opening Br. at 43).

67

**b**

"The fourth fair use factor is 'the effect of the use upon the potential market for or value of the copyrighted work.'" *Campbell*, 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)). Furthermore, "[t]he enquiry 'must take account not only of harm to the original but also of harm to the market for derivative works.'" *Id.* (quoting *Harper & Row Publishers*, 471 U.S. at 568). "[T]he possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original." *Authors Guild*, 804 F.3d at 224. "There must be a *meaningful or significant* effect 'upon the potential market for or value of the copyrighted work.'" *Id.* (emphasis added) (quoting 17 U.S.C. § 107(4)); *see also Campbell*, 593 U.S. at 593 ("Evidence of *substantial* harm to [a derivative market] would weigh against a finding of fair use[.]" (emphasis added)).

"Courts have, on the whole, been more cautious when considering a plaintiff's claim of harm in a derivative market—that is, a market not for the plaintiff's work itself, but for derivative works based on the plaintiff's work." RESTATEMENT OF THE LAW, COPYRIGHT § 6.12 cmt. q. In particular, courts must be cautious of the "'danger of circularity posed' by considering unrealized licensing opportunities because 'it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar[.]'" *Google*, 593 U.S. at 38 (quoting 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13F.05[A][2][a] (2019)). Courts must therefore focus on

cognizable harms—as relevant here, harms to markets that fall within the statutory definition of derivative works.  *See* RESTATEMENT OF THE LAW, COPYRIGHT § 6.12 cmt. q.

The statute defines a "derivative work" as a "work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted."  17 U.S.C. § 101.  This definition, especially its illustrative examples, show that a derivative is a work that "re-present[s] the protected aspects of the original work, *i.e.*, its expressive content, converted into an altered form[.]" *Authors Guild*, 804 F.3d at 225.  Although derivative works may involve a substantial change in form, importantly, they "are likely to share the original work's purpose and character."  RESTATEMENT OF THE LAW, COPYRIGHT § 6.12 cmt. q. "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop."  *Campbell*, 510 U.S. at 592.  Therefore, "copyright owners may not preempt exploitation of *transformative* markets[.]"  *Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 145 n.11 (2d Cir. 1998) (emphasis added).[15]

---

[15]    However, as we have repeatedly stated, transformativeness is a matter of degree.  A secondary work may be somewhat transformative, i.e., having some further character or purpose beyond the original, while still sharing enough character or purpose with the original to cause cognizable derivative-market harm.  *See Campbell*, 510 U.S. at 593 (allegedly infringing rap song was transformative because

The first fair-use factor, and transformativeness in particular, informs the question of market impact.  "A secondary use that is more different in purpose and character is less likely to usurp demand for the original work or its derivatives[.]" *Warhol*, 598 U.S. at 536 n.12; *see Campbell*, 510 U.S. at 591 (noting that when the defendant's "use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred").  But "the relationship is not absolute." *Warhol*, 598 U.S. at 536 n.12.  "While the first factor considers whether and to what extent an original work and secondary use have substitutable *purposes*, the fourth factor focuses on actual or potential *market substitution*." *Id.* (emphases added).  For example, "[e]ven if the purpose of the copying is for a valuably transformative purpose, such copying might nonetheless harm the value of the copyrighted original if done in a manner that results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute." *Authors Guild*, 804 F.3d at 223.  Likewise, a transformative use may be similar enough to a protectible derivative market to cause market harm. *See Campbell*, 510 U.S. at 593 ("But the [transformative work] may have a more complex character, with effects not only in the [unprotected, transformative market] but also in protectible markets for derivative works, too."); *see also supra* note 15.

"'Fair use is an affirmative defense,' thus requiring the defendant to 'bring forward favorable evidence about relevant markets.'" *ComicMix LLC*, 983 F.3d at

---

it discernibly parodied the rock original, but the rap parody could potentially still substitute for nonparody rap derivatives).

459 (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997)); *accord Campbell*, 510 U.S. at 590.  Nevertheless, a defendant need not prove a lack of harm to derivative markets if the plaintiff has not identified any such markets.  *See Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 n.6 (2d Cir. 1998) (noting that where the copyright holder does "not identif[y] any market for a derivative work that might be harmed . . . the defendant ha[s] no obligation to present evidence showing lack of harm in a market for derivative works"); *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 194 (2d Cir. 2024) ("[T]he rightsholder may bear some initial burden of identifying relevant markets[.]"); *see also Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021) ("*[S]ince Goldsmith has identified a relevant market*, AWF's failure to put forth any evidence [negating market harm] tilts the scales toward Goldsmith." (emphasis added)), *aff'd sub nom. Warhol*, 598 U.S. 508.

