No. 22-6086
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

WHYTE MONKEE PRODUCTIONS LLC, TIMOTHY SEPI,

Plaintiff-Appellants,

v.

NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,

Defendant-Appellees.

On Appeal from the United States District Court
for the Western District of Oklahoma
No. 5:20-cv-00933-D
Hon. Timothy D. DeGiusti, United States District Judge
_____

APPELLANTS' BRIEF
_____

[Oral Argument Requested]

Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew@DigitalJusticeFoundation.org

*Attorney for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Appellate Rule 26.1(a), Plaintiff-Appellant Whyte Monkee

Productions LLC ("WMP") discloses as follows:

1. WMP has no parent corporation.

2. No publicly held corporation owns 10% or more of the stock issued by WMP.


Date: September 29, 2022                    Respectfully submitted,

                                           */s/ Andrew Grimm*
                                           Andrew Grimm

                                           *Attorney for Appellants*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF AUTHORITIES .................................................... vi

STATEMENT OF RELATED CASES ..................................................x

JURISDICTIONAL STATEMENT ...................................................1

RELEVANT STATUTORY PROVISIONS ............................................2

STATEMENT OF ISSUES .........................................................6

INTRODUCTION AND STATEMENT OF THE CASE.........................7

SUMMARY OF ARGUMENT ...................................................16

STANDARD OF REVIEW .......................................................17

ARGUMENT .....................................................................18

    I.    THE DISTRICT COURT ERRED ON FAIR USE. ........................................18

        A.    The District Court only decided fair use as to one of eight works and entirely overlooked the most significant use of that work, *i.e.*, streaming.............................................18

        B.    Under the statutory fair-use factors, the streaming use overlooked by the District Court is unfair and contrary to the purposes of copyright................................................23

            i.    Factor 1: Widespread, commercial use .........................23

            ii.    Factor 2: Unpublished, artistic, personal work...............32

            iii.    Factor 3: Heart of the work taken by competitor ...........38

            iv.    Factor 4: Licensing value to the work undermined ........43

C.    Beyond the statutory fair-use factors, two case-specific factors overlooked by the District Court demonstrate that the uses here were unfair..................................................48

      i.    Attribution: No credit given to known creator ..............50

      ii.    Compensation: No offer of licensing fee to creator .......54

D.    This Court could remand for consideration of the streaming use of the eighth work and, if it reverses on authorship, should remand for the other works as well. ..............................58

II.    THE DISTRICT COURT ERRED ON AUTHORSHIP. ...................................63

A.    Even adopting the deposition testimony most favorable to Defendants to avoid the sham-affidavit concerns, the record still supports reversal. ...............................................63

B.    There is no dispute that Mr. Sepi is the actual creator, so he is the legal author unless the seven works were made within the scope of his employment as a cameraman for the tours at the park..........................................................................65

C.    Mr. Sepi's scope of employment as a tour videographer did not extend to cinematography and film editing conducted on his own time outside of tours. ...................................66

      i.    Kind of Work: Film editing and cinematography, not tour videography...........................................................67

      ii.    Hours and Location: Lived on park premises and paid $150/week...................................................................69

      iii.    Purpose of work: Further significant creative ambitions, like Appellees ...............................................73

CONCLUSION ............................................................................74

ORAL ARGUMENT STATEMENT ....................................................75

CERTIFICATE OF COMPLIANCE.....................................................76

ADDENDUM OF ORDERS & OPINIONS ..........................................................77

| ADDENDUM CONTENTS | | | |
|---|---|---|---|
| _ECF_ | _Date_ | _Description_ | _Page_ |
| 57 | Apr. 27, 2022 | Order Granting Summary Judgment | Add. 1 |
| 58 | Apr. 27, 2022 | Judgment | Add. 35 |

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

ABC, Inc. v. Aereo, Inc.,
573 U.S. 431 (2014)....................................................................................21

Agee v. Paramount Communs., Inc.,
59 F.3d 317 (2d Cir. 1995). ........................................................................35

Am. Geophysical Union v. Texaco Inc.,
60 F.3d 913 (2d Cir. 1994). ................................................................. 54, 61

Andy Warhol Found. for the
Visual Arts, Inc. v. Goldsmith,
11 F.4th 26 (2d Cir. 2021). ........................................ 24, 29, 47, 48, 51, 57, 62

Authors Guild v. Google, Inc.,
804 F.3d 202 (2d Cir. 2015). ......................................................................29

Authors Guild, Inc. v. HathiTrust,
755 F.3d 87 (2d. Cir. 2014). .......................................................................56

Bleistein v. Donaldson Lithographing Co.,
188 U.S. 239 (1903)....................................................................................41

Bouchat v. Baltimore Ravens Ltd. P'ship,
737 F.3d 932 (4th Cir. 2013). .....................................................................48

Brammer v. Violent Hues Prods., LLC,
922 F.3d 255 (4th Cir. 2019). .............................................. 25, 36, 38, 42, 50

Cambridge Univ. Press v. Patton,
769 F.3d 1232 (11th Cir. 2014). ..................................................................54

Campbell v. Acuff-Rose Music, Inc.,
510 U.S. 569 (1994).................................... 23, 24, 27, 28, 29, 36, 38, 51, 54

Chambers v. Green-Stubbs,
2021 U.S. Dist. LEXIS 7575 (N.D. Miss. Jan. 12, 2021). ...........................35

Chegup v. Ute Indian Tribe of the Uintah & Ouray Reservation,
28 F.4th 1051 (10th Cir. 2022). ...................................................................58

vi

Cmty. for Creative Non-Violence v. Reid,
    490 U.S. 730 (1989)......................................................66

Cooper v. NCS Pearson, Inc.,
    733 F.3d 1013 (10th Cir. 2013). ....................................17

De Fontbrune v. Wofsy,
    39 F.4th 1214 (9th Cir. 2022). .......................... 24, 28, 30

Dr. Seuss Enters., L.P. v. ComicMix LLC,
    983 F.3d 443 (9th Cir. 2020). ........................... 27, 28, 29, 43, 44, 46, 47, 48

Easter Seal Soc'y for Crippled Children
    & Adults of La., Inc. v. Playboy Enters.,
    815 F.2d 323 (5th Cir. 1987). ........................................70

Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.,
    194 F.3d 1211 (11th Cir. 1999). ............................... 32, 33

Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,
    499 U.S. 340 (1991).................................................. 13, 68

Fin. Info., Inc. v. Moody's Investors Serv.,
    751 F.2d 501 (2d Cir. 1984). .........................................49

Fogerty v. Fantasy, Inc.,
    510 U.S. 517 (1994).......................................................55

Fox News Network, LLC v. TVEyes, Inc.,
    883 F.3d 169 (2d Cir. 2018). .........................................24

Gaiman v. McFarlane,
    360 F.3d 644 (7th Cir. 2004). ........................................70

Golan v. Holder,
    565 U.S. 302 (2012).......................................................56

Harper & Row, Publrs. v. Nation Enters.,
    471 U.S. 539 (1985)............................................ 25, 39, 48, 49, 60

Iowa State Univ. Research Found., Inc. v. American Broad. Cos.,
    621 F.2d 57 (2d Cir. 1980). ...........................................39

Kelly v. Arriba Soft Corp.,
    336 F.3d 811 (9th Cir. 2003). ........................................41

L.A. News Serv. v. KCAL-TV Channel 9,
    108 F.3d 1119 (9th Cir. 1997). ...................................................... 54, 57

Law Co. v. Mohawk Constr. & Supply Co.,
    577 F.3d 1164 (10th Cir. 2009). .................................................64

Marcus v. Shirley Rowley an Diego Unified Sch. Dist.,
    695 F.2d 1171 (9th Cir. 1983). ...................................................51

Midlevelu, Inc. v. ACI Info. Grp.,
    989 F.3d 1205 (11th Cir. 2021). .................................................51

Mirage Editions, Inc. v. Albuquerque A.R.T. Co.,
    856 F.2d 1341 (9th Cir. 1988). ...................................................20

Monge v. Maya Magazines, Inc.,
    688 F.3d 1164 (9th Cir. 2012). ...................................................44

Nunez v. Caribbean Int'l News Corp.,
    235 F.3d 18 (1st Cir. 2000). ................................................. 50, 51

NXIVM Corp. v. Ross Inst.,
    364 F.3d 471 (2d Cir. 2004). .....................................................31

Pauna v. Swift Transp. Co of Ariz. LLC,
    2022 U.S. App. LEXIS 6381 (10th Cir. Mar. 11, 2022). ...........................66

Rogers v. Koons,
    960 F.2d 301 (2d Cir. 1992). .....................................................38

Shockley v. Svoboda,
    342 F.3d 736 (7th Cir. 2003). ....................................................68

Sinclair v. Am. Media, Inc.,
    2018 U.S. Dist. LEXIS 154116 (S.D.N.Y. Sept. 7, 2018). .......................57

SunTrust Bank v. Houghton Mifflin Co.,
    268 F.3d 1257 (11th Cir. 2001). ......................................... 25, 26, 27

United States v. Suggs,
    998 F.3d 1125 (10th Cir. 2021). ........................................... 58, 61

Williamson v. Pearson Educ., Inc.,
    2001 U.S. Dist. LEXIS 17062 (S.D.N.Y. Oct. 19, 2001). ......................50

Zomba Enters. v. Panorama Records, Inc.,
    491 F.3d 574 (6th Cir. 2007). ............................................. 25, 26

## Statutes

17 U.S.C. § 101. ............................................................. 12, 20, 33, 34, 65

17 U.S.C. § 106. .................................................................... 20, 60

17 U.S.C. § 107. .............................................................. 23, 27, 38, 44

17 U.S.C. § 1201. ......................................................................... 34

17 U.S.C. § 1202. ......................................................................... 52

17 U.S.C. § 201. .......................................................................... 65

## Other Authorities

"Chasing TikTok Dreams in the 'New Black Hollywood,'"
The New York Times, (June 2, 2021). ...........................................39

Aegidius, Andreas L., The Music Streaming Metaphor
and its Underlying Tangle of Transcodes,
19 Population Communications (2021)...........................................34

Documentary Filmmakers' Statement of Best Practices in Fair Use,
Association of Independent Video and Filmmakers (2005)..........................52

Levendowski, A., Using Copyright to Combat Revenge Porn,
3 N.Y.U. J. Intell. Prop. & Ent. L. 422 (2014). ...........................................37

## Treatises

GOLDSTEIN ON COPYRIGHT................................................... 25, 38, 55, 56

NIMMER ON COPYRIGHT. ..................................................... 38, 48

RESTATEMENT (SECOND) OF AGENCY. ..................................................66

## STATEMENT OF RELATED CASES

To the knowledge of undersigned counsel, there are no prior or related

appeals.

/s/ Andrew Grimm
Andrew Grimm

# JURISDICTIONAL STATEMENT

(A) This appeal concerns claims of copyright infringement.  1 App. 126-131.[1]  The District Court had exclusive federal-question jurisdiction.  28 U.S.C. §§ 1331 (federal-question jurisdiction), 1338(a) (exclusive federal jurisdiction over copyright claims).

(B) The District Court entered final judgment below.  Add. 35.  This Court has appellate jurisdiction.  28 U.S.C. § 1291.

(C) The District Court entered judgment on April 27, 2022.  Add. 35.  Notice of appeal was timely filed on May 26, 2022.  8 App. 280; Fed. R. App. P. 4(a)(1)(A).

(D) This appeal is from a final judgment.  Add. 1-34 (order granting summary judgment); Add. 35 (judgment).

---

[1] The Appellants' Appendix is cited as follows: "1 App. 126-131" cites pages 126-131 of Volume I.  The Addendum of Opinions and Orders is cited as follows: "Add. 5" cites page 5 of the Addendum, *infra*.

Unless otherwise indicated, all emphasis is supplied, internal footnotes and quotations are usually omitted, all internal brackets are omitted, and all statutory references are to Title 17 of U.S. Code.

# RELEVANT STATUTORY PROVISIONS

- Section 101 of Title 17 of United States Code reads, in pertinent part:

## § 101. Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

[….]

A "work made for hire" is—

    **(1)** a work prepared by an employee within the scope of his or her employment; or

    **(2)** a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

[….]

- Section 106 of Title 17 of United States Code reads:

**§ 106. Exclusive rights in copyrighted works**

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

- Section 107 of Title 17 of United States Code reads:

### § 107. Limitations on exclusive rights: Fair use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

- Section 201 of Title 17 of United States Code reads, in pertinent part:

**§ 201. Ownership of copyright**

**(a) Initial ownership.** Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are co-owners of copyright in the work.

**(b) Works made for hire.** In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

[….]

# STATEMENT OF ISSUES

**I.**    <u>**Fair Use**</u>: Whether unauthorized, vast nationwide distribution of copyrighted works for commercial advantage by a large corporate entity, without any compensation or attribution to the original creator, is a fair use.

**II.**    <u>**Authorship**</u>: Whether the undisputed creator of copyrighted works is the legal author of those works (the default rule) or not (as a work made for hire).  Here, this question turns on:

    **A.**    Whether these creations were among the kinds of work the creator was employed to do.

    **B.**    Whether these creations were made during work hours and on work premises.

* * * * *

Both issues were pressed and passed upon below.[2]

---

[2] Authorship was disputed at summary judgment.  1 App. 169-175 (MSJ); 4 App. 28-33 (Opp.).  Fair use was too.  1 App. 177-182 (MSJ); 4 App. 34-42 (Opp.).  The District Court ruled upon both issues.  Add. 12-25 (authorship); Add. 27-34 (fair use).  Both issues are ripe for review.

## INTRODUCTION AND STATEMENT OF THE CASE

He was a "documentarian's dream."

Joe Exotic, also known as the Tiger King, was a volatile megalomaniac. He was also "an incredibly funny, eccentric, charismatic character who wore his heart on his sleeve." He was "deeply narcissistic and desperate to become famous." 3 App. 237 ¶ 10.

Joe Exotic featured himself in mockery-worthy music videos, presidential runs, and a regular series of skits. Yet, it wasn't just Joe Exotic the person that was so compelling. It was his entire milieu—with a park full of big cats, two husbands, automatic rifles pointed everywhere, drugs flowing freely, and longstanding feuds with competitors like Carole Baskin.

And he wasn't camera shy. He loved to be on camera. In short, he was content gold.

Joe Exotic was so compelling that a film-production company that had originally intended to make a show about exotic reptiles or big cats, dropped everything to make a show about him the moment they met him. In turn, this production company, Royal Goode Productions LLC, later released a reality-show-like, true-crime series about Joe Exotic, called "Tiger King," via Netflix, Inc.'s streaming platform.

It was an overnight smash hit.  The salacious material and compelling character of Joe Exotic captured the attention of an America stuck at home on pandemic lockdown.

Yet, Royal Goode didn't make all the material that it used.  Some, it filmed itself.  Some, it took from Joe Exotic.  Some, it took without permission from a creatively-oriented park employee, Timothy Sepi, who liked to produce footage— just like Royal Goode did.

The footage taken from Mr. Sepi—without his permission, without paying him anything, and without giving him any credits in the film—are the subject of this appeal.  Critically, for the footage taken from Mr. Sepi, no one has ever disputed that Mr. Sepi did, in fact, create this footage and edit it to his liking.  Mr. Sepi filmed this footage personally.

And, Royal Goode and Netflix exploited Mr. Sepi's footage to generate some of the most memorable scenes in "Tiger King" itself.  If Joe Exotic was content gold, Mr. Sepi polished that gold.  He had a way of capturing the Tiger King in his wildest antics, *i.e.*, at his most entertaining.

When Mr. Sepi was refused reasonable compensation and credit for the widespread use of eight works he had created, he sued for their unauthorized use.  Royal Goode and Netflix didn't dispute that they had used, quite successfully, eight works Mr. Sepi had personally created—because they couldn't.

Instead, their response as to seven of the eight works was that Mr. Sepi's employment as a photographer and videographer for the park _tours_ meant that he did not own _any_ of the videos he created at the park where he lived and worked, _regardless of their relation to park tours_.

For the eighth work that was indisputably made after Mr. Sepi left employment with the park, they argued that it was _fair_ for them to use Mr. Sepi's footage for free and without credit. It was fair, they argued, to show his footage of a funeral in the most commercial manner online while never paying him a penny or giving an ounce of credit.

