**No. 22-6086**

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

WHYTE MONKEE PRODUCTIONS LLC, TIMOTHY SEPI,

*Plaintiff-Appellants*,

v.

NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,

*Defendant-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA,
HON. TIMOTHY D. DEGIUSTI
NO. 5:20-CV-00933-D

---

**APPELLEES' SUPPLEMENTAL BRIEF RE:**
***Andy Warhol Foundation for the Visual Arts, Inc. v. Lynn Goldsmith et al.*,**
**143 S. Ct. 1258 (2023)**

---

[Argument Held March 22, 2023]

Robert H. Rotstein
Emily F. Evitt
MITCHELL, SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California 90067
Telephone: (310) 312-2000
Email: rxr@msk.com

Mack J. Morgan, III
MJMLAW PLLC
6618 N. Hillcrest Ave
Nichols Hills, Oklahoma 73116
Telephone: (405) 343-7454
Email: mack@mjmlaw.biz

*Attorneys for Defendants-Appellees*
*Netflix, Inc. and Royal Goode Productions LLC*

## TABLE OF CONTENTS

**Page**

**INTRODUCTION** .......... 1

**THE *WARHOL* OPINION** .......... 2

**ARGUMENT** .......... 5

**I.** ***Warhol*'s Reasoning Confirms That the First Factor Weighs in Favor of Fair Use in the Current Case** .......... 5

**II.** **Nothing in *Warhol* Changes the Conclusion That the Remaining Three Factors Weigh in Favor of Fair Use** .......... 9

**CONCLUSION** .......... 10

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
143 S. Ct. 1258 (2023) .......... 1, 2, 3, 4, 5, 6, 7, 8, 9, 10

*Andy Warhol Foundation v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021) .......... 3, 10

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .......... 4, 10

*Blanch v. Koons*,
467 F.3d 244 (2d. Cir. 2006) .......... 7

*Campbell v. Acuff-Rose Music, Inc.*,
510 U. S. 569 (1994) .......... 6, 8

*Google LLC v. Oracle America, Inc.*,
593 U.S. __, 141 S. Ct. 1183 (2021) .......... 1, 4, 8, 10

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985) .......... 9

*Núñez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000) .......... 4, 10

*SOFA Entertainment, Inc. v. Dodger Productions*,
709 F.3d 1273 (9th Cir. 2013) .......... 7

### STATUTES

17 U.S.C. § 107 .......... 1, 2, 3, 6

## INTRODUCTION

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023) ("*Warhol*") confirms that, because *Tiger King* (the "Documentary") used short portions of the Funeral Video for a completely different purpose from Plaintiffs' original use, the first fair use factor under 17 U.S.C. § 107 weighs in favor of fair use:

***First***, the works at issue in *Warhol* had substantially the *same* purpose: commercial licensing to magazines publishing articles about Prince. In sharp contrast, the parties here used the Funeral Video for entirely different purposes—Mr. Sepi to commemorate his friend's death, and Defendants to create a documentary about a dark subculture and a colorful narcissist. Contrary to Plaintiffs' assertion, moreover, these distinct uses are *objective facts*, not subjective interpretations of meaning or message.

***Second***, *Warhol* instructs courts to look at the "context of the *specific use* at issue," which in that case entailed the narrow purpose of licensing images to magazines to accompany stories about the musical artist Prince. There is no merit to Appellants' contention that *Warhol* dictates that "specific use" be equated with a challenged work's mode of distribution or transmission, *e.g.* "streaming."

***Third***, the cases that the Supreme Court upheld as examples of transformative uses—most notably, *Google LLC v. Oracle America, Inc.*, 593 U.S. __ , 141 S. Ct. 1183 (2021)—confirm that the first factor weighs heavily in Defendants' favor here.

***Fourth***, *Warhol* reaffirmed that Section 107's "preamble" uses (*i.e.*, criticism, comment, news reporting, teaching …, scholarship, or research) are the types of uses most commonly found to be fair. The Documentary used short excerpts from the Funeral Video

for purposes of commentary and criticism. Indeed, *Warhol* condemns the type of aesthetic gatekeeping that Plaintiffs would import into these preamble uses.

