No. 22-6086

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

WHYTE MONKEE PRODUCTIONS LLC, TIMOTHY SEPI,

*Plaintiff-Appellants*,

v.

NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,

*Defendant-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA,
HON. TIMOTHY D. DEGIUSTI
NO. 5:20-CV-00933-D

---

## PETITIONERS/APPELLEES' LIMITED PETITION FOR PARTIAL PANEL REHEARING AND REHEARING *EN BANC*

---

Robert H. Rotstein
Emily F. Evitt
MITCHELL, SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California 90067
Telephone: (310) 312-2000
Email: rxr@msk.com

Mack J. Morgan, III
MJMLAW PLLC
6618 N. Hillcrest Ave
Nichols Hills, Oklahoma 73116
Telephone: (405) 343-7454
Email: mack@mjmlaw.biz

*Attorneys for Defendants-Appellees*
*Netflix, Inc. and Royal Goode Productions LLC*

# TABLE OF CONTENTS

**Page**

STATEMENT PURSUANT TO FED. R. APP. P. 35(b) AND INTRODUCTION ........................................................................................ 1

RELEVANT BACKGROUND ............................................................................. 2

ARGUMENT ......................................................................................................... 4

I.  THE PANEL'S RULING ON THE FIRST FAIR USE FACTOR CONFLICTS WITH *WARHOL* AND *GOOGLE*. .......................................... 4

    A.  By Requiring "Targeting" Under the First Factor, the Opinion Conflicts with *Warhol* and *Google*. ...................................................... 5

    B.  The Panel Opinion Also Conflicts With *Warhol* By Failing to Recognize that Use of a Film Clip in a Documentary Is a "Preamble" Use. ...................................................................................... 9

II.  THE RULING ON THE FOURTH FACTOR CONFLICTS WITH *CAMPBELL*, *HARPER & ROW*, AND THE DECISIONS OF OTHER CIRCUITS. .............................................................................................. 11

III.  THE OPINION WILL INHIBIT THE CREATION OF IMPORTANT EXPRESSIVE WORKS. ................................................................................ 15

CONCLUSION ................................................................................................... 17

CERTIFICATE OF COMPLIANCE ................................................................. 18

ATTACHMENT 1: OPINION AND JUDGMENT

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

<b>Page(s)</b>

## CASES

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023)................................................1, 4, 5, 6, 7, 8, 9, 11

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
  11 F.4th 26 (2d Cir. 2021) ................................................................13

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014) ...............................................................14

*Bill Graham Archives v. Dorling Kindersley*,
  448 F.3d 605 (2d Cir. 2006) .............................................................14

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
  737 F.3d 932 (4th Cir. 2013) ..............................................................9

*Brown v. Netflix, Inc.*,
  855 Fed. App'x 61 (2d Cir. 2021) .......................................................9

*Cambridge Univ. Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) ........................................................14

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)..............................................1, 11, 13, 14, 15

*Data Gen. Corp. v. Grumman Systems Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994)..............................................................12

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
  983 F.3d 443 (9th Cir. 2020) ............................................................13

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003)..............................................................................1

*Google LLC v. Oracle Am., Inc.*,
  593 U.S. 1, 141 S. Ct. 1183 (2021)....................................1, 4, 5, 8, 9

*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985)..............................................1, 11, 12, 13

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hofheinz v. Discovery Commc'ns, Inc.*,
  2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) ....................................9

*Katz v. Google, Inc.*,
  802 F.3d 1178 (11th Cir. 2015) ..........................................16

*Leibovitz v. Paramount Pictures Corp.*,
  137 F.3d 109 (2d Cir. 1998) ......................................13, 14

*Lennon v. Premise Media Corp.*,
  556 F. Supp. 2d 310 (S.D.N.Y. 2008) .......................................16

*Monster Commc'ns v. Turner Broadcasting System, Inc.*,
  935 F. Supp. 490 (S.D.N.Y. 1996) ....................................10, 15

*Nat'l Center for Jewish Film v. Riverside Films LLC*,
  2012 WL 4052111 (C.D. Cal. Sept. 14, 2012) ................................15

*Polar Bear Prods. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) ...........................................12

*Thoroughbred Software Int'l, Inc. v. Dice Corp.*,
  488 F.3d 352 (6th Cir. 2007) ...........................................12

*United States v. Maldonado-Passage*,
  4 F.4th 1097 (10th Cir. 2021) ..........................................2

## STATUTES

17 U.S.C.
  § 101.................................................................4
  § 107...........................................................4, 9, 15, 16
  § 107(4)...............................................................11
  § 201.................................................................4
  § 1201...........................................................10, 16

## REGULATIONS

37 C.F.R. § 201.40(b)(1) (2021) ........................................10

16475898.1

# TABLE OF AUTHORITIES
(continued)

## RULES

Federal Rules of Appellate Procedure
    Rule 35 .................................................................................................1
    Rule 35(b) ............................................................................................1
    Rule 40 .................................................................................................1

## OTHER AUTHORITIES

A. Falzone and J. Urban, *Demystifying Fair Use: The Gift of the Center For Social Media Statements of Best Practices*, 57 J. Copyright Soc'y U.S.A. 337, 340 (2009-10) ...........................................................................16

Karen Shatzkin & Dale Cohen*, Picture This: Applying the Fair Use Doctrine to Documentary Films After* Google/Oracle *and* Warhol*,* 30 UCLA Ent. L. Rev. 1, 22, 45 (2023) .................................................11

U.S. Copyright Office, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (Oct. 2012) ........................................................10, 16

16475898.1

## STATEMENT PURSUANT TO FED. R. APP. P. 35(b) AND INTRODUCTION

Copyright's fair use doctrine ensures that copyright law does not impinge upon free expression. *See Eldred v. Ashcroft*, 537 U.S. 186, 218-21 (2003). Defendants/Appellees Netflix, Inc. and Royal Goode Productions LLC ("Petitioners") seek limited rehearing of a portion of the Panel's opinion ("Opinion" or "Op.") that conflicts with four U.S. Supreme Court decisions: *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ("*Warhol*"); *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021) ("*Google*"); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ("*Campbell*"); and *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ("*Harper & Row*"). This proceeding involves one or more questions of exceptional importance. The Panel's ruling will likely prevent documentarians and other content creators from telling their important stories through methods that traditionally have been, and, under recent Supreme Court authority continue to be, quintessential fair uses and exercises of free speech—all to the detriment not only of creators but also of the consuming public.

Pursuant to FRAP 35 and 40 and the Rules of this Court, Petitioners seek partial panel rehearing or rehearing *en banc* **only** as to the portion of the Opinion holding that an issue of disputed fact exists whether Petitioners made fair use of short excerpts from Plaintiffs/Appellants' so-called "Funeral Video." The published

1

Opinion and Judgment, which affirmed in part and reversed in part the district court's order granting summary judgment for Petitioners, were entered on March 27, 2024. The portions of the Opinion that are the subject of this petition can be found at pages 3-4, 16-24, and 34-42; Petitioners challenge the portion of the Judgment reversing in part. This Petition is timely filed per this Court's April 3, 2024 order granting Petitioners' Motion for Extension of Time. The Court's opinion and judgment are appended as Attachment 1.

## RELEVANT BACKGROUND

Plaintiffs/Appellants Whyte Monkee Productions LLC and Timothy Sepi sued Petitioners for allegedly infringing copyrights in eight videos created during and shortly after Sepi's employment as a videographer at an Oklahoma animal park (the "Park"). Petitioners included short excerpts from those videos in their 2020 documentary series, *Tiger King: Murder, Mayhem and Madness* (the "Documentary")—which primarily focused on Joseph Allen Schreibvogel, aka Joseph Maldonado-Passage, aka Joe Exotic ("Exotic")—a controversial figure who founded the Garold Wayne Zoological Park, raised big cats, ran for Oklahoma Governor and U.S. President, and was imprisoned for two counts of murder-for-hire. *See United States v. Maldonado-Passage*, 4 F.4th 1097, 1098-1101 (10th Cir. 2021). The Documentary—nominated for six Emmy Awards (including Outstanding Documentary or Nonfiction Series and Outstanding Directing for a

Documentary/Nonfiction Program, *see* 3App.243)—explored how Exotic's autocratic and erratic leadership and disputes with big-cat conservationists and profiteers, along with a culture of violence at the Park, ultimately destroyed lives and resulted in Exotic's downfall.

The most tragic event depicted in the Documentary was the death of 23-year-old Travis Maldonado, Exotic's husband, who died of a self-inflicted gunshot wound. Travis's funeral, like his death, occurred on Park premises and was documented on video. Wearing a clerical collar, Exotic officiated and sang at his spouse's funeral. Sepi, who had previously left the Park's employ, returned to film the entire ceremony (the "Funeral Video") because "that is what [Travis] would want." 2App.194-197. After setting up a stationary camera on a tripod, he sat down, let the camera run, and livestreamed the video through the *Joe Exotic TV* YouTube page, where it remained. 2App.196-200. The Funeral Video is approximately 23-minutes-and-52-seconds long.

Travis's shocking death and subsequent funeral were highly relevant to the Documentary's focus on the Park's toxic, insular, and violent culture and Exotic's larger-than-life persona. Episode 5, "Make America Exotic Again," therefore included a short excerpt from the Funeral Video as part of a one-minute-and-six-second segment. Over half the material in that short segment is from sources other than the Funeral Video: the Documentary interspersed Sepi's footage with other

video material and an interview with Travis's bereft mother, who criticizes Exotic for making himself, not Travis, the center of attention, and for turning everything around him into a "show."

The district court granted summary judgment for Petitioners, holding (1) Plaintiffs/Appellants did not own seven of the eight videos in question because Sepi filmed them in the course of his employment at the Park, such that the videos were works made for hire under the Copyright Act, 17 U.S.C. §§101, 201; and (2) use of the brief excerpt from the Funeral Video was fair use under Section 107. The Panel affirmed the district court's order regarding the seven "work-made-for-hire" videos, but reversed and remanded regarding the Funeral Video, finding a disputed factual issue on fair use. This petition seeks limited panel rehearing or *en banc* rehearing only as to the fair use ruling on the Funeral Video.

## ARGUMENT

### I. THE PANEL'S RULING ON THE FIRST FAIR USE FACTOR CONFLICTS WITH *WARHOL* AND *GOOGLE*.

Section 107 provides in pertinent part:

> [T]he fair use of a copyrighted work…for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The Panel properly ruled that the second and third fair use factors weigh in favor of Petitioners. However, the analysis of the first and fourth factors conflicts with Supreme Court authority.

### A. *By Requiring "Targeting" Under the First Factor, the Opinion Conflicts with* **Warhol** *and* **Google**.

Under the first factor, a court enquires whether a secondary use of a copyrighted work is commercial and "transformative," that is, "has a distinct purpose" furthering copyright's objective "to promote the progress of science and the arts, without diminishing the incentive to create." *Warhol,* 598 U.S. at 529-531. The Panel concluded that use of the Funeral Video in a portion of the Documentary lasting 66 seconds—a maximum of 5% percent of the entire Funeral Video, as part of a more-than-five-hour documentary series—was non-transformative because the Documentary clip did not ***target*** the original Funeral Video. *See* Op. 19-20, 21 ("Defendants did not comment on or "target" Mr. Sepi's work at all; instead, Defendants used the Funeral Video to comment on Joe Exotic."). Although the Panel found that *Warhol* compelled this conclusion, its holding in fact conflicts with both *Warhol* and *Google*.

