No. 22-6086

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

WHYTE MONKEE PRODUCTIONS, LLC, TIMOTHY SEPI,

*Plaintiffs-Appellants,*

v.

NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA,
HON. TIMOTHY D. DEGIUSTI
NO. 5:20-CV-00933-D

*AMICUS CURIAE* BRIEF OF MOTION PICTURE ASSOCIATION, INC.
IN SUPPORT OF DEFENDANTS-APPELLEES' LIMITED PETITION FOR
PARTIAL PANEL REHEARING AND REHEARING *EN BANC*

Kelly M. Klaus
Shannon Galvin Aminirad
MUNGER, TOLLES, & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone: (415) 512-4000
Email: kelly.klaus@mto.com
Email: shannon.aminirad@mto.com

Rose Leda Ehler
MUNGER, TOLLES, & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Email: rose.ehler@mto.com

*Attorneys for Amicus Curiae
Motion Picture Association, Inc.*

# CORPORATE DISCLOSURE STATEMENT

The Motion Picture Association, Inc. ("MPA") is a not-for-profit trade association. The MPA's members are Netflix Studios, LLC,[1] Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Universal City Studios LLC, Walt Disney Studios Motion Pictures, and Warner Bros. Entertainment Inc. The MPA does not have any parent companies, and no publicly held company owns 10% or more of the MPA.

DATED: May 2, 2024

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By: */s/ Kelly M. Klaus*
 KELLY M. KLAUS
 Attorneys for *Amicus Curiae* Motion
 Picture Association, Inc.

---

[1] Defendant-Appellee Netflix, Inc. is the parent company of Netflix Studios, LLC.

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| ARGUMENT | | 2 |
| I. | Fair Use Analysis Focuses On Context, Not Bright-Line Rules | 2 |
| II. | Neither *Warhol* Nor Any Other Case Compelled The Panel's Bright-Line Rule | 4 |
| III. | The Panel's Bright-Line Rule Threatens To Stifle Creativity, Particularly With Respect To Creative Works That Use Earlier Works For Realism And Authenticity | 7 |
| CONCLUSION | | 11 |

# TABLE OF AUTHORITIES

                                                                                                                                    **Page(s)**

**FEDERAL CASES**

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023) ............................................................................. 1, passim

*Bill Graham Archives v. Dorling Kindersley Limited*,
    448 F.3d 605 (2d Cir. 2006) ........................................................................ 8, 9

*Bouchat v. Baltimore Ravens Limited Partnership*,
    737 F.3d 932 (4th Cir. 2013) ........................................................................... 9

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ................................................................................ 2, 3, 5

*Diversey v. Schmidly*,
    738 F.3d 1196 (10th Cir. 2013) ....................................................................... 8

*Elvis Presley Enterprises, Inc. v. Passport Video*,
    349 F.3d 622 (9th Cir. 2003) ......................................................................... 10

*Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*,
    654 F.3d 989 (9th Cir. 2011) ......................................................................... 10

*Google LLC v. Oracle America, Inc.*,
    593 U.S. 1 (2021) ........................................................................................ 2, 4

*Hofheinz v. A&E Television Networks*,
    146 F. Supp. 2d 442 (S.D.N.Y. 2001) ............................................................ 9

*Lennon v. Premise Media Corp.*,
    556 F. Supp. 2d 310 (S.D.N.Y. 2008) ............................................................ 8

*Monster Communications, Inc. v. Turner Broadcasting System, Inc.*,
    935 F. Supp. 490 (S.D.N.Y. 1996) ................................................................. 9

*Red Label Music Publishing, Inc. v. Chila Productions*,
    388 F. Supp. 3d 975 (N.D. Ill. 2019) .............................................................. 9

*Rosemont Enterprises, Inc. v. Random House, Inc.*,
    366 F.2d 303 (2d Cir. 1966) ........................................................................... 7

*Salinger v. Random House, Inc.*,
 811 F.2d 90 (2d Cir. 1987) .................................................................................8

*Sarver v. Chartier*,
 813 F.3d 891 (9th Cir. 2016) ..............................................................................7

*SOFA Entertainment, Inc. v. Dodger Productions, Inc.*,
 709 F.3d 1273 (9th Cir. 2013) ............................................................................9

*Whyte Monkee Productions, LLC v. Netflix, Inc.*,
 97 F.4th 699 (10th Cir. 2024) .....................................................................1, 4, 5

**STATE CASES**

*De Havilland v. FX Networks, LLC*,
 21 Cal. App. 5th 845 (2018) ...............................................................................7

**FEDERAL RULES**

Fed. R. App. P. 29 ....................................................................................................1

