CASE NO. 22-6086
IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————————

WHYTE MONKEE PRODUCTIONS LLC, TIMOTHY SEPI,

*Plaintiffs-Appellants,*

*v.*

NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA (NO. CIV-20-933-D),
HON. TIMOTHY D. DEGIUSTI

———————————————

**BRIEF OF *AMICI CURIAE* 31 COPYRIGHT AND MEDIA LAW
PROFESSORS IN SUPPORT OF LIMITED PETITION FOR
PARTIAL PANEL REHEARING AND REHEARING *EN BANC* OF
DEFENDANTS-APPELLEES NETFLIX, INC. AND ROYAL
GOODE PRODUCTIONS LLC**

———————————————

Phillip R. Malone
Nina K. Srejovic
Alex S. Cohen
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford
    Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: 650-725-6369
Email: pmalone@stanford.edu
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. i

INTEREST OF *AMICI CURIAE* .....................................................1

SUMMARY OF ARGUMENT .........................................................1

ARGUMENT...................................................................................3

    I.    The Panel's Decision Directly Conflicts with the Two Most Recent Supreme Court Fair Use Decisions. ............... 3

        A.  The Panel Misapplied *Warhol*'s Holding to Works that Do Not Share the Same Specific Use. ........................................ 4

        B.  The Panel Ignored *Google*'s Holding Regarding Transformative Works that Share the Purpose of the Original. ................................................................... 8

    II.    The Panel's Flawed Decision Harms Exceptionally Important Public Interests. ................................................. 11

CONCLUSION ................................................................................14

CERTIFICATE OF COMPLIANCE ...................................................15

APPENDIX — LIST OF *AMICI* ...........................................................A1

# TABLE OF AUTHORITIES

## Cases

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
    598 U.S. 508 (2023) ........................................2, 3, 4, 5, 6, 7, 8, 12

*Authors Guild v. Google, Inc.,*
    804 F.3d 202 (2d Cir. 2015) .........................................................7

*Bond v. Blum,*
    317 F.3d 385 (4th Cir. 2003) ................................................12–13

*Brown v. Ent. Merchants Ass'n,*
    564 U.S. 786 (2011) .............................................................7–8

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994) ......................................................4, 6, 7, 11–12

*Google LLC v. Oracle Am., Inc.,*
    593 U.S. 1 (2021) ......................................................2, 8, 9, 10, 11

*Núñez v. Caribbean Int'l News Corp.,*
    235 F.3d 18 (1st Cir. 2000) .........................................................12

*Sony Computer Ent. Am., Inc. v. Bleem, LLC,*
    214 F.3d 1022 (9th Cir. 2000) .....................................................12

*Whyte Monkee Prods., LLC v. Netflix, Inc.,*
    97 F.4th 699 (2024) ...........................................4, 5, 9, 11, 12

*Time Inc. v. Bernard Geis Assocs.,*
    293 F. Supp. 130 (S.D.N.Y. 1968) .............................................12

## Statutes

17 U.S.C. § 106 ........................................................................4

17 U.S.C. § 107 ...............................................................3, 4, 12

## Law Review Articles

Pamela Samuelson,
*Unbundling Fair Uses*, 77 FORDHAM L. REV. 2537 (2009) ............12

Pierre N. Leval,
*Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990) .....12

## Other Materials

Center for Media and Social Impact, *Documentary Filmmakers'
Statement of Best Practices in Fair Use* (2005),
https://cmsimpact.org/wp-content/uploads/2016/01/Documentary-
Filmmakers.pdf ...................................................................10–11

## INTEREST OF *AMICI CURIAE*

*Amici* are 31 law professors who teach and write about copyright and media law. *Amici* have no personal interest in this case.[1] *Amici*'s sole interest is to ensure that the bounds of fair use are correctly interpreted, in light of recent Supreme Court decisions, to safeguard creative expression.[2]

*Amici* are listed in the Appendix.

## SUMMARY OF ARGUMENT

The panel's decision presents the extraordinary case where *en banc* rehearing is necessary, both because the decision directly conflicts with the Supreme Court's two most recent fair use decisions and because it harms exceptionally important public interests. Its conclusion that the first fair use factor favors Appellants misapplies binding precedent and consequently undermines copyright's purpose of promoting creative expression.