### c

Plaintiffs have not identified, below or on appeal, any protectible derivative market that may be harmed by Defendants' use.  Plaintiffs merely speculate and offer conclusory statements to the effect that there must have been some derivative markets, while remaining vague about what they are: "Given that Joe Exotic is content gold and a documentarian's dream, it's hard to imagine that there was not a market to make derivative uses" of the Funeral Video.  Aplts.' Opening Br. at 43.  Notwithstanding that Defendants have the evidentiary burden to show the impact on derivative markets, they have no burden to disprove effects on hypothetical

71

derivative markets that Plaintiffs have not identified. *Leibovitz*, 137 F.3d at 117; *Hachette Book Grp.*, 115 F.4th at 194. Combined with the district court's (unchallenged) conclusion that *Tiger King* is not a substitute for the original Funeral Video, Plaintiffs' failure to identify protectible derivative markets that may be harmed is likely enough to preclude a showing of market harm and, therefore, likely enough for us to conclude that the fourth factor weighs in favor of fair use. But there is more.

Defendants' copying of the Funeral Video is significantly transformative and, consequently, attenuates the likelihood of any cognizable market harm. Defendants clipped just sixty-six seconds from the Funeral Video, chopped it up, and interspersed it with footage of Mr. Maldonado's mother commenting on Mr. Exotic. At times her comments are played directly over visuals of Mr. Exotic's remarks, with her stating, "He has to do dramatics, you know, drama," and "He was even acting there." Aplts.' App., Vol. IX, Multimedia Ex. 5, at 27:07–27:18. Those changes, along with the broader context of the episode and the series as a whole, make abundantly clear that Defendants' use had a totally different purpose from the original Funeral Video. The Funeral Video is a remembrance, but Defendants used the specific excerpt to advance their documentary-style commentary. Whereas the Funeral Video is focused on capturing Mr. Maldonado's funeral, Defendants use the clip of the Funeral Video to tell a story about Mr. Exotic, probing the appropriateness of his theatrics at his husband's funeral as part of *Tiger King*'s broader exploration of his megalomania. As we have said, Defendants' use is significantly transformative.

72

This transformative use undermines the likelihood of market harm. As *Warhol* and *Campbell* articulate, the more transformative the defendant's use, the less likely it is to substitute for the original or derivatives. *See Warhol*, 598 U.S. at 536 n.12; *Campbell*, 510 U.S. at 591. That relationship is apparent here. Based on Defendants' limited copying from the Funeral Video and their significantly transformative use of the copied clips, it strains belief that anyone would watch *Tiger King* or the segment at issue as a substitute for the Funeral Video. Even if there were derivative markets at issue, Defendants' significantly transformative use would attenuate the possibility of harm to those markets as well. *See Warhol*, 598 U.S. at 536 n.12 ("A secondary use that is more different in purpose and character is less likely to usurp demand for the original work *or its derivatives*[.]" (emphasis added)). Anything qualifying as a derivative of the Funeral Video would be quite dissimilar to Defendants' use, making substitution unlikely. Therefore, Defendants' significantly transformative use militates significantly in favor of the conclusion that the fourth factor favors Defendants.[16]

---

[16]    We think that in some cases, akin to this one, the implausibility of substitution can be so apparent that evidence concerning market impact that is extrinsic to the uses of the original and secondary works themselves (including sophisticated empirical evidence, offered by an expert or otherwise) is unnecessary. *E.g.*, *HathiTrust*, 755 F.3d at 100 (holding that a full-text library search tool was not a market substitute for the underlying books where the tool was highly transformative and generally did not reproduce the underlying text to the searcher); *Monbo v. Nathan*, 623 F. Supp. 3d 56, 105–06 (E.D.N.Y. 2022) ("[T]he 2013 Documentary is not a market substitute for Plaintiffs' works because the . . . Defendants have made a transformative use of a small portion of the 2001 Documentary."); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 861 F. Supp. 2d 336, 342 (S.D.N.Y. 2012) ("Nothing in the record suggests any possible market effect stemming from