Boiled down to their essential elements, these arguments don't add up. It's not fair for one of the world's largest media companies to take an aspiring creator's footage without compensation, without credit, without his permission, and then use it in the most commercial manner. Rather, refusing to reasonably license the works or give any credit in that situation signals bad faith. It is deeply unfair to Mr. Sepi.

As for legal authorship, Netflix and Royal Goode are making what is essentially a pragmatic argument: if not for his employment, _why_ would Mr. Sepi make this footage? They suggest that, but-for Mr. Sepi being an employee, it's inconceivable that Mr. Sepi would follow Joe Exotic around with a camera and film him and his antics.

Their argument is superficially appealing.

Yet, their point is readily answered. Mr. Sepi, who aspired to success in media and had had his own podcast, was making footage on his own time *for the same reasons that Royal Goode was*: Joe Exotic was content gold. Royal Goode dropped everything to film Joe Exotic—and millions tuned in to follow his antics. That alone is strong proof that, no, it's not beyond the pale that someone would want to film Joe Exotic when they're not working for the park. That's exactly what Royal Goode did.

Regardless, their employment argument requires one to adopt highly unlikely inferences *against* Mr. Sepi at summary judgment:

- That photography, videography, cinematography, and film editing are all one job—unlike how Royal Goode and much of the film-production industry structures itself.

- That, although he was paid just $150/week and given sub-standard corporate housing in a trailer, Mr. Sepi was on the job around the clock for all the skilled roles needed to capture, edit, and finalize compelling footage.

- That, although Mr. Sepi was hired specifically for park-tour photography and videography at a rate of $150/week, he was the park's auteur.

None of these are reasonable assumptions.

Furthermore, it's understandable that the District Court was upset that Mr. Sepi was inconsistent between his 2016 and 2021 depositions. And, a jury should hear about those inconsistencies. Yet, it's worth noting that the world of "Tiger King" was not just entertainment for Mr. Sepi: he lived there in the crosshairs among volatile figures who waved guns wildly while high on drugs, who threatened to murder him, who are now in federal penitentiary for conspiracy to commit murder, and who are rumored to have murdered their own husband, *i.e.*, feeding him to a tiger.

Lying under oath is a huge deal. But, if you live on a volatile site where guns were pointed at you, where park owners threatened to murder you, and where murders *were* planned, you'd be very careful about things you said that might set someone off.

Ultimately, the untruthful aspects of Mr. Sepi's deposition testimony are a distraction from this case, however. Even if you adopt the position that Mr. Sepi knew nothing about the company he incorporated, knowledge of a separate company doesn't change his scope of employment for the park. Also, whether Mr. Sepi was a *tour* photographer or a *tour* videographer, none of the footage at issue in this case is *tour* footage.

This Court should reverse and remand.

* * * * *

11

Despite the prominence of "Tiger King," this copyright dispute is in many respects a relatively simple dispute. Add. 12 ("straightforward").

There are eight audiovisual works[3] at issue. Add. 2. There is no serious dispute that Plaintiff-Appellant Timothy Sepi personally created all eight of these works. Add. 4-6. There is also no serious dispute that Defendant-Appellee Royal Goode Productions, LLC ("RGP") copied portions of these eight audiovisual works into a separate audiovisual work that RGP then displayed as its own, called "Tiger King." Add. 6-7.

Furthermore, there is no dispute that Defendant-Appellee Netflix, Inc., along with RGP, released "Tiger King," including the portions taken from Mr. Sepi's eight audiovisual works, onto Netflix's streaming platform—and that millions tuned in to watch. Add. 1; 1 App. 128 ¶ 17 ("over 34 million viewers" in the first 10 days").

Therefore, much of the copyright-infringement claims in suit have been essentially conceded and aren't reasonably debatable. Yet, two issues—an aspect of the first element of copyright infringement and an affirmative defense—are sharply contested.

---

[3] The term "audiovisual works" is a defined term in copyright. §101 (defining "Audiovisual works").

Copyright infringement has "two elements": "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Here, the *second element* of infringement is largely established. There's no question that RGP and Netflix copied from these eight videos rather than originally creating the footage themselves. Add. 6-7.

Furthermore, although RGP and Netflix challenged the originality of the works in question below, the District Court rejected those arguments as to one of the works. Add. 25-27. That issue is not on appeal. Nor is it likely to be a remaining issue in this case: the District Court rejected the originality challenge for the very work where it might have had the most hope, and the District Court did so rightfully. See id.

That's because the standard for an originality challenge is quite high. Feist, 499 U.S. at 345 ("The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be."). Defendants don't approach this very high bar for an originality challenge because the footage is original.

Ultimately, the second element of copyright infringement is not at issue in this appeal. Instead, the gravamen of the current dispute is a portion of the first element and an affirmative defense.

RGP and Netflix assert that, although Mr. Sepi is indisputably the person who actually created the works at issue, the legal author of the works was his former employer.  1 App. 169-176.  Accordingly, they argue, Mr. Sepi does not own the works and cannot sue for copyright infringement of them.  1 App. 169-175.  Mr. Sepi disputes that the works were owned by his former employer, the park, because their creation was not within the scope of his employment with the park.  4 App. 28-33.

Mr. Sepi did not dispute that he was employee below, but he did dispute that his scope of employment (for the tours that ran twice a day) covered him every hour of every day.  There are five key facts related to the scope of employment here:

- Prior to working at the park, Mr. Sepi spent time in Florida doing podcasting work for which he was not paid.  9 App. 21-25.

- Mr. Sepi was paid to work on the tours.  Add. 4-5.

- Mr. Sepi was paid just $150 per week.  Add. 5.

- Mr. Sepi lived at the park "rent-free" and "used the Park's studio and equipment" as a perk.  Add. 5.

- Mr. Sepi personally created the videos in question.  Add. 6-7.

Those key aspects of this case tellingly indicate that Mr. Sepi was not an employee employed to make the works in question.

Furthermore, the Parties disputed and the District Court ruled upon RGP and Netflix's argument that it was fair to Mr. Sepi to take his work without his consent, pay him nothing, give him no credit, and distribute his video of a funeral nationally to millions in the most commercial manner. 1 App. 177-182 (MSJ); 4 App. 34-42 (Opp.); Add. 27-34 (fair use).

These two issues—legal authorship and the affirmative defense of fair use—are the issues on appeal.

# SUMMARY OF ARGUMENT

I.  The massively commercial streaming use of the funeral video without compensation, without credit, and without authorization is deeply unfair. It's not a fair use—as all four statutory factors and two case-specific factors weigh against fairness. First, the streaming use is as commercial as it gets and is not transformative because the use makes no commentary upon the work itself. Second, the work was not published, is not factual, and is personal in nature, *i.e.*, a funeral video. Third, the heart of the work was taken. Fourth, there was no showing below, on this affirmative defense, of a lack of market harm. Fifth, the lack of attribution, *i.e.*, credit, to the actual creator is deeply unfair and wholly unjustified given that Mr. Sepi was the known creator here. Sixth, the lack of any attempt to pay for a license from Mr. Sepi is also unfair. Put simply, this is not a fair use.

II. The legal-authorship determinations below were error. Mr. Sepi's line of work was tour photography and videography, but the works in question are not related to tours, are not videography but cinematography, were not made during working hours, and were made at his home as well as his workplace. There are at least genuine issues of material fact on this issue.

## STANDARD OF REVIEW

The standard of review for all issues in this appeal is de novo.  <u>E.g</u>, <u>Cooper</u> <u>v. NCS Pearson, Inc.</u>, 733 F.3d 1013, 1016 (10th Cir. 2013).

# ARGUMENT

## I. THE DISTRICT COURT ERRED ON FAIR USE.

### A. The District Court only decided fair use as to one of eight works and entirely overlooked the most significant use of that work, *i.e.*, streaming.

Below, the District Court decided disputed questions of authorship, Add. 12-25, <u>see</u> Section II, *infra*; questions of originality not on appeal, Add 25-27; and questions of fair use, Add. 28-34.

Fair use asks whether the Defendants' various uses were fair to Mr. Sepi. The District Court held that they were. Add. 34. Three aspects of its decision are noteworthy:

(1) The District Court decided the question of fair use as to only *one of the eight* works at issue, not deciding the rest.

(2) The District Court decided fair use with respect to only *one of the types of uses* at issue, ignoring the biggest use.

(3) The District Court *never weighed the fair-use factors* because it held that all four factors weighed one way.

Each is discussed in turn.

***First***, the District Court only ruled on fair use for one work.

The District Court prudently recognized that it had held that "seven of the videos are works for hire with authorship vesting in Mr. Sepi's employer," *not* Mr. Sepi.  Add. 28.

Accordingly, and at that point, it was "not necessary" to determine an affirmative defense (fair use) because the District Court had already determined that an element of a copyright-infringement claim (ownership) was unmet for seven of the eight works.  Add. 28.

It was "only necessary" for the District Court to decide fair use for the "remaining video" that Mr. Sepi indisputably owned, *i.e.*, the motion picture[4] that was created by Mr. Sepi after his employment and that depicts the funeral of Joe Exotic's late husband ("Funeral Film").  Add. 12-25.

In short, fair use has not been decided for seven of the eight copyrighted works at issue in this case.  <u>See</u> Section II, *infra*.  It was only decided as to one of them, the Funeral Film.

**_Second_**, the District Court's analysis of fair use overlooked the biggest use entirely.

---

[4] Motion picture is a defined term in copyright.  §101 (defining "Motion pictures").

Because it's a fair-_use_ analysis, being clear about the _use_ at issue is essential. Here, there are _two_ distinct types of uses that implicate different exclusive rights. As factually and legally different uses, a fair-use decision as to one use does not necessarily decide fair use as to the other.

There's the _derivative_ use.

A derivative work is "a work based upon one or more preexisting works[.]" §101 (defining "derivative work"); §106(2) (exclusive right to "to prepare derivative works").

Defendants, particularly Royal Goode, made a derivative use of the works when they "incorporate[d] a portion" of preexisting works into "Tiger King." See, e.g., Mirage Editions, Inc. v. Albuquerque A.R.T. Co., 856 F.2d 1341, 1344 (9th Cir. 1988); Add. 1 (noting that Defendants incorporated "clips" from the works into "Tiger King").

There's also the _public-performance_ use.

To "perform" a work means to "show its images [.]" §101 (defining "perform"). To perform it "publicly" means to "transmit […] to the public by means of any device or process[.]" §101 (defining "publicly"); §106(4) (exclusive right "to perform the copyrighted work publicly").

Defendants, particularly Netflix, are still making public-performance uses at massive scale as they transmit the videos to millions via their streaming platform.

See, e.g., ABC, Inc. v. Aereo, Inc., 573 U.S. 431, 448 (2014) ("[T]he subscribers to whom Aereo transmits television programs constitute 'the public.'"); Add. 6 (released on Netflix in "March 2020").

The District Court's analysis, however, only focused on one of these types of uses, *i.e.*, the <u>*derivative*</u> uses.  By contrast, the District Court largely ignored the public-performance uses.  <u>See</u> Add. 29-34 (no mention of online streaming to millions).

Indeed, one would read the District Court's analysis of fair use in vain to find any mention of the salient facts relating to the public-performance use.  A reader would have little idea how the public-performance uses (online broadcast to millions) affected the fair-use analysis.  <u>See</u> Add. 29-34.

That's a big omission.

After all, this dispute did not arise because a small film-production company put clips in videos.  Instead, it arose because of wholly unauthorized streams of someone else's works to untold millions.  <u>Cf.</u> 1 App. 128 ¶ 17 ("over 34 million viewers" in first 10 days").

<u>*Third*</u>, the District Court never weighed the fair-use factors because it held that the factors all went one way.

To the District Court, each of the fair-use factors favored Defendants. Add. 28-30 (first factor), Add. 31 (second factor), Add. 31-32 (third factor), Add. 32-34 (fourth factor).

Accordingly, the District Court did not weigh the factors against each other because it didn't need to in light of its views that all four statutory fair-use factors went in the same direction. Add. 28-34. Thus, if this Court thinks that the District Court erred with respect to any of the factors, a weighing of the factors would then be appropriate.

Moreover, the District Court's fair-use analysis did not consider any equitable or fairness considerations beyond the four enumerated but non-exclusive statutory factors. Add. 27-34; §107 (illustrative, not exhaustive, list of statutory factors).

\* \* \* \* \* \*

The District Court decided fair use as to one work, for one type of use, without considering aspects of fairness beyond the four enumerated statutory fair-use factors.

**B.** **Under the statutory fair-use factors, the streaming use overlooked by the District Court is unfair and contrary to the purposes of copyright.**

The District Court erred with respect to each of the statutory fair-use factors.

      i.      <u>Factor 1: Widespread, commercial use</u>

The first fair-use factor examines the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes[.]" §107(1). This first factor also asks a court to determine whether "the new work is 'transformative.'" <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 579 (1994).

Below, the District Court determined that the first factor weighed in favor of fair use. Add. 28-30. Specifically, the District Court determined that Mr. Sepi's copyrighted work was not "exploited for commercial gain" by Defendants. Add. 30. Further, it determined that Defendants' use of Mr. Sepi's copyrighted work was "transformative." Add. 30. It therefore found that the first factor supported fair use.

On this factor, the District Court made two fundamental mistakes. First, the District Court overlooked Defendants' widespread streaming to millions occurred on Netflix's for-profit streaming platform. That's clearly a heavily commercial use.

Second, the District Court misconstrued the meaning of "transformative" by adopting a problematically capacious understanding of that term while ignoring an important limiting principle. Specifically, the District Court ignored the limiting principle that transformative-use doctrine permits "the use of some elements of a prior author's composition to create a new one" _only_ where the defendant's work "at least in part, _comments on that [original] author's works_." Campbell, 510 U.S. at 580.

**_First_**, the District Court overlooked the heavily commercial nature of Defendants' streaming use.

Section 107 "specifically directs courts" to examine whether the use was of a commercial nature. Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith, 11 F.4th 26, 44 (2d Cir. 2021) (citing §107(1)). It is widely acknowledged that a commercial use tilts the first factor _against_ fair use:

- "Commercial use 'tends to weigh against a finding of fair use.'" De Fontbrune v. Wofsy, 39 F.4th 1214, 1224 (9th Cir. 2022) (quoting Campbell, 510 U.S. at 585).

- "The commercial nature of a secondary use weighs against a finding of fair use." Fox News Network, LLC v. TVEyes, Inc., 883 F.3d 169, 178 (2d Cir. 2018).

- "The 'commercial nature' of a defendant's use will weigh against a finding of fair use." Paul Goldstein, GOLDSTEIN ON COPYRIGHT §12.2.2.1 at 25.

As the Supreme Court has stated, "the crux of the profit/nonprofit distinction is [...] whether the user **stands to profit** from exploitation of the copyrighted material without paying the customary price." SunTrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1269 (11th Cir. 2001) (quoting Harper & Row, Publrs. v. Nation Enters., 471 U.S. 539, 562 (1985)); Brammer v. Violent Hues Prods., LLC, 922 F.3d 255, 265 (4th Cir. 2019) ("**stands to profit**").

Here, there's no question Defendants stood to profit—*and did profit*—from their streaming uses. Thus, Defendants' streaming use of Mr. Sepi's work is decidedly commercial, tilting the first factor against fair use. Defendants profited immensely from the commercial exploitation of Mr. Sepi's work by engaging in the nationwide, ongoing public performance of this work to millions of paying subscribers of Netflix's for-profit streaming platform.

That's about as commercial as it gets.

Indeed, Mr. Sepi' copyrighted work was publicly performed "by a for-profit corporation that has decided to **maximize its profits . . . by declining to pay**" the copyright holder. Zomba Enters. v. Panorama Records, Inc., 491 F.3d 574, 583 (6th Cir. 2007). Defendants' streaming use is a textbook commercial use.

Nevertheless, the District Court concluded that Defendants' use of clips from Mr. Sepi's video was not "for commercial gain." Add. 30. Arguably, RGP's mere inclusion of Mr. Sepi's Funeral Film in a derivative work as part of a private film-production process is less commercial.

Yet, the District Court seems to have entirely overlooked the _streaming_ use. The streaming use of Mr. Sepi's Funeral Film _is_ a deeply commercial exploitation of Mr. Sepi's exclusive rights under Section 106(5). This streaming use was quite plainly for Defendants' "commercial gain" such that Defendants "stood to profit." Indeed, if this streaming use is not a commercial use, it's hard to imagine what would be.