***Fifth***, in creating his portrait of Prince, Andy Warhol made only "modest alterations" to Goldsmith's photographic portrait. In contrast, Defendants here took short excerpts of the Funeral Video, interspersed them with other video footage, juxtaposed audio commentary, and used the resultant material as a small part of a single episode of a seven-episode documentary.

Appellants also re-argue the other fair use factors. *Warhol* and prior case law refute these additional arguments as a matter of law.

## THE *WARHOL* OPINION

In 1981, photographer Lynn Goldsmith photographed Prince, then an up-and-coming musician. In 1984, Goldsmith granted a limited one-time license for one of these photographs to be used as a "reference image" by another artist. That artist turned out to be Andy Warhol, whose resulting image was published in *Vanity Fair* to illustrate a 1984 story about Prince. Later, however, Warhol without permission created a further series of works based on Goldsmith's photograph. Warhol died in 1987. In 2016, Andy Warhol Foundation for Visual Arts ("AWF") licensed one of these later Warhol works ("Orange Prince") to Condé Nast to appear on the cover of a commemorative magazine article about Prince. When Goldsmith objected to Condé Nast's unauthorized use of Orange Prince, AWF sued, seeking a declaratory judgment that Warhol's use of Goldsmith's photo constituted fair use under Section 107; Goldsmith countersued.

The district court found Warhol's use to be fair. The Second Circuit reversed, noting, *inter alia*, that "there can be no meaningful dispute that the overarching purpose and function of the two works . . . is identical," and that Warhol's portraits based on Goldsmith's work were "closer to what the law deems 'derivative' [than] 'transformative'." *Andy Warhol Foundation v. Goldsmith*, 11 F.4th 26, 42, 44 (2d Cir. 2021) ("*AWF v. Goldsmith*"). By AWF's construction in its petition for certiorari, the sole question before the Supreme Court was whether the first factor weighed in favor or against fair use.

The *Warhol* Court first noted that, under the first fair use factor, a court will analyze whether an allegedly infringing work has a further purpose or different character from the original purpose. The Court explained that Section 107 of the Copyright Act requires this inquiry proceed by "analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" 143 S. Ct. at 1277. In the case before it, the Court focused on the narrow purpose of AWF's use—namely, AWF's commercial licensing of Orange Prince to Condé Nast for publication—and held that Goldsmith's original photograph of Prince had "substantially the same purpose." That is, both were "*portraits of Prince used to depict Prince in magazine stories about Prince*." *Id.* at 1273 (emphasis added). Thus, because the use was non-transformative and commercial, the Court held that the first factor weighed against fair use.

Importantly, the Court stressed that its holding was quite narrow, limited *only* to AWF's licensing in 2016 of Warhol's unlicensed Orange Prince to Condé Nast for use with a magazine story, as that was the only "specific use" that Goldsmith challenged as

infringing. *See Warhol* at 143 S. Ct. at 1266, 1278 and n. 9; *see also id.* at 1289 (Gorsuch, J., concurring).[1] Finally, the Court made clear that, while targeting the original work weighs in favor of fair use, such targeting is not required. *Id.* at 1285, n.21.

While noting that the commercial nature of a use is a consideration under the first factor, the *Warhol* Court stressed that commerciality is to be weighed along with the degree of transformation that was added to the work, and whether justification existed for the specific use. *Id.* at 1276-77. As a contrast to the facts before it, the Court cited, among other opinions, *Google LLC v. Oracle America, Inc.*, 593 U.S. __ , 141 S. Ct. 1183 (2021), as a case where the first factor weighed in favor of fair use. Despite Google's extensive use of Oracle's software and the high degree of commerciality, Google's uses had "significantly different" purposes and compelling justifications for interoperability of an entire industry—and were thus transformative in a way that the use in *Warhol* was not. *Id.* at 1277 n. 8.[2]

---

[1] Indeed, in his concurring opinion, Justice Gorsuch wrote: "[W]hile our interpretation of the first fair-use factor does not favor the Foundation in this case, it may in others. If, for example, the Foundation had sought to display Mr. Warhol's image of Prince in a nonprofit museum or a for-profit book commenting on 20th-century art, the purpose and character of that use might well point to fair use." 143 S. Ct. at 1291.