In *Warhol*, photographer Lynn Goldsmith had licensed her 1981 photograph of the musician Prince to *Vanity Fair* magazine for one-time use as an "artist's reference." Years later, without Goldsmith's permission, Warhol used her photograph to create a further series of works that made only modest changes to her original, *i.e.*, by applying Warhol's "characteristic style." 598 U.S. at 516-22. In 2016, the Andy Warhol Foundation for the Visual Arts ("AWF") licensed one of these unauthorized images, "Orange Prince," to Condé Nast, *Vanity Fair's* parent company, to appear on the cover of another magazine featuring a commemorative article about Prince—the selfsame manner of exploitation that Goldsmith had pursued with her photograph. After Goldsmith objected, AWF sought a declaratory judgment that AWF's use of Goldsmith's photo constituted fair use; Goldsmith countersued. *Id.* at 518-22.

The Supreme Court's analysis in *Warhol* was limited to a single question: whether AWF's licensing "Orange Prince" for use on a magazine cover was transformative of Goldsmith's original image. *Id*. at 515-16, 533-34 & n.9. In discussing the first fair use factor, *Warhol* explicitly stated that while targeting the original work weighs in favor of fair use, such targeting is ***not required*** for a second work to be transformative. *Id.* at 547, n.21 ("Although targeting is not always required, fair use is an affirmative defense, and AWF bears the burden to justify its taking of Goldsmith's work with some reason other than, 'I can make it better.'").

Instead, the fundamental question is "whether the use of a copyrighted work has a further purpose or different character," rather than "shar[ing] the same or highly similar purposes." *Id.* at 532-33. Under this test, the majority held that the use at issue was not transformative, since Warhol had made only "modest" changes to the original, and "Goldsmith's photograph and AWF's 2016 licensing of Orange Prince [to Condé Nast] share substantially the same purpose." *Id.* at 537-38.

Significantly, the Court distinguished between "broad" and "narrow" transformative uses, stressing that transformation is likely where the second artist's work has a wholly distinct purpose from the first. "In a broad sense," the majority wrote, "a use that has a distinct purpose is justified because it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." 598 U.S. at 531. "In a narrower sense, a use may be justified because copying is reasonably necessary to achieve the user's new purpose." *Id.* at 532.

The Court cited a book review as an example of both types of use:

> The [book] review's use of quoted material may be justified in both *the broad and the narrower senses*. First, the use is likely to *serve a different purpose* than the material itself. Second, there may be compelling reason to borrow from the original to achieve that purpose because the review targets the material for comment or criticism.

*Id.* at 532 n.7 (emphasis added). Notably, the word "targeting" appears only when the Court describes transformation in the "narrow" sense. Transformation in the

"broad" sense, however, does not require targeting. Indeed, *Warhol* approved *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 141 S. Ct. 1183 (2021), in which Google used roughly 11,500 lines of code from Oracle's Java SE program to create an entirely new software product. *See Warhol*, 598 U.S. at 533 n.8. By no stretch of imagination did Google "target" Oracle's work for comment or criticism. Rather, Google transformed Oracle's work in a broad sense by creating a new work with "significantly different" purposes and a public benefit. *Id.*

Here, the Opinion misapplies *Warhol* by failing to recognize that the Documentary transforms the Funeral Video in *Warhol*'s broad sense, *i.e.,* by "serv[ing] a different purpose." The Documentary is not a modified or altered version of the Funeral Video, but rather incorporates an excerpt from it to create something new and distinct: a work of cultural commentary that chronicles the toxicity of celebrity and dangers of living in a milieu that glorifies violence—***broad*** transformation in the Supreme Court's parlance. Put differently, in *Warhol*, the dispositive fact was that both Goldsmith and AWF licensed images of Prince for the same purpose of illustrating a magazine story about Prince. *See* 598 U.S. at 526 (both parties' uses were "portraits of Prince used to depict Prince in magazine stories about Prince"). Here, by contrast, the ***documentary series*** contains narrative, voice over, and intercuts; it is not a ***video of a person's funeral***, and Petitioners' use cannot

substitute for the full memorial video of Travis's funeral. *See* 598 U.S. at 528 ("[T]he first factor relates to the problem of substitution….").

In focusing exclusively on targeting, the Opinion fails to appreciate the distinction between broad and narrow transformative uses and *Warhol's* instruction to examine whether "an allegedly infringing use has a further purpose or different character." *Id.* at 525. The Opinion thus conflicts with both *Warhol* and *Google*.[1]

**B.**     ***The Panel Opinion Also Conflicts With* Warhol *By Failing to Recognize that Use of a Film Clip in a Documentary Is a "Preamble" Use.***

*Warhol* reiterated the well-established principle that Section 107's "preamble" uses (*i.e.*, "criticism, comment, news reporting, teaching …, scholarship, or research") are most commonly found to be fair use. 598 U.S. at 528 (preamble uses "may guide the first factor inquiry"). Documentaries and biographies have long been considered "preamble" uses. *See, e.g., Brown v. Netflix, Inc*., 855 Fed. App'x 61, 62-63 (2d Cir. 2021) (documentary about burlesque dancers); *Bouchat v. Baltimore Ravens Ltd. P'ship,* 737 F.3d 932, 944 (4th Cir. 2013) (documentaries combine comment, criticism, news reporting and scholarship*); Hofheinz v. Discovery Commc'ns, Inc.,* 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) (same);

---

[1] The Opinion's analogy to "sampling" of sound recordings is inapt—unlike musical samples, which excerpt one commercial sound recording within another and generally have no necessary relationship to the secondary work, the excerpt from the Funeral Video is intimately bound to the different subject matter and distinct purpose of the Documentary.

16475898.1

*Monster Commc'ns v. Turner Broadcasting System, Inc.,* 935 F. Supp. 490 at 493-94 (S.D.N.Y. 1996) (same).

Following this, the U.S. Copyright Office treats use of video clips for purposes of biographical documentary as likely to be fair. Based on the Copyright Office's recommendations, the rules and regulations promulgated under 17 U.S.C. §1201 provide exemption from anti-circumvention laws for "use of short portions of . . . motion pictures"— including "television shows and videos"—where the purpose is "criticism or comment . . . [f]or use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature." 37 C.F.R. §201.40(b)(1) (2021). In its initial consideration of such an exemption, the Office noted that "such uses fall within the favored purposes referenced in the preamble of Section 107 and therefore are likely to be fair uses."[2]

Thus, the Panel's holding that the Documentary targeted Exotic, but not the Funeral Video itself or Sepi's creative choices in the making the video, is beside the point. The use of excerpts for biographical and historical purposes—to comment on and criticize Exotic and, more broadly, a little-known U.S. subculture of exotic-animal keepers—is a preamble use and thus highly transformative under *Warhol*'s

---

[2] U.S. Copyright Office, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (Oct. 2012) at 126-27 ("2012 Copyright Office Recommendation").

16475898.1

reasoning. [3] *See* Karen Shatzkin & Dale Cohen*, Picture This: Applying the Fair Use Doctrine to Documentary Films After* Google/Oracle *and* Warhol*,* 30 UCLA Ent. L. Rev. 1, 22, 45 (2023) (stressing centrality of preamble uses to documentary films, concluding "there is little reason to believe that the statutory four-factor analysis in documentary fair-use cases will change in light of *Warhol*'s narrowly focused holding").

## II.  THE RULING ON THE FOURTH FACTOR CONFLICTS WITH *CAMPBELL*, *HARPER & ROW*, AND THE DECISIONS OF OTHER CIRCUITS.

The fourth factor asks whether a defendant's use of an original harms the potential market for the copyrighted work. 17 U.S.C. §107(4); *Warhol*, 598 U.S. at 555 (Gorsuch, J., concurring). The Panel held that, notwithstanding Sepi's failure to establish any licensing or commercial exploitation of the Funeral Video, because fair use is an affirmative defense, Petitioners had the burden of establishing the ***absence*** of a market—*i.e.,* the burden of proving a negative. Op. 18-19, 34-39. Although the Opinion relied on *Campbell* for this proposition, *Campbell* and *Harper & Row* in fact stand for the opposite.

---

[3] While Appellants have continually disparaged the Documentary's quality (despite its multiple Emmy Award nominations), a court should not attempt to evaluate the artistic significance of a particular work. *Warhol*, 598 U.S. at 544, quoting *Bleistein v. Donaldson Lithographing Co*., 188 U.S. 239, 251 (1903) (Holmes, J.) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits").

16475898.1

In analyzing the fourth factor, the Court in *Harper & Row* stated: **"[O]nce a copyright holder establishes** with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, **the burden properly shifts** to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression." 471 U.S. at 567 (emphases added). This rule, while applied to fair use in *Harper & Row*, restates the basic principle that a copyright plaintiff bears the initial burden of proving that the infringement was the cause of its loss of revenue. *See, e.g., Data Gen. Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1170 (1st Cir. 1994) (citing *Harper & Row*); *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 358 (6th Cir. 2007); *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) (citing *Mackie v. Rieser*, 296 F.3d 909, 915 n.6, 916-17 (9th Cir. 2002)).

The Opinion nevertheless quotes the following:

> Although [the petitioners] submitted uncontroverted affidavits on the question of market harm to the original, neither they, nor [the respondent], introduced evidence or affidavits addressing the likely effect of [the petitioners'] parodic rap song on the market for a nonparody, rap version of "Oh, Pretty Woman." And while [the respondent] would have us find evidence of a rap market in the very facts that [the petitioners] recorded a rap parody of "Oh, Pretty Woman" **and another rap group sought a license to record a rap derivative,** there was no evidence that a potential rap market was harmed in any way by [the petitioners'] parody, rap version.

16475898.1

Op. 36 (quoting *Campbell*, 510 U.S. at 593) (emphasis added). The bolded language makes clear that the respondent—*i.e.*, the plaintiff—came forward with prima facie evidence that a relevant market existed: not only was "Oh, Pretty Woman" a well-known song, but another rap group had sought to license it for a non-parody rap version. While *Campbell* noted that it is difficult for a defendant to "***carry[] the burden of demonstrating fair use*** without favorable evidence about relevant markets," 510 U.S. at 590 (emphasis added), it was still the plaintiff who had—and met—an initial burden to show such markets existed. Similarly, in *Dr. Seuss*, on which the Opinion also relied (Op. 38), it was undisputed that there was a robust licensing market for the plaintiff's works. *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 449 (9th Cir. 2020). By placing an initial burden to show **absence** of a market on Petitioners, the Opinion conflicts with *Campbell* and *Harper & Row*.