# INTRODUCTION

The Motion Picture Association, Inc. ("MPA") respectfully urges the Court to grant Panel or *en banc* rehearing.[2] The Panel announced a bright-line rule that a secondary use must "comment on" an earlier work to be "transformative," and held that because Defendants' documentary ("*Tiger King*") did not comment on the brief footage from Plaintiffs' "Funeral Video," the first fair use factor weighed against the fair use defense in this case. *Whyte Monkee Prods., LLC v. Netflix, Inc.*, 97 F.4th 699, 714 (10th Cir. 2024). The Panel's decision was wrong as a matter of well-established fair use law. If not corrected, the decision threatens to severely impair the ability of MPA members and others to create works that depend on realism and authenticity—including documentaries, docudramas, biographies, and other works based on the real world.

The Panel erred by construing the Supreme Court's recent decision, *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ("*Warhol*"), to impose the bright-line requirement of "comment[ing] on" the underlying work. The Panel's rule is inconsistent with the flexible, context-

---

[2] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the MPA states: no party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no other person except MPA and its members (*excluding* MPA member Netflix Studios, LLC or any of its affiliates) contributed money intended to fund the preparation or submission of this brief.

1

specific inquiry that the Supreme Court's decisions, including *Warhol*, call for in evaluating fair use. *See Warhol*, 598 U.S. at 527 ("[F]air use is a 'flexible' concept, and 'its application may well vary depending on context.'" (quoting *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 20 (2021))).

The Panel's unfounded and erroneous rule jeopardizes the ability of creators to create works that are grounded in or comment upon real-world people, places, and events. There is a rich tradition of such works utilizing discrete portions of prior works as historical reference points or to illustrate underlying events. Whether any particular use is transformative, or ultimately a fair use, depends on an analysis of all the facts and circumstances of the particular use. In this case, *Tiger King*'s use of a short portion of the Funeral Video to illustrate characteristics of the documentary's subject was plainly transformative.

## ARGUMENT

### I. Fair Use Analysis Focuses On Context, Not Bright-Line Rules

The Supreme Court has long held that the fair use inquiry "is *not* to be simplified with bright-line rules." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (emphasis added), as it reflects a "balancing act," *Warhol*, 598 U.S. at 526. The first factor, in particular, calls for a context-specific determination of "'whether *and to what extent*' the use at issue has a purpose or character different from the original." *Id.* at 529 (emphasis added) (quoting

2

*Campbell*, 510 U.S. at 579). The answer to that question often will be "a matter of degree" and not "clear cut." *Id.* at 528.

*Warhol* made clear that the "central" focus of the transformativeness inquiry "relates to the problem of substitution"—"whether the new use served a purpose distinct from the original, or instead superseded its objects." *Id*. at 528, 542 (quoting *Campbell*, 510 U.S. at 579). Whether a secondary use substitutes for the original depends critically on *context*—a word the Court used nine times in its analysis of the first fair use factor. *Id.* at 526, 527, 533 n.8, 535 & n.11, 538, 543 n.18, 545, 546.

*Warhol*'s resolution of the first fair use factor illustrates the centrality of the concern over substitutive purpose. The Court emphasized that the photographer (Goldsmith) and the Andy Warhol Foundation (AWF) used the works at issue for the same purpose: the licensing of portraits of Prince for use in magazine stories about Prince. *Id*. at 526. Goldsmith had previously licensed her photograph for magazine use, including for an illustration Warhol himself created for *Vanity Fair*. *Id.* at 517-20. "In that *context*"—i.e., licensing to a magazine for an issue about Prince—AWF's use was not transformative. *Id.* at 535 (emphasis added).

The Court cautioned against analyzing purpose generically and without reference to context. The Court said it was not enough to characterize a work's purpose as a "work[] of visual art" or a "portrait[] of the same person." *Id.* at 535

3

n.11.  The Court went further and "examine[d] the copying's more specifically described 'purpose[s]' *in the context of the particular use at issue*."  *Id.* (second alteration in original) (emphasis added) (internal quotations omitted).

*Google* likewise illustrates the importance of context to the first fair use factor.  At a general level, Sun and Google used Sun's code for the same purpose: "to enable programmers to call up implementing programs that would accomplish particular tasks."  593 U.S. at 30.  But the Court instead "examine[d] the copying's more specifically described 'purpose[s]' and 'character.'"  *Id.* (second alteration in original).  On that more specific analysis, the Court held that Google's purpose was different because it used Sun's code to "provide[] a new collection of tasks . . . in a distinct and different computing environment."  *Id.* at 31.  Google's copying therefore "was justified *in that context*."  *Warhol*, 598 U.S. at 533 n.8 (emphasis added).