---

[1] No party's counsel authored this brief in whole or in part, and no party or party's counsel made a monetary contribution intended to fund its preparation or submission. No person other than the *amici* or counsel contributed money to fund preparation or submission of this brief.

[2] *Amici* thank Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic Certified Law Student Sean Arrieta-Kenna for substantial drafting assistance.

First, the panel erred by disregarding the central question of the first-factor analysis after *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023): whether Appellees' use of the funeral video supersedes the objects of Appellants' original. *Warhol* instructed courts to analyze whether the specific, allegedly infringing secondary use shares a similar purpose to the original work or any of its potential licensed derivatives. *See id.* Instead, the panel's decision articulated a far narrower standard by overemphasizing the non-parodic and commercial nature of the secondary use. The panel's decision would render infringing any commercial secondary use that does not target the original. That is not the law.

The panel's decision also conflicts with the Supreme Court's first-factor analysis in *Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021). The panel failed to perform any contextual analysis of Appellees' video, and it also failed to address any potential justifications for Appellees' secondary use that serve the broader purposes of copyright. *Warhol* cited *Google* approvingly—including for the proposition that even works that share a common general purpose can be deployed for different,

transformative uses when properly justified in new contexts. *See Warhol*, 598 U.S. at 543 n.18.

The panel's misapplication of Supreme Court precedent will cause serious harms that are of exceptional public importance. The panel's rule would render infringing a large number of classically fair uses, including some paradigmatically fair uses listed in the preamble of 17 U.S.C. § 107. Moreover, the decision will have a chilling effect on creative expression by improperly aggrandizing copyright's exclusionary power. Rehearing of this case is thus necessary to return the scope of fair use to what Congress—and the Supreme Court—intended.

## ARGUMENT

### I. The Panel's Decision Directly Conflicts with the Two Most Recent Supreme Court Fair Use Decisions.

The panel's decision is one of the first circuit court opinions to apply *Warhol*. For that reason, its analysis misconstruing *Warhol* may have a dramatic—and damaging—effect on future decisions and future creation.

**A.    The Panel Misapplied *Warhol's* Holding to Works that Do Not Share the Same Specific Use.**

The panel applied an improper standard that would deny fair use protections to commercial works where "the purported commentary did not 'comment' on [or parody] the original composition," holding that "*Warhol* has deemed such use[s] to not be sufficiently transformative." *Whyte Monkee Prods., LLC v. Netflix, Inc.*, 97 F.4th 699, 714 (2024). *Warhol* did not create such a restrictive rule for transformative fair use.

In *Warhol*, the Supreme Court clarified that the first fair use factor, "the purpose and character of the use," § 107(1), focuses on whether the specific "use at issue has a purpose or character different from the original." 598 U.S. at 529 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). In particular, the Court held that the first factor likely weighs against fair use if a *specific* secondary use will substitute for or supplant the range of potential uses of an original work, including licensed derivatives. *See Warhol*, 598 U.S. at 532–33.

Analysis under the first factor thus requires courts to examine whether the purpose of the allegedly infringing secondary use overlaps with that of the original work (or the derivatives referenced in 17 U.S.C. § 106). *See Warhol*, 598 U.S. at 532–33. Here it does not. Appellees'

documentary does not in any way compete with the eulogizing purpose of the funeral footage. Indeed, the panel itself acknowledged that "[Appellees] used the [original work], which [Appellants] created for the purpose of 'remembrance,' . . . for a different purpose—*viz.*, to comment on Mr. Exotic's purported megalomania." *Whyte Monkee*, 97 F.4th at 715.

The panel erred by disregarding the Court's direction to "consider[] whether and to what extent an original work and secondary use have substitutable purposes." *Warhol*, 598 U.S. at 536 n.12. The panel's assertion that "under *Warhol*'s guidance, it is clear that [Appellees'] use of the Funeral Video for a different purpose does not—standing alone— suffice to tilt the first factor in their favor," *Whyte Monkee*, 97 F.4th at 715, cannot be reconciled with *Warhol*.