Furthermore, though not extensive or sophisticated, the evidence here of market impact—extrinsic to the uses of the original and secondary works themselves—bolsters that conclusion.  There is virtually nothing suggesting that Defendants' use harmed the market for the Funeral Video or any derivatives.  Plaintiffs point to the fact that Defendants "licensed film clips from Exotic and Lowe . . . includ[ing] the works at issue in this lawsuit."  Aplts.' App., Vol. I, at 162 ¶ 35 (Defs. Netflix, Inc. and Royal Goode Productions LLC's Mot. for Summ. J. and Supp. Br., filed Jan. 27, 2022).  But inferring market harm from that payment would be both factually and legally problematic.  As a factual matter, the payment may have been made in hopes of avoiding the need to litigate the complicated fair-use doctrine.  *See Campbell*, 510 U.S. at 585 n.18 (noting that the defendant's prior offer to pay a licensing fee "may simply have been made in a good-faith effort to avoid this litigation"); *Bill Graham*, 448 F.3d at 615 ("[A] publisher's willingness to pay license fees for reproduction of images does not establish that the publisher may not, in the alternative, make fair use of those images.").

Legally, we must not reflexively infer harm based on "the theoretical market for licensing the very use at bar."  Nimmer, *supra*, § 13F.08[B] (2025).  Under the circumstances here, that loss of potential licensing is only cognizable if the defendant's use is a derivative work or substitutes for such works.  *See Campbell*,

---

[d]efendant's use of such a limited portion of the recording of the Earnings Call.  Nor does common sense.").  Regardless, there is some extrinsic evidence confirming a lack of market harm here as explained *infra*.

510 U.S. at 593; RESTATEMENT OF THE LAW, COPYRIGHT § 6.12 cmt. q.  As we have explained, Defendants' significantly transformative use falls far outside the bounds of a statutory derivative of the Funeral Video.

Moreover, other evidence tends to confirm a lack of licensing harm.  Mr. Sepi admitted that he "has never licensed, sold, or otherwise commercially exploited any of his work (including the Videos)."  Aplts.' App., Vol. I, at 167 ¶ 51; *Id.*, Vol. IV, at 22 ¶ 51.  Indeed, Mr. Sepi's deposition testimony indicates he never *attempted* to license the Funeral Video.  When asked what he has done with the Funeral Video, Mr. Sepi made no mention of any commercial plans.  Aplts.' App., Vol. II, at 195–97 ("Q. What did you do with the [Funeral Video] after you made it?  A. I look back on it and remember the times that I had with Travis, the friendship we had. . . . Q. Has it been used in any other way other than being on the Joe Exotic YouTube page?  A. Not by me.  Not by anyone but Netflix and Royal Goode.").  Asked whether he retained a copy after the funeral, Mr. Sepi stated that he did so "because Travis was a really, really good friend."  *Id.* at 193.

The fact that Mr. Sepi has not licensed or attempted to license the Funeral Video is evidence cutting against derivative market harm.  *See* Nimmer, *supra*, § 13F.08[B][1] (2025) ("Some courts have held that factor four favored defendant when plaintiff had no history of entering the licensing market in question and no plans to do so."); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993) ("In the cases where we have found the fourth factor to favor a defendant, the defendant's work filled a market niche that the plaintiff simply had no

interest in occupying."); *cf. Campbell*, 510 U.S. at 592 ("The market for potential derivative uses includes only those that creators of original works would in general *develop or license others to develop*.") (emphasis added); RESTATEMENT OF THE LAW, COPYRIGHT § 6.12 cmt. q ("[C]ourts have found harm likely in particular derivative markets that the plaintiff either *has exploited or is preparing or likely to exploit*." (emphasis added)).  We think that these admissions from Mr. Sepi provide, under the circumstances here, a sufficient evidentiary basis for us to assess and weigh the fourth factor.  And, when those admissions are considered in the context of Defendants' significantly transformative use and limited copying of the original work, we think the fourth factor convincingly weighs in favor of Defendants.