Importantly, Defendants made this commercial exploitation at a staggering scale, publicly performing Mr. Sepi's intellectual property to tens of millions of Defendants' paying subscribers. There's no serious question as to commerciality of this vast, ongoing streaming use.

In sum, this work "was performed on a profit-making basis by a commercial enterprise." See Zomba, 491 F.3d at 583. Thus, "the use is commercial in nature, a fact militating against its fair-use defense." See id. The fact that Defendants performed Mr. Sepi's copyrighted works "for profit is the first factor weighing against a finding of fair use." See SunTrust Bank, 268 F.3d at 1269.

This rampant commercial exploitation was highly inequitable—done for profit "without paying[.]" See id. Such commercial use weighs heavily against fair use.

Second, the District Court misconstrued the meaning of "transformative" in ruling that Defendants' use was a transformative use. In turn, adopting the District Court's overly broad understanding of transformative use would be deeply problematic.

What constitutes a transformative use is "guided by the examples given in the preamble to § 107[.]" Dr. Seuss Enters., L.P. v. ComicMix LLC, 983 F.3d 443, 452 (9th Cir. 2020). Those preamble examples include "criticism, comment, news reporting, teaching, scholarship, and research[.]" §107. Parodies, for example, fit the bill because they are inherently commentary upon the original work. Dr. Seuss, 983 F.3d at 452 ("The purpose and character of a parody fits squarely into preamble examples.").

Indeed, all the preamble uses fit well within transformative-use doctrine's limiting principle: a transformative use must "at least in part, **comment[] on that [original] author's works**." Campbell, 510 U.S. at 580. Indeed, the very hallmark of a transformative use is that a transformative use comments on the taken work.

By contrast, where "the commentary has *no critical bearing on the substance or style of the original composition*, [...] the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." Campbell, 510 U.S. at 580.

Here, Defendants' unauthorized uses lack the hallmarks of transformative use. Defendants' use makes absolutely no critique or commentary on Mr. Sepi's work. That "**lack of critique** [...] coupled with its commercial use" does "**not** result in a transformative use." See Dr. Seuss, 983 F.3d at 455. Accordingly, this "first factor weighs definitively against fair use." See id.

Nevertheless, the District Court held Defendant's use was transformative because "Defendants' use" of Mr. Sepi's Funeral Film "serves a different purpose than the one Mr. Sepi intended." Add. 29. Yet, the District Court overlooked that "a mere **difference in purpose is not** quite the same thing as **transformation**." De Fontbrune, 39 F.4th at 1225.

The District Court also reasoned that the use was transformative because it "altered its message" and added "new information." Add. 30.

That's legally wrong too.

The District Court's new-content view overlooks that the addition of "new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative." Dr. Seuss Enters., 983 F.3d at 453.

Perhaps most troubling here is the disregard below for transformative use's core limiting principle—*i.e.*, the principle requiring **commentary** upon the taken work. See Campbell, 510 U.S. at 580. Stripped of this limiting principle, the District Court's overly-broad approach to "transformativeness" would prove highly problematic in practice.

Importantly, courts must be cautious to respect transformativeness' key limiting principle. See Authors Guild v. Google, Inc., 804 F.3d 202, 216 n.18 (2d Cir. 2015) (Leval, J.) ("[T]he word 'transformative,' if interpreted too broadly, can also seem to authorize copying that should fall within the scope of an author's derivative rights.").

Examples abound. Consider "a film adaptation of a novel." Andy Warhol Found., 11 F.4th at 39. Or, consider a filmmaker who wants to use a song in her movie. Making such uses ordinarily requires a license or permission from the copyright owner—and common industry practice respects that legal norm. After all, any production company worth their salt would know to clear the rights before placing someone else's song in their feature film—especially if they're distributing that film nationwide to millions of viewers.

By contrast, a failure to properly procure such clearance would present a textbook case of copyright infringement.

Yet, under the District Court's limitless notion of transformative use, it's hard to see how such typical licensing uses wouldn't be swept up into fair use. After all, a director using a song in a film is using the song for a different purpose than the songwriter's original purpose. Add. 29 ("serves a different purpose"). Under the District Court's view of transformativeness, entire licensing markets would evaporate.

Indeed, the capacity of a limitless transformative-use doctrine to decimate licensing markets is why courts have hewed closely to the limiting principle of requiring not merely a *new* use but a new use that *comments* upon the original work. De Fontbrune, 39 F.4th at 1225 (9th Cir. 2022) ("difference in purpose is not quite the same thing as transformation").

Thus, the District Court's approach to transformativeness (if adopted on appeal) would immunize infringers from liability for run-of-the-mill copyright infringements and would also call into question well-established licensing practices throughout the copyright ecosystem.

Ultimately, Defendants' use of Mr. Sepi's work was heavily commercial. Defendants streamed Mr. Sepi's intellectual property to millions of paying customers for their own profit.

And, because this use occurred without commentary *upon the footage itself*, Defendants' streaming use was by no means a transformative as that term is used in copyright. Copyright law has never encouraged parties to "exploit[] a purloined work for free" that could have been licensed through proper channels. <u>NXIVM Corp. v. Ross Inst.</u>, 364 F.3d 471, 478 (2d Cir. 2004).

Given the staggering scale at which Defendant Netflix, one of the largest media companies in the world, commercially exploited Mr. Sepi's work here, there is no equitable excuse for such vast commercial exploitation without payment. The first factor weighs heavily against fair use.

ii.    Factor 2: Unpublished, artistic, personal work

The second fair-use factor examines the "nature of the copyrighted work[.]" §107(2).

The District Court made three errors in its analysis of this factor:

(1) *Publication*: The District Court erroneously said that the Funeral Film is published.

(2) *Artistic Nature*: The District Court erroneously considered the work factual, when it is not.

(3) *Personal Nature*: The District Court erroneously ignored the highly personal nature of the work, *i.e.*, a film of a funeral.

***First***, the District Court held that the Funeral Film was "previously *published*" because it was "livestreamed via YouTube and remained there afterwards[.]"  Add. 31.

This was error.  The Funeral Film was not published in a copyright sense: "in this area of the law the word **'publication' is 'a legal word of art**, denoting a process much more esoteric than is suggested by the lay definition of the term.'" Estate of Martin Luther King, Jr., Inc. v. CBS, Inc., 194 F.3d 1211, 1214 n.3 (11th Cir. 1999) (applying 1909 Copyright Act).

What may be surprising to learn is that even Martin Luther King Jr.'s "I Have a Dream" speech is not published in the copyright sense even though it's one of the most famous and important speeches of all time. Id. at 1217 ("performance, no matter how broad the audience, is not a publication; to hold otherwise would be to upset a long line of precedent."). Publication of a work does not occur simply because the work is publicly accessible.

Rather, traditionally, publication in the copyright sense could occur "*only in two situations*" that indicated the owner's desire to relinquish control over the work to the public. Id. at 1215. The first situation was where the owner distributed "tangible copies of the work" to the public. Id. The second situation was where the work was "exhibited or displayed in such a manner as to permit *unrestricted* copying by the general public[.]" Id.

This traditional understanding of copyright publication has carried forward into the operative statute's definition of publication, that the District Court overlooked:

> "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. **A public performance or display of a work does not of itself constitute publication.**

§101 (defining "Publication").

None of that happened here.

While the YouTube livestream and later posting were a persistent public performance, see §101 (defining "perform" and "publicly"), it is by no means the distribution of tangible objects to the public, see §101 (defining "**copies**" to be "**material objects**").  Posting a video on YouTube is **not** the distribution of any tangible material objects.  Posting a video to YouTube is **not** the offering to distribute any tangible material objects to the public.

Rather, posting to YouTube is just a persistent public performance, which as the statute expressly states is **not** by itself a publication: "*A public performance or display of a work does **not** of itself constitute publication.*" §101 (defining "Publication").  And, all that happened here is a public performance of a copyrighted work.  That's not—and never has been— publication in a copyright sense.

Indeed, YouTube restricts downloads.  See, e.g., Andreas L. Aegidius, The Music Streaming Metaphor and its Underlying Tangle of Transcodes, 19 Population Communications (2021) ("There is no download button or off-line functionality in the YouTube interface[.]").  Downloads from YouTube often involve illegal stream ripping.  Id. ("stream-rip from a prior source"); see also §1201 (copyright's anti-hacking provision).

Therefore, the District Court is emphatically wrong to say that the works were published by being performed on YouTube. Just as the MLK speech is famous but _not_ published in any copyright sense, so too the Funeral Film is in no sense published. See Agee v. Paramount Communs., Inc., 59 F.3d 317, 325 (2d Cir. 1995) (discussing how the closer analog in copyright to publication is distribution of copies and, impliedly, not public performances that give out no tangible object containing the work).

The District Court's reading of publication makes colloquial sense, but it overlooked that, in copyright, publication is a "**term of art**" that is far more concerned with indicia of artistic and authorial relinquishment of control than with whether the public has been able to view the work. See, e.g., Chambers v. Green-Stubbs, 2021 U.S. Dist. LEXIS 7575, *8-10 (N.D. Miss. Jan. 12, 2021) (noting that publication also requires voluntary action by author, such that infringing uses don't constitute publication).

The Funeral Film was not a published work under copyright law's meaning of the term publication.

_**Second**_, the District Court erroneously considered the Funeral Film a factual work because it captures images of reality, _i.e._, of a funeral that actually happened. Add. 31.

Yet, depiction of real events via the camera doesn't make a work factual. Indeed, in the copyright sense, it's not factual at all: "*photographs [and videos] are 'generally viewed as creative*, aesthetic expressions of a scene or image' and have long received ***thick copyright protection*.*" See* <u>Brammer</u>, 922 F.3d at 267. "This is so *even though photographs capture **images of reality***." <u>Id.</u>

Consider, for example, a 1950s Hollywood movie. Everything that's filmed actually occurred: it was acted out by the actors and carefully selected by the directors. The fact that the actors, the set, and the sounds are all in some sense "real" does not take away from its protection. Likewise, the art of portraiture is very artistic even though it involves faithfully reproducing the image of a person through paint.

Moreover, Defendant's own theory on why this use is purportedly transformative undermines their claims about the nature of this work. If Joe Exotic is performing at the funeral as claimed, M.M.7 at 25:00-27:00, then Mr. Sepi was capturing a live performance of a real-life character. Insofar as Mr. Exotic is compelling creative content by an actor, it's artistic and expressive—not factual.

This work is not factual. In copyright, a factual work means one compiled together from preexisting works. <u>Campbell</u>, 510 U.S. at 586 (factual means "bare factual compilations" like databases that use pre-made content.).

***Third***, the District Court overlooked that the Funeral Film was deeply personal in nature.

It's of a funeral, after all. As with a video of a baby shower, a wedding, or a bar mitzvah, the nature of this work is that it is highly personal. Importantly, copyright is "a powerful tool to combat" many types of invasions into personal privacy—and to even get materials taken down when wrongfully uploaded online. Amanda Levendowski, Using Copyright to Combat Revenge Porn, 3 N.Y.U. J. Intell. Prop. & Ent. L. 422, 446 (2014).

In order to play this role, however, fair use has been restricted insofar as the nature of a work is private. See id. Certain kinds of self-photography of the body at the most extreme example should be heavily protected from findings of fair use. Intimate self-photography isn't at issue here, but suppose that a close relative of the deceased wanted the videos of the funeral taken down in a few years.

The District Court's fair-use decision would make it impossible for Mr. Sepi to respect that family member's request. While not dispositive, the private nature of this work—footage of a funeral of a friend—weighs against a finding of fair use that would permit Netflix to use the clip with impunity for perpetuity.

The second factor weighs heavily against fair use for these three reasons.

### iii. Factor 3: Heart of the work taken by competitor

The third fair-use factor concerns "the amount and substantiality of the portion used in relation to the copyrighted work as a whole[.]" §107(3). This factor demands "a determination of not just quantitative, but also *qualitative* substantiality." 4 NIMMER ON COPYRIGHT § 13.05[A][3] (2022). At core, the "key question is whether 'no more was taken than necessary' to accomplish the secondary user's purpose." Brammer, 922 F.3d at 267-268 (4th Cir. 2019) (quoting Campbell, 510 U.S. at 589).

Below, the District Court determined that this factor weighed in favor of fair use. Add. 31-32. Yet, the District Court made several errors, most critically overlooking the qualitative value of what was taken.

*First*, the District Court failed to appreciate that quantity is not dispositive. Add. 32. ("Because Defendants' use of the video comprises a small portion of the original, this factor weighs in favor of fair use.").

A proper analysis of this factor demands a qualitative analysis. Indeed, "[q]ualitative measures *outweigh* quantitative measures in determining the weight to be given the third factor." GOLDSTEIN ON COPYRIGHT §12.2.2 at 56; Rogers v. Koons, 960 F.2d 301, 311 (2d Cir. 1992) ("**Even more critical** than the quantity **is the *qualitative* degree of the copying**[.]").

Qualitative significance explains why, even where defendants have taken very small portions of a plaintiff's work, courts have still found the use to be unfair on this factor.  E.g., Harper & Row, 471 U.S. at 569 (unfair to take "300 words" out of 200,000 words in book).  For example, the Second Circuit found the third factor to weigh against fair use where a defendant had taken a mere 2.5 minutes of a 28-minute film.  Iowa State Univ. Research Found., Inc. v. American Broad. Cos., 621 F.2d 57, 61 (2d Cir. 1980).

That's because quality, not quantity, drives the third factor.  Thus, when the District Court treated the "small portion" taken to be determinative of this third factor, it erred.

Furthermore, it's worth stressing the pragmatic point that this error has real bite here.  After all, the well-established doctrinal principle that quality not quantity drives the third factor has taken on newfound significance in the Digital Age, an age where large media companies chase Internet virality too.  Short, quirky video clips on media platforms like Vine, TikTok, and YouTube going viral are essential to the success of most content.

Indeed, in the twenty-first century's media landscape, "[g]oing viral has become big business."  "Chasing TikTok Dreams in the 'New Black Hollywood,'" The New York Times, (June 2, 2021).

Part of the success of "Tiger King" was that it went viral—quickly reaching millions of viewers and becoming a social-media phenomenon. So, while taking even *short-but-salient* video clips has always mattered doctrinally, pragmatically, short-but-salient video clips have taken on newfound qualitative significance in the Digital Age's social-media environments.

**_Second_**, the District Court overlooked the qualitative significance of the video clip taken. In cursory fashion, the District Court dismissed any qualitative significance by saying "[q]ualitatively, these clips are some of the more *unusual* portions of the video, although they are not *necessarily* the most important." Add. 32.

Of course, the clip here was taken *precisely* because it was unusual—*i.e.*, was notable, compelling, captivating footage. Here, the qualitative value of the works copied in this case is quite high. Many of the clips of Plaintiffs' works used by Defendants are ranked by fans and commentators as some of the best and most interesting scenes in "Tiger King." See, e.g., 8 App. 160-174.

Especially at the summary-judgment posture, it is problematic to take the question of qualitative significance out of the hands of the jury because the significance of the portion taken is an essentially factual determination upon which viewers can reasonably disagree.

That's precisely why it should go to the jury. Long ago, Justice Holmes famously cautioned that "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of" what a copyright defendant took. Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903) (Holmes, J.).

Justice Holmes' pragmatic justification that the judiciary should defer to the "taste of [the] public" imparts a common-sense insight: "That these pictures had their worth and their success is sufficiently shown by the desire to reproduce them without regard to the plaintiffs' rights." Id. at 252.

That's true here. We _know_ that what was taken had qualitative significance not only because it captivated the public and was prominently featured in "Tiger King," but also because Defendants—_professional filmmakers_— deemed it qualitatively valuable enough to steal.

**_Third_**, the District Court failed to consider the possibility that Defendants could have created their own film of the funeral, instead of stealing Mr. Sepi's Funeral Film. At core, this third factor asks whether the Defendant "only copies as much as is necessary for his or her intended use[.]" Kelly v. Arriba Soft Corp., 336 F.3d 811, 821 (9th Cir. 2003).

What is *necessary* to take, and whether a taking of another's work was justified, turns on whether the defendant _could have_ made / used their own work. The third factor "weighs against fair use" when a defendant "could just as easily have accomplished its goal [...] by taking its own" footage.  See Brammer, 922 F.3d at  268.