[2] Also cited as examples of transformative uses were *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (Leval, J.) (first factor weighed in favor of fair use where Google copied entire works for commercial purposes but made them searchable); *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 21-23 (1st Cir. 2000) (commercial use in newspaper of plaintiff's copyrighted photograph was transformative where plaintiff's photographs were originally intended to appear in modeling portfolios, not in the newspaper). *See* 143 S. Ct. at 1275 n.5, 1276, 1284.

## ARGUMENT

### I. *Warhol*'s Reasoning Confirms That the First Factor Weighs in Favor of Fair Use in the Current Case

In *Warhol*, Andy Warhol's work made only "modest alterations" to Goldsmith's photograph, and Warhol used Goldsmith's work for a virtually identical purpose—to license a portrait of Prince to a magazine company for a magazine story about Prince. On those facts, the Court held that the first factor weighed against fair use. The Court's reasoning, however, compels the opposite conclusion in the instant case.

"[A] use that has a distinct purpose is justified because it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." 143 S. Ct. at 1276. Here, the Documentary used excerpts from the Funeral Video for a purpose distinct from the original. As the district court noted:

> At his 2021 deposition, Mr. Sepi testified that he created the video "[f]or remembrance" and that it was livestreamed on YouTube without any editing, where it remained afterward. Defendants' use and purpose is decidedly different – they have excised a relatively small portion of the video, interspersed it with comments from Mr. Maldonado's mother that are critical of Exotic, and woven it into the larger narrative of the series.

8App.273. As the district court also noted, the Documentary used the video clips as raw materials to create a completely new work, for an entirely different purpose. 8App.274. This contrast between uses could hardly differ more from the scenario in *Warhol*.[3]

[3] It is telling that the Court in *Warhol* used Andy Warhol's painting of a Campbell's Soup label as an example of quintessential fair use, even though the painting "precisely replicate[d]" the label—the purpose of the original was to advertise, while the purpose of Warhol's painting was to comment on consumerism. 143 S. Ct. at 1280-81.

*Warhol* supports affirmance for another reason. The Court reiterated that Section 107's "preamble" uses (*i.e.*, criticism, comment, news reporting, teaching …, scholarship, or research) are the types of copying most commonly found to be fair use. As noted in the Responding Brief, the Documentary constitutes criticism, comment, and news reporting. Resp. Brief at 34-36.[4] And while, under *Warhol*, the defendant's work need not target the original, the Documentary's use of the short Funeral Video clips targets both Exotic *and* the solemnity of the funeral as depicted in the Video. Plaintiffs' argument that the Documentary does not target the Funeral Video is thus contrary to the undisputed facts and unsupported by law. *See, e.g., Campbell v. Acuff-Rose Music, Inc.*, 510 U. S. 569, 580 (1994) (asking whether the new work's "commentary has . . . critical bearing *on the substance or style* of the original composition") (emphasis added).

*Warhol* differs from this case in yet another way. While Warhol made only "modest alterations" to the original Goldsmith photo, such that the secondary work remained a "portrait of Prince," Defendants here took only short, non-continuous snippets of the Funeral Video and added commentary and voiceovers, stitching this into a broader narrative work—a purpose distinct from that of the original Video. Nothing in *Warhol* limits the long-established principle that substantial modifications via, for example,

[4] While Appellants continually dismiss the quality of the Documentary (for which it was nominated for multiple Emmy Awards including in "Documentary" and "Non-Fiction" categories, 3App.243), a court should not attempt to evaluate the artistic significance of a particular work. *Warhol*, 148 S. Ct. at 1283-84, citing *Bleistein v. Donaldson Lithographing Co.*, 188 U. S. 239, 251 (1903) (Holmes, J.) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits").

physical alterations or attenuation in duration, support a finding of a transformative use. *See, e.g.*, *SOFA Entertainment, Inc. v. Dodger Productions,* 709 F.3d 1273 (9th Cir. 2013) (use for biographical purposes of seven-second clip of performance on *Ed Sullivan Show* was transformative); *Blanch v. Koons*, 467 F.3d 244, 253 (2d. Cir. 2006) (manipulation of elements in original work and juxtaposition with a new background supported conclusion that use was transformative and ultimately fair use).