The Opinion also conflicts with other circuit decisions holding a plaintiff has the "***initial burden*** of identifying relevant markets," notwithstanding a defendant's '***ultimate burden*** of proving that the secondary use does not compete in the relevant market." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 49 (2d Cir. 2021) (emphasis added). In *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998), the Second Circuit contrasted the case before it to *Campbell*, noting that, unlike *Campbell*, the celebrity photographer plaintiff "ha[d] not

identified *any* market for a derivative work that might be harmed" by Paramount's advertising poster, and that, accordingly, "the defendant had no obligation to present evidence showing lack of harm." *Id.* at 116-117 & n.6 (emphasis added). *See also Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1280 (11th Cir. 2014) (no "improper burden shifting" where the district court "required [Plaintiffs] to go forward with evidence of license availability," but "kept the ultimate burden of persuasion on Defendants on the question of market harm"). These cases properly recognize that defendants cannot prove a negative, and plaintiffs have a minimal initial burden to identify that markets even exist.

Along with this, the Panel improperly treated licensing done for the Documentary—including the seven other videos licensed via the Park's owners—as establishing Plaintiffs/Appellants met any initial burden. *See* Op. 36-37 & n.7. But referring to those videos is insufficient if they were equally fair use. *See Leibovitz*, 137 F.3d at 117 (evidence of market harm cannot rely on "a work that … qualifies for the fair use defense"); *see also Campbell*, 510 U.S. at 585 n.18 (requests for permission are not inconsistent with fair use); *Bill Graham Archives v. Dorling Kindersley*, 448 F.3d 605, 614 (2d Cir. 2006) (arguments for harm on fourth factor must "show[] impairment to a traditional, as opposed to a transformative market"); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014) ("The only market harms that count are [] ones that are caused because the secondary use serves as a

substitute for the original, not when the secondary use is transformative….") (citing *Campbell*, 510 U.S. at 591-92).

In sum, the Panel's opinion conflicts with Supreme Court precedent and decisions in other circuits.

## III. THE OPINION WILL INHIBIT THE CREATION OF IMPORTANT EXPRESSIVE WORKS.

As Petitioners did here, Documentarians often include excerpts of works that do not "target" but that rather further the filmmaker's narrative. *See, e.g.*, *Nat'l Center for Jewish Film v. Riverside Films LLC*, 2012 WL 4052111, at *3 (C.D. Cal. Sept. 14, 2012) (fictional movie clips depicting 19th century Jewish life to teach and enlighten about Jewish history); *Monster Commc'ns*, 935 F. Supp. at 491, 493-94 (footage of Muhammad Ali's 1974 trip to Zaire for his heavyweight "Rumble in the Jungle" fight in a television biography).[4] Without question, under *Warhol* these uses—like the Documentary's brief use of the Funeral Video—are transformative "preamble uses" in the broad sense of transformation because they serve to create a new work with a different purpose from the original. In 2012, the U.S. Copyright Office pointed to such examples as support for its recommendation of a documentary

---

[4] Petitioners cite these pre-*Warhol* cases not for their precedential value, but as examples of important uses that do not involve "targeting" an original work yet that clearly fall within the preamble of Section 107.

film exemption under 17 U.S.C. §1201. *See* 2012 Copyright Office Recommendation at 127-28 & n.738, n.739.

The Opinion's insistence on "targeting," at odds with Section 107 and precedent, will inevitably have a chilling effect on documentarians and other creators who make use of short excerpts of other works to create something entirely new for a different purpose. Many documentary projects depend on the long-recognized ability to make fair use of pre-existing material.

Neither would requiring a documentarian to license all clips rectify the problem. It is often impossible for documentary filmmakers to obtain permission to use these materials. Some owners will set unreasonable prices. *See*, *e.g.*, A. Falzone and J. Urban, *Demystifying Fair Use: The Gift of the Center For Social Media Statements of Best Practices*, 57 J. Copyright Soc'y U.S.A. 337, 340 (2009-10). Other copyright owners will refuse to license their works on any terms, such as when they disapprove of the documentary's content or believe a portrayal will be unflattering. *See, e.g., Katz v. Google, Inc*., 802 F.3d 1178 (11th Cir. 2015) (landlord sued to prevent photograph's use by a tenant criticizing his business practices); *Lennon v. Premise Media Corp*., 556 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2008) (15-second excerpt of John Lennon's song "Imagine" to critique Lennon's "secular [anti-religion] utopian vision"; Lennon's family objected to the filmmaker's religious

16475898.1

message). The harm to free expression is manifest: For the documentarian, pictures are not only worth a thousand words—they are essential to filmmaking.

## CONCLUSION

Petitioners respectfully request that this limited petition for partial rehearing and rehearing *en banc* be granted and that the Court affirm the district court's order in its entirety.

DATED: April 25, 2024               Respectfully submitted,

By: /s/ Robert H. Rotstein
    Robert H. Rotstein (CA Bar # 72452)
      Admitted *Pro Hac Vice*
    Emily F. Evitt (CA Bar # 261491)
      Admitted *Pro Hac Vice*
    MITCHELL SILBERBERG & KNUPP LLP
    2049 Century Park East, 18th Floor
    Los Angeles, CA  90067-3120
    (310) 312-2000 – Telephone
    (310) 312-3100 – Facsimile
    rxr@msk.com
    efe@msk.com

    Mack J. Morgan, III (OBA #6397)
    MJMLAW PLLC
    6618 N. Hillcrest Ave.
    Nichols Hills, OK 73116
    (405) 343-7454 - Telephone
    mack@mjmlaw.biz

    *Attorneys for Defendants-Appellees*
    *Netflix, Inc. and Royal Goode*
    *Productions LLC*

16475898.1

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because this brief was produced using a computer and contains 3,896 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word-count function of Microsoft Word 2016.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(A), and the typestyle requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Times New Roman 14-point.

Dated:  April 25, 2024          /s/ Robert H. Rotstein

16475898.1

# OPINION AND JUDGMENT

FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 27, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

WHYTE MONKEE PRODUCTIONS,
LLC; TIMOTHY SEPI,

       Plaintiffs - Appellants,

v.

NETFLIX, INC.; ROYAL GOODE
PRODUCTIONS, LLC,

       Defendants - Appellees.

No. 22-6086

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:20-CV-00933-D)**

_____

Gregory Keenan, Digital Justice Foundation, Floral Park, New York (Andrew Grimm of
Digital Justice Foundation, Omaha, Nebraska, with him on the briefs), for Plaintiffs-
Appellants.

Robert H. Rotstein, Mitchell, Silberberg & Knupp LLP, Los Angeles, California (Emily
F. Evitt of Mitchell, Silberberg & Knupp, LLP, Los Angeles, California; and Mack J.
Morgan, III, of MJMLAW PLLC, Nichols Hills, Oklahoma, with him on the brief), for
Defendants-Appellees.

_____

Before **HOLMES**, Chief Judge, **HARTZ**, and **CARSON**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

Plaintiffs-Appellants, Whyte Monkee Productions, LLC and Timothy Sepi, appeal from the District Court for the Western District of Oklahoma's order granting summary judgment to Defendants-Appellees, Netflix, Inc. ("Netflix") and Royal Goode Productions, LLC ("Royal Goode"). In March 2020, Defendant Netflix released *Tiger King: Murder, Mayhem and Madness* ("*Tiger King*"), a seven-part documentary series produced by Defendant Royal Goode. Included in the series are short clips from eight videos ("the Videos") that were filmed by Mr. Sepi. Seven of the videos were filmed while Mr. Sepi was working for the Gerald Wayne Interactive Zoological Park ("the Park"). The eighth video—Travis MM Funeral Ceremony ("Funeral Video")—was shot after Mr. Sepi terminated his employment relationship with the Park. Following the release of *Tiger King*, Mr. Sepi registered the eight videos for copyright protection, either under his own name or the name of Whyte Monkee Productions. Plaintiffs (i.e., Mr. Sepi and Whyte Monkee Productions) then sued Netflix and Royal Goode for copyright infringement, contending that Plaintiffs owned the copyrights in the Videos and that Defendants had used clips of those videos without permission.

On April 27, 2022, the district court granted summary judgment to Defendants. First, the district court held that seven of the videos were works made for hire under § 201(b) of the Copyright Act, and thus Mr. Sepi did not own the copyrights in the works. Second, the district court found that Defendants' use of the eighth video was fair use that did not infringe upon Mr. Sepi's copyright.

On appeal, Plaintiffs argue that the district court erred in concluding that the first seven videos were works made for hire, as "Mr. Sepi's line of work was tour photography and videography, but the works in question are not related to tours, are not videography but cinematography, were not made during working hours, and were made at his home as well as his workplace." Aplts.' Opening Br. at 16. Plaintiffs also argue that the district court erred on fair use, as "all four statutory factors" weighed against such a finding. *Id.* In support of their position, Plaintiffs point to the Supreme Court's recent decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), which allegedly "supports reversal of the fair-use decision below." Aplts.' Am. Suppl. Br. at 11.

With respect to the first seven videos, we conclude that Plaintiffs have asserted a new theory on appeal—which was not raised in the district court—and have failed to argue for plain error. As such, we hold that Plaintiffs have waived this argument for purposes of this appeal. And, consequently, we uphold the district court's judgment as it pertains to the first seven videos.

With respect to the eighth video, we conclude that the district court erred in determining that Defendants were entitled to summary judgment on their fair use defense. Specifically, we conclude—in light of the Supreme Court's recent guidance in *Warhol*—that, contrary to the district court's ruling, the first factor does not favor Defendants; instead, it militates in Plaintiffs' favor. The second and third statutory factors do favor Defendants. But, as to the fourth factor, Defendants failed to provide any affidavits or other evidence demonstrating the absence of a market

3

impact; consequently, they failed to meet their burden as to this factor, and the district court erred in finding that this factor weighed in their favor.

We therefore **affirm** the district court's judgment as to the first seven videos and **reverse** the court's judgment as to the eighth video, and **remand** to the court for further proceedings consistent with this opinion.

**I**

**A**

**1**

Joseph Maldonado-Passage, also known as Joe Exotic, founded the Gerald Wayne Interactive Zoological Park in Wynnewood, Oklahoma. The Park housed tigers, lions, and other exotic animals and was open to the public for tours. The Park also maintained a studio that was used to produce a web series called *Joe Exotic TV*. *Joe Exotic TV* was primarily an unscripted series featuring video footage from around the Park and skits invented by Mr. Exotic. In early 2015, *Joe Exotic TV* was produced by Rick Kirkham, who oversaw the studio operations with a team of four people.

In March 2015, Mr. Sepi traveled to the Park to discuss working for *Joe Exotic TV* with Mr. Kirkham and Mr. Exotic. *See* Aplts.' App., Vol. IV, at 22–23, ¶ 54 (Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J., filed Feb. 28, 2022). From these discussions, Mr. Sepi understood that part of what he would be doing was working on *Joe Exotic TV*, that he would be paid $150 per week, and that he would be allowed to live on Park property for free. *See id.* Only a week after starting his employment,

however, a fire destroyed the studio and camera equipment.  Mr. Kirkham quit, leaving Mr. Sepi as the sole videographer at the Park.