## II. Neither *Warhol* Nor Any Other Case Compelled The Panel's Bright-Line Rule

The Panel reasoned Defendants' use of the Funeral Video was not transformative because Defendants "did not comment on or 'target' [the original] work at all."  *Whyte Monkee*, 97 F.4th at 714.  The Panel concluded that, under *Warhol*, there could be no transformative use unless Defendants' work "comment[ed] on" the "creative decisions" or "intended meaning" underlying the Funeral Video.  *Id*. at 714-15 (quoting *Warhol*, 598 U.S. at 546-47).  This was so,

the Panel held, even though the *Tiger King* documentary used discrete portions of the video to "comment on Joe Exotic," e.g., to "illustrate [his] purported megalomania" and "provid[e] a historical reference point in [his] life." *Id.* Based on this analysis, the Panel concluded that the first factor "strongly weigh[ed]" in the Plaintiff's favor.³ *Id.* at 713.

The Panel erred in reading *Warhol* to impose such a bright-line rule. The Panel relied on *Warhol*'s discussion in contexts not at issue here: parody and satire. The Court explained "[p]arody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." *Warhol*, 598 U.S. at 510 (quoting *Campbell*, 510 U.S. at 580-81). In describing how satire was different, the Court said that "when 'commentary has no critical bearing on the substance or style of the original composition, . . . the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.'" *Id.* at 530-31 (alteration in original)

---

³ The Panel suggested Defendants could have prevailed on the first factor if they had a "sufficiently compelling justification" for their use. *Whyte Monkee*, 97 F.4th at 715. *Warhol* states that "[a]n independent justification . . . is . . . relevant to assessing fair use where an original work and copying use share the same or highly similar purposes" or there otherwise is a risk of substitution. 598 U.S. at 532. The two uses here did not share the same purpose.

5

(quoting *Campbell*, 510 U.S. at 580). Parody has a strong claim to borrowing because the purpose of the secondary use is to comment on or criticize the original. Satire, on the other hand, does not need to use the underlying work.

The questions relevant to distinguishing parody from satire do not necessarily apply to other contexts. *Warhol* made this clear when it said the parody-satire distinction illustrates broader principles, including whether the original and secondary use share the same purpose. *Id.* at 530-33. It is those broader principles—and not the test for distinguishing parody from satire—that are relevant in this case.

It makes no sense to apply a bright-line "comment on" rule where, as here, the facts do not give rise to a concern about a substitutive purpose. Plaintiffs used the Funeral Video to commemorate Travis Maldonado. Defendants used a portion of the Funeral Video, interspersed with commentary and other footage and as part of a larger segment, to provide a historical reference point in Joe Exotic's life and to exemplify his showmanship. *Compare* M.M.5; *with* M.M.15. Because the two uses had such different purposes, the concerns about substitution central to *Warhol* had no application here. There was no history of Plaintiffs licensing the Funeral Video, in contrast to Goldsmith's history of licensing her photograph. *See* 3 App. 148-49. On the contrary, Plaintiffs livestreamed the footage on YouTube—and then left the video there. 2 App. 193.

6

*Warhol*'s parody-satire distinction serves to illustrate the importance of context to the fair use inquiry. That distinction does not set forth a general rule that applies even where, as here, the contexts of the original and secondary uses show that each has a substantially different purpose.

**III. The Panel's Bright-Line Rule Threatens To Stifle Creativity, Particularly With Respect To Creative Works That Use Earlier Works For Realism And Authenticity**

The context here involves a documentary, a story that is based on real-world people, places, and events. Documentaries and other types of works grounded in or commenting on the real world (e.g., docudramas, biographies, and historical narratives) depend on authenticity to tell a story through the creator's narrative lens. By commenting on a particular real-world story, these works can bring to light larger social and cultural issues. Courts have long recognized the importance of protecting creators' ability to tell stories grounded in realism. *See, e.g.*, *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966) (discussing "the public benefit in encouraging the development of historical and biographical works and their public distribution"); *Sarver v. Chartier*, 813 F.3d 891, 905 (9th Cir. 2016) (holding the First Amendment "safeguards the storytellers and artists who take the raw materials of life—including the stories of real individuals, ordinary or extraordinary—and transform them into art"); *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 860-61 (2018) (same).

7

In creating motion pictures that rely on realism and authentic storytelling, creators often refer to or utilize portions of earlier works. They commonly do so not to substitute for the underlying work, but for entirely different purposes, e.g., to achieve realism by invoking the mood of a particular time-period or to vividly illustrate an event or character trait. While the Tenth Circuit has not had occasion to address fair use in these contexts,[4] other courts "have frequently afforded fair use protection" in these contexts, "recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006); *cf. Salinger v. Random House, Inc.*, 811 F.2d 90, 96 (2d Cir. 1987) (ultimately concluding there was no fair use, but noting that the biographer's "purpose in using the Salinger letters to enrich his scholarly biography weigh[ed] the first fair use factor in [the biographer's] favor").