The panel's decision inappropriately broadens the Court's statement that "*Campbell* cannot be read to mean that § 107(1) weighs in favor of any use that adds some new expression, meaning, or message." *Warhol*, 598 U.S. at 541. The panel erroneously concludes that *Warhol always* requires a secondary use to be more transformative than merely adding expression, meaning, or message to an original work. *See Whyte Monkee*, 97 F.4th at 713–715.

In *Warhol*, the Court found that Goldsmith's photograph and AWF's 2016 licensing of Orange Prince shared substantially the same specific purpose, that is, "to illustrate a magazine about Prince with a portrait of Prince." *Warhol*, 598 U.S. at 545. In its holding, the Court analogized to *Campbell*, where "new meaning or message was not sufficient," on its own, to render the particular secondary use in question transformative. *Id.* at 542. But the Court also explicitly stated that "[t]he same copying may be fair when used for one purpose but not another." *Id.* at 533; *see also id.* at 534 n.10 ("Had AWF's use been solely for teaching purposes, that clearly would affect the analysis, and the statute permits no other conclusion.").

While parody is a paradigmatic example of a specific secondary use with a distinct purpose from the original work, neither *Campbell* nor *Warhol* limits transformative uses to commentary or criticism of the original. Where a challenged secondary use does *not* share the same specific purpose as the original work, it may be sufficiently transformative even *absent any targeting of the original work*. *See, e.g.*, *Warhol*, 598 U.S. at 557–558 (Gorsuch, J., concurring) ("If, for example, the Foundation had sought to display Mr. Warhol's image of Prince in . . .

a for-profit book commenting on 20th-century art, the purpose and character of that use might well point to fair use."); *see also id.* at 544–45 (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215–16 (2d Cir. 2015)) (suggesting that providing otherwise unavailable information about the original may also constitute fair use). Illustrating this point, the Court contrasted Warhol's magazine portrait of Prince with his iconic Soup Can prints, describing the artistic purpose of the latter as "orthogonal" to the advertising purpose of the soup company logo. *Warhol*, 598 U.S. at 539.

The panel's insufficient consideration of the distinct purpose of Appellees' specific secondary use meant the panel afforded undue weight to the commercial nature of Appellees' work. *See Campbell*, 510 U.S. at 579 ("The more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."). While the Court in *Warhol* did not explicitly provide the requisite level of specificity for comparing the purposes of two works, it made clear that courts may not "define the purpose" of a work so generally as "'commercial' or 'commercial licensing.'" *See* 598 U.S. at 535 n.11. Assigning dispositive weight to commerciality in the first-factor analysis, as the panel did, would threaten important speech uses. *Cf.*

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011) (explaining that video games—like other commercial works—are communicative and advance the marketplace of ideas).

Courts must consider how the purpose of the secondary work differs from that of the original, then balance this difference against the commercial nature of the secondary use. *See Warhol*, 598 U.S. at 532. Where, as here, the specific secondary use of copyrighted material has a sufficiently distinct purpose from the original work, a court may conclude that factor one tilts towards fair use. The panel's contrary conclusion defies *Warhol*.

**B.    The Panel Ignored *Google*'s Holding Regarding Transformative Works that Share the Purpose of the Original.**

The panel's decision also conflicts with the holding of the Supreme Court's second-most recent opinion on fair use, *Google v. Oracle*, 593 U.S. 1 (2021). The Court in *Warhol* was careful to explain that "the same concepts of use and justification that the Court relied on in *Google* are the ones that it applies today." 598 U.S. at 543 n.18. But the panel failed to acknowledge, in light of *Google*, that even where a secondary work

copies another without any changes[3] and was created "for the same reason," the secondary work may still constitute fair use if "the copying's more *specifically* described 'purpose[]' and 'character,'" in context, are sufficiently different from that of the original. *See Google*, 593 U.S. at 30 (emphasis added) (citation omitted). Further, the panel failed to evaluate a justification that the Court considered key in *Google*—whether appropriating Appellants' video was necessary to serve the broader purpose of copyright. *See* 593 U.S. at 30.