To be sure, Plaintiffs hang their fourth-factor hat on the following language from *Campbell*: "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."  510 U.S. at 590.[17]  It is of course true that the proponent of fair use bears the evidentiary burden on market impact.  *Id.*; *Warhol*, 11 F.4th at 49; Nimmer, *supra*, § 13F.08[F][1] (2025).  But we do not read *Campbell* as a rigid requirement that the proponent of fair use must always produce evidence of market

---

[17]    We note that Plaintiffs made no mention below of this argument or *Campbell*'s discussion of the burden of proof.  "Yet, the decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary."  *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013).  Therefore, we overlook any potential preservation concerns related to Plaintiffs' argument (including its invocation of *Campbell*'s discussion of the burden of proof) and address the argument on the merits.

impact—extrinsic to the uses of the original and secondary works themselves—to prevail. For one thing, *Campbell* speaks of "difficulty" of shouldering the fair use burden, not the impossibility of doing so. 510 U.S. at 590. The Court goes on to explain that, where a defendant's use is significantly transformative, there is no presumption of market harm. *Id.* at 591. We therefore agree with the Restatement that the above *Campbell* "statement may best be read as providing a prediction, i.e., that a defendant would be unlikely to prevail without favorable evidence on the fourth factor, rather than stating a legal requirement, i.e., that a defendant must always present favorable evidence on the fourth factor in order to prevail." RESTATEMENT OF THE LAW, COPYRIGHT § 6.12 cmt. p.

We recognize that a few pages later the *Campbell* Court says that "it is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense, 2 Live Crew, to summary judgment." 510 U.S. at 594. But the Court made that statement in the context of the particular derivative market at issue, namely nonparody rap versions of the original rock song, that plausibly could have been harmed by the defendant's parody rap version. *See id.* at 593–94. Because Plaintiffs identify *no* protectible markets for derivative works, this discussion from *Campbell* is inapposite.

In summary, Plaintiffs do not challenge the district court's conclusion that Defendants' use is not a market substitute for the Funeral Video itself. And although Plaintiffs argue that the district court failed to hold Defendants to their evidentiary

burden regarding derivative market harm, Plaintiffs have not identified any protectible derivative markets.  Moreover, the available evidence tends to confirm that Defendants' use has not harmed any such markets.

## C

After consideration of each factor, "the results [are to be] weighed together, in light of the purposes of copyright."  *Warhol*, 598 U.S. at 551 (quoting *Campbell*, 510 U.S. at 578).  Here, that weighing is straightforward because all four factors point with force in the same direction: fair use.[18]

---

[18]  Even if, contrary to our conclusion, one could infer market harm from the fact that Defendants paid Mr. Exotic and Mr. Lowe to license the footage such that the fourth factor weighed slightly against fair use, that would not overcome the other three factors in this case, which weigh strongly in favor of fair use.  *See Bouchat*, 737 F.3d at 949 (noting that the fourth fair-use factor "standing alone is neutral," but "reiterat[ing] that although the district court made no findings regarding the existence of a licensing market for historical logos, findings in Bouchat's [the plaintiff's] favor on this point would be insufficient to overcome the substantial weight of the first three factors" (citation omitted)); *Red Label Music Publ'g*, 388 F. Supp. 3d at 989 n.5 ("Even assuming for the sake of argument that factor four weighed in the plaintiffs' favor, it would still be insufficient to overcome the substantial weight of the other factors."); *see also Wright v. Warner Books, Inc.*, 953 F.2d 731, 740 (2d Cir. 1991) ("The fair use test remains a totality inquiry, tailored to the particular facts of each case.  Because this is not a mechanical determination, a party need not 'shut-out' her opponent on the four factor tally to prevail."); RESTATEMENT OF THE LAW, COPYRIGHT § 6.12 cmt. r (noting that *Campbell* "[a]pparently abandon[ed] the idea that any factor enjoys primacy" and that "the connection between the fourth statutory factor and the first, second, and third . . . counsels that it is not the fourth factor, as such, that is fundamental, but rather the market-substitution inquiry that bears on each of these factors").

**VI**

For the foregoing reasons, we **AFFIRM** the district court's summary judgment order.[19]

---

[19]    The Joint Motion to Seal Limited Portions of Appellants' Appendix—which the Clerk of Court provisionally granted on September 29, 2022, subject to final determination by the merits-panel—is **GRANTED**. Appellants' Appendix, Volume IX, shall remain sealed. We are satisfied that the parties "articulate a real and substantial interest that justifies depriving the public of access to the records that inform[ed] our decision-making process." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1135–36 (10th Cir. 2011).