Here, it was not necessary to take Mr. Sepi's film.  Defendants were well in the midst of filming at the time of the pertinent funeral in 2017 and could have readily taken their own footage.  Thus, for the additional reason that taking this amount was unnecessary, the quantity taken also weighs against fair use because the "small portion" was nonetheless unnecessary to take.

For these reasons, the third factor weighs against fair use.

iv.     Factor 4: Licensing value to the work undermined

For the fourth fair-use factor, it is important to stress that the Supreme Court and other Circuits "**have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use**." Dr. Seuss Enters, 983 F.3d at 459. Thus, it is Defendants—not Mr. Sepi—who are required to "bring forward favorable evidence about relevant markets." Id.

*First*, the District Court declared that "Tiger King is not a substitute for the" Funeral Film. Add. 33. Yet, that's the wrong question. The proper question is whether Tiger King is a substitute for a *derivative use* of the Funeral Film. Indeed, the Ninth Circuit has cautioned that the fourth factor analysis needs to "**address a crucial right for a copyright holder—the derivative works market.**" Dr. Seuss Enters, 983 F.3d at 460 (citing §106(2)'s derivative right).

In other words, one essential question that was nowhere addressed below, is whether there is a market for *derivative uses* of the Funeral Film, *i.e.*, whether there is a potential market for derivative uses of footage of Joe Exotic at his late husband's funeral.

.Given that Joe Exotic is content gold and a documentarian's dream, it's hard to imagine that there was not a market to make derivative uses of the work— at least before the content was streamed nationwide.

Again, it is the Defendants—as the parties bearing the burden of proof on this affirmative defense—who bear the burden on this specific question too. Dr. Seuss Enters., 983 F.3d at 459 (requiring fair-use proponent to "bring forward favorable evidence about relevant markets").

They did not meet their burden and, thus, the District Court erred on this factor.

***Second***, the District Court pointed to Mr. Sepi's subjective purpose at the time of creating the film as foreclosing "any primary market for the work." Add. 33 ("Mr. Sepi filmed this particular video as a means of remembering his friend[.]").

Here, the District Court's analysis commits two missteps.

As an initial matter, the "**potential** market . . . **exists independent** of the [copyright owner]'s present intent." Monge v. Maya Magazines, Inc., 688 F.3d 1164, 1181 (9th Cir. 2012). After all, the "the relevant consideration was the *potential* market[.]" Id.; §107(4) ("**potential** market"). Thus, Mr. Sepi's subjective motivation in creating the Funeral Film, *i.e.*, "as a means of remembering his friend[,]" does not speak to the **potential** market for *uses* of the work—let alone speak to the potential market for *derivative* uses. See Add. 33 (nowhere addressing potential derivative markets).

Beyond that, the District Court's focus on a creator's subjective motivations or purpose in creating a work so as to preclude potential markets would make a mess of copyright law.

After all, there's nothing mutually exclusive about making a work to commemorate or honor a deceased friend and having a potential market for that work. Elton John famously memorialized the late Princess Diana with his rendition of the song "Candle in the Wind."

Elton John's subjective motivation to memorialize Princess Diana didn't somehow foreclose potential markets for uses of the song outside of a memorial, *etc.*, as the District Court's analysis would. Likewise, the writer Mitch Album wrote the book Tuesdays with Morrie, memorializing his late professor and mentor who succumbed to ALS disease. Potential markets did not close for this best seller because Mitch Album might have written the book "as a means of remembering his friend." See Add. 33.

In short, copyright's purpose is not to punish the nobly motivated creator and reward only the money-motivated artist. Indeed, there is nothing unusual about an artist creating a copyrighted work as a means of remembering a deceased friend, while still exploring the potential markets for use of that work.

In sum, the District Court's focus on a creator's subjective purpose at the time of creation in order to determine the "effect on potential markets" under §107(4), is doctrinally wrong and misguided as a policy matter.

***Third***, the District Court determined there would be no adverse effect on the potential market for Mr. Sepi's video because "[p]otential purchasers of the [Funeral Film] or clips from this video are unlikely to purchase that material from Defendants, as opposed to Plaintiffs[.]" Add. 33.

It's not at all clear how the District Court reaches this conclusion. After all, Defendants did not provide Mr. Sepi any **attribution** for the use of his work. Millions of people have seen Defendants' use of the footage, but none of those people would have any meaningful way of knowing who Mr. Sepi is or how to contact him for future licenses of the Funeral Film.

More importantly, it's not clear why anyone would ever license Mr. Sepi's funeral film from any source—Plaintiffs or Defendants—given the District Court's fair use ruling. After all, the fourth factor must address "whether unrestricted and widespread conduct of the sort engaged in" by Defendants would undermine Mr. Sepi's potential market. Dr. Seuss Enters., 983 F.3d at 461.

Thus, the District Court's opinion is myopically focused on the Defendant's individual use rather than what unrestricted and widespread conduct of this sort would do to the market.

If *everyone* did what Defendants did (copy the work in full, pick out favored portions, make for-profit uses, and then provide the author no attribution and compensation), that would create perverse "incentives to pirate intellectual property[.]" Id.

Here, "permitting this use would effectively destroy that broader [licensing] market[.]" Andy Warhol, 11 F.4th at 50. After all, if artists "could use such images for free, there would be little or no reason to pay for [them]." Id. The fourth factor weighs against fair use as well.

**C.** **Beyond the statutory fair-use factors, two case-specific factors overlooked by the District Court demonstrate that the uses here were unfair.**

Above, this Brief applied the statutory fair-use factors that must be considered in a fair-use analysis. <u>See</u> Section II.B, *supra*; §107 ("factors to be considered *shall* include" the four statutory factors).

That's not the end of the analysis, however. As the Supreme Court has made clear, the four statutory fair-use factors in Section 107 are "**<u>nonexclusive</u>**." <u>Harper</u>, 471 U.S. at 549; Add. 27 (same). Indeed, the four statutory fair-use factors are "sometimes augmented by extra-statutory" considerations. 4 NIMMER ON COPYRIGHT §13.05[A] (2022).

Broader considerations of fairness are appropriate because the "fair use doctrine continues to serve as an **equitable** rule of reason[.]" <u>Bouchat v. Baltimore Ravens Ltd. P'ship</u>, 737 F.3d 932, 937 (4th Cir. 2013). Fair use originally "developed as a creature of common law" attendant to fairness concerns. <u>Andy Warhol Found</u>, 11 F.4th at 36. Although Congress has since codified fair use, fair use's codification did **<u>not</u>** "disrupt the common-law tradition of fair use adjudication." <u>Dr. Seuss Enters</u>, 983 F.3d at 451.

At core, fair use is an equitable doctrine that is fundamentally about what its name would naturally imply: **<u>fairness</u>**. Courts must make a "determination whether a particular use is **<u>fair</u>**[.]" <u>Harper</u>, 471 U.S. at 549.

After all, "[f]air use presupposes 'good faith' and 'fair dealing.'" Id. at 562. A _fair_ use must be _fair_.

Therefore, the four statutory factors are "not simply hurdles over which an accused infringer may leap to safety from liability." Fin. Info., Inc. v. Moody's Investors Serv., 751 F.2d 501, 508 (2d Cir. 1984). Rather, a fair-use analysis should be guided by, but not shackled to, the four "non-exclusive" statutory factors. See Harper, 471 U.S. at 549.

Here, two case-specific factors weigh heavily against the fairness of Defendants' uses:

(1) _No Attribution Given to Creator_: Despite knowing that Mr. Sepi was the actual creator of the works in question, Defendants unfairly withheld giving him any credit or attribution during their widespread uses of his creations. See Section II.C.i, _infra_.

(2) _No Compensation to Creator_: Also, Defendants, especially Netflix, are sophisticated organizations that faced no real barriers to obtaining a license, either of being able to pay or knowing who to pay. See Section II.C.ii, _infra_.

These two case-specific factors demonstrate that Defendants' uses were unfair to Mr. Sepi. Each one individually, and all of them jointly, strongly bolster the conclusion that Defendants' nationwide streaming uses were not fair uses.

i.        Attribution: No credit given to known creator

Here, one case-specific factor weighing strongly against the fairness of the uses is that Defendants, despite knowing precisely who created the works, never gave Mr. Sepi any credit.  See generally M.M.1-7.

When making the equitable determination of fair use, courts routinely consider whether a copyright defendant provided attribution, *i.e.*, credit, to the person who created the work:

- "Although acknowledgment does not excuse infringement, **the failure to acknowledge counts against the infringer**."  Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 23 (1st Cir. 2000).

- A defendant "posted a cropped version of [a plaintiff]'s Photo [...] **without any attribution**[.]"  Brammer, 922 F.3d at 261 (4th Cir. 2019) (reversing district court's finding of fair use).

- "This **attribution [...] favors a finding of fair use**[.]"  Williamson v. Pearson Educ., Inc., 2001 U.S. Dist. LEXIS 17062, *17 (S.D.N.Y. Oct. 19, 2001).

Courts, in making decisions about the fairness of unauthorized uses, consider attribution a basic but fundamental showing of respect for the creator.

Indeed, one often overlooked aspect of Campbell—the paradigmatic case on transformative fair use—is that the defendants in that case had promised to "afford all credit" to the author. Campbell, 510 U.S. at 572; see also Midlevelu, Inc. v. ACI Info. Grp., 989 F.3d 1205, 1213 (11th Cir. 2021) (affirming fair use where unauthorized uses had "credited" the copyright holder).

By contrast, courts have found against fair use where the unauthorized use was made "without crediting" the original author. Andy Warhol Found., 11 F.4th at 50 (reversing district court's finding of fair use).

Here, "there was no attempt by [D]efendant[s] [...] to credit" Mr. Sepi at all. See Marcus v. Shirley Rowley an Diego Unified Sch. Dist., 695 F.2d 1171, 1176 (9th Cir. 1983). That "failure to acknowledge counts **against**" fair use. See Nunez, 235 F.3d at 23. Simply put, there is nothing fair or equitable about using another's work and then refusing to give them credit.

Ultimately, it's wholly unclear why Defendants didn't provide this basic respect to Mr. Sepi. They could have. They knew who he was. Giving credit where it was due would not have cost them anything. Indeed, providing proper attribution to Mr. Sepi for the use of his video would not have interfered with Defendants' unauthorized use of his work at all.

Nor does the public benefit from Defendants' unexplained failure to credit Mr. Sepi.

To the contrary, the public benefits both artistically and from the retention of information about who created a copyrighted work.  That's one reason why Congress protects such information, *i.e.*, the public interest.  <u>See</u> §1202 (copyright-management information federally protected).

As a practical matter, crediting Mr. Sepi for the use of his work would have been par for the course.  We all know what comes after a movie: the credits.  Like almost all films and motion pictures, Defendants' "Tiger King" rolls the credits at the end of each episode.  Such credits are common practice and audiences expect a list of rolling credits at the end of a motion picture.

Indeed, providing attribution is an industry best practice.  Best practice, according to a consensus of documentarians, is that the material used should be "**<u>properly attributed</u>**, either through an accompanying on-screen identification or a mention in the film's final credits[.]"  <span style="color:blue">Documentary Filmmakers' Statement of Best Practices in Fair Use</span>, Association of Independent Video and Filmmakers, at 4 (2005, last accessed Sept. 23, 2022).

Conspicuously absent from "Tiger King"'s credits, however, is Mr. Sepi. <u>See generally</u> M.M.1-7.  Providing credit and attribution to Mr. Sepi specifically would have been simple, easy, and fair.  Defendants knew who he was and had emailed him during production.  3 App. 249; 3 App. 253-254.

Yet even after he sent a letter, 1 App. 29 ¶ 23, and even after the lawsuit was filed, Defendants still refused to give the creator credit.  That's not fair—and it's not in good faith.

Given that Defendants _knew_ Mr. Sepi was the creator, it's profoundly disrespectful and in bad faith not to give him credit.  Here, Defendants' failure to provide attribution to Mr. Sepi for the use of his work is a case-specific factor that weighs heavily against fair use.

ii.      Compensation: No offer of licensing fee to creator

Another case-specific factor demonstrating a fundamental lack of fairness here is that Defendants never *offered* to compensate Mr. Sepi with a licensing fee for their use of his intellectual property.

The "propriety of the defendant's conduct is relevant" especially to "the extent that it may knowingly have exploited a purloined work for free that could have been obtained for a fee." L.A. News Serv. v. KCAL-TV Channel 9, 108 F.3d 1119, 1122 (9th Cir. 1997).

For instance, the fair users in Campbell had expressed to the copyright holder that they "were **willing to pay a fee** for the use they wished to make of it." Campbell, 510 U.S. at 572.  By contrast, the Defendants here didn't offer to compensate Mr. Sepi, via a licensing fee or other form of payment, for their use of his intellectual property.  See 3 App. 253-254 (emails with Rebecca Chaiklin).

Especially given the sophistication and resources of the particular Defendants here, this failure to offer a licensing fee is unfair.  After all, "an unauthorized use should be considered **'less fair'** when," as here, Defendants have the "means to pay for the use" but choose not to.  Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1276-1277 (11th Cir. 2014) (quoting Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 931 (2d Cir. 1994)).

Copyright law can reasonably expect "corporate behemoths" like Netflix to offer payment for its pervasive streaming uses at the time of pervasive use, even if it might be more difficult for an outfit like Royal Goode to get a license upfront. Cf. Fogerty v. Fantasy, Inc., 510 U.S. 517, 519 (1994). By contrast, copyright law looks more forgivingly upon proverbial "starving artists" with a genuine inability to pay. See id.

In short, an *unwillingness* to pay for use and an *inability* to pay for use are two different matters from a fairness perspective. Here, it's not that Defendants *couldn't* pay for the use they wished to make of Mr. Sepi's work. It's that they *preferred* not to pay.

Nor was this a case where transaction costs present any genuine obstacle to compensating the artist for the use. Courts considering fair use often focus on the transaction cost of negotiating a paid license for the use. See GOLDSTEIN ON COPYRIGHT §12.3.1 at 72 (discussing how fair use often turns on "the transaction costs of negotiating licenses").

Fair use readily permits uses that "would have been made under license if transaction costs had not hobbled license negotiations." Id. Accordingly, courts should consider whether "transaction costs would stand in the way of a negotiated license" for the use. Id.

For instance, personal "private uses almost invariably present transaction cost hurdles[.]" Id. An individual, making a personal and private use, would probably have no idea how to get a license. Yet, there's no need to guess here whether Defendants know how to license. See 1 App. 69 (license), 9 App. 80-93 (more licenses).

An individual would find licensing near impossible to navigate and cost prohibit. Netflix and Royal Goode are in a different camp. Netflix is a highly sophisticated corporate defendant undertaking large-scale, pervasive public performances with an entire licensing department at its disposal. Getting a streaming license from a known author would present no meaningful obstacle to compensating the actual creator, as copyright intends.

Nor is this a case where a licensing fee could not be paid because the author was unknown—i.e., copyright law's "so-called 'orphan works' problem." Golan v. Holder, 565 U.S. 302, 334 (2012). An orphan work is a "work that is still in copyright, but whose copyright holder cannot be readily identified or located." Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 92 (2d. Cir. 2014). In instances of orphan works, offering a license is typically impossible or at least impracticable and fair use plays a greater role.

This is no orphan work here that couldn't be licensed.

Rather, Defendants simply preferred to "purloin[] for free" instead of fairly "offering a licensing **fee**." <u>L.A. News Serv.</u>, 108 F.3d at 1122.

This failure to *offer* a licensing fee is another case-specific factor that weighs heavily against fair use. After all, "[t]he fair use doctrine is **not** a license for **corporate theft**" even when "the underlying work contains material of possible public importance." <u>Sinclair v. Am. Media, Inc.</u>, 2018 U.S. Dist. LEXIS 154116, *12 (S.D.N.Y. Sept. 7, 2018).

Rather, copyright law "insist[s] that, just as artists must pay for their paint, canvas, [etc.]" Defendants "must pay for" the raw materials used in making their streaming content. <u>See</u> <u>Andy Warhol Found.</u>, 11 F.4th at 52.

* * * * *

As discussed above, six factors (four statutory and two case-specific factors) weigh against fair use. The streaming use of the Funeral Film was decidedly not a fair use. Indeed, it was deeply unfair.