Finally, *Warhol* turned largely on the concept of market substitution: both Goldsmith and the defendant licensed their works for magazine stories about Prince (indeed, they did so to the very same company). Here, no evidence exists regarding market substitution, nor could it—the short excerpts from the Funeral Video that appear in the Documentary could not possibly substitute for the Video, nor have Plaintiffs ever licensed their works. 4App.22.

Plaintiffs' arguments to the contrary misconstrue *Warhol*. First, they assert that the above-described differences in purpose are merely subjective interpretations of meaning and message, and that Mr. Sepi's interpretation of his own purpose in recording the Funeral Video should be irrelevant. Supp. Brief at 4-5. As a threshold matter, as demonstrated by Plaintiffs' own citations, the Court in *Warhol* noted that the subjective intent of the *defendant* is not determinative. *See id.* Sepi, of course, is not a defendant. And meaning is not, as Plaintiffs claim, irrelevant: "The meaning of a secondary work, as reasonably can be perceived, should be considered to the extent necessary to determine whether the purpose of the use is distinct from the original, for instance, because the use comments on, criticizes, or provides otherwise unavailable information about the original…." 143 S. Ct.

at 1284 (*citing Authors Guild*, 804 F.3d, at 215-216). Regardless, the manifestly different purposes of the uses here arise out of objective facts. It is an *objective fact* that Sepi titled the video "Travis MM Funeral Ceremony" and streamed the entire funeral in real time so that YouTube viewers could virtually attend the Maldonado Funeral. And it is an *objective fact* that the short excerpts in the Documentary, in an episode titled "Make America Exotic Again," focus and contain commentary on Joe Exotic's megalomania and on how he turned a solemn, tragic event into a self-centered performance.

Plaintiffs also purport to rely on *Warhol* in asserting that Defendants were "scooping work of a contemporary filmmaker," Supp. Brief. at 7, and that Netflix's "specific use" of the Funeral Video snippets, in distinction to Royal Goode's, must be seen simply as "streaming," and hence as non-transformative. *Id.* at 3, 5 n.5. Not only do such arguments flout *Warhol*'s clear pronouncement that the opinion has a narrow focus, but they also read the concept of fair use out of the Copyright Act. For example, in *Campbell*, both the plaintiff and defendant performed and exploited their songs to a musical audience, and defendants sold "a quarter of a million copies of [their] recording." 510 U.S. at 573. In *Google Inc.*, both Google and Oracle created commercial software and distributed copies of that software to the public. Yet *Warhol* did not focus on the broad manner of distributing or transmitting the works, but rather considered both of these cases as examples where the *specific* transformative purposes outweighed commerciality. *Warhol* therefore lends no support to Defendants' attempts to rely on the Documentary's commercial qualities, or on the shibboleth of "streaming use." In sum, *Warhol*'s reasoning confirms that the first fair use factor weighs in favor of Defendants.

## II. Nothing in *Warhol* Changes the Conclusion That the Remaining Three Factors Weigh in Favor of Fair Use

Appellants' Supplemental Brief addresses the remaining three fair use factors. Although *Warhol* made a point of not specifically addressing these factors, 143 S. Ct. at 1266, 1287, Defendants feel compelled to respond to Plaintiffs' arguments.