With the studio and camera equipment destroyed, *Joe Exotic TV* went on hiatus.  During this time, Mr. Sepi continued to photograph park tours and assist with animal care around the park.  Within a couple of months, however, a new production studio had been built, new camera equipment had been obtained, and *Joe Exotic TV* resumed production.

Mr. Sepi admits that during the day, while using the studio's equipment, "he split time taking tour photographs, filming, and editing for *Joe Exotic TV*, and filming campaign videos for [Mr.] Exotic,[1] but denies that these were all part of his workday duties for the Park."  *Id.* at 19, ¶ 17.  Instead, he alleges on appeal that he was solely employed to take photography and videography of park *tours*.  *See* Aplts.' Opening Br. at 67.  As such, he claims that he "was making footage" for *Joe Exotic TV* "on his own time," because "Joe Exotic was content gold" and the footage would allow him to achieve success in the media.  *Id.* at 10.

Following the studio fire, *Joe Exotic TV* returned to streaming on May 7, 2015. Each episode was preceded by a disclaimer stating that the footage is owned by Whyte Monkee Productions.  Whyte Monkee Productions is an Oklahoma limited

---

[1]     While Mr. Sepi was working with him, Mr. Exotic undertook a campaign for President of the United States.  *See* Aplts.' App., Vol. II, at 167 (Dep. of Timothy Sepi, dated Oct. 5, 2021) (discussing Mr. Exotic's campaign for U.S. President); Aplees.' Resp. Br. at 1 (noting that Mr. Exotic stood as a candidate for "U.S. President").

liability company that was established on May 5, 2015.  The Articles of Organization include Mr. Exotic's email address, the Park's street address, and "Tim Sepi" as the signatory.  Although Mr. Sepi's degree of control over Whyte Monkee Productions was contested below, he now concedes that "[f]or the purposes of this appeal, the Court should assume that Mr. Sepi was unaware of [Whyte Monkee Productions] at the time of formation."  *Id.* at 63.

## 2

Until his resignation in August 2016, Mr. Sepi continued to film and produce videos for *Joe Exotic TV*.  During and after Mr. Sepi's tenure at the Park, filmmakers associated with Defendant Royal Goode were shooting footage at the Park and editing what would eventually become the *Tiger King* series.  *See* Aplts.' App., Vol. I, at 162, ¶ 35 (Defs.' Mot. for Summ. J., filed Jan. 27, 2022).  In addition to its own footage, Royale Goode licensed film clips from Mr. Exotic and Jeffrey Lowe—the new owner, after around February 2016, of the Park—including the works that Mr. Sepi now claims to own.  *See id.*

While creating the documentary, Royal Goode emailed Mr. Sepi to obtain his assistance in accessing video footage that was apparently located at the Park.  Royal Goode also offered to compensate Mr. Sepi for his efforts.  Mr. Sepi responded to Royale Goode's email, telling them to contact Mr. Exotic because he no longer worked there.  He also did not assert any ownership interest in the footage at that time.

In March 2020, Netflix released *Tiger King* and included clips from the following seven videos that were filmed by Mr. Sepi *while he was an employee* of the Park:

1.    Disrespectful Tomato Thrower Trouble

2.    Joe – Getting Dragged by Lion

3.    Joe – Presidential PSA

4.    Mobile Trailer Inspections for Volunteers

5.    Country Music Artist Joe Exotic – Bring It On

6.    Joe Exotic Country Music "Here Kitty Kitty"

7.    Joe Exotic TV – Tornado on the Ground

*See id.* at 163, ¶ 39.  These videos were all filmed by Mr. Sepi between May 2015 and August 2016.  *See id.* at 163–66, ¶¶ 40–46.

The eighth video—Travis MM Funeral Ceremony—was shot after Mr. Sepi terminated his relationship with the Park.  *See id.* at 166, ¶ 47.  The video is approximately twenty-three minutes and fifty-two seconds long and documents the funeral of Mr. Exotic's husband, Travis Maldonado.  *See id.*  The Funeral Video depicts guests arriving at the funeral, Mr. Exotic giving a eulogy, and the showing of a memorial video.  Mr. Sepi shot the video by placing the camera on a tripod and leaving it running.  *See id.*  The video was livestreamed on the *Joe Exotic TV* YouTube page and remained there after the funeral.  *See id.*  A clip from the video appears in a segment of *Tiger King* lasting approximately one minute and six seconds.  *See id.* at 167, ¶ 49.  The clip focuses on portions of Mr. Exotic's eulogy

7

and is interspersed with other footage, including comments from Mr. Maldonado's mother that are critical of Mr. Exotic. *See id.*

Following the release of *Tiger King*, Mr. Sepi obtained copyright registrations for the eight videos. *See id.* ¶ 50. Mr. Sepi "has never licensed, sold, or otherwise commercially exploited any of his work (including the Videos)." *Id.* ¶ 51.

**3**

In a separate lawsuit, Carole Baskin—a big-cat enthusiast and Mr. Exotic's longstanding rival—obtained a $1 million judgment against Mr. Exotic. To collect this judgment, Ms. Baskin initiated garnishment proceedings against Mr. Exotic in Oklahoma. On September 13, 2016, approximately one month after leaving the Park, Mr. Sepi gave a deposition as a fact witness in connection with the garnishment proceedings. During the course of his 2016 deposition, Mr. Sepi testified (1) that he had been hired by and worked for the Park as a videographer and photographer, and (2) that he had no involvement in the creation of the entity known as Whyte Monkee Productions, LLC, nor any knowledge of that entity's activities. *See id.* at 161, ¶ 32.

However, Mr. Sepi's testimony on these points changed significantly by the time he filed this lawsuit. In 2021, he gave a deposition in connection with this litigation where he directly contradicted his earlier testimony and admitted to committing perjury during his 2016 deposition. *See id.* at 162, ¶ 33. Specifically, at his 2021 deposition, Mr. Sepi testified that he came up with the idea to form Whyte Monkee Productions after the studio fire and gained permission from the Park to film videos using the entity. *See* Aplts.' App., Vol. V, at 57:2–14 (Dep. of Timothy Sepi,

dated May 13, 2021).  Mr. Sepi also testified that he was being paid $150 per week

for his photography work at the Park, which did not include *any* videography.  *See id.*

at 99:7–10.  Specifically, he testified that when he described himself as a

"cameraman" in his 2016 deposition, he did not properly elaborate to indicate that he

only meant photography.  *See id.* at 44:6–19.

## B

On September 14, 2020, Plaintiffs sued Netflix—and later Royal Goode—for

copyright infringement, contending that Plaintiffs owned the copyrights in the Videos

and that Defendants had used clips of those Videos without permission.  *See* Aplts.'

App., Vol. I, at 24, ¶¶ 23–24 (Compl., filed Sept. 14, 2020).  On January 27, 2022,

Defendants moved for summary judgment on the grounds that (1) Mr. Sepi had shot

seven of the videos within the scope of his employment such that those videos were

works made for hire; and (2) the remaining video—i.e., the eighth—is not subject to

copyright protection because it is lacking in originality.  Alternatively, Defendants

argued that their use of the eighth video qualified as a fair use such that no copyright

infringement had occurred.

On April 27, 2022, the district court granted Defendants' motion for summary

judgment, holding that seven of the videos were works made for hire under § 201(b)

of the Copyright Act, and thus Mr. Sepi did not own the copyrights in those videos.

In reaching that conclusion, the district court also determined that Mr. Sepi's 2021

testimony should be "excluded as a transparent attempt to create a sham issue of

fact." Aplts.' App., Vol. VIII, at 264 (Order on Defs.' Mot. Summ. J., filed Apr. 27, 2022).

The district court then concluded that "a reasonable juror could conclude that the Travis MM Funeral Ceremony video [(the eighth video)] contains elements of originality that are subject to copyright." *Id.* at 271. Nonetheless, the district court concluded that Defendants' use of the Funeral Video was fair use that did not infringe upon Mr. Sepi's copyright. *See id.* at 277–78. The same day, the district court entered judgment in favor of Defendants. *See id.* at 279 (Dist. Ct. J., filed Apr. 27, 2022). On May 26, 2022, Plaintiffs filed a timely notice of appeal from the district court's order granting summary judgment. *See id.* at 280–81 (Pls.' Notice of Appeal, filed May 26, 2022).

## II

Plaintiffs raise two issues on appeal. First, they argue that the seven videos Mr. Sepi filmed while employed at the Park were not works made for hire. Specifically, Plaintiffs contend—for the first time on appeal—that "Mr. Sepi's scope of employment as a tour videographer did not extend to cinematography and film editing conducted on his own time outside of tours." Aplts.' Opening Br. at 66. Second, Plaintiffs argue that the district court erred on fair use. In particular, Plaintiffs contend that "[u]nder the statutory fair-use factors, the [Defendants'] streaming use . . . is unfair and contrary to the purposes of copyright." *Id.* at 23. In support of their position, Plaintiffs point to the Supreme Court's recent decision in

10

*Warhol*, which allegedly "supports reversal of the fair-use decision below." Aplts.' Am. Suppl. Br. at 11.

With respect to the first seven videos, we conclude that Plaintiffs have asserted a new theory on appeal—which was not raised in the district court—and have failed to argue for plain error. As such, we hold that Plaintiffs have waived this theory. And, because this theory constitutes their sole ground for challenging the district court's entry of judgment regarding the first seven videos, we uphold that judgment.

With respect to the eighth video, however, we conclude that the district court erred in determining that Defendants were entitled to summary judgment on their fair use defense. Specifically, the district court erroneously concluded that the first factor, which concerns the purpose and character of the use, favors Defendants. Further, the district court erred in concluding that the fourth factor weighs in Defendants' favor; Defendants failed to provide any affidavits or other evidence demonstrating the absence of a market impact. In light of our rulings on these matters, we reverse the district court's entry of summary judgment as to the eighth video and remand for further proceedings consistent with this opinion.

### III

"We review the district court's summary judgment decision de novo, applying the same standards as the district court." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1046 (10th Cir. 2017). "Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Peterson v.*

*Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013). However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)); *see also N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171–72 (10th Cir. 2021) ("To survive a motion for summary judgment, the nonmoving party must show more than '[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position . . . there must be evidence on which the jury could reasonably find for the [nonmoving party].'" (alterations and omission in original) (quoting *Anderson*, 477 U.S. at 252)).

To determine whether a "genuine issue" as to a material fact exists, we consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *accord SEC v. GenAudio, Inc.*, 32 F.4th 902, 920 (10th Cir. 2022). Furthermore, "[m]ere allegations unsupported by further evidence . . . are insufficient to survive a motion for summary judgment." *James v. Wadas*, 724 F.3d 1312, 1319–20 (10th Cir. 2013) (omission in original) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005)); *accord Potts v. Davis Cnty.*, 551 F.3d 1188, 1192 (10th Cir. 2009).