Analyzed in context and specific to each case, there are numerous examples of motion picture works fairly using earlier works. Sometimes a new work may directly concern an earlier work. *See, e.g.*, *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 322-24 (S.D.N.Y. 2008) (use of "Imagine" song as focus of film's

---

[4] The Tenth Circuit has analyzed fair use only rarely, and not in the context at issue here. *See Diversey v. Schmidly*, 738 F.3d 1196, 1203-04 (10th Cir. 2013).

commentary was fair use). But later works may also use clips from earlier works to provide context, or to illustrate a newsworthy event or a historical figure. *See, e.g.*, *Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 493-94 (S.D.N.Y. 1996) (use of clip of 1974 heavyweight title fight in documentary was fair use).

The MPA is not aware of any decision, prior to the Panel's, holding that filmmakers must comment on or criticize the artistry or intended meaning of a prior work for their use to be transformative. On the contrary, courts have long held that uses of portions of copyrighted works in contexts like this one may be transformative, especially where the uses serve as historical markers. *See, e.g.*, *Bill Graham*, 448 F.3d at 609-10 (rejecting rule that secondary use had to "discuss the artistic merits" of original work); *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 940 (4th Cir. 2013) (use of logo as "historical guidepost" in documentary was transformative); *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (use of clip "as a biographical anchor" in musical was transformative); *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 984-85 (N.D. Ill. 2019) (use of song in documentary as part of "historical record" was transformative); *Hofheinz v. A&E Television Networks*, 146 F. Supp. 2d 442, 446-47 (S.D.N.Y. 2001) (use of film clips in actor's biography was transformative).

9

Where courts have recognized fair use in motion pictures, a key factor has been whether the secondary use was sufficiently distinct in purpose and character from the original. This is a matter of degree that requires analysis of each use in context. A good example of this is *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003), *overruled on other grounds by Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011) (per curiam). The defendant there created a documentary about Elvis and used a number of clips of Elvis's televised performances. The court held that the defendant's use was transformative where it used some small clips "as historical reference points"; the defendant's use of other longer clips "in excess of this benign purpose" was not transformative but instead the clips were "simply rebroadcast for entertainment purposes that Plaintiffs rightfully own." *Id.*

*Warhol* did not disturb these analyses of the first fair-use factor. And the district court's holding that it is transformative for a documentary to use brief clips, interwoven with criticism and commentary, for fundamentally different purposes than the original work, 8 App. 272-74, accorded with this precedent. Defendants interspersed excerpts of the Funeral Video (which originally ran for nearly 24 minutes) into a segment of just over a minute (more than half of which came from other material). *See* 3 App. 260-61. Defendants used the excerpts as historical markers and the means of illustrating facts about the documentary's subject. This

was a significantly different purpose than that of the Funeral Video, which was intended to commemorate the decedent.

In sum, whether it is transformative for creators of stories based in the real world to use discrete portions of earlier works must be determined on a case-by-case basis. In this case, the district court correctly concluded that Defendants' use of small portions of the Funeral Video was transformative. The Panel's bright-line "comment on" rule has no foundation in *Warhol* or any other case. Unless changed on rehearing, the Panel's decision threatens authors' ability to use vivid depictions of historical reference points and illustrations of their subjects to tell new and engaging stories.

## CONCLUSION

The MPA respectfully submits that the Court should grant Defendants-Appellees' petition for rehearing.

DATED: May 2, 2024

Respectfully submitted,

By: */s/ Kelly M. Klaus*
    Kelly M. Klaus

    Attorneys for *Amicus Curiae* Motion Picture Association, Inc.

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(b)(4) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 2,594 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(A), and the typestyle requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman 14-point.

I hereby certify, pursuant to Circuit Rule 25.5, that all required privacy redactions have been made. I further certify that the hard copies of this brief to be submitted to the Clerk's Office pursuant to Circuit Rules 29.2 and 31.5 are exact copies of the electronic filing. I further certify that the electronic submission was scanned for viruses with the most recent version of Windows Defender and is free of viruses.

DATED: May 2, 2024                MUNGER, TOLLES & OLSON LLP


By:     */s/ Kelly M. Klaus*
           KELLY M. KLAUS
           Attorneys for *Amicus Curiae* Motion
           Picture Association, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that counsel for all parties are registered CM/ECF users and that service to all parties will be accomplished by the CM/ECF system.

*/s/ Kelly M. Klaus*
Kelly M. Klaus