Even where two works are offered for the same general purpose, fair use is not necessarily precluded. While the Court in *Google* acknowledged that Google and Sun Java shared a broad general purpose for their APIs—that is, "call[ing] upon . . . tasks" useful in computer programming, 593 U.S. at 30—it did not stop there. Rather, the Court considered the functions of the two APIs *in context* and found that the specific purpose and character of Google's uses in mobile systems were substantially different from Sun Java's uses in desktop computers. *See*

---

[3] Appellees *did* alter the portions of Appellants' video that they appropriated. *See Whyte Monkee*, 97 F.4th at 708 ("The clip . . . is interspersed with other footage, including comments from Mr. Maldonado's mother that are critical of Mr. Exotic.").

*id.* at 30–32. Here, Appellants' original work, like Sun Java's API, was intended for a particular use—as a personal video, devoid of editorializing, and not intended for a wide audience. Appellees, like Google, transformed the raw materials of Appellants' video for use in the distinct context of a documentary whose main subject was not the funeral Appellants filmed.

The Court in *Google* cautioned against automatically foreclosing fair use where two works share the same general purpose because this "would severely limit the scope of fair use" and stymie the "creative 'progress' that is the basic constitutional objective of copyright." *Id.* (citation omitted). The Court concluded that Google's direct appropriation of parts of Sun Java's API was fair because Google had transformed the copied-as-necessary API for programmers to use in a "distinct and different" interoperable mobile environment. *Id.* at 30–31.

So too here. Appellees are "not presenting the [copied] material for its original purpose but harnessing it for a new one. This is an attempt to add significant new value, not a form of 'free riding'—the mere exploitation of existing value." Center for Media and Social Impact, *Documentary Filmmakers' Statement of Best Practices in Fair Use* 4

(2005), https://cmsimpact.org/wp-content/uploads/2016/01/Documentary-Filmmakers.pdf. Accordingly, the panel should have deemed fair Appellees' necessary minimal excerpting of Appellants' personal memorial video to create a new work—a documentary "providing a historical reference point in Mr. Exotic's life and commenting on [his] showmanship." *Whyte Monkee*, 97 F.4th at 714.

Finally, the panel's holding—suggesting that, without parody or comment on the artistic aspects of the original work, a commercial secondary work cannot be sufficiently transformative under factor one—is directly inconsistent with the conclusion reached in *Google*. Just as functional computer code need not comment on or parody its precursors in fairly using them, a documentary need not comment on the style or form of its constituent videos to make fair use of them.

## II. The Panel's Flawed Decision Harms Exceptionally Important Public Interests.

The panel's rule that commercial secondary uses are insufficiently transformative unless they—like parody—target the original work for commentary or criticism, *see Whyte Monkee*, 97 F.4th at 714, improperly limits the scope of fair use. This rule will damage a fundamental safeguard of free expression and creativity. *See Campbell*, 510 U.S. at

579; Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1107–1110 (1990); Pamela Samuelson, *Unbundling Fair Uses*, 77 FORDHAM L. REV. 2537, 2537 (2009).

The panel's decision would render infringing a range of classically fair uses, including those that Congress explicitly endorsed in the preamble to § 107: "criticism, comment, news reporting, teaching . . . , scholarship, [and] research." But courts have never found that copyright precludes a newspaper from directly reproducing photos integral to the reporting of a story. *See, e.g.*, *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 21–23 (1st Cir. 2000) (cited approvingly in *Warhol*, 598 U.S. at 529 n.5). Courts have also permitted books on the Kennedy Assassination to include stills of the Zapruder film because the "public interest in having the fullest information available on the murder" exists, even without commentary on the artistic style of the photographs. *Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968).

Such uses enhancing public information have long been considered transformative and fair. *See, e.g.*, *Sony Computer Ent. Am., Inc. v. Bleem, LLC*, 214 F.3d 1022 (9th Cir. 2000) (facilitating comparative advertising); *Bond v. Blum*, 317 F.3d 385, 397 (4th Cir. 2003) (providing court

evidence). Similarly, copyright law cannot fully advance creativity and free expression if a documentary that provides commentary on a cultural phenomenon or iconic figure cannot make use of primary source footage.