**D.** **This Court could remand for consideration of the streaming use of the eighth work and, if it reverses on authorship, should remand for the other works as well.**

This Court doesn't need to wade far into fair use. Instead, it could simply remand on fair use because the District Court failed to address the biggest use, *i.e.*, Defendants' streaming.

After all, this Court is a court "of **review**, not of first view[.]" United States v. Suggs, 998 F.3d 1125, 1141 (10th Cir. 2021). As an appellate court, this Court would be "well within its authority to reverse the trial court's dismissal and remand for the district court to consider, in the first instance," major unaddressed questions. E.g., Chegup v. Ute Indian Tribe of the Uintah & Ouray Reservation, 28 F.4th 1051, 1070 (10th Cir. 2022).

In fact, the appellate process benefits when disputed issues get the "full vetting" that they deserve in the trial court. Suggs, 998 F.3d at 1141. Litigants benefit from the clarity —and so does the Court. When issues are fully decided below, then, on appeal, this Court is in a better "position to offer a judgment with the degree of confidence the question merits." Id.

Yet, here, the decision below didn't address key aspects of this case. There are two reasons that remand on fair use, after course correcting on the legal errors below, may be appropriate:

(1) *Unaddressed Questions*: The District Court decided the fairness of the derivative uses (*i.e.*, the film production) but did **not** decide the fairness of the markedly more significant public-performance uses (*i.e.*, online streaming to millions).

(2) *Additional Works*: The District Court held, and Mr. Sepi has challenged here on appeal, that seven of Mr. Sepi's creations were works made for hire.  If this Court reverses on that authorship issue, remand would be appropriate so that the District Court consider in the first instance the fair-use doctrine for all eighth works.

Because the fair-use analysis overlooked a key use and because the authorship decisions on appeal could raise new issues, this Court may wish to simply remand rather than "dwell on the [fair-use] point further[.]"  Suggs, 998 F.3d at 1141.

*First*, the District Court nowhere addressed whether Defendants' vast, online public performances of Mr. Sepi's work to millions of viewers on its paywalled streaming platform in its fair-use analysis.  See Add. 27-34; cf. 1 App. 128 ¶ 17 ("over 34 million viewers" in the first 10 days").  It never applied the fair-use factors to *that* particular use.

Thus, the District Court failed to analyze whether Defendants' infringement of Mr. Sepi's exclusive public-performance rights was fair. Compare §106(4) (public-performance right) with §106(2) (derivative right).

A fair-use determination as to one use doesn't inherently make the other uses fair as well. This is especially so because these distinct uses implicate different statutory rights and raise distinct uses raise different equitable questions. Harper, 471 U.S. at 551 ("equitable nature of the fair use doctrine"). After all, making a derivative work (§106(2)) in the privacy of a film-production studio is a vastly different use than publicly performing that work on a streaming platform nationwide (§106(4)).

After all, Mr. Sepi did not bring suit just because another filmmaker used his copyrighted materials to make their own work. Rather, Mr. Sepi sued when Defendants, especially Netflix, publicly performed his copyrighted material to millions of consumers on their paywalled platform, for their own profit, without providing him any compensation or attribution for the pervasive streaming use of his work.

Thus, even if the Court is not prepared to reverse, it should course correct on the legal errors below and remand for consideration of the fair use of the streaming uses, with the District Court's legal errors corrected.

***Second***, if this Court reverses on the work-made-for-hire doctrine, then it should also remand the issue of fair use as to Defendants' use of the other seven videos.

Importantly, this is a court "of review[.]" Suggs, 998 F.3d at 1141. Yet, there is nothing to review regarding whether Defendants' uses of those seven other works were fair uses. Below, the District Court prudently did not address whether Defendants' uses of the other seven work were fair because of its ruling on work-made-for-hire doctrine. See Add. 27-34.

Yet, if this Court reverses on work-made-for-hire doctrine, then this Court should remand the issue of fair use to permit the District Court to supply, in the first instance, a fair-use analysis of Defendants' streaming use of those seven additional works—and do so with additional guidance from this Court correcting the District Court's legal errors below.

Reversal as to the seven other works would affect the fair-use analysis of the eighth. Octopling the works taken—eight works rather than one—would present a different factual situation.

Importantly, "fair use is a doctrine the application of which always depends on consideration of the **precise facts at hand**." Am. Geophysical Union, 60 F.3d at 916. Indeed, it is widely recognized that "determinations of fair use are **highly contextual and fact specific**[.]" Andy Warhol Found, 11 F.4th at 51.

For these reasons, the Court may wish to remand

## II.  THE DISTRICT COURT ERRED ON AUTHORSHIP.

### A.  Even adopting the deposition testimony most favorable to Defendants to avoid the sham-affidavit concerns, the record still supports reversal.

Below, there were a lot of concerns about Mr. Sepi's credibility because he stated that he lied in the 2016 deposition because of concerns and fears about Joe Exotic, Jeff Lowe, and others.

There were largely two concerns about credibility—(1) whether Mr. Sepi's roles included videography, not just photography, and (2) what Mr. Sepi knew about the formation of Whyte Monkey Productions ("WMP").

In order to avoid the taint of any dishonesty, however excusable given the circumstances, this appeal can be conducted on the stipulated assumption that the two following facts, which adopt Defendants' views:

(1)  For the purposes of this appeal, the Court should assume Mr. Sepi was involved in _both_ videography and photography, as he originally stated in his 2016 deposition and as Defendants prefer.

(2)  For the purposes of this appeal, the Court should assume that Mr. Sepi was unaware of WMP at the time of formation, as he originally stated in his 2016 deposition and as Defendants prefer.

Even with these stipulations, there is still a live dispute.

Those stipulations alone should make the sham-affidavit issue a non-issue for this appeal. But, there are four key points to make about the application of the sham-affidavit position below, and which are hereby expressly preserved for Reply should opposing counsel raise the issue in a broader way than going to those two facts:

- Mr. Sepi was scared and he provided a believable and coherent explanation of his fear, including serious threats made against him. E.g., 5 App. 140:11-13; see also Add. 1.

- The sham-affidavit doctrine was incorrectly applied below. E.g., Law Co. v. Mohawk Constr. & Supply Co., 577 F.3d 1164, 1169 (10th Cir. 2009) ("We have described cases in which an affidavit raises but a sham issue as 'unusual.'").

- Given the stipulations above regarding videography and regarding knowledge as to WMP, any concern about sham affidavits is now moot, at least for the purposes of the appeal, and need not be considered further.

With these comments, it's ripe to apply the test of authorship.

**B.      There is no dispute that Mr. Sepi is the actual creator, so he is the legal author unless the seven works were made within the scope of his employment as a cameraman for the tours at the park.**

It's undisputed that Mr. Sepi personally created the works in question. Add. 6-7.

That would make him the legal author and initial owner of the copyrighted works.  §201(a).  The only exception to this rule is the work-made-for-hire doctrine.  §201(b).

There are only two ways to be a work made for hire.  §101(1)-(2) (defining "work made for hire").  The second possibility—requiring a special contract—is inapplicable here.  Mr. Sepi and the park, as all Parties admit, had no employment contract and no work-made-for-hire contract.  Likewise, the Parties did not dispute below that Mr. Sepi was a park employee.

Thus, the only and determinative question for legal authorship and ownership of the seven remaining audiovisual works is the question of the scope of employment.

**C. Mr. Sepi's scope of employment as a tour videographer did not extend to cinematography and film editing conducted on his own time outside of tours.**

Because the Copyright Act does not define when a work is created within the scope of employment, "common-law agency principles govern resolution of that question." Reid, 490 U.S. at 739-40. Accordingly, many courts have adopted the three-prong test expressed in Section 228 of the RESTATEMENT (SECOND) OF AGENCY in determining whether a copyrighted work was made within the scope of employment.

Under the Restatement's three-pronged test, creation of the work is "within the scope of employment "**if, but only if**:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits; [and]

(c) it is actuated, at least in part, by a purpose to serve the master[.]"

RESTATEMENT (SECOND) OF AGENCY § 228(1)(a)-(c) (1958); Pauna v. Swift Transp. Co of Ariz. LLC, 2022 U.S. App. LEXIS 6381, *3-4 (10th Cir. Mar. 11, 2022) ("within the scope of his employment **only if**" the three elements are satisfied).

Thus, all three prongs of the Restatement test must be satisfied for Defendants to prevail on the question of whether or not Mr. Sepi's creation of the seven videos was within the scope of employment.

Here, two of the three elements of the test are _not_ satisfied. Accordingly, the seven videos were not created within the scope of his employment, and Mr. Sepi is the legal author of those works under copyright law.

>    i.    <u>Kind of Work: Film editing and cinematography, not tour videography</u>

Mr. Sepi was employed to take photography and videography of park **tours**. Add. 22. Yet, the seven videos include works far afield from that task–including the production and editing of music videos. <u>E.g.</u>, Add. 6 ("Country Music Artist Joe Exotic – Bring It On (Please Unite)").

The District Court simply by fiat determined that "'videography' encompasses filming and editing work." Add. 13 n.2. But photographing and videoing park tours is very different conduct and involves far different tasks than making cinematic short films and engaging in video editing required to make country music videos.

After all, the purpose of documenting park tours, either through photography or videography is to memorialize the park tours and create memorabilia. And, the skill involved is fairly straightforward. A familiar example would be a family having their photo taken on a rollercoaster at a trip to Disneyworld. On the way out of the park families are offered a snapshot photo or a still frame video as a keepsake. Or, consider a videographer serving in a court deposition who is simply documenting and memorializing a deposition.

By contrast, the seven videos made are of a very "different in kind," and implicate skills beyond merely photographing and videoing park tours. <u>Shockley v. Svoboda</u>, 342 F.3d 736, 740 (7th Cir. 2003). Creating music videos requires skills and creative decisions that are quite distinct from photographing and/or videoing a tour.

Producing a music video would involve creative decisions and selections taking videos of a park tour. Such distinct creative decisions would readily give rise to original copyrighted works that fall outside the scope of documenting or capturing park tours. <u>Cf.</u> <u>Feist</u>, 499 U.S. at 358 ("Originality requires only that the author make the selection or arrangement independently [...] and that it display some minimal level of creativity[.]").

In short, producing and editing music videos are very different tasks than photographing or videographing park tours. Or, at least a jury could so find. And there's no reason to assume that videography necessarily "encompasses [...] editing work" as the District Court simply fiats. Add. 13 n.2. Particularly on this summary-judgment posture, it was improper to resolve those disputed material facts as a matter of law against Mr. Sepi.

ii.     Hours and Location: Lived on park premises and paid
        $150/week

The second element of the Restatement's test asks whether the work was created "substantially within the authorized time and space limits" of the employment]. RESTATEMENT (SECOND) OF AGENCY § 228(1)(b). Here that's a difficult question to resolve and there is certainly evidence to suggest that Mr. Sepi created the seven videos outside the time and space limits of his employment with the park.

***First***, the District Court noted that Mr. Sepi testified that "he filmed and produced videos featuring Exotic in exchange for his $150 per week salary from the Park." Add. 15. The District Court then concluded that "[t]his testimony is fatal to his copyright infringement claim." Add. 15

But the fact that Mr. Sepi spent *some* time producing videos of park tours featuring Joe Exotic in exchange for $150 per week, does not indicate that all the videos are part of his work duties. Indeed, $150 per week is a very modest salary. The time commitments that an employee reasonably exchanges for $150 certainly is not a 24/7, round-the-clock employment. Nor is it likely a conventional forty-hour work.

After all, a $150 salary for a 40-hour week would come out to $3.75 per hour.

Indeed, the reasonable inference drawn from the fact that Mr. Sepi received $150 per week to shoot footage of Mr. Exotic, is that the vast, overwhelming majority of Mr. Sepi's hours each week were off the clock.

The District Court determined Mr. Sepi's testimony about earning $150 per a week to be "fatal" to his copyright infringement claim. But a juror could reasonably conclude that for $150 per week, Mr. Sepi spent most of his time off the clock. Accordingly, it is not clear why the testimony about a $150 salary conclusively established that the seven videos were made within "time" limits of employment.

***Second***, the question of whether Mr. Sepi made the seven videos within the space of his employment is complicated by the fact that Mr. Sepi lived on his job site. This creates a genuine question of material fact about whether he was functionally in a private space or his workplace when creating the seven videos for purposes of determining the second element.

That question is not easily resolvable. Cf. Easter Seal Soc'y for Crippled Children & Adults of La., Inc. v. Playboy Enters., 815 F.2d 323, 328 (5th Cir. 1987) ("A big part of the problem in both the statute and the cases is that the basic terms are ambiguous."). Resolving this question turns on case-by-case bases and requires a "practical rather than formal basis[.]" Gaiman v. McFarlane, 360 F.3d 644, 650 (7th Cir. 2004).

After all, the answer surely isn't that every video Mr. Sepi creates where he lives is in the "space limits" of his employment just because he lives at his worksite in corporate housing.  That's an overly broad and overly "formal basis" on which to resolve the question:

- Consider a graduate student who lives on campus but also works a campus job as a research assistant at the university library.  Is everything that that student writes within the space limits of their environment?

- Or, consider a carpenter who lives on the jobsite. If they build a bookshelf for themselves in their free time, does that suddenly become within the scope of employment because they happen to live where they work?

Such simplistic and formalistic applications of this second prong become all the more strained in light of the boom in the work-from-home phenomenon caused by the recent COVID-19 pandemic. If an employee, working from home, creates something at their house is that "within the authorized [...] space limits" of employment?

Given that Mr. Sepi lived on his worksite, this creates genuine issues of material fact about whether or not the seven videos were created within the "space limits" of his employment.

Here, reasonable jurors could disagree about whether a videographer who earns $150 a week and who lives on his job site created these seven videos within the space and time limits of that employment.

iii.     Purpose of work: Further significant creative ambitions, like Appellees

The third element of the Restatement test asks whether creation of the work was "actuated, at least in part, by a purpose to serve the master." RESTATEMENT (SECOND) OF AGENCY § 228(1)(c).  Mr. Sepi acknowledges that Defendants likely satisfy this third element.  But this third element is not dispositive of the Restatement's three-*element* test of scope of employment.

\* \* \* \* \*

Because all three elements do not establish that Mr. Sepi's creation of the seven videos was within the scope of his employment, Defendants do not satisfy the Restatement's three-element test.  Accordingly, these seven videos were not work made for hire.

On a parting pragmatic note, it's worth emphasizing that employment is not the only explanation, or even the likeliest explanation, why Mr. Sepi created the seven videos of a compelling character.  After all, others who were not employees also jumped at the chance to get footage of Joe Exotic.  3 App. 237 ¶ 10 ("documentarian's dream").

**CONCLUSION**

This Court should reverse and remand on fair use and on ownership.


Date: September 29, 2022                Respectfully submitted,


                                        */s/ Andrew Grimm*
                                        Andrew Grimm
                                        DIGITAL JUSTICE FOUNDATION
                                        15287 Pepperwood Drive
                                        Omaha, Nebraska 68154
                                        (531) 210-2381
                                        Andrew@DigitalJusticeFoundation.org

                                        *Attorney for Appellants*

## ORAL ARGUMENT STATEMENT

Counsel respectfully requests oral argument in this appeal. There are several complex fair-use legal issues and complex nuances to the scope-of-employment questions.

There are also a number of issues raised where there is persuasive authority but no binding Tenth Circuit precedent on precisely how to conduct a fair-use or copyright scope-of-employment analysis for which the Court might have questions when fashioning its own law on these issues. Oral argument would allow counsel to address the Court's questions.

Date: September 29, 2022                    Respectfully submitted,


                                            */s/ Andrew Grimm*
                                            Andrew Grimm

# CERTIFICATE OF COMPLIANCE

This Brief contains **12,963** words.

This Brief was prepared in Microsoft Word using Times New Roman 14-point font.