Under the second factor—the nature of the copyrighted work—Plaintiffs persist in arguing that, even though Sepi streamed the Funeral Video to potentially millions of viewers on YouTube, that factor weighs in Appellants' favor because the Video was technically unpublished under the definition of "publication" in the Copyright Act. Supp. Brief at 7. As noted in the Responding Brief, the courts give this factor little weight where a use is transformative, and modern courts routinely treat internet videos as published in contexts, like this one, that are not clearly bound by the statutory definition. Resp. Brief at 39-40. Moreover, the very case on which Plaintiffs heavily rely, *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 551 (1985), contains language directly refuting Plaintiffs' contention. Noting the equitable nature of fair use, *Harper & Row* observed that even where a work is unpublished, "[i]n a given case, factors such as implied consent *through de facto publication on performance or dissemination of a work* may tip the balance of equities in favor of prepublication use" (emphasis added). *See also id.* at 564 (a news account of an *unpublished* speech might qualify as fair use). So, even under *Harper & Row*, Sepi's dissemination of the Funeral Video to potentially hundreds of millions, first by "livestreaming" and then by leaving the video on YouTube, tips the second factor in favor of fair use irrespective of Copyright Act technicalities.

Neither does *Warhol* help Plaintiffs regarding the third fair use factor, the substantiality of the use. On the contrary, *Warhol*'s favorable citations of *Google, Inc.*, *Núñez*, and *Author's Guild* confirm that the third factor weighs in favor of fair use in the instant case. The substantiality of the use in all three of those cases far exceeded the use of the short clips here, where less than three percent of the Funeral Video was used. *See* Resp. Brief at 16. Indeed, *Núñez* and *Author's Guild* entailed copying of entire works, and the uses were still deemed fair.

Finally, relevant to the fourth factor, *Warhol* emphasized, in the starkest of terms, that plaintiff Goldsmith had a market for selling her photographic portraits of Prince for use in magazine articles. She had done just that in 1984 with the magazine *Vanity Fair*, owned by the same company to which AWF contracted in 2016 for the unlicensed fruits of her 1984 transaction. 143 S. Ct. at 1266-69. In this regard, the Second Circuit had noted in its opinion that "our prior cases have suggested that the rightsholder bears some initial burden of identifying relevant markets.…" *AWF v. Goldsmith*, 11 F.4th at 49 & n. 11 (*citing Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014), and *Leibovitz v. Paramount Pictures Corp*, 137 F.3d 109, 116 n.6 (2d Cir. 1998)). In the instant case, Plaintiffs identified no relevant markets for any non-transformative uses of the Funeral Video.

## CONCLUSION

The Supreme Court's decision in *Warhol* confirms that the trial court's order granting summary judgment should be affirmed.

DATED: June 22, 2023

Respectfully submitted,

By: /s/ Robert H. Rotstein
Robert H. Rotstein (CA Bar # 72452)
Admitted *Pro Hac Vice*
Emily F. Evitt (CA Bar # 261491)
Admitted *Pro Hac Vice*
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
(310) 312-2000 – Telephone
(310) 312-3100 – Facsimile
rxr@msk.com
efe@msk.com

Mack J. Morgan, III (OBA #6397)
MJMLAW PLLC
6618 N. Hillcrest Ave.
Nichols Hills, OK 73116
(405) 343-7454 - Telephone
mack@mjmlaw.biz

*Attorneys for Defendants-Appellees Netflix, Inc. and Royal Goode Productions LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10 pages and 2,901 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(A), and the typestyle requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Times New Roman 13-point.

I hereby certify, pursuant to 10th Cir. R. 25.5, that all required privacy redactions have been made. I further certify, pursuant to 10th Cir. R. 27.2 and ECF User Manual, Section II, Part J(b), that the hard copies of this Supplemental Brief of Appellees to be submitted to the Clerk's Office are exact copies of the electronic filing. I further certify that the electronic submission was scanned for viruses with the most recent version of Windows Defender and is free of viruses.

Dated: June 22, 2023 /s/ Robert H. Rotstein

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that counsel for all parties are registered CM/ECF users and that service to Plaintiffs-Appellants will be accomplished by the CM/ECF system.

/s/ Robert H. Rotstein