**IV**

Plaintiffs first argue that the district court erred in concluding that Mr. Sepi
was acting within the scope of his employment when filming the first seven videos at
issue in this appeal because "Mr. Sepi's scope of employment as a tour videographer
did not extend to cinematography [or] film editing *conducted on his own time outside
of tours*." Aplts.' Opening Br. at 66 (emphasis added). Specifically, Plaintiffs claim
that "Mr. Sepi was employed to take photography and videography of park *tours*."
*Id.* at 67. Plaintiffs assert that the seven videos at issue in this appeal include works
far afield from that task—e.g., "the production and editing of music videos"—and
were thus not made within the scope of Mr. Sepi's employment. *Id.*

Defendants note that Plaintiffs assert a new theory on appeal. *See* Aplees.'
Resp. Br. at 2 ("On appeal, Plaintiffs have invented a new theory—that, yes,
[Mr.] Sepi was hired as a videographer, but only to record visitors during Park tours.
Plaintiffs failed to raise this argument below, such that it is waived."). Our review of
the district court proceedings confirms Defendants' contention.

"We have held that an appellant waives an argument if she fails to raise it in
the district court and has failed to argue for plain error and its application on appeal."
*Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1306 (10th Cir. 2017) (quoting *Campbell
v. City of Spencer*, 777 F.3d 1073, 1080 (10th Cir. 2014)). "And our forfeiture-and-
waiver rule applies even 'when a litigant changes to a new theory on appeal that falls
under the same general category as an argument presented at trial.'" *Id.* (quoting
*Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013)).

13

In the proceedings below, Plaintiffs argued that Mr. Sepi's "duties for the Park were separate from his duties for Whyte Monkee Productions, LLC." Aplts.' App., Vol. IV, at 28. Specifically, Plaintiffs—citing Mr. Sepi's 2021 deposition testimony—argued that Mr. Sepi "was hired solely to perform photography services and [that] he personally conceived of and set up Whyte Monkee Productions as a separate venture for his videography work." Aplts.' App., Vol. VIII, at 259. Although these arguments were in direct contravention to his 2016 deposition testimony, Mr. Sepi asserted that his 2021 position was the correct one.

Unsurprisingly, Defendants argued that the 2021 deposition testimony should be excluded under the sham affidavit doctrine. As such, given the case's posture, the vast majority of the district court's analysis centered on the sham affidavit doctrine. Recall that the court concluded that Mr. Sepi's 2021 testimony should be "excluded as a transparent attempt to create a sham issue of fact." *Id.* at 264. With the sham affidavit issue resolved and the 2021 testimony excluded, the district court determined (1) that Mr. Sepi did not solely perform photography services and (2) that he did not create Whyte Monkee Productions as a separate venture for his videography work. Taken together, the district court concluded that Mr. Sepi's works were created within the scope of his employment.

On appeal, Plaintiffs have reversed course. They now concede, for purposes of this appeal, that (1) "Mr. Sepi was involved in *both* videography and photography," and (2) "that Mr. Sepi was unaware of [Whyte Monkee Productions] at the time of formation." Aplts.' Opening Br. at 63. In other words, Plaintiffs accept

the district court's determinations.  However, Plaintiffs now assert, for the first time, that "Mr. Sepi's scope of employment as a tour videographer did not extend to cinematography [or] film editing conducted on his own time outside of tours."  *Id.* at 66.

This line of argument for seeking reversal of the district court's judgment regarding the seven videos is meaningfully different from the argument that Plaintiffs raised below.[2]  Stated another way, Plaintiffs' argument on appeal was not raised below and is forfeited for purposes of appeal.  And Plaintiffs' failure to now argue for plain error waives the issue; in other words, Plaintiffs have no entitlement to be heard on this line of argument for reversal.  *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) ("When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise."); *United States v. Lamirand*, 669 F.3d 1091, 1099 n.7 (10th Cir. 2012) ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court . . . ." (first omission in original) (citation omitted) (quoting *Richison v. Ernest*

---

[2]    It could be said that, at a broad level, Plaintiffs' argument below falls within the same general category as the argument raised on appeal (i.e., that Mr. Sepi was not acting within the scope of his employment when filming these videos). However, as noted *supra*, "our forfeiture-and-waiver rule applies even 'when a litigant changes to a new theory on appeal that falls under *the same general category* as an argument presented at trial.'"  *Jacks*, 856 F.3d at 1306 (emphasis added) (quoting *Schrock*, 727 F.3d at 1284).

15

*Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011)).  And, because this line of argument constitutes Plaintiffs' sole basis for challenging the district court's entry of judgment regarding the first seven videos, we uphold that judgment.

## V

Next, Plaintiffs assert that the district court "erred with respect to each of the statutory fair-use factors" when determining whether Defendants' use of the Funeral Video was fair use.  Aplts.' Opening Br. at 23.  Specifically, Plaintiffs claim that the first statutory factor counsels in their favor because Defendants' "streaming use is as commercial as it gets and is not transformative because the use makes no commentary upon the work [(i.e., the Funeral Video)] itself."  *Id.* at 16.  Furthermore, Plaintiffs argue that the second and third statutory factors point in their favor, as "the work was not published, is not factual," and "the heart of the work was taken."  *Id.* Finally, Plaintiffs allege that the fourth factor counsels in their favor, as "there was no showing below, on this affirmative defense, of a lack of market harm."  *Id.* Plaintiffs contend that this conclusion is only bolstered by the Supreme Court's recent decision in *Warhol*, which allegedly "supports reversal of the fair-use decision below."  Aplts.' Am. Suppl. Br. at 11.

We partially agree with Plaintiffs.  Specifically, we agree that the first factor points in Plaintiffs' favor.  But our range of agreement with Plaintiffs is narrow after that.  We cannot agree regarding the second and third factors; they weigh in Defendants' favor.  It is only regarding the fourth factor that we can find additional room for agreement; the district court erred in determining that Defendants carried

their burden in showing an absence of a market impact.  Accordingly, we must reverse and remand.

## A

Under § 107 of the Copyright Act, "a copyright holder cannot prevent another person from making a 'fair use' of copyrighted material." *Google LLC v. Oracle Am., Inc.*, 593 U.S. ----, 141 S. Ct. 1183, 1196 (2021).  This doctrine embodies "an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  *Id.* (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).

The Copyright Act sets out four nonexclusive factors that courts must consider in determining whether the use of a protected work is a fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  When evaluating fair use, all of the factors "are to be explored, and the results weighed together, in light of the purposes of copyright."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

"Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985).  However, "the court may resolve issues

of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

"As with all affirmative defenses . . . the defendant bears the burden of proof" on demonstrating fair use. *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012); *see also Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 320 (5th Cir. 2022) ("In the copyright realm, fair use is an affirmative defense . . . ."); *cf. Campbell*, 510 U.S. at 590 ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets.").

**B**

In assessing whether Defendants' use of the Funeral Video is a fair use, each of the four statutory factors must be considered and the results weighed together. *See Campbell*, 510 U.S. at 578. In weighing the factors, none may "be treated in isolation, one from another." *Id.*

Beginning with the first factor, we determine that it strongly weighs in Plaintiffs' favor in light of the Supreme Court's recent guidance in *Warhol*. Turning to the second and third factors, we agree with the district court that both factors favor Defendants. As to the fourth factor, we conclude that Defendants did not carry their burden to produce evidence regarding the absence of a market impact. Because it is "impossible to deal with the fourth factor . . . [on] a silent record," it is impossible for us to engage in the case-specific weighing of the four factors, which is the

hallmark of the fair use doctrine. *Id.* at 594. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## 1

The first factor concerns "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). A central, relevant inquiry is "whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579 (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990)).

In finding the first factor to weigh in Defendants' favor, the district court stated that "the core of [the] inquiry is 'whether the new work merely "supersede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" Aplts.' App., Vol. VIII, at 273 (second alteration in original) (quoting *Campbell*, 510 U.S. at 579). Operating under this standard, the district court found Defendants' use to be transformative.

Plaintiffs contend that the district court applied the incorrect standard when assessing the first factor. Specifically, Plaintiffs assert that the district court "misconstrued the meaning of 'transformative' in ruling that Defendants' use was a transformative use." Aplts.' Opening Br. at 27. Stated otherwise, they argue that the district court "overlooked that 'a mere *difference in purpose is not* quite the same thing as *transformation*.'" *Id.* at 28 (quoting *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1225 (9th Cir. 2022)). Accordingly, Plaintiffs claim that the first statutory factor

19

counsels in their favor because Defendants' "streaming use is as commercial as it gets and is not transformative because the use makes no commentary upon the work itself." *Id.* at 16.  We agree with Plaintiffs.

<strong>a</strong>

The district court correctly noted that in *Campbell* the Supreme Court described a transformative use as one that "adds something new, with a further purpose or different character, altering the first [(i.e., the original)] with new expression, meaning, or message."  510 U.S. at 579.  However, in *Warhol*, the Court clarified that "*Campbell* cannot be read to mean that § 107(1) weighs in favor of any use that adds some new expression, meaning, or message."  598 U.S. at 541.  More specifically, in clarifying *Campbell*, the *Warhol* Court described it thusly:

> The use at issue in *Campbell* was 2 Live Crew's copying of certain lyrics and musical elements from Roy Orbison's song, "Oh, Pretty Woman," to create a rap derivative titled "Pretty Woman." Without a doubt, 2 Live Crew transformed Orbison's song by adding new lyrics and musical elements, such that "Pretty Woman" had a new message and different aesthetic than "Oh, Pretty Woman."  Indeed, the whole genre of music changed from rock ballad to rap.  That was not enough for the first factor to weigh in favor of fair use, however.  The Court found it necessary to determine whether 2 Live Crew's transformation of Orbison's song rose to the level of parody, a distinct purpose of commenting on the original or criticizing it.

> Distinguishing between parody (which targets an author or work for humor or ridicule) and satire (which ridicules society but does not necessarily target an author or work), the Court further explained that "[p]arody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing."

20

*Id.* at 530 (alteration in original) (citation omitted) (quoting *Campbell*, 510 U.S. at 580–81).

This discussion of *Campbell* shows us that the Court did not deem a different genre of music and different lyrics to be enough to support a claim of transformative use. Instead, it was only when the Court found that 2 Live Crew's work was a parody involving commentary on the original that the balance tilted in favor of fair use. As such, the *Warhol* Court crucially stated, "*when 'commentary has no critical bearing on the substance or style of the original composition*, . . . the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.'" *Id.* at 530–31 (omission in original) (emphasis added) (quoting *Campbell*, 510 U.S. at 580).