By making licensing a *de facto* requirement for commercial works that copy from, but do not supersede the objects of, original works—regardless of their contributions to the public interest—the panel's reasoning will have a chilling effect on the production of new creative works. Creators like documentary producers and reporters will face heightened and uncertain costs of creation that may, in many cases, be prohibitive. The panel's rule implies that copyright affords original authors the right to exclude all possible commercial derivative uses. This would create a risk that copyright holders who do not like how they or their work are portrayed by a secondary user will refuse permission altogether.

The public will suffer the consequences of the panel's decision as creators produce fewer informative and inspiring works. This unwarranted restraint of artistic and creative works stands in direct opposition to the public-interest purpose of copyright, and as such, merits rehearing.

**CONCLUSION**

The panel's decision directly conflicts with recent Supreme Court fair use decisions and will cause serious harms to the creative arts that are of exceptional public importance. *En banc* review is warranted.

Date: May 2, 2024

Respectfully submitted,

By: /s/ Phillip R. Malone
Phillip R. Malone
Nina K. Srejovic
Alex S. Cohen
*Counsel for Amici Curiae*
Juelsgaard Intellectual Property and
　　　Innovation Clinic
Mills Legal Clinic at Stanford
Law School
559 Nathan Abbott Way
Stanford, CA 94305
Email: pmalone@stanford.edu
Telephone: 650-725-6369

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This document complies with the word limit of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X] this document contains 2586 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 16.84 in 14-Point Century Schoolbook font.

Date: May 2, 2024

/s/ Phillip R. Malone
Phillip R. Malone
Nina K. Srejovic
Alex S. Cohen
*Counsel for Amici Curiae*
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford
Law School
559 Nathan Abbott Way
Stanford, CA 94305
Email: pmalone@stanford.edu
Telephone: 650-725-6369

## APPENDIX — LIST OF *AMICI*

*Amici curiae* are the 31 copyright and media law professors listed below. Affiliation is provided for identification purposes only; all signatories are participating in their individual capacity and not on behalf of their institutions.

**Professor Jonathan Askin**
Brooklyn Law School

**Professor Mark Bartholomew**
University at Buffalo School of Law

**Professor Barton Beebe**
New York University School of Law

**Professor Michael A. Carrier**
Rutgers Law School

**Professor Michael W. Carroll**
American University College of Law

**Professor Zachary Catanzaro**
St. Thomas University College of Law

**Professor Dale Cohen**
UCLA School of Law

**Professor Jorge L. Contreras**
University of Utah S.J. Quinney College of Law

**Professor Stacey Dogan**
Boston University School of Law

**Professor Brian L. Frye**
University of Kentucky College of Law

**Professor Shubha Ghosh**
Syracuse University College of Law

**Professor James Gibson**
University of Richmond School of Law

**Professor Ellen P. Goodman**
Rutgers Law School

**Professor James Grimmelmann**
Cornell Law School

**Professor Laura A. Heymann**
William & Mary Law School

**Professor Peter Jaszi**
American University College of Law

**Professor Stacey M. Lantagne**
Western New England University School of Law

**Professor Mark A. Lemley**
Stanford Law School

**Professor Yvette Joy Liebesman**
Saint Louis University School of Law

**Professor Orly Lobel**
University of San Diego School of Law

**Professor Glynn Lunney**
Texas A&M University School of Law

**Professor Timothy J. McFarlin**
Samford University Cumberland School of Law

**Professor Mark P. McKenna**
UCLA School of Law

**Professor Tyler T. Ochoa**
Santa Clara University School of Law

**Professor Betsy Rosenblatt**
Case Western Reserve University Law School

**Professor Zahr K. Said**
Santa Clara University School of Law

**Professor Pamela Samuelson**
UC Berkeley School of Law

**Professor Jason M. Schultz**
New York University School of Law

**Professor Jessica Silbey**
Boston University School of Law

**Professor Erik Stallman**
UC Berkeley School of Law

**Professor Rebecca Tushnet**
Harvard Law School