Date: September 29, 2022     Respectfully submitted,


*/s/ Andrew Grimm*
Andrew Grimm

# ADDENDUM OF ORDERS & OPINIONS

The pertinent opinion of the District Court—and its judgment—are included

below:

| INDEX OF CONTENTS | | | |
|---|---|---|---|
| *ECF* | *Date* | *Description* | *Page* |
| 57 | Apr. 27, 2022 | Order Granting Summary Judgment | Add. 1 |
| 58 | Apr. 27, 2022 | Judgment | Add. 35 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WHYTE MONKEE PRODUCTIONS, LLC, and TIMOTHY SEPI, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) |  Case No. CIV-20-933-D |
| NETFLIX, INC., and ROYAL GOODE PRODUCTIONS, LLC, | ) ) ) ) |
| Defendants. | ) ) |

## ORDER

In March 2020, Defendant Netflix, Inc. released *Tiger King: Murder, Mayhem and Madness*, a seven-part documentary series that was produced by Defendant Royal Goode Productions, LLC. As anyone who has watched *Tiger King* can attest, its subtitle is not hyperbole. The series features several individuals who own tigers and other exotic animals, but mainly focuses on the Tiger King himself – Joe Exotic – and his acrimonious rivalry with self-styled animal activist Carol Baskin. The rivalry takes a turn for the worse, and by the end of the series, Exotic has been arrested for his involvement in a murder-for-hire plot directed at Ms. Baskin.

Included in the series at various points are short clips from eight videos filmed by Plaintiff Timothy Sepi and purportedly produced by Plaintiff Whyte Monkee Productions, LLC. With one exception, all the videos were filmed while Mr. Sepi was working at Exotic's home base – the Gerald Wayne Interactive Zoological Park. Following the release of *Tiger King*, Mr. Sepi registered the videos for copyright protection, either under his own

1

name or the name of Whyte Monkee Productions. Plaintiffs then sued Netflix and Royal Goode for copyright infringement, contending that the videos were used without their permission.

Defendants have moved for summary judgment [Doc. No. 46] on this claim, arguing that seven of the videos are not owned by Plaintiffs because they were made within the scope of Mr. Sepi's employment, and the remaining video is not subject to copyright protection because it is lacking in originality. Alternatively, Defendants argue that their use of the videos qualifies as a fair use such that no copyright infringement occurred. Plaintiffs have responded in opposition [Doc. No. 55] and Defendants have replied [Doc. No. 56]. For the reasons explained below, the Court finds that Defendants are entitled to summary judgment because seven of the videos are works for hire that are not owned by Plaintiffs, and the use of the remaining video was a fair use.

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id*. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id*.

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–

23 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see also* Fed. R. Civ. P. 56(c)(1)(A). Although "[t]he court need consider only the cited materials," it may also "consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The key inquiry is whether the facts and evidence present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## UNDISPUTED MATERIAL FACTS

Joe Exotic, also known as Joseph Maldonado-Passage or Joseph Allen Schreibvogel, founded the Gerald Wayne Interactive Zoological Park in Wynnewood, Oklahoma. Defs.' Stmt. Undisp. Facts ¶ 1. The Park housed tigers, lions, and other exotic animals and was open to the public for tours. *See* Pls.' Br., Ex. 1 to Chaiklin Dec. [Doc. No. 46-26]. There was also a studio on park grounds, which was used to produce a web series called *Joe Exotic TV*. Def.'s Stmt. Undisp. Facts ¶¶ 2, 19. *Joe Exotic TV* was primarily an unscripted series featuring video footage from around the Park and skits invented by Exotic. *Id.*

In early 2015, *Joe Exotic TV* was produced by Rick Kirkham, who oversaw the studio operations and a team of four people. *Id.* at ¶ 4. In March 2015, Mr. Sepi was hired to work with Mr. Kirkham as a cameraperson. *Id.* at ¶ 5; Pls.' Add. Material Facts ¶ 54-55.

At the time of his hiring, Mr. Sepi understood that his job duties would include taking photographs of Park tours and working on *Joe Exotic TV*, that he would be paid $150 per week, and that he could live on Park property for free. Defs.' Stmt. Undisp. Facts ¶¶ 5-6; Pls.' Add. Material Facts ¶ 54-55. Although initially unclear about who was actually employing him, Mr. Sepi came to understand that he was working for the Park. Sepi Depo 2016 at 109:11-20 [Doc. No. 46-3]. Only a week after starting his employment, a fire destroyed the Park's studio and camera equipment. *Id.* at ¶¶ 10, 13. Mr. Kirkham and his crew promptly quit, and Mr. Sepi was left as the sole videographer at the Park. *Id.*

With the studio and camera equipment destroyed, *Joe Exotic TV* went on hiatus. *Id.* at ¶ 11. During this time, Mr. Sepi continued to photograph park tours and assisted with animal care around the Park. *Id.*; Pls.' Add. Material Facts ¶ 57. But this was only a temporary situation. Within a couple of months, a new production studio had been built, new camera equipment obtained, and *Joe Exotic TV* was back in production. Defs.' Stmt. Undisp. Facts ¶¶ 12-13. The new equipment was procured from Michael Sandlin, a *Joe Exotic TV* sponsor and the owner of a facility known as the Tiger Truck Stop. *Id.* at ¶ 12; Pls.' Add. Material Facts ¶ 63. Mr. Sepi did not make the arrangements to obtain the new equipment, but it was made available for his use. Defs.' Stmt. Undisp. Facts ¶ 12.

Using this new equipment, Mr. Sepi spent his workdays taking tour photographs, filming and editing *Joe Exotic TV*, filming campaign videos for Exotic (who ran for governor and president), filming music videos featuring Exotic, and filming the day-to-day operations of the Park. Defs.' Stmt. Undisp. Facts ¶ 17; Pls.' Response ¶ 17. Mr. Sepi filmed and produced the videos to provide publicity for the Park, to benefit Exotic, and to

promote the cause of the nonprofit that operated the Park. Defs.' Stmt. Undisp. Facts ¶¶ 24-26. Mr. Sepi admits that during this time frame, he was an employee of the Park, made $150 per week, lived rent-free on Park premises, and used the Park's studio and equipment, although he disputes that all the videography work he performed was done in the scope of his employment. Defs.' Stmt. Undisp. Facts ¶¶ 9,13; Pls.' Add. Material Facts ¶¶ 17, 63; Sepi Depo 2021 at 51:2-3 [Doc. No. 55-1].

Following the studio fire, *Joe Exotic TV* returned to streaming on May 7, 2015. Defs.' Stmt. Undisp. Facts ¶ 14. Each episode was preceded by a "disclaimer" stating that the footage is owned by Whyte Monkee Productions. Pls.' Add. Material Facts at ¶ 64. Whyte Monkee Productions is an Oklahoma limited liability company that was established on May 5, 2015. Defs.' Stmt. Undisp. Facts ¶ 16; Pls.' Add. Material Facts ¶ 59. The Articles of Organization include Exotic's email address, the Park's street address, and "Tim Sepi" as the signatory. Defs.' Stmt.  Undisp. Facts ¶ 16. During the May 7th episode of *Joe Exotic TV*, Exotic referenced the newly formed Whyte Monkee Productions by stating "they can take a lot away from me, but they can't take my freedom of speech, and since this is all Whyte Monkee Productions and has nothing to do with us other than I'm the pretty face sittin' right here, I can say F--- you Carole Baskin." Pls.' Add. Material Facts ¶ 55.

Around February 2016, ownership of the Park was transferred to an entity owned by Jeffrey Lowe and it was renamed the Greater Wynnewood Exotic Animal Park. Defs.' Stmt. Undisp. Facts ¶ 28. Despite the change in ownership, Exotic continued to work as the Park's entertainment director and Mr. Sepi continued to film and produce videos

featuring Exotic. *Id.* at ¶¶ 28-30; Sepi Depo 2016 at 214:3-215:1. In August 2016, Mr. Sepi quit so that he could pursue his photography and get paid more than $150 per week. Sepi Depo 2016 at 189:6-13.

During and after Mr. Sepi's tenure at the Park, filmmakers associated with Defendant Royal Goode were shooting footage at the Park and editing what would eventually become the *Tiger King* series. Chaiklin Dec. ¶¶ 10-11. In addition to its own footage, Royal Goode licensed film clips from Exotic and Lowe, including the works that Plaintiffs now claim to own. Defs.' Stmt. Undisp. Facts ¶ 35. In January 2018, while creating *Tiger King*, one of the filmmakers emailed Mr. Sepi to obtain his assistance in accessing video footage that was apparently located at the Park. *Id.* at ¶ 36-38; Ex. 7 to Chaiklin Dec [Doc. No. 46-32]. Mr. Sepi responded by telling the filmmakers to contact Exotic because he did not work there anymore. *Id.* He did not assert any ownership interest in the footage at that time. *Id.*

*Tiger King* was released by Netflix in March 2020 and includes clips from the following videos that were filmed while Mr. Sepi was an employee of the Park:

- Disrespectful Tomato Thrower Trouble
- Joe-Getting Dragged by a Lion, Joe – Presidential PSA
- Mobile Trailer Inspections for Volunteers
- Country Music Artist Joe Exotic – Bring It On (Please Unite)
- Joe Exotic Country Music 'Here Kitty Kitty'
- Joe Exotic TV – Tornado on the Ground

*Id.* at ¶¶ 40-46. These seven videos were made during normal work hours using equipment loaned by Mr. Sandlin and edited (if at all) at the Park's studio. *Id.*

Add. 6

The remaining video – Travis MM Funeral Ceremony – was shot after Mr. Sepi terminated his relationship with the Park. *Id.* at ¶ 47. The video is approximately 23 minutes and 52 seconds long and documents the funeral of Exotic's husband, Travis Maldonado. *Id.* The video records guests arriving at the funeral, Exotic giving a eulogy, and the playing of a memorial video. The video was shot using a camera belonging to Mr. Sandlin and was livestreamed via the *Joe Exotic TV* YouTube channel, where it remained afterward. *Id.* Mr. Sepi shot the video by placing the camera on a tripod and leaving it running. *Id.* He did not edit the video, *id.*, but he did decide where to place the camera by figuring out the best viewpoint. Sepi Depo 2021 at 433:14-434:14. A clip from this video appears in a segment of *Tiger King* lasting approximately one minute and six seconds. The video is interspersed with other footage, including comments from Mr. Maldonado's mother that are critical of Exotic. Ex. 1 to Chaiklin Dec. at Ep. 5, 25:51.

Following the release of *Tiger King*, Mr. Sepi obtained copyright registrations for these eight videos. Pls.' Ex. 5-12 [Doc. Nos. 55-5 through 55-12]. Three of the videos are registered under Mr. Sepi's name and five of the videos are registered under Whyte Monkee Production's name. *Id.*

But the story does not stop there. Prior to Mr. Sepi's involvement with the Park, Carol Baskin – a big cat enthusiast and Exotic's nemesis – obtained a $1 million judgment against Exotic. Defs.' Stmt. Undisp. Facts ¶ 15. To collect this judgment, Ms. Baskin initiated garnishment proceedings against Exotic in Oklahoma. *Id.* The dispute between Exotic and Ms. Baskin was a bitter one, and it was an ongoing topic of discussion at the

Park during Mr. Sepi's employment. *See, e.g.,* Ex. 6 to Evitt Dec. [Doc. No. 46-6]; Sepi Depo 2021 at 160:16-22.

On September 13, 2016, approximately one month after leaving the Park, Mr. Sepi gave a deposition as a fact witness in connection with the garnishment proceedings. Defs.' Stmt. Undisp. Facts ¶ 31. At this deposition, Mr. Sepi testified extensively regarding his relationship with the Park and the creation of Whyte Monkee Productions. Most pertinent to this matter, he testified that Exotic hired him to be a "cameraman," his job duties would include "[t]aking still pictures and videoing whatever happens on the park," and he would be working, at least in part, on *Joe Exotic TV*. Sepi Depo 2016 at 73:3-77:25; 88:2-10. Mr. Sepi also testified that he was an employee of the Park, that his job responsibilities included videography, and that this work was performed in exchange for his $150 per week salary. *Id.* at 75:23-76:11; 76:24-77:4; 88:11-20; 96:11-17; 97:97-97:24; 109:4-17; 120:16-121:19; 129:3-133:8; 200:5-8. At that time, he believed that he had been fully compensated for the work he performed for the Park. *Id.* at 246:6-14.

With respect to Whyte Monkee Productions, Mr. Sepi made it abundantly clear at his 2016 deposition that he had nothing to do with the creation of this entity. He testified that he had "never seen" the LLC registration paperwork "before in his life," it was not his idea to create Whyte Monkee Productions, he did not know who came up with the idea, and he did not have access to the email account provided on the paperwork. *Id.* at 134:7-135:19-140:23, 141:8-11; 156:25-158:1. Further, although the name "Tim Sepi" was included as the signatory on the Articles of Organization filed with the Oklahoma Secretary of State, Mr. Sepi testified that he did not give permission for his name to be used and

would not have signed the paperwork using the name "Tim." *Id.* at 135:19-136:1; 140:3-23.

Mr. Sepi also testified that he had no control over Whyte Monkee Productions and did not believe he had any right to accounts owned by Whyte Monkee Productions. *Id.* at 158:5-8; 246:6-14. As to whether he thought Whyte Monkee Productions owned any rights to video footage from *Joe Exotic TV*, he was, at best, unclear on the issue. First, he testified that he thought Whyte Monkee Productions was "going to be the company that was used for Joe Exotic TV" but that he "didn't know" that it "would own anything from Joe Exotic TV." *Id.* at 136:2-137:2. He then reiterated that he did not know who owned the rights to *Joe Exotic TV. Id.* 137:17-19. However, later in his deposition, he testified that he believed that all video footage would be owned by Whyte Monkee Productions. *Id.* at 151:17-20. When asked again who owned the content, he responded "[f]rom what it looks like, me." *Id.* at 154:12-13.

Mr. Sepi's testimony on these points changed significantly by the time he filed this lawsuit. In 2021, he gave a deposition in connection with this matter where he directly contradicted his earlier testimony and admitted to committing perjury at his 2016 deposition. Specifically, at his 2021 deposition, Mr. Sepi testified that he came up with the idea to form Whyte Monkee Productions after the studio fire and gained permission from the Park's nonprofit to film videos using this entity. Sepi Depo 2021 at 43:2-14. The purpose of forming a separate entity, Mr. Sepi testified, was to protect the footage that he filmed and produced. *Id.* at 44:13-20. When confronted with the 2016 deposition testimony where he repeatedly denied knowing anything about the formation of Whyte Monkee

Productions, Mr. Sepi initially stated that he was "confused" because Whyte Monkee Productions "did not solicit or offer any services or get paid for anything." *Id.* at 105:14-106:15.

Mr. Sepi also testified at his 2021 deposition that he completed the paperwork to register Whyte Monkee as an LLC with the Oklahoma Secretary of State. *Id.* at 110:15-119:19. When confronted with his contradictory 2016 deposition testimony, Mr. Sepi first said he did not know why he answered the question that way. *Id.* at 106:16-109:18. He then responded that he denied ever seeing the registration paperwork because he completed the paperwork electronically. *Id*. When asked about his prior testimony indicating that he would not have used the name "Tim Sepi" on official paperwork, his explanation was that he "just said that." *Id.* at 113:1-114:8. When pressed further as to why he changed his testimony on this specific issue, Mr. Sepi said that he was "attempting to keep myself safe." *Id.* at 115:8-116:20. He explained that he did not know what Exotic was capable of doing, Exotic "thinks he owns it all," and he said whatever he could to "leave on good terms." *Id.* at 115:8-119:22. Later, Mr. Sepi testified that he "got involved with an individual who was an employee at the facility" that "had cats there that were under Joe's license" and he said whatever he could to keep on good terms to get the animals and himself safely out of the facility. *Id.* at 120:1-121:7.

When asked why he thought giving a truthful answer regarding Whyte Monkee Productions' formation would be harmful to him, Mr. Sepi said he did not have an answer and did not know why he thought that. *Id.* at 122:11-23:14. He was "nervous, scared, confused" and "feared for his life" but could not explain why lying about the formation of

Whyte Monkee Productions would somehow protect him. *Id.* at 128:20-129:19. Later in his deposition, he testified that he lied because if he didn't provide false testimony about Whyte Monkee Productions he would be locked out of the Park and would not be able to retrieve camera equipment and footage. *Id.* at 138:18-141:15. However, Mr. Sepi also admitted that there was not any reason why Exotic would not want Mr. Sepi to take copies of the footage. *Id.* at 147:21-148:4.