With this clarification in mind, Defendants' use of the Funeral Video is not transformative under the first fair use factor. Here, Defendants did not comment on or "target" Mr. Sepi's work at all; instead, Defendants used the Funeral Video to comment on Joe Exotic. More specifically, Defendants used the Funeral Video to illustrate Mr. Exotic's purported megalomania, even in the face of tragedy. By doing so, Defendants were providing a historical reference point in Mr. Exotic's life and commenting on Mr. Exotic's showmanship. However, Defendants' use did not comment on Mr. Sepi's video—i.e., its creative decisions or its intended meaning.[3]

---

[3]    In their Supplemental Brief, Defendants assert that their "use of the short Funeral Video clips targets both [Mr.] Exotic *and* the solemnity of the funeral as depicted in the Video." Aplees.' Suppl. Br. at 6. However, Defendants do not

In other words, the purported commentary did not "comment" on the original composition, but rather targeted a character in the composition.  And *Warhol* has deemed such a use to not be sufficiently transformative.  Indeed, in *Warhol*, Andy Warhol himself targeted a character—the artist, Prince—but the Court determined that his work was not sufficiently transformative in part because Mr. Warhol did not target the original work—*viz.*, Lynn Goldsmith's photograph of Prince.

Accordingly, Netflix's asserted commentary "is at *Campbell*'s lowest ebb. Because it 'has no critical bearing on' [Mr. Sepi's video], the commentary's 'claim to fairness in borrowing from' [his] work 'diminishes accordingly (if it does not vanish).'  The commercial nature of the use, on the other hand, 'loom[s] larger.'"  *Id.* at 546–47 (third alteration in original) (footnotes omitted) (citation omitted) (quoting *Campbell*, 510 U.S. at 580).

**b**

"Like satire that does not target an original work, [Netflix's] asserted commentary 'can stand on its own two feet and so requires justification for the very act of borrowing.'"  *Id.* (quoting *Campbell*, 510 U.S. at 581).  Here, however,

---

elaborate on how their use targets the Funeral Video—in particular, its "solemnity." And we are unpersuaded that it does.  Indeed, *Warhol*'s discussion of "targeting," which is astutely explained through the example of the Campbell's Soup Cans series, confirms our conclusion.  The Court explained that the "Soup Cans series uses Campbell's copyrighted work for an artistic commentary on consumerism, a purpose that is orthogonal to advertising soup."  *Warhol*, 598 U.S. at 539.  As such, the Court stated that such a use "does not supersede the objects of the advertising logo."  *Id.* Here, however, Defendants' use does not target the solemnity of the funeral to convey a broader social message (or any other message, beyond commenting on Mr. Exotic).  As such, we find no merit in Defendants' assertion.

Defendants do not appear to have a sufficiently compelling justification for their use. Defendants simply wished to use Mr. Sepi's Funeral Video to convey a new meaning or message—*viz.*, commenting on and criticizing Mr. Exotic. More specifically, Defendants used the Funeral Video, which Mr. Sepi created for the purpose of "remembrance," Aplts.' App., Vol. VII, at 151:21, for a different purpose—*viz.*, to comment on Mr. Exotic's purported megalomania. "But that does not suffice under the first factor. Nor does it distinguish [Defendants] from a long list of would-be fair users: a musician who finds it helpful to sample another artist's song to make his own, a playwright who finds it helpful to adapt a novel, or a filmmaker who would prefer to create a sequel or spinoff, to name just a few." *Warhol*, 598 U.S. at 547–48. Indeed, as discussed *supra*, the *Warhol* Court clarified that § 107(1) does not weigh in favor of a use simply because it adds some new expression, meaning, or message. Thus, under *Warhol*'s guidance, it is clear that Defendants' use of the Funeral Video for a different purpose does not—standing alone—suffice to tilt the first factor in their favor.

This conclusion is further bolstered by the commerciality of Netflix's use. *Warhol* reiterated that the "undisputed commercial character of [a] use, though not dispositive, 'tends to weigh against a finding of fair use.'" *Id.* at 537 (quoting *Harper*, 471 U.S. at 562). Here, it is undisputed that Defendants profited from their streaming of the *Tiger King* series. *See* Aplts.' App., Vol. I, at 128, ¶ 17 (Second Am. Compl., filed Dec. 13, 2021) ("Netflix released the Tiger King documentary miniseries[,] and [it] was reportedly watched by over 34 million viewers in the U.S.

23

during the first 10 days.").  As such, it follows that Defendants profited from their commercial use of Mr. Sepi's work in the *Tiger King* series—which was streamed to millions of paying subscribers of Netflix's for-profit streaming service.  *See id.* Furthermore, it is also undisputed that Defendants did not pay Mr. Sepi the customary licensing fee for using his video.  Therefore, "[t]he commercial nature of [Defendants'] secondary use [also] weighs against a finding of fair use."  *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018).

Taken together, then, the first statutory factor weighs in Plaintiffs' favor.

**2**

The second fair use factor focuses on "the nature of the copyrighted work."  17 U.S.C. § 107(2).  Specifically, the Supreme Court has recognized that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Campbell*, 510 U.S. at 586.  The inquiry under the second factor generally focuses on two criteria.  First, the law generally "recognizes a greater need to disseminate factual works than works of fiction or fantasy," and hence it is more likely that the use of a factual or informational work will be fair use.  *Harper*, 471 U.S. at 563; *see also Hustler Mag., Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1153–54 (9th Cir. 1986) ("The scope of fair use is greater when 'informational' as opposed to more 'creative' works are involved." (quoting *Marcus v. Rowley*, 695 F.2d 1171, 1176 (9th Cir. 1983))).

Second, whether a work has been published is also critical to its nature, as "the scope of fair use is narrower with respect to unpublished works." *Harper*, 471 U.S. at 564. As such, "[w]hile even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public or disseminated to the press, the author's right to control the first public appearance of his expression weighs against such use of the work before its release." *Id.* (citation omitted).

### a

Plaintiffs claim that the second statutory factor counsels in their favor. Specifically, Plaintiffs first argue that the district court "erroneously considered the Funeral [Video] a factual work because it captures images of reality, *i.e.*, of a funeral that actually happened." Aplts.' Opening Br. at 35. Instead, Plaintiffs contend that the "depiction of real events via the camera doesn't make a work factual." *Id.* at 36. Plaintiffs assert that "[i]nsofar as Mr. Exotic is compelling creative content by an actor, [the video is] artistic and expressive—not factual." *Id.* We are unpersuaded.

A paradigmatic example of a creative work, the use of which will disfavor fair use under the second factor, is "[a] motion picture based on a fictional short story." *Stewart*, 495 U.S. at 238. On the factual end of the spectrum, secondary use of a "bare factual compilation[]" favors fair use under the second factor. *Campbell*, 510 U.S. at 586. However, "[e]ven within the field of fact works, there are gradations as to the relative proportion of fact and fancy. One may move from sparsely embellished maps and directories to elegantly written biography." *Harper*, 471 U.S.

25

at 563 (quoting Robert A. Gorman, *Fact or Fancy? The Implications for Copyright*, 29 J. COPYRIGHT SOC. 560, 563 (1982)).

Additionally, "[w]hen determining the thickness of a [video's] copyright, a court weighs the 'range of creative choices available in selecting and arranging the [video's] elements,' examining aspects like 'lighting, camera angle, depth of field, and selection of foreground and background elements.'" *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 266 (4th Cir. 2019) (quoting *Rentmeester v. Nike Inc.*, 883 F.3d 1111, 1120–21 (9th Cir. 2018), *overruled on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc)). "The ultimate task is to separate the 'facts or ideas set forth in a work,' which are not protected, from the 'author's manner of expressing those facts and ideas,' which is protected." *Id.* at 266–67 (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015); *Authors Guild*, 804 F.3d at 220 ("[W]hile the copyright does not protect facts or ideas set forth in a work, it does protect that author's manner of expressing those facts and ideas.").

Here, the Funeral Video is indisputably factual, containing only footage of actual events. *See* Aplts.' App., Vol. I, at 166, ¶ 47. Put another way, nothing in the video could be categorized as a work of fiction. The fact that Joe Exotic attended and spoke at the funeral does not suddenly transform an otherwise factual depiction into a fictional work. Furthermore, Mr. Sepi's creative vision or "manner of express[ion]" in the Funeral Video was extremely limited. *Brammer*, 922 F.3d at 267. Mr. Sepi shot the video by placing a camera on a tripod and leaving it running.

*See* Aplts.' App., Vol. I, at 166, ¶ 47.  He did not edit the video, and his sole creative decision was where to place the camera.  *See id.*  Indeed, Plaintiffs do not even attempt to argue that Mr. Sepi exercised creative decision-making when filming this video.  As such, the district court correctly concluded that the "video is more factual than creative."  Aplts.' App., Vol. VIII, at 275.  Accordingly, the second factor counsels in favor of fair use.

**b**

Next, Plaintiffs argue that the district court erred in holding that "the Funeral [Video] was 'previously *published*' because it was 'livestreamed via YouTube and remained there afterwards.'"  Aplts.' Opening Br. at 32.  Specifically, Plaintiffs contend that the Funeral Video "was not published in a copyright sense: 'in this area of the law the word "publication" is a "legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term."'"  *Id.* (quoting *Est. of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211, 1214 n.3 (11th Cir. 1999)).  Plaintiffs claim that "publication in the copyright sense could occur 'only in two situations' that indicated the owner's desire to relinquish control over the work to the public."  *Id.* at 33 (quoting *Est. of Martin Luther King, Jr.*, 194 F.3d at 1215).  "The first situation was where the owner distributed 'tangible copies of the work' to the public."  *Id.* (quoting *Est. of Martin Luther King, Jr.*, 194 F.3d at 1215).  "The second situation was where the work was 'exhibited or displayed in such a manner as to permit unrestricted copying by the general public.'"  *Id.* (quoting *Est. of Martin Luther King, Jr.*, 194 F.3d at 1215).  As such, Plaintiffs assert that "[w]hile the

27

YouTube livestream and later posting were a persistent public performance," it was by no means the distribution of a work to the public. *Id.* at 34. Plaintiffs' argument is unavailing.

17 U.S.C. § 101 provides the following definition of publication:

> "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

Although the statutory definition does not clearly include YouTube videos, persuasive authority suggests that such videos would be "published" for the purposes of resolving a copyright dispute. *See* U.S. COPYRIGHT OFFICE, COPYRIGHT REGISTRATION OF WEBSITES AND WEBSITE CONTENT 4 (2021), https://www.copyright.gov/circs/circ66.pdf ("The key element of publication for an online work is that the copyright owner must authorize distribution. . . . A copyright owner must have expressly or implicitly authorized users to make retainable copies of a work by downloading, printing, or other means for the work to be considered published."). More importantly, the Supreme Court has stated "[t]he right of first publication implicates a threshold decision by the author whether and in what form to release his work." *Harper*, 471 U.S. at 553. As such, apparently underpinning the publication inquiry is a focus on "the author's right to control the first public appearance of his expression." *Id.* at 564.

At the outset, Mr. Sepi's display of the Funeral Video appears to satisfy even the stringent interpretation of "publication" that he and Whyte Monkee Productions (i.e., Plaintiffs) posit.[4]  Mr. Sepi livestreamed the Funeral Video on YouTube as the funeral occurred, and then made the video publicly available on YouTube.  *See* Aplts.' App., Vol. I, at 166, ¶ 47.  Thus, contrary to Plaintiffs' assertion, this appears to be a situation where the work was "exhibited or displayed in such a manner as to permit unrestricted copying by the general public," as members of the public could access and download the video at any time.  *Est. of Martin Luther King, Jr.*, 194 F.3d at 1215.