Prior to testifying that he lied at his 2016 deposition, Mr. Sepi initially testified that he had reviewed his 2016 deposition transcript and believed it was truthful. *Id.* at 116:17-20. After he admitted to committing perjury, he attempted to qualify this answer by explaining that he "didn't have time to go through everything" but he "reviewed enough" of the 2016 transcript and "just didn't get all the way to the bottom." *Id.* at 124:1-18. His answer then changed to "I've reviewed it" but "didn't read it" and "[r]eading and reviewing is two totally different things." *Id.*

In addition to the contradictions regarding Whyte Monkee Productions, Mr. Sepi also testified that he was being paid $150 per week for his photography work at the Park, which did not include any videography. *Id.* at 63:8-19; 85:7-10. He testified that when he described himself as a "cameraman" in his 2016 deposition, he did not properly elaborate to indicate that he only meant photography. *Id.* 29:20-31:7. He did not explain why any of his other 2016 statements describing his job duties at the Park were incorrect. *Id.* Finally, at his 2021 deposition, Mr. Sepi admitted that he committed perjury when he testified in 2016 that Exotic hired him, but did not explain why he lied about this issue. *Id.* at 386:5-9.

11

## DISCUSSION

Plaintiffs' claim is straightforward: they assert that Defendants infringed their respective copyrights when they used clips from the eight videos in the *Tiger King* series without permission. To succeed on this claim, Plaintiffs must prove two elements: 1) ownership of a valid copyright and 2) unauthorized copying of original elements of the protected work. *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc*., 528 F.3d 1258, 1262 (10th Cir. 2008). As to seven of the videos, Defendants argue that Plaintiffs cannot prove the first element because the videos are works for hire belonging to Mr. Sepi's employer. As to the remaining video, Defendants argue that Plaintiffs cannot prove the second element because the video lacks the required originality. Alternatively, Defendants argue that, even if Plaintiffs own a valid copyright, the use of the clips was fair use such that no copyright infringement occurred. Each of these issues is addressed in turn.

### A. Ownership and Originality

#### 1. Works for Hire

Although ownership "vests initially in the author or authors of the work," 17 U.S.C. § 201(a), the Copyright Act carves out an "an important exception" for works made for hire. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). If a work is made for hire, "the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17

U.S.C. § 201(b). The Copyright Act defines a work made for hire as one that is "prepared by an employee within the scope of his or her employment."[1] *Id*. at § 101(1).

Defendants assert that seven of the eight videos involved in this litigation qualify as works for hire because they were created while Mr. Sepi was an employee of the Park and were made within the scope of his employment. Plaintiffs do not dispute that Mr. Sepi was an employee of the Park but argue that his duties for the Park were separate from his videography[2] services. The relevant inquiry, then, turns on whether the videos were made within the scope of Mr. Sepi's employment for the Park. *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1018 (9th Cir. 2012) (addressing only scope of employment because it was undisputed that alleged copyright owner was employee); *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) (same); *Fleurimond v. New York Univ.*, 876 F. Supp. 2d 190, 199 (E.D.N.Y. 2012) (same).

Because the Copyright Act does not define when a work is created within the scope of employment, "common-law agency principles govern resolution of that question." *Peiffer*, 21 F.3d at 571 (quoting *Reid*, 490 U.S. at 739-40). Accordingly, numerous courts have adopted the three-prong test expressed in Section 228 of the Restatement (Second) of Agency in determining whether a work was made within the scope of employment. *See,*

---

[1] A work made for hire is also defined to include "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. §101(2). The parties do not contend that this provision is applicable.

[2] As used here, the term "videography" encompasses filming and editing work.

*e.g., U.S. Auto Parts*, 692 F.3d at 1015; *Peiffer*, 21 F.3d at 571; *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 186 (2d Cir. 2004); *Sterpetti v. E-Brands Acquisition, LLC*, No. 6:04-CV-1843-ORL-3DA, 2006 WL 1046949, at *5 (M.D. Fla. Apr. 20, 2006); *Fleurimond*, 876 F. Supp. 2d at 199. Section 228 provides that conduct of a servant is within the scope of employment if "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228(1) (1958).[3] As explained below, Mr. Sepi's conduct meets each of these three elements.

---

[3] The parties rely on the formulation of "scope of employment" articulated in § 228 of the Restatement (Second) of Agency in their analysis, as opposed to the more recent version articulated in § 7.07 of the Restatement (Third) of Agency. The Restatement (Third) of Agency provides that

> [a]n employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

Restatement (Third) Of Agency § 7.07(2) (2006). The comments to this section indicate that, as compared to the definition used in the Restatement (Second) of Agency, this formulation is "phrased in more general terms" and designed to accommodate "contemporary workforces" where employees may not be "situated on the employer's premises nor continuously or exclusively engaged in performing assigned work." *Id.* at cmt. b. Because the parties rely on the formulation contained in the Restatement (Second) of Agency, the Court has also structured its analysis using this formulation. Opinions post-dating the publication of the Restatement (Third) of Agency have similarly relied on the Restatement (Second) of Agency's three-part formulation when analyzing whether a work was made for hire under the Copyright Act. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 277 (3d Cir. 2019); *U.S. Auto Parts*, 692 F.3d at 1015; *Fleurimond*, 876 F. Supp. 2d at 199. However, regardless of which definition is used, the Court would reach the same result.

a. *Whether the conduct was "of the kind" the servant was employed to perform.*

At his 2016 deposition, Mr. Sepi testified – unequivocally – that he was hired to perform videography work which would include, at least in part, producing videos for *Joe Exotic TV*. He further testified that he eventually came to understand that he was working for the Park and that he filmed and produced videos featuring Exotic in exchange for his $150 per week salary from the Park. Although Mr. Sepi's ability to perform the full range of his job duties was temporarily halted when the Park's studio was destroyed, he was still employed as a videographer and he resumed performing these duties once the studio was rebuilt. As to Whyte Monkee Productions, Mr. Sepi testified that he neither created nor controlled it. This testimony is fatal to his copyright infringement claim – no reasonable juror could interpret the 2016 testimony as establishing anything other than Mr. Sepi's admission that he was a Park employee who was performing videography work within the scope of his employment.

But Mr. Sepi's testimony has changed. According to his 2021 deposition testimony, he was hired solely to perform photography services and he personally conceived of and set up Whyte Monkee Productions as a separate venture for his videography work. Mr. Sepi does not attribute this drastic change in testimony to a failure of memory or confusion, but to a brazen act of perjury. He contends that the testimony he provided in 2016 (which is now unfavorable to him) was simply a lie. Unsurprisingly, Defendants argue that the 2021 testimony should be excluded under the sham affidavit doctrine.

The sham affidavit doctrine provides that an affidavit conflicting with the affiant's prior sworn statements should be disregarded when "it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). The policy underlying this rule is obvious: "the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Id.* Although the rule is typically applied to affidavits submitted during summary judgment briefing, it has also been applied to preclude corrections on a deposition errata sheet, *Burns v. Bd. of Cty. Comm'rs of Jackson Cty.*, 330 F.3d 1275, 1282 (10th Cir. 2003), and later deposition testimony that contradicts an earlier sworn statement. *Martinez v. Barnhart*, 177 F. App'x 796, 800 (10th Cir. 2006) (unpublished); *Essick v. Yellow Freight Sys., Inc.,* 965 F.2d 334, 336 (7th Cir. 1992). "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks*, 796 F.2d at 127.

Although Mr. Sepi was not represented by a lawyer during his 2016 deposition or cross-examined in the traditional sense, he did have access to the pertinent evidence and his responses reflected no confusion regarding either the job he was employed to perform or his lack of involvement in the formation or operation of Whyte Monkee Productions. Moreover, the inconsistencies in his testimony are not slight variations affecting only the weight of the evidence, but direct contradictions on issues that are dispositive of his claims.

16

Still, there *might* be a case for not excluding the later testimony as a sham had Mr. Sepi provided a rational explanation for lying under oath. But he did not.

Start with the testimony regarding his job responsibilities. At his 2021 deposition, Mr. Sepi stated that he was paid by the Park only for his photography work, that he was not hired by Exotic, and that he was hired only as a photographer.[4] Sepi Depo 2021 at 63:8-19; 85:7-10; 386:5-9. These statements plainly contradict his 2016 testimony, where he stated that Exotic hired him, he was hired to work partly on *Joe Exotic TV*, and that his Park salary included videography work.[5] Sepi Depo 2016 at 74:9-76:11. His only attempted explanation for these contradictions is that when he used the word "cameraperson" in his 2016 deposition to describe what Exotic hired him to do, he did not properly specify that he meant only still photography. *Id.* at 29:20-31:10. But Mr. Sepi demonstrated no confusion at his 2016 deposition regarding the duties of a cameraman and even explained that "[c]ameraman can mean still or video." Sepi Depo 2016 at 88:8-10. In any event, Mr. Sepi's subsequent clarification of his testimony goes to a single question and fails to

---

[4] Although Mr. Sepi testified in 2021 that he was hired only as a photographer, Plaintiffs' response brief states otherwise. Plaintiffs' Statement of Additional Material Facts admits that Mr. Sepi was hired – not as a photographer taking still photos of park tours – but as a cameraman on *Joe Exotic TV* for $150 per week. The inconsistency between Mr. Sepi's 2021 testimony and the admissions made in Plaintiffs' brief further supports the Court's conclusion that Mr. Sepi's 2021 testimony is designed to create a sham issue of fact.

[5] Plaintiffs argue that this testimony describes only what Mr. Sepi was hired to do, and not what his job responsibilities were following the studio fire. Pls.' Br. at 14. However, as Defendants point out in their reply brief, this is a tortured reading of Mr. Sepi's 2016 testimony. Mr. Sepi's 2016 testimony indicates that he worked for the Park as a videographer even after the studio was rebuilt. *See, e.g.* Sepi Depo 2016 at 97:9-98:14; 120:20-121:13.

address the other statements he made in 2016 indicating that he was filming and producing videos as part of his employment for the Park.

With respect to his testimony regarding the formation of Whyte Monkee Productions, Mr. Sepi could not provide a consistent explanation as to why he lied. At the outset of his 2021 deposition, he indicated that he reviewed his 2016 testimony and believed it to be truthful. When confronted with his 2016 testimony indicating that he did not know why Whyte Monkee Productions was created, he first stated that he was "confused" by what he was being asked because Whyte Monkee Productions "did not solicit or offer any services or get paid for anything." Sepi Depo 2021 at 105:14-106:15. He did not explain how these features would cause confusion when responding to a question as straightforward as "Do you know why it was created at that time, what the purpose was?" Sepi Depo 2016 at 104:9-11.

Similarly, when Mr. Sepi was confronted with his 2016 testimony indicating he had never seen the LLC paperwork for Whyte Monkee Productions, Mr. Sepi first stated that he did not know why he answered the question that way. He quickly changed tack and asserted that he said he had not seen the paperwork before because it was filed electronically. If that is true, it represents an unreasonably narrow interpretation of the deposition question and an inappropriately evasive response. Moreover, his explanation does not account for the testimony directly surrounding his response, where he acknowledged that the paperwork was obtained from a state website, that the paperwork submission date had no significance to him, and that he did not know how Whyte Monkee Productions came to be created. *Id.* at 134:7-136:15.

Mr. Sepi's explanation for committing perjury in 2016 continued to evolve as his deposition went on. When asked why he stated in 2016 that he would not have signed the LLC paperwork using the name "Tim," he said he "probably just said that." *Id.* at 112:20-114:8. Eventually, he explained that he lied because he feared for his life and wanted to keep on good terms with Exotic.[6] *Id.* at 115:8-122:22. He then elaborated that he "got involved with an individual who was an employee at the facility" that "had cats there that were under Joe's license" and he said whatever he could to keep on good terms to get the animals and himself safely out of the facility. *Id.* At another point in his 2021 deposition, he testified that he lied because if he didn't provide false testimony he would be locked out of the Park and would not be able to acquire camera equipment and footage. *Id.* at 140:9-141:15. But when asked why he thought giving a truthful answer regarding Whyte Monkee Productions' formation would be harmful to him, Mr. Sepi said he did not have an answer and did not know why he thought that. *Id.* at 122:11-23:14.

Ultimately, Mr. Sepi's 2021 testimony regarding his job responsibilities and the formation of Whyte Monkee directly contradicts his earlier sworn testimony and he has failed to offer a rational or consistent explanation for the contradictions. Because the testimony is in direct conflict and the contradictions are not the result of confusion, a failure

---

[6] It must be noted that this explanation makes no sense. The 2016 testimony was given in connection with the garnishment proceeding initiated by Exotic's rival, Carol Baskin, in an attempt to collect on her $1 million judgment. Mr. Sepi's 2016 testimony disclaiming knowledge of Whyte Monkee Production's creation and denying he had the ability to control its accounts *hurt* Exotic's interests with respect to the garnishment and would presumably not be what a person would say if they wanted to keep on good terms with Exotic.

of memory, or newly discovered evidence, Mr. Sepi's 2021 testimony is appropriately excluded as a transparent attempt to create a sham issue of fact. *See Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1017 (10th Cir. 2002) (excluding affidavit that contradicted deposition testimony because nothing in deposition questions suggested deponent should limit his answers to particular meetings or conversation); *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) (excluding defendant's affidavit that came into existence a year and half after deposition, directly contradicted earlier testimony, and which was detrimental to plaintiff's sole remaining cause of action); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 894 (10th Cir. 1997) (excluding affidavit that specified key information where earlier deposition testimony responses were "probably not" and "I don't know"); *Barber v. Hallmark Cards, Inc.*, 74 F.3d 1248 (10th Cir. 1996) (unpublished) (excluding affidavit that directly contradicted deposition testimony because testimony was unequivocal and did not reflect confusion); *Rios v. Bigler,* 67 F.3d 1543, 1551 (10th Cir. 1995) (excluding affidavit testimony because deposition was unequivocal and deponent had access to relevant materials); *Franks,* 796 F.2d at 1237 (excluding affidavit that directly contradicted prior sworn testimony). No other result is warranted – litigants cannot be permitted to create a fact issue by simply dismissing as a lie prior sworn testimony that no longer serves their purpose, particularly when they cannot offer anything other than a nonsensical, inconsistent explanation for their actions.

Without Mr. Sepi's 2021 testimony to rely on, the only other evidence Plaintiffs offer is an unnotarized declaration from former Park manager John Reinke stating that

"Sepi was hired as the parks [sic] photographer for zoo tours and graphic designer"[7] and "[s]eperate from employment duties at the Zoo, Sepi produced content for the Joe Exotic TV YouTube channel under Whyte Monkee Productions LLC." Ex. 4 to Pls. Br. Defendants object to the admissibility of this declaration as running afoul of Fed. R. Civ. P. 56(c)(4) because it is not made on personal knowledge and does not show that Mr. Reinke is competent to testify on these matters. However, Rule 56(c)'s requirements of personal knowledge and competence may be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge. *Told v. Tig Premier Ins. Co.*, 149 F. App'x 722, 725 (10th Cir. 2005) (unpublished). Construing the evidence in the light most favorable to Plaintiffs, it can reasonably be inferred that the park manager, who worked at the park during the duration of Mr. Sepi's employment, would have at least some personal knowledge of Mr. Sepi's job responsibilities.

However, to establish a fact for summary judgment purposes, an "affidavit must set forth facts, not conclusory statements." *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1101 (10th Cir. 1999). Mr. Reinke's declaration provides only a conclusory statement that Mr. Sepi's videography work was a separate enterprise for Whyte Monkee Productions and fails to include any facts indicating how he came to know of this arrangement, the details of the arrangement, or the purpose of the arrangement. Mr. Reinke's affidavit is therefore insufficient to create a factual dispute on this issue. *Lantec, Inc.*, 306 F.3d at 1019 (refusing to consider verified complaint on summary judgment

---

[7] Mr. Reinke's statement is contradicted by Plaintiffs' brief which states that Mr. Sepi was hired to work as a cameraman on *Joe Exotic TV*.

because it "did little more than state a legal conclusion" and failed to include details regarding an alleged oral contract); *Mitchael v. Intracorp, Inc*., 179 F.3d 847, 856 n. 9 (10th Cir. 1999) (finding affidavit submitted on summary judgment "unpersuasive because much of it is conclusory, vague, and/or lacking in foundation" and fails to include details regarding alleged agreement).