Furthermore, Defendants' use of the clip did not infringe on Mr. Sepi's "right to control the first public appearance of his expression."  *Harper*, 471 U.S. at 564.  Specifically, Mr. Sepi was able to exercise his right of first publication by choosing to livestream and post the video on YouTube for the public's consumption.  Only after Mr. Sepi exercised this right did Defendants use the video for their *Tiger King* series.  As such, Plaintiffs cannot now contend that Defendants' use of Mr. Sepi's

---

[4]    Even if the display did not satisfy such a stringent interpretation and we were to accept Plaintiffs' argument that the Funeral Video was unpublished, "the fact that a work is unpublished [does] not itself bar a finding of fair use."  17 U.S.C. § 107.  In consideration of the other fair use factors, a court could find fair use.  *See id.*; *see also* 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 13F.06[B] (2023) ("[A]lthough a work's unpublished status may still weigh against fair use, it must not count as dispositive.").

clip impeded their right of first publication. Accordingly, the district court did not

err in its analysis on the second factor.[5]

**3**

We next turn our attention to the third statutory factor. The third factor

concerns the amount and substantiality of the material used and is reviewed "with

reference to the copyrighted work, not the infringing work." *Bill Graham Archives*,

448 F.3d at 613; *see* 17 U.S.C. § 107(3) (noting that the third factor concerns "the

amount and substantiality of the portion used in relation to *the copyrighted work as a*

*whole*" (emphasis added)). This factor requires courts to consider not only "the

quantity of the materials used," but also "their quality and importance." *Campbell*,

510 U.S. at 587. So long as "the secondary user only copies as much as is necessary

for his or her intended use, then this factor will not weigh against him or her." *Kelly*

*v. Arriba Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003); *Brammer*, 922 F.3d at

267–68 ("The key question is 'whether "no more was taken than necessary"' to

accomplish the secondary user's purpose." (quoting *Authors Guild, Inc. v.*

*HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014))).

---

[5] Plaintiffs also argue that the district court "overlooked that the Funeral [Video] was deeply personal in nature." Apls.' Opening Br. at 37. As such, Plaintiffs contend that "[w]hile not dispositive, the private nature of this work—footage of a funeral of a friend—weighs against a finding of fair use." *Id.* However, Plaintiffs cite no authority demonstrating that such a consideration is relevant to the fair use analysis. Even if such a consideration were relevant, Mr. Sepi's own conduct would belie the notion that the video was of a "private nature." *Id.* Specifically, Mr. Sepi livestreamed and posted the video on YouTube for the public's consumption. As such, this contention has no merit.

Plaintiffs argue that the district court erred in assessing this factor, as it "failed to appreciate that quantity is not dispositive" of the inquiry. Aplts.' Opening Br. at 38. Instead, Plaintiffs contend that a "proper analysis of this factor demands a qualitative analysis." *Id.* Plaintiffs claim that "the qualitative value of the works copied in this case is quite high." *Id.* at 40. Specifically, they assert that "the clip here was taken *precisely* because it was unusual—*i.e.*, was notable, compelling, captivating footage." *Id.* We are unconvinced.

As a threshold matter, Defendants used a quantitatively insubstantial amount of the Funeral Video—a total of approximately sixty-six seconds out of a video lasting nearly twenty-four minutes. Thus, only about five percent of the Funeral Video appears in the *Tiger King* series. *See Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986) ("We agree with the district court that [defendant's] inclusion of 4.3 percent of the words in [the copyrighted work] in his own book is not incompatible with a finding of fair use."); *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 158 (2d Cir. 1990) ("Here, the book uses overall a small percentage of [appellee's] works. Appellant calculates that the book quotes only a minuscule amount of 25 of the 48 works that appellee claimed were infringed, 5–6% of 12 other works and 8% or more of 11 works . . . . In the context of quotation from published works, where a greater amount of copying is allowed, this is not so much as to be unfair." (citation omitted)). Although not dispositive, Defendants' use of such an insubstantial amount of the Funeral Video counsels in favor of a finding of fair use.

Furthermore, contrary to Plaintiffs' assertion, the district court did assess the qualitative value of the clips used from the Funeral Video. Specifically, the district court noted:

> The portions of the video used by Defendants show [Mr.] Exotic speaking at the funeral. Qualitatively, these clips are some of the more unusual portions of the video, although they are not necessarily the most important. The comments by Mr. Maldonado's mother, for example, may be just as significant as the comments by [Mr.] Exotic to a person wanting to view the funeral.

Aplts.' App., Vol. VIII, at 276. In both their Opening and Reply briefs, Plaintiffs fail to meaningfully engage with the district court's analysis and demonstrate why it is incorrect. In itself, that is a fundamental problem for them. *See Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong."); *accord GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1213 (10th Cir. 2022).

However, even if we were to assume that Defendants used the most qualitatively important scenes from the Funeral Video, Plaintiffs' claim would still lack merit. [6] Specifically, Defendants used no more of the Funeral Video than

---

[6] Plaintiffs separately contend that the district court erred by not "consider[ing] the possibility that Defendants could have created their own film of the funeral, instead of stealing Mr. Sepi's Funeral Film." Aplts.' Opening Br. at 41. According to Plaintiffs, this possibility of independent acquisition of the same scene is important to the "core" inquiry of the third factor, which "asks whether the Defendant 'only copies as much as is necessary for his or her intended use.'" *Id.* (quoting *Kelly*, 336 F.3d at 821). The only authority that Plaintiffs cite in support of this proposition, however, is *Brammer v. Violent Hues Productions, LLC*, 922 F.3d 255 (4th Cir. 2019). And at least without more, we are not persuaded. In particular, we read the language in *Brammer* that Plaintiffs rely on—in which the Fourth Circuit

necessary, and what they did use was reasonable in light of providing historical reference points of Mr. Exotic's life, commenting on Mr. Exotic's showmanship, and creating a captivating viewing experience that would bring his story to life. *Cf. Bill Graham Archives*, 448 F.3d at 613 ("[E]ven though the copyrighted images are copied in their entirety, the visual impact of their artistic expression is significantly limited because of their reduced size.  We conclude that such use by [defendant] is tailored to further its transformative purpose . . . .  Accordingly, the third fair use factor does not weigh against fair use." (citation omitted)); *Threshold Media Corp. v. Relativity Media, LLC*, No. CV 10-09318, 2013 WL 12331550, at *12 (C.D. Cal. Mar. 19, 2013) (unpublished) ("Although one might quibble whether the filmmakers could have cut a second or two from their uses of [plaintiff's] song in order to further reduce its overall exposure, the overall amount used was reasonable in light of their purpose.").  Stated another way, for Defendants to make their point about Mr. Exotic, they reasonably used clips in which he focused on himself during Travis Maldonado's funeral.  As such, Defendants copied only as much as was necessary for their intended use; thus, the third statutory factor also weighs in their favor.

---

hypothesizes that the defendant could have independently secured a depiction of the same scene, *id.* at 268—as tangential to the court's holding.  That is, *Brammer*'s holding did not turn on whether the defendant could have independently acquired a depiction of the same scene that the plaintiff captured in the original work.  *See id.* at 267–68.  Rather, *Brammer* turned on the amount and substantiality of the defendant's use of the original, which the court determined under the circumstances was "not justified."  *Id.* at 268.

**4**

In finding the fourth factor to weigh in Defendants' favor, the district court concluded that "*Tiger King* is not a substitute for the . . . Funeral Ceremony video." Aplts.' App., Vol. VIII, at 277. Specifically, the district court reasoned that it was "not likely that a person interested in viewing the funeral would consider viewing *Tiger King* as a replacement." *Id.* However, Plaintiffs correctly note that, in reaching this conclusion, the district court did not cite to any evidence in the record demonstrating the absence of a market impact. *See* Aplts.' Opening Br. at 43–44. As such, Plaintiffs claim that "any lack of evidence about market harms cuts against [Defendants'] fair use and means [Defendants,] as the movant on an affirmative defense[,] have failed to carry their burden on the fourth factor[]." Aplts.' Reply Br. at 26. Indeed, Plaintiffs note that "the Supreme Court and other Circuits 'have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use.'" Aplts.' Opening Br. at 43 (quoting *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020)).

Defendants attempt to defend the district court's decision, arguing that the "fourth factor weighs in the defendant's favor when the plaintiff provides no evidence demonstrating a market impact." Aplees.' Resp. Br. at 43. As such, Defendants argue that "[i]n attacking the district court's order, Plaintiffs merely assert—without a shred of evidence—that [*Tiger King*] is an unfair 'derivative use' of Plaintiffs' work." *Id.* at 44 (quoting Aplts.' Opening Br. at 43). We conclude that Plaintiffs have the better of this argument.

34

"The fourth fair use factor is 'the effect of the use upon the potential market for or value of the copyrighted work.'" *Campbell*, 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)). "It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Id.* at 590 (omission in original) (quoting 3 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 13.05[A][4] (1993)). Furthermore, "[t]he enquiry 'must take account not only of harm to the original but also of harm to the market for derivative works.'" *Id.* (quoting *Harper*, 471 U.S. at 568).

Critically, "'[f]air use is an affirmative defense,' thus requiring the defendant to 'bring forward favorable evidence about relevant markets.'" *ComicMix LLC*, 983 F.3d at 459 (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997)); *accord Campbell*, 510 U.S. at 590.

The Supreme Court's decision in *Campbell* is instructive. There, in addressing the fourth factor, the Court noted that "[s]ince fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell*, 510 U.S. at 590 (footnote omitted). As such, the Supreme Court noted that in moving for summary judgment on the ground of fair use, petitioners "left themselves at just such a disadvantage when they failed to address the effect on the market for rap derivatives." *Id.* Specifically, the Supreme Court stated:

> Although [the petitioners] submitted uncontroverted affidavits on the question of market harm to the original, neither they, nor [the respondent], introduced evidence or affidavits addressing the likely effect of [the petitioners'] parodic rap song on the market for a nonparody, rap version of "Oh, Pretty Woman." And while [the respondent] would have us find evidence of a rap market in the very facts that [the petitioners] recorded a rap parody of "Oh, Pretty Woman" and another rap group sought a license to record a rap derivative, there was no evidence that a potential rap market was harmed in any way by [the petitioners'] parody, rap version.

*Id.* at 593.

As such, the Supreme Court concluded that "it [wa]s impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense, [the petitioners], to summary judgment. The evidentiary hole will doubtless be plugged on remand." *Id.* at 594.

Here, Defendants' evidentiary showing is even more lacking than the petitioners' showing in *Campbell*. Specifically, Defendants did not submit any affidavits or other evidence on the question of market harm to the original (i.e., the market for the Funeral Video itself) *or* to the market for derivative works (i.e., the market for other works, like *Tiger King*, which may incorporate portions of the original Funeral Video).[7] Yet the Supreme Court highlighted the need for concrete evidence of market impact in *Campbell*. *See* 510 U.S. at 593–94.