In any event, even crediting Mr. Sepi's 2021 testimony, videography is sufficiently related to photography to be considered "of the kind" of work Mr. Sepi was employed to perform. Mr. Sepi testified in 2021 that after the studio was destroyed, he was working for the Park "doing photography for the tours," "doing marketing photos," and "doing audio in the gift shop and the audio at the stage area." Sepi Depo 2021 at 57:10-18. This type of work – photography, audio set up, and marketing – is similar in kind to the videography work Mr. Sepi was also performing. Indeed, as even Mr. Sepi admits, photography and videography involve overlapping skills, both fall under the umbrella of camera operation, and both involved promotion of the Park. Sepi Depo 2021 at 212:16-21. The videography work, then, is more aptly described as an expansion of the photography work Mr. Sepi was already performing for the Park rather than a departure from that work, and as such, it falls within the scope of his employment. *See Fleurimond*, 876 F. Supp. 2d at 204 (artistic creation of mascot for university within scope of employment for graphic designer employed to create seals, signs, and banners for university website); Restatement (Third) of Agency §7.07(2) cmt b (describing work as outside the scope of employment where it "represents a departure from, not an escalation of, conduct involved in performing assigned work or other conduct that an employer permits or controls.").

22

Plaintiffs respond that – perjured statements aside – Mr. Sepi testified consistently in 2016 that he believed Whyte Monkee Productions owned the rights to the footage produced under its name. But the relevant inquiry is whether an employee's conduct in creating the work was "of the kind" he was employed to perform, not whether the employee believed he owned the work or wished to keep it separate. Moreover, material created separate from an employee's normal responsibilities can still fall within the scope of employment if its creation is incidental to an employee's job duties and within the ultimate objective of the principal. *See Genzmer v. Pub. Health Tr. of Miami-Dade Cty.,* 219 F. Supp. 2d 1275, 1281 (S.D. Fla. 2002) (creation of computer program by doctor undertaking research project within scope of employment); *Vanderhurst v. Colorado Mountain Coll. Dist.,* 16 F. Supp. 2d 1297, 1307 (D. Colo. 1998) (outline created by teacher on his own time and with own materials was a work for hire); *Miller v. CP Chemicals, Inc.,* 808 F. Supp. 1238, 1243-44 (D.S.C. 1992) (creation of computer program by lab supervisor on his own time and with own materials was a work for hire). Videography of the Park and Exotic (the Park's entertainment director) was incidental to Mr. Sepi's employment as Park photography and, importantly, both tasks were within the Park's objective of promoting its activities. Mr. Sepi's videography work was therefore "of the kind" Mr. Sepi was employed to perform.

Finally, the fact that Mr. Sepi and Exotic (or anyone else at the Park) may have orally agreed to define Mr. Sepi's work as separate from his Park duties is not sufficient to place the conduct outside the scope of employment or to vary the ownership rights of a work made for hire. 17 U.S.C. § 201(b) (requiring signed, written instrument to vary

23

Add. 23

ownership rights); *Fleurimond*, 876 F. Supp. 2d at 207-208 ("Moreover, to the extent the parties may have orally agreed to define the Plaintiff's work as one outside the scope of her employment, such an agreement is non-enforceable under the Copyright Act."). The same is true with respect to the formation of a limited liability company. Where an employee creates a work within the scope of employment, a work does not cease to be a work made for hire simply because the employee creates a separate entity. As Mr. Sepi was acting within the scope of his employment for the Park, the videos are works for hire with authorship vesting in the Park. Had the involved parties wished for authorship to vest in Whyte Monkee Productions or in Mr. Sepi individually, they should have executed a written agreement pursuant to 17 U.S.C. § 201(b).

Accordingly, Defendants have met their burden of demonstrating that there is no genuine dispute that Mr. Sepi's videography work was of the kind he was employed to perform.

> b. *Whether the work occurred substantially within the authorized time and space limits.*

Having satisfied the first element for demonstrating that the videos were created within the scope of employment, Defendants must still prove the two remaining elements. The second element requires proof that the employee's conduct occurred substantially within the authorized time and space limits. Plaintiffs offer no specific argument in response to Defendants' assertion that this element is satisfied. The undisputed facts show that Mr. Sepi split his workday between photography, filming, and editing, that the videos were filmed on or near Park premises, that he completed at least some of this work at a

studio on Park premises, and that he used at least some camera and computer equipment that was procured by someone at the Park for his use. Defendants have therefore met their burden of establishing that the work occurred substantially, if not entirely, within the authorized time and space limits.

      c. *Whether the work was actuated, at least in part, by a purpose to serve the employer.*

Finally, Defendants must show that Mr. Sepi's conduct in creating the videos was actuated, at least in part, by a purpose to serve the Park. Plaintiffs do not dispute that Mr. Sepi filmed the videos "to provide publicity for the Zoo" and to make Exotic look good. Thus, even if part of Mr. Sepi's motivation was to eventually license the footage or otherwise use it for his own purposes, his work was at least partly actuated by a desire to serve the Park.

Accordingly, viewing the evidence in the light most favorable to Plaintiffs, and considering the record as a whole, no reasonable juror could conclude that the seven videos at issue were created outside the scope of Mr. Sepi's employment for the Park. The videos therefore qualify as works for hire under § 201(b) of the Copyright Act, and Mr. Sepi's employer[8] is the author of the works.

**2. Originality**

The sole remaining video at issue is titled Travis MM Funeral Ceremony and was filmed after Mr. Sepi ended his employment with the Park. Defendants argue that this video

---

[8] Whether that be the Gerald Wayne Interactive Zoological Park, the Greater Wynnewood Zoological Park, or some other entity is not relevant. All that matters for purposes of this litigation is that the works are not owned by Mr. Sepi or Whyte Monkee.

is not subject to copyright protection because it lacks originality. In support of this argument, Defendants rely on *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008), where the Tenth Circuit explained that "not every work of authorship, let alone every aspect of every work of authorship, is protectable in copyright; only original expressions are protected." An original expression is one that is "'independently created by the author (as opposed to copied from other works).'" *Id.* at 1263 (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)). With respect to a medium like photography, a photograph is subject to copyright to the extent it "reflects the photographer's decisions regarding pose, positioning, background, lighting, shading, and the like." *Id.* at 1264. Applying these principles, the Tenth Circuit in *Meshwerks* held that digital models of Toyota vehicles that were developed to be used on Toyota's website were not original, and therefore not copyrightable, because they were unadorned copies that did not involve making any decisions regarding lighting, shading, angle, and so on. *Id.* at 1265-66.

The same cannot be said here. Mr. Sepi admits that the video was filmed using a tripod and was unedited, but he also testified that he decided where to place the camera by figuring out the best viewpoint. The video itself shows the camera zooming in and out several times and panning around the scene, further suggesting that Mr. Sepi made at least some intentional decisions regarding angle, focus, and what to film. Just as these elements are sufficient to make a photograph of a real world object copyrightable, they are sufficient to make a video of a real world event copyrightable. *See Feist*, 499 U.S. at 1289 ("Thus, even a directory that contains absolutely no protectible written expression, only facts,

meets the constitutional minimum for copyright protection if it features an original selection or arrangement."). And, unlike in *Meshworks*, 528 F.3d at 1264, where the models were "not so much independent creations as (very good) copies of Toyota's vehicles," this video is not a copy of another work but an independent creation. Thus, construing the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that the Travis MM Funeral Ceremony video contains elements of originality that are subject to copyright.

Because there is at least a factual dispute as to the originality of the video, and the video is not a work for hire, it is necessary to evaluate Defendants' alternative argument – that their use of the video in *Tiger King* was a fair use that did not infringe Mr. Sepi's copyright.

### B. Fair Use

Under § 107 of the Copyright Act, "a copyright holder cannot prevent another person from making a 'fair use' of copyrighted material." *Google LLC v. Oracle Am., Inc.*, __ U.S. __, 141 S. Ct. 1183, 1196 (2021). This doctrine embodies "an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Id.* (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). The Copyright Act sets out four nonexclusive factors that courts must consider in determining whether the use of a protected work is a fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. When evaluating fair use, all of these factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 578 (1994)*.* "Although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

Defendants contend that, applying the four factors outline in the Copyright Act, their use of all eight videos qualifies as a fair use. However, because seven of the videos are works for hire with authorship vesting in Mr. Sepi's employer, it is only necessary to determine whether Defendants' use of the remaining video – Travis MM Funeral Ceremony – was a fair use. *See PDK Lab'ys Inc. v. U.S. D.E.A*., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) ("[I]f it is not necessary to decide more, it is necessary not to decide more.").

### 1.  Purpose and Character of the Use

The first factor concerns "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Where a defendant's use of a protected work qualifies as "criticism, comment, news reporting, teaching…scholarship, or research," there is a strong presumption that this

factor favors the defendant. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004). But the core of this inquiry is "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (internal citation and quotation marks omitted) (alteration in original). Put another way, this factor asks "whether and to what extent the new work is 'transformative.'" *Id.* "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*

The parties have very different views of the *Tiger King* series. Defendants describe it as a documentary providing criticism and commentary on Exotic's behavior, roadside zoos, and contemporary society, whereas Plaintiffs liken it to a reality show that serves only to entertain. But under either categorization, there can be no dispute that Defendants' use of the Travis MM Funeral Ceremony video serves a different purpose than the one Mr. Sepi intended.

At his 2021 deposition, Mr. Sepi testified that he created the video "[f]or remembrance" and that it was livestreamed on YouTube without any editing, where it remained afterward. Sepi Depo 2021 at 425:19-21. Defendants' use and purpose is decidedly different – they have excised a relatively small portion of the video, interspersed it with comments from Mr. Maldonado's mother that are critical of Exotic, and woven it into the larger narrative of the series. Thus, whether for entertainment value, cultural commentary, or both, Defendants have imbued the original video with a different character

and altered its message. Rather than "merely repackage[ing] or republish[ing]" the Travis MM Funeral Ceremony video, Defendants have used it as "raw material" to create "new information, new aesthetics, new insights and understandings." *Seltzer v. Green Day, Inc*., 725 F.3d 1170, 1176 (9th Cir. 2013) (quotation omitted). Their use is therefore transformative, and this factor weighs in favor of fair use. *See Bill Graham Archives*, 448 F.3d at 609-610 (use of copyrighted images in biography accompanied by commentary and when standing alone was transformative because it was "plainly different from the original purpose for which [the images] were created."); *SOFA Ent., Inc. v. Dodger Prods., Inc*., 709 F.3d 1273, 1278 (9th Cir. 2013) (use of clip of the Four Seasons performance on *The Ed Sullivan Show* in a musical about the Four Seasons was transformative because it was used as a "biographical anchor" rather than "for its own entertainment value"); *Red Label Music Publ'g, Inc. v. Chila Prods*., 388 F. Supp. 3d 975, 984 (N.D. Ill. 2019) (football documentary's use of clip of *Super Bowl Shuffle* song was transformative because the song was "not serving its original function of entertainment in the film.").

The commercial nature of *Tiger King* does not undermine this conclusion. The clips from the Travis MM Funeral Ceremony video comprise a tiny fraction of the series and are not themselves exploited for commercial gain. *Seltzer*, 725 F.3d at 1178 (finding that use of copyrighted image at concert was only incidentally commercial because it was never used to market concert or merchandise). Additionally, "[w]hen the defendant does not merely duplicate and copy verbatim the original in its entirety, pecuniary gain is largely a non-issue." *Red Label Music Publ'g, Inc*, 388 F. Supp. 3d at 985 (citing Campbell, 510 U.S. at 591).

### 2.  Nature of the Copyrighted Work

The second factor in the fair use inquiry – the nature of the copyrighted work – recognizes that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Generally, the law "recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 563 (1985). Whether a work has been published is also critical to its nature: "the scope of fair use is narrower with respect to unpublished works" but "even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public." *Id.* 563.

Although perhaps possessing some elements of originality with respect to angle, lighting, and framing, the Travis MM Funeral Ceremony video is not a work of fiction or artistry. The video is more factual than creative, which tips the scales slightly in favor of fair use. More important, however, is that the video was previously published – it was livestreamed via YouTube and remained there afterwards – and Defendants' use of a few select clips therefore did not infringe Mr. Sepi's "right to control the first expression" of the work. *Id.*; *see also Seltzer*, 725 F.3d at 1178. This factor therefore also weighs in favor of fair use.

### 3.  Amount and Substantiality of the Portion Used

The third factor concerns the amount and substantiality of the portion used and is reviewed "with reference to the copyrighted work, not the infringing work." *Bill Graham*

*Archives*, 448 F.3d at 613. This factor requires courts to consider not only "the quantity of the materials used," but also "their quality and importance." *Campbell*, 510 U.S. at 587. So long as "the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003).

The portions of the video used by Defendants show Exotic speaking at the funeral. Qualitatively, these clips are some of the more unusual portions of the video, although they are not necessarily the most important. The comments by Mr. Maldonado's mother, for example, may be just as significant as the comments by Exotic to a person wanting to view the funeral. Quantitatively, only a tiny portion of the Travis MM Funeral Ceremony video is featured in *Tiger King*. Because Defendants' use of the video comprises a small portion of the original, this factor weighs in favor of fair use.

### 4. Effect on the Potential Market for or Value of the Work

The final factor "asks what effect the allegedly infringing use has on the 'potential market for or value of the copyrighted work.'" *Seltzer*, 725 F.3d at 1179 (quoting 17 U.S.C. § 107(4). This factor requires consideration of "the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant...would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotation omitted). When "a commercial use amounts to mere duplication of the entirety of an original" and "serves as a market replacement," it is more likely that "cognizable market harm to the original will occur." *Id.* at 591. Conversely, when "the second use is

transformative, market substitution is at least less certain, and market harm may not be so readily inferred." *Id.*

   *Tiger King* is not a substitute for the Travis MM Funeral Ceremony video. It is not likely that a person interested in viewing the funeral would consider viewing *Tiger King* as a replacement. Given that Mr. Sepi filmed this particular video as a means of remembering his friend, and not as a creative or entertainment venture, Defendants' use of the video has therefore not usurped any primary market for the work. *SOFA Ent., Inc.,* 709 F.3d at 1280 (no market harm where second work was not a substitute for the original); *Bill Graham Archives*, 448 F.3d at 614 (transformative work did not cause market harm). Further, to the extent Mr. Sepi intends to license the video or certain clips, the portions featured in *Tiger King* are "too few, too short, and too small in relation to the whole" to undercut any market for this material. *Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 495 (S.D.N.Y. 1996). Potential purchasers of the Travis MM Funeral Ceremony video or clips from this video are unlikely to purchase that material from Defendants, as opposed to Plaintiffs, and Defendants' use of the video will therefore have a minimal effect on any potential markets or the value of this work. *Red Label Music Publishing, Inc.*, 388 F. Supp. 3d at 898.

   In sum, each of the four statutory factors favors a finding that Defendants' use of portions of the Travis MM Funeral Ceremony video was a fair use. Considering these factors together, and mindful that copyright aims to both "secure a fair return for an 'author's' creative labor" and "stimulate artistic creativity for the general public good,"

Add. 33

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975), Defendant's use of the Travis MM Funeral Ceremony video was fair use.

## CONCLUSION

For the reasons stated above, the court finds that Defendants are entitled to summary judgment on Plaintiffs' copyright infringement claim.

**IT IS THEREFORE ORDERED** that Defendants Netflix, Inc. and Royal Goode Productions LLC's Motion for Summary Judgment [Doc. No. 46] is **GRANTED**.

**IT IS SO ORDERED** this 27th day of April, 2022.

_____

TIMOTHY D. DeGIUSTI
Chief United States District Judge

34

Add. 34

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

WHYTE MONKEE PRODUCTIONS,    )
LLC, and    )
TIMOTHY SEPI,    )
   )
      Plaintiffs,    )
   )
v.    )    Case No. CIV-20-933-D
   )
NETFLIX, INC., and    )
ROYAL GOODE PRODUCTIONS, LLC,    )
   )
      Defendants.    )

## **JUDGMENT**

Pursuant to the Order issued this date granting summary judgment to Defendants Netflix, Inc. and Royal Goode Productions, LLC, the Court enters judgment in favor of Defendants and against Plaintiffs.

ENTERED this 27th day of April, 2022.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge

Add. 35

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the Tenth Circuit by submitting through the

appellate CM/ECF.

Opposing counsel have been served by the notice of docketing activity they

will receive through the CM/ECF system.


Date: September 29, 2022          Respectfully submitted,

                                  */s/ Andrew Grimm*_____
                                  Andrew Grimm