---

[7]    At oral argument, Defendants suggested that Plaintiffs bore the initial burden of production to show the existence of a relevant market for Mr. Sepi's video. However, Defendants have failed to offer any binding precedent to support such a position. Furthermore, even assuming *arguendo* that such a burden existed—a matter that we do not decide here—Plaintiffs have satisfied it in this case. Specifically,

36

There, petitioners only took a few verses and riffs from the original song.  As such, like in this case, it was similarly unlikely "that a person interested in [listening to the original song] would consider [listening to the parody] as a replacement." Aplts.' App., Vol. VIII, at 277.  However, the Supreme Court still concluded that the proponent of the affirmative defense was obliged in supporting its affirmative defense to submit affidavits or other evidence demonstrating the absence of a market effect on both the original and the derivative market.  *See* 510 U.S. at 593–94; s*ee also ComicMix LLC*, 983 F.3d at 459–60 ("[T]he Supreme Court . . . ha[s] unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use. . . . [The defendant,] as the proponent of the affirmative defense of fair use, 'must bring forward favorable evidence about relevant markets.'  Because [the defendant's] position is that it does not bear the burden of proof, it does not argue the adequacy of its scant evidence. . . .  We conclude that [the defendant] did not meet its burden on the fourth factor." (citation omitted) (quoting *Penguin Books*, 109 F.3d at 1403)).

---

there is record evidence that Defendants themselves paid others to license videos used in *Tiger King*; they just did not pay Mr. Sepi a license for use of his work.  In fact, in this very appeal, Royal Goode licensed seven of the eight videos from Mr. Exotic and Mr. Lowe.  This strongly suggests the existence of a relevant market for Mr. Sepi's Funeral Video.  In this regard, the circumstances here are akin to those in *Warhol*.  There, the Court noted that there was "evidence 'that photographers generally license others to create stylized derivatives of their work' . . . .  In fact, [Mr.] Warhol himself paid to license photographs for some of his artistic renditions." 598 U.S. at 535 (citations omitted) (quoting *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 50 (2d Cir. 2021), *aff'd*, 598 U.S. 508).  Accordingly, we conclude that, to the extent Plaintiffs bore an initial burden of production regarding the existence of a relevant market, they have met it.

To be sure, Defendants note that Mr. Sepi "admitted [to] having never licensed, sold, or otherwise commercially exploited *any* of his work (including the Videos)." Aplees.' Resp. Br. at 43. As such, they claim that this is evidence that their "use of the Funeral Video did not harm any purported market for licensing the Videos." *Id.* While not dispositive, we believe that Mr. Sepi's failure to commercially exploit any of his work may indeed constitute evidence of market impact (or lack thereof) favorable to Defendants. *See* 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 13F.08[B] (2023) ("Some courts have held that factor four favored defendant when plaintiff had no history of entering the licensing market in question and no plans to do so."); *cf. ComicMix LLC*, 983 F.3d at 460 (noting, where the defendants published a Star Trek-themed book in the style of Dr. Seuss, that fourth factor weighed in favor of Dr. Seuss's publisher in part, and "[c]rucially," because the publisher often licensed its work for derivative uses). The district court's analysis should have taken this evidence into account and evaluated its significance against the backdrop of Defendants' ultimate burden to establish through concrete evidence their fair use defense.[8]

---

[8]    It should be noted that the district court also failed to consider "'whether unrestricted and widespread conduct of the sort engaged in by the defendant[s] . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (omission in original) (quoting 3 NIMMER ON COPYRIGHT § 13.05[A][4] (1993)). Specifically, by reasoning that it was "not likely that a person interested in viewing the funeral would consider viewing *Tiger King* as a replacement," Aplts.' App., Vol. VIII, at 277, the district court improperly limited its analysis to the Defendants' individual use rather than evaluating what unrestricted and widespread conduct of this sort would do to the market for the original Funeral Video.

In sum, we conclude that the district court's analysis of the record does not support its conclusion that the fourth factor weighs in favor of Defendants.

## C

Because the district court erroneously concluded—based on an inadequate factual record and without proper consideration of Defendants' burden of proof—that the fourth factor weighed in Defendants' favor, we cannot determine whether Defendants' use of the Funeral Video was a fair use.[9]  We must reverse and remand with instructions to the district court to afford Defendants an opportunity to fill the evidentiary hole and to then reweigh the results of all four factors "together, in light of the purposes of copyright."  *Campbell*, 510 U.S. at 578.

Ultimately, we rest our conclusion that remand is appropriate on the Supreme Court's admonition that courts should explore each of the four factors and "weigh[] [the results] together, in light of the purposes of copyright."  *Id.*  Here, the district

---

[9]     The district court erred by rendering judgment on the fourth factor on an inadequate factual foundation, without considering whether there was evidence of derivative market impact and, if not, weighing the absence of such evidence on the resolution of the fourth factor.  "Fair use is a mixed question of law and fact." *Harper*, 471 U.S. at 560.  The Supreme Court has said that "[w]here the district court has found facts sufficient to evaluate each of the statutory factors, an appellate court 'need not remand for further factfinding . . . [but] may conclude as a matter of law that [the challenged use] do[es] not qualify as a fair use of the copyrighted work.'" *Id.* at 560 (alterations and omission in original); *see, e.g.*, *Bell*, 27 F.4th at 325–26; *ComicMix LLC*, 983 F.3d at 461; *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 663 (2d Cir. 2018).  But "the corollary to this point is true as well—where there are material facts in dispute and those facts have not yet been resolved by the trier of fact, appellate courts may not make findings of fact in the first instance." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1373 (Fed. Cir. 2014).  The circumstances here are more akin to the latter situation.

court's error as to the fourth factor prevents the weighing of all four factors.  More specifically, we would need before us conclusive determinations on each of the factors—including the fourth—before we could weigh them in light of the aim of copyright, which is "to promote the progress of science and the arts, without diminishing the incentive to create."  *Warhol*, 598 U.S. at 531; *see Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 448–49 (D.C. Cir. 2018) (remanding on summary judgment "for the district court to further develop the factual record and weigh the factors as applied to [the defendant's] use . . . in the first instance"); *Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997) (remanding on summary judgment "to afford an opportunity for further development of the record and a sensitive aggregate assessment by the fact-finder of the fair use factors in light of the applicable legal principles").  However, we lack a comprehensive set of such conclusive determinations here because the district court ruled on the fourth factor without an adequate factual foundation.

We decline on appeal to engage in a partial weighing of the factors.[10]  And, more specifically, we will not opine on what our conclusions herein—that the first

---

[10]     We note that the Supreme Court once characterized the fourth factor as "undoubtedly the single most important."  *Harper*, 471 U.S. at 566.  But since then, the Supreme Court has repeatedly admonished "courts to avoid rigid application of the copyright statute."  *Campbell*, 510 U.S. at 577; *see also Warhol*, 598 U.S. at 527 ("The fair use doctrine 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" (quoting *Stewart*, 495 U.S. at 236)); *Google*, 141 S. Ct. at 1197 ("In a word, we have understood [§ 107] to set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances . . . ."); *cf.* 4 NIMMER ON COPYRIGHT, § 13F.09 (2023) ("In any event,

factor favors Plaintiffs and the second and third factors favor Defendants—may mean for the overall sufficiency of Defendants' fair use defense.  We leave it to the district court to apply the legal standards that we have charted out here on remand.  *See Bay v. Anadarko E&P Onshore LLC*, 73 F.4th 1207, 1219 (10th Cir. 2023).

## VI

For the foregoing reasons, we **affirm in part** and **reverse in part** the district court's summary judgment order and **remand** the case for further proceedings, including but not limited to those discussed herein.  More specifically, we **affirm** the

---

all four of the statutory factors must be considered, notwithstanding the temptation to label some aspect of each as presumptively dispositive."); William F. Patry, PATRY ON FAIR USE § 6:5 (2023) ("Assigning predetermined weights to individual factors is, moreover, inconsistent with Congress's recognition that, in examining fair use claims, 'the relative weight to be given [the statutory factors] will differ from case to case.'  Congress thus intended that courts should be free to weigh each factor as appropriate to the facts of a given case, not according to rigid, a priori rules." (alteration in original) (footnote omitted) (quoting H.R. Rep. No. 1476, at 72 (1976); S. Rep. No. 473, at 65 (1975))).

Our sister circuits are divided on whether to continue affording special weight to the fourth factor.  *Compare Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998) (affording the fourth factor no special weight), *and Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1275 n.31 (11th Cir. 2014) (same), *with Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 320 (5th Cir. 2022) (treating the fourth factor as "the single most important"), *and Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 64 (1st Cir. 2012) (same), *and Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996) (en banc) (noting that the fourth factor is "at least *primus inter pares*").  We need not, however, wade into this disagreement amongst our sister circuits and do not definitively opine on the matter.  That is because we consider remand to be the appropriate course of action in any event under the unique circumstances of this case—most notably, the fact-based nature of the district court's error on the fourth factor.

court's order insofar as it granted summary judgment in Defendants' favor

concerning Plaintiffs' copyright claims as to the first seven videos; we **reverse** the

court's order to the extent that it granted summary judgment in Defendants' favor

regarding Plaintiffs' copyright claim concerning the eighth and final video at issue;

and we **remand** the case for further proceedings consistent with this opinion.[11]

---

[11]    The parties "articulate a real and substantial interest that justifies depriving the public of access to the records that inform[ed] our decision-making process." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1135–36 (10th Cir. 2011).  Thus, the Joint Motion to Seal Limited Portions of Appellants' Appendix—which the Clerk of Court provisionally granted on September 29, 2022, subject to final determination by the merits-panel—is **granted**.  Appellants' Appendix, Volume IX, shall remain sealed.

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**March 27, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

WHYTE MONKEE PRODUCTIONS,
LLC; TIMOTHY SEPI,

      Plaintiffs - Appellants,

v.

NETFLIX, INC.; ROYAL GOODE
PRODUCTIONS, LLC,

      Defendants - Appellees.

No. 22-6086
(D.C. No. 5:20-CV-00933-D)
(W.D. Okla.)

_____

**JUDGMENT**
_____

Before **HOLMES**, Chief Judge, **HARTZ**, and **CARSON**, Circuit Judges.
_____

     This case originated in the Western District of Oklahoma and was argued by

counsel.

     The judgment of that court is affirmed in part and reversed in part.  The case is

remanded to the United States District Court for the Western District of Oklahoma for

further proceedings in accordance with the opinion of this court.


                     Entered for the Court


                     CHRISTOPHER M. WOLPERT, Clerk

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify, pursuant to 10th Cir. R. 25.5, that all required privacy redactions have been made. I further certify that the electronic submission was scanned for viruses with the most recent version of Windows Defender and is free of viruses.

Dated: April 25, 2024                    /s/ Robert H. Rotstein

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that counsel for all parties are registered CM/ECF users and that service to Plaintiffs-Appellants will be accomplished by the CM/ECF system.

Dated:  April 25, 2024                    /s/ Robert H. Rotstein