No. 22-6086

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

WHYTE MONKEE PRODUCTIONS LLC, TIMOTHY SEPI,

*Plaintiff-Appellants,*

v.

NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,

*Defendant-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA,
HON. TIMOTHY D. DEGIUSTI
NO. 5:20-CV-00933-D

## APPELLEES' SUPPLEMENTAL BRIEF PURSUANT TO MAY 13, 2024 ORDER GRANTING REHEARING

[Further Argument Set for July 10, 2024]

Robert H. Rotstein
Emily F. Evitt
MITCHELL, SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California 90067
Telephone: (310) 312-2000
Email: rxr@msk.com

Mack J. Morgan, III
MJMLAW PLLC
6618 N. Hillcrest Ave
Nichols Hills, Oklahoma 73116
Telephone: (405) 343-7454
Email: mack@mjmlaw.biz

*Attorneys for Defendants-Appellees*
*Netflix, Inc. and Royal Goode Productions LLC*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 1

I.     Response to Question 1: Appellees' Unlicensed, Commercial Use of the Funeral Video in the Documentary Fits Squarely Within the Predominate Fair Use Jurisprudence.................................................................................... 1

        A.    Predominant Principles of Fair Use Jurisprudence Relating to Film Clips: Biography, Social Comment, and Documentary. .............................. 1

        B.    The Above Principles Apply to Appellees' Use of the Funeral Video. ........ 5

II.    Response to Question 2: The Principles Enunciated in Warhol Strongly Reaffirm that the First Fair Use Factor Weighs in Appellees' Favor. ................... 10

III.   Response to Question 3: The Panel Opinion Did Not Take Into Account Applicable Law. ..................................................................................... 14

CONCLUSION ................................................................................................ 15

CERTIFICATE OF COMPLIANCE ............................................................... 17

CERTIFICATE OF SERVICE ........................................................................ 18

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023)....................................................................5, 6, 10, 11, 12, 13, 15

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)...........................................................................11

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006)............................................................................4, 5

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
  737 F.3d 932 (4th Cir. 2013) .....................................................................4, 5, 6, 8

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)..........................................................................................13

*Dr. Seuss Enters. L.P. v. ComicMix LLC*,
  983 F.3d 443 (9th Cir. 2020) .........................................................................14

*Elvis Presley Enters., Inc. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003) .......................................................................3, 14

*Google LLC v. Oracle America, Inc.*,
  593 U.S. 1 (2021)..................................................................................11, 12, 13

*Hofheinz v. Discovery Commc'ns, Inc.*,
  2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001).............................................5

*Katz v. Google, Inc.*,
  802 F.3d 1178 (11th Cir. 2015) ......................................................................9

*Lennon v. Premise Media Corp.*,
  556 F. Supp. 2d 310 (S.D.N.Y. 2008)...........................................................9

*Monbo v. Nathan*,
  623 F. Supp. 3d 56 (E.D.N.Y. 2022))............................................................4

*New Era Publications Int'l, ApS v. Carol Publishing Group*,
  904 F.2d 152 (2d Cir. 1990)......................................................................2, 5, 7

*Rosemont Enters., Inc. v. Random House, Inc.*,
  366 F.2d 303 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009 (1967)....................2, 5, 6

*SOFA Entm't, Inc. v. Dodger Prods., Inc.*,
  709 F.3d 1273 (9th Cir. 2013) .......................................................................3, 8

*Time Inc. v. Bernard Geis Assocs.*,
  293 F. Supp. 130 (S.D.N.Y. 1968) ....................................................................3

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993)...........................................................................6

**STATUTES**

17 U.S.C. § 107...........................................................................1, 2, 4, 5, 7, 9, 10

**REGUATIONS**

28 C.F.R. §201.40(b)(1)(i)(A) ...........................................................................5

**OTHER AUTHORITIES**

A. Falzone & J. Urban, *Demystifying Fair Use: The Gift of the Center For Social Media Statements of Best Practices*, 57 J. COPYRIGHT SOC'Y U.S.A. 337, 340 (2009-10) .................9

Daniel Chandler & Rod Munday, DICTIONARY OF MEDIA AND COMMUNICATION (2d ed. 2016) .................................................................................................7

Karen Shatzkin & Dale Cohen, *Picture This: Applying the Fair Use Doctrine to Documentary Films After* Google/Oracle *and* Warhol, 30 UCLA ENT. L. REV. 1, 10 (2023).........................................................................................................1

U.S. Copyright Office, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (Oct. 2012) ..............................5

## <u>INTRODUCTION</u>

The answers to the questions set forth in the Court's Order of May 13, 2024, lead to the inescapable conclusion that the first factor under 17 U.S.C. § 107 weighs in Appellees' favor. As the amicus briefs filed in support of the Petition for Rehearing discuss, a contrary ruling would inhibit the creation and dissemination of valuable copyrighted works, thereby defeating the core purposes of copyright law—to encourage free speech and creativity.

## ARGUMENT

I.     **Response to Question 1: Appellees' Unlicensed, Commercial Use of the Funeral Video in the Documentary Fits Squarely Within the Predominate Fair Use Jurisprudence.**

The Court's first question asks: "To what extent are the predominant principles of fair use jurisprudence that relate to documentary use for 'preamble' purposes (17 U.S.C. § 107) of film clips without paying licensing fees—including, but not limited to, the use of such clips as historical markers—apposite here to Petitioners-Appellees' commercial use of the Funeral Video?" The answer is that the predominant principles of fair use jurisprudence relating to documentary use of film clips for "preamble" purposes are entirely apposite to Appellee's use of the Funeral Video in the *Tiger King* documentary (the "Documentary"). Courts have for decades found highly analogous uses to be fair use.

### A.     *Predominant Principles of Fair Use Jurisprudence Relating to Film Clips: Biography, Social Comment, and Documentary.*

Section 107's preamble identifies criticism, comment, news reporting, teaching, scholarship, and research as favored fair uses. "Most documentaries…often fill several of these purposes." Karen Shatzkin & Dale Cohen, *Picture This: Applying the Fair Use Doctrine to Documentary Films After* Google/Oracle *and* Warhol, 30 UCLA ENT. L. REV.

1, 10 (2023). By combining biography, social commentary, and recent history, the Documentary is precisely the type of work as to which the use of unlicensed film clips—even in a commercial context—constitutes a preamble fair use.

The salient principles relating to documentary use of film clips have their roots in cases analyzing whether quotations from copyrighted works for use in biography constitute fair use. *See, e.g., Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009 (1967) (quotations of copyrighted works in commercial biography of Howard Hughes was fair use even though the work was commercial and written for the popular market; "[t]his practice is permitted because of the public benefit in encouraging the development of historical and biographical works and their public distribution"); *New Era Publications Int'l, ApS v. Carol Publishing Group*, 904 F.2d 152 (2d Cir. 1990) (unlicensed commercial use of more than 100 quotations, which occupied between two and three percent of the total manuscript, in critical biography of Scientology founder L. Ron Hubbard, many prominently, was preamble fair use under section 107). In *New Era*, the Second Circuit noted that "biographies in general, and critical biographies in particular, fit comfortably within these statutory categories" in Section 107's preamble and that the defendant's use of the quotations was fair because "the author uses Hubbard's works for the entirely legitimate purpose of making his point that Hubbard was a charlatan and the Church a dangerous cult." *Id.* at 156 (internal quotation marks omitted).[1] Notably, neither Rosemont nor New Era grounded the finding of fair use on

---

[1] This purpose mirrors the Documentary's purpose in including the Funeral Video snippets.

targeting or commenting on the quoted works themselves.

*Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968), is an early example of a case in which a defendants used copyrighted *film excerpts* to create a work of history and social commentary. There, the defendants—after unsuccessfully seeking a license—included unlicensed stills of Time, Inc.'s copyrighted Zapruder film in a book about the Kennedy Assassination. The district court found the use to be fair because there was a "public interest in having the fullest information available on the murder." *Id.* at 146. As in the above cases, the defendants' use in *Time, Inc.* was commercial. *Id.* Neither did the use target or comment upon the original work. Rather, the excerpts from the Zapruder film supported the author's theory and explanation of the assassination. *Id.*

Later decisions have applied these principles to use of film clips. In *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003), *cert. denied*, 542 U.S. 921 (2004), *overruled on other grounds by Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011) (per curiam), the Ninth Circuit found that the defendant's use of short clips as historical references in an Elvis documentary was transformative.[2] Yet again, the defendant did not target or comment upon the original. And in *SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013), the Ninth Circuit found that the defendant made fair use of a copyrighted clip from *The Ed Sullivan Show* as a biographical anchor in a musical about the Four Seasons singing group.

---

[2] As discussed *infra*, the Ninth Circuit rejected the fair use defense regarding a longer copyrighted segment that substituted for and served the same entertainment purposes as the original recordings.

In *Bouchat v. Baltimore Ravens Ltd. Partnership*, 737 F.3d 932 (4th Cir. 2013), the defendants used plaintiff's copyrighted logo in three videos featured on the NFL television network about the NFL or the Ravens football team. In analyzing the first factor, the Court noted that archival footage, commentary, and interviews are key components "crucial to the creation of any historically accurate film." *Id*. at 944. These three components "align the videos with the examples in § 107's preamble." *Id*.[3] Moreover:

> Social commentary as well as historical narrative could be affected if, for example, companies facing unwelcome inquiries could ban all depiction of their logos. This would align incentives in exactly the wrong manner, diminishing accuracy and increasing transaction costs, all the while discouraging the creation of new expressive works. This regime, the logical outgrowth of Bouchat's fair use position, would chill the very artistic creation that copyright law attempts to nurture.
>
> …
>
> The NFL may not arouse sympathies in the way that a revered artist does, but the consequences of this case reach far beyond its facts. Society's interest in ensuring the creation of transformative works incidentally utilizing copyrighted material is legitimate no matter who the defendant may be.

*Id*. at 944-45. *Bouchat* thus reaffirmed prior key principles: neither the defendant's status nor the perceived quality of the defendant's work matters for fair use; using unlicensed

---

[3] Numerous other cases so hold. *See Monbo v. Nathan*, 623 F. Supp. 3d 56, 100 (E.D.N.Y. 2022)*, reconsideration denied*, 2022 WL 4134455 (E.D.N.Y. Sept. 11, 2022) ("Documentaries and biographies fall within the protected categories of § 107, and are entitled to the presumption that the use of the copyrighted material is fair.") (quoting *Hofheinz v. Discovery Commc'ns, Inc.*, 2001 WL 1111970, at *3 (S.D.N.Y. Sept. 20, 2001)) (citing *Monster Commc'ns, Inc. v. Turner Broad. Sys.*, 935 F. Supp. 490, 493-94 (S.D.N.Y. 1996); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) ("courts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects") (citing Section 107 preamble).

copyrighted material in commercial historical or biographical works for purposes of social commentary—and not only to target or comment on the original work—is transformative; and such uses fall within Section 107's preamble.[4]

### B. *The Above Principles Apply to Appellees' Use of the Funeral Video.*

While targeted to a popular audience, the Documentary is a biographical documentary,[5] and also a work of criticism of the U.S. exotic animal subculture and a window into other aspects of American society. A series about Joe Exotic, owners of big cats, and Exotic's animal park is no less newsworthy than biographies of Howard Hughes (in *Rosemont Enterprises*), L. Ron Hubbard (*New Era Publications*), actor Peter Graves (*Hofheinz*), the Baltimore Ravens (*Bouchat*), The Four Seasons (*Sofa Enterprises*) or a book about The Grateful Dead (*Bill Graham Archives*). Years before Appellees began filming the Documentary, Exotic and his animal park were subjects of widespread media coverage, as Plaintiffs even emphasized. 1.App.22.[6]

---

[4] The U.S. Copyright Office too applies these principles. 28 C.F.R. §201.40(b)(1)(i)(A) allows circumvention of copyright access controls in motion pictures, including "videos," "[f]or the purpose of criticism or comment … in documentary filmmaking," including where a "clip is used … for its biographical or historically significant nature." In its initial consideration of this exemption, the Office noted that "such uses fall within the favored purposes referenced in the preamble of Section 107 and therefore are likely to be fair uses." U.S. Copyright Office, *Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (Oct. 2012) at 126-27. No challenge has been raised to this exemption in the wake of *Warhol*. *See generally* Ninth Triennial Section 1201 Proceeding, 2024 Cycle, available at https://www.copyright.gov/1201/2024/.

[5] The Documentary's significant biographical component is reflected in its very title—*Tiger King, Murder, Mayhem & Madness*. "Tiger King," of course, refers to Joe Exotic.

[6] *See, e.g.*, THE OKLAHOMAN, "'Joe Exotic' files for bankruptcy protection after court ruling" (Apr. 3, 2013), at https://www.oklahoman.com/story/news/2013/04/03/joe-exotic-files-for-bankruptcy-protection-after-court-ruling/60991456007/;          NEWSON6.COM,

While Appellants have continually disparaged the Documentary's quality, a court should not attempt to evaluate the artistic significance of a particular work. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 544 (2023) ("*Warhol*"), quoting *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) (Holmes, J.) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits"); see *Rosemont Enters.*, 366 F.2d at 307 ("[W]hile the Hughes biography may not be a profound work, it may well provide valuable source material for future biographers (if any) of Hughes or for historians or social scientists. Contrary to the district court's view, the arts and sciences should be defined in their broadest terms…"); *Bouchat*, 737 F.3d at 945 (NFL might not have status of an artist but nonetheless is entitled to claim fair use); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1374 (2d Cir. 1993) (that a work is "of and about pop culture… does not remove it from the scope of section 107"). Whether the Documentary fits the mold of a scholarly documentary or a "traditional" one (however defined) is irrelevant to the fair use analysis.

---

"Owner of Wynnewood Exotic Animal Park Announces He's Running For President" (Nov. 23, 2015), at https://www.newson6.com/story/5e34be74e0c96e774b347b2d/owner-of-wynnewood-exotic-animal-park-announces-hes-running-for-president; N.Y. POST, "Joe Exotic is the tiger-loving candidate America needs right now" (Oct. 18, 2016), at https://nypost.com/video/joe-exotic-is-the-tiger-loving-candidate-america-needs-right-now/; CBSAUSTIN.COM, "Joe Exotic, 2 other Libertarian candidates announce plans to run for Oklahoma governor" (May 25, 2017), at https://cbsaustin.com/news/offbeat/joe-exotic-2-other-libertarian-candidates-announce-plans-to-run-for-oklahoma-governor; NEWS9.COM, "Husband of Animal Park Operator Joe Exotic Dies in Shooting" (October 6, 2017), at https://www.news9.com/story/5e34985d527dcf49dad81012/%20husband-of-animal-park-operator-joe-exotic-dies-in-shooting.

Regardless, the Documentary is hardly an outlier in reporting and commenting on the dark side of contemporary society. A documentary has been broadly defined as:

> A genre … dealing with a particular theme, and seeking to represent actual people, places, and events in a manner intended to leave viewers or listeners feeling that they have gained some insight into the subject matter. ***Although often categorized as a serious, factual, or non-fiction genre, this tends to neglect the extent to which particular examples can represent many blends of communicative functions.***

Daniel Chandler & Rod Munday, A DICTIONARY OF MEDIA AND COMMUNICATION (2d ed. 2016) (emphasis added).  Indeed, many other contemporary documentaries focus on cults, criminals, and true crime, some even winning prestigious awards.[7]  These types of documentaries have value to the public, and their uses of source material fall squarely within Section 107's preamble. This value, and not just entertainment value, is why the Documentary was one of only six series nominated for an Emmy award in 2020 in the category for "Outstanding Documentary or Nonfiction Series." 3.App.243.

The Documentary's specific use of clips from the Funeral Video falls within Section 107's preamble. Just like the defendant in *New Era Publications*, the Documentary uses quotation—albeit in the form of video—as historical artifact and as a means to comment

---

[7] *See, e.g., Wild Wild Country*, 2018 winner of the Primetime Emmy Award for Outstanding Documentary Or Nonfiction Series; *The Jinx: The Life and Deaths of Robert Durst*, 2015 winner of the same Primetime Emmy Award and a Peabody Award (Documentary and Education category); and *Going Clear: Scientology and the Prison of Belief*, 2015 winner of the Primetime Emmy Award for Outstanding Documentary or Nonfiction Special. *See* https://www.emmys.com/shows/wild-wild-country. https://peabodyawards.com/award-profile/the-jinx-the-life-anddeaths-of-robert-durst/; https://www.emmys.com/shows/jinx-life-and-deaths-robert-durst; https://www.emmys.com/shows/going-clear-scientology-and-prison-belief.

on and criticize a charismatic, cultish leader. Put differently, the series uses the footage as a "biographical anchor." *See SOFA Entm't*, 709 F.3d at 1278. And as in *Bouchat*, the Documentary uses the essential tools of archival footage, commentary, and interviews to make its—all preamble uses.

Travis Maldonado's death plays a central role in the series. Throughout, Joe Exotic uses guns in bizarre, and sometimes dangerous, situations. He and others shoot at an effigy of Carol Baskin. Later, he brandishes a weapon at Cheryl Maldonado. Then Travis shoots himself, apparently by accident, while carelessly handling a firearm in the park's gift shop. The Documentary to that point has raised questions whether Exotic was simply exploiting a naïve, young man who then suddenly loses his life at age 21; more broadly, the series has developed a portrait of Exotic's larger-than-life persona, his flirtation with danger and lawlessness, and his tendency to turn everything into a self-centered media spectacle.

Use of the Funeral Video clips is integral to accurate commentary and historical reportage: the excerpts vividly demonstrate how Exotic continued to exploit Travis even at the funeral, turning a tragedy into another Exotic "event." *See* M.M.5 at 25:51-26:57. The scene draws not only on Sepi's video, but also on multiple sources and perspectives that crystalize many of the key elements of the story of Exotic as a controversial and emblematic figure. The scene contains interviews and commentary. The excerpts from Sepi's Funeral Video—which are not the sole source of the footage[8]—depict Exotic continuing his spectacle at a somber event. He wears a cleric's collar and hat, tells

---

[8] *Compare* M.M.15 (Funeral Video) with M.M.5 (Documentary Episode 5).

outrageous stories that sexualize the deceased, and lip-synchs to "his" country music song. His megalomania is astutely captured by Travis's mother, who says, partly in voice-over as Exotic sings: "He has to do dramatics, you know, drama… He has to do a show wherever he goes, whatever he does … He was even acting there." The Funeral Video excerpts are essential to documenting what occurred as a matter of historical accuracy, and to making an overarching point about Exotic and those around him. The predominant fair use jurisprudence is entirely apposite to Appellees' use of brief excerpts from the Funeral Video and leads to the conclusion that such use falls within section 107's preamble, and is transformative, such that the first factor weighs in Appellees' favor.

The Court's first question also refers to "unlicensed" uses. Of course, all uses that take advantage of Section 107 are by definition unlicensed. The documentary filmmaker's ability to make fair use can be crucial, because it is often impossible for documentary filmmakers to obtain permission to use these materials. Some owners will set unreasonable prices. *See, e.g.*, A. Falzone and J. Urban, *Demystifying Fair Use: The Gift of the Center For Social Media Statements of Best Practices*, 57 J. COPYRIGHT SOC'Y U.S.A. 337, 340 (2009-10). Other copyright owners will refuse to license their works on any terms, such as when they disapprove of the documentary's content or believe a portrayal will be unflattering. See, e.g., *Katz v. Google, Inc.*, 802 F.3d 1178, 1181 (11th Cir. 2015) (landlord sued to prevent photograph's use by a tenant criticizing his business practices); *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2008) (Lennon family refused to license 15-second excerpt of John Lennon's song "Imagine" to critique Lennon's "secular [anti-religion] utopian vision"). Indeed, in this very case, Appellee Royal Goode

gave Sepi at least two chances to claim ownership in any video he shot; yet Sepi said nothing even though he knew the Documentary would include video excerpts—which he had even helped provide while a Park employee—and even rebuffed requests for footage and an offer to pay. 1.App.64-65; 3.App.237-40, 250-54 ("Your gonna have to contact joe, I don't work there anymore."). To require licensing in a case like this would manifestly harm free expression: for the documentarian, pictures are essential to filmmaking.

**II.    Response to Question 2: The Principles Enunciated in Warhol Strongly Reaffirm that the First Fair Use Factor Weighs in Appellees' Favor.**

The Court's second question asks: "What impact, if any, does the Supreme Court's decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), have on the content and scope of the fair use principles described in question 1? The short answer: *Warhol* affirms the principles and actually strengthens Appellees' case.

*Warhol* recognized that the purposes listed in Section 107's preamble "reflect 'the sorts of copying that courts and Congress most commonly ha[ve] found to be fair uses,' and so may guide the first factor inquiry.'" 598 U.S. at 528 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994)). Critically, the Court approved the Second Circuit's observation below that the examples of fair use "purposes" listed in the preamble "'are easily understood,' as they contemplate the use of an original work to **'serv[e] a manifestly different purpose from the [work] itself.'"** *Id*. (quoting 11 F.4th 26, 37 (2d Cir. 2021)) (emphasis added). The Court then explained that the first-factor analysis "asks 'whether and to what extent' the **use at issue has a purpose or character different from the original**," and that this inquiry must proceed via "analysis of the specific 'use' … that

is alleged to be 'an infringement.'" *Id*. at 529 (quoting Campbell, 510 U.S. at 579) (non-bold italics in Warhol); *Id*. at 533 (quoting § 107).

In the case before it, the Warhol Court focused on the highly specific facts of AWF's use—illustration of a magazine cover—and held that Goldsmith's original photograph of Prince, which she had previously licensed for use in Vanity Fair, had "substantially the same purpose." That is, both were "*portraits of Prince used to depict Prince in magazine stories about Prince*." *Id*. at 526 (emphasis added). Also importantly, the Court stressed that its holding was quite restricted, limited only to AWF's licensing in 2016 of Warhol's unlicensed Orange Prince to Condé Nast for use with a magazine story, as that was the only "specific use" that Goldsmith challenged as infringing. *Id*. at 534 & n. 9.

The *Warhol* Court explicitly stated that targeting is not always required for a use to be transformative, even where the use is not a "preamble" one. 598 U.S. at 547 n.21. Thus, in reaching this conclusion concerning AWF's licensing use, the Court pointed to several examples that, in contrast to the facts of *Warhol*, involved transformative use independent of targeting. In *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 30-32 (2021), Google used roughly 11,500 lines of code from Oracle's Java SE program to create an entirely new software product for a different, transformative purpose. In *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015), *cert. denied*, 578 U.S. 941 (2016), the defendant copied tens of thousands of books to make a searchable database, again a transformative use. And the *Warhol* majority, citing *Google v. Oracle*, stressed that Warhol's "Campbell's Soup Cans" series used Campbell's copyrighted work for "an artistic commentary on consumerism, a purpose that is orthogonal to advertising soup." 598 U.S. at 539. The Soup

Can example leaves no doubt that under *Warhol*—as under prior fair use jurisprudence—a secondary use is transformative where it comments on a social or cultural issue rather than commenting on the original work.[9] Notably, none of the aforementioned Warhol-approved transformative uses involved targeting or commenting upon the original.

*Warhol* thus **reaffirms** prior fair use jurisprudence as it relates to use of unlicensed film clips. As preamble works, Documentaries are favored under Warhol. Documentaries use prior works in what Warhol calls a "broad" sense, which does not require targeting. And by discussing the Soup Cans, *Warhol* reaffirms that social commentary—long transformative according to established fair use jurisprudence—serves a different purpose from the original even when there is not targeting or commentary on the original.

The Documentary in this case checks every box required for a use to be transformative under *Warhol*. Use of the Funeral Video clips is a favored preamble use. Appellees used the clips transformatively in a "broad sense," namely to create a completely different work—a documentary series—that serves a purpose distinct from a full video of a funeral. As the Panel Opinion acknowledges, Appellees used the excerpts not to commemorate Travis's death, but rather as historical and biographical markers to reveal

---

[9] It is true that the *Warhol* court went on to state that a "further" justification for Warhol's use of the Campbell's logo was that he targeted the original. *Id.* at 539-40. But that language hardly detracts from the Court's main point—that the Soup Can painting was transformative because it commented on consumerism. Neither did the original observation in *Google* invoking the Soup Can series refer to targeting or commentary on the original. *See Google*, 593 U.S. at 29 (referring to an "artistic painting … precisely replicat[ing] a copyrighted advertising logo **to make a comment about consumerism**") (quotation marks omitted) (quoting 4 Nimmer on Copyright § 13.05[A][1][b]) (emphasis added).

Exotic's character and tell the tragic story surrounding life at the Park. (Panel Op. at 23). By virtue of the *Warhol* opinion itself, the first factor weighs heavily in favor of fair use.

     *Warhol*'s discussion of commerciality does not change this. Merely labeling a secondary use as "commercial" or "commercial licensing" is insufficient to obviate a transformative use. 598 U.S. at 530. *Warhol* did not overrule Campbell, which observed:

> If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities "are generally conducted for profit in this country."

510 U.S. at 584 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 592 (1985) (Brennan, J., dissenting)). *Google v. Oracle* and *Campbell*—like the vast majority of fair use cases—involved commercial exploitation of a defendant's work. Yet the uses considered in those cases were transformative and fair.

     Rather, *Warhol* emphasized that commerciality under "the first factor relates to the problem of **substitution**—copyright's bête noire. The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or 'supplan[t],' the work." 598 U.S. at 528 (emphasis added and citation omitted) (quoting *Campbell*, 510 U.S. at 579). So, "if an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Id*. at 532-33. In other words, commercial use becomes relevant where the secondary work competes with the original. *Id*. at 555-56. (Gorsuch, J. concurring).

Goldsmith's magazine photograph of Prince and Warhol's magazine image of Prince were in direct competition. Condé Nast could have just as easily used Goldsmith's photo to accompany its article about Prince, just as its magazine *Vanity Fair* had done in the past.[10] The opposite is true here: the Documentary's use of brief excerpts from the Funeral Video to tell the story of Joe Exotic could not conceivably substitute for the Funeral Video, and the purposes of the two works are, in the words of Warhol, "orthogonal." The fact that the Documentary's use is not a substitute for the original means that, under Warhol, the first fair use factor weighs in Appellees' favor. *See Elvis Presley Enters.*, 349 F.3d at 629 (use of short clips as historical references in Elvis documentary was transformative, as they were not substitutes for the original copyrighted video recordings; but longer clips of Elvis's performances placed in the same work were non-transformative because they substituted for and served the same entertainment purposes as the original recordings, even being as advertised as such on the video's cover).

## III. Response to Question 3: The Panel Opinion Did Not Take Into Account Applicable Law.

The Court's third question asks: "If the fair use principles described in question 1 are apposite here, does the Panel's analysis properly take into account those principles and any impact of Warhol on the content and scope of those principles?" Appellees respectfully submit that, for the following reasons, the Panel Opinion fails to take into account either those applicable principles or *Warhol*'s impact, which reaffirms those principles.

---

[10] Similarly, in *Dr. Seuss Enterprises L.P. v. ComicMix LLC*, 983 F.3d 443, 460 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2803 (2021), defendant's infringing book ***actually*** competed with plaintiff's copyrighted work in the market for high school-graduation gifts.

First, the Panel Opinion did not give due regard to *Warhol*'s reaffirmation that preamble uses are favored. The Documentary's use of the clips was a socially valuable preamble use. Moreover, *Warhol* instructs that a court should focus on the "specific use alleged to be infringing," and in particular its "purpose." The specific allegedly infringing use here—using film snippets to make a Documentary—is *not* the same thing as a full-length video of a funeral. The Documentary's purpose—criticizing a controversial public figure—differs entirely from a livestreamed memorial of a friend. In addition, the Panel reached its holding by concluding that the Documentary did not target or comment upon the Funeral Video. For the reasons stated above, *Warhol* reaffirmed that targeting or commentary is unnecessary, and thus whether Appellees targeted the Funeral Video is not relevant. Finally, in analyzing commerciality, the Panel Opinion did not credit *Warhol*'s emphasis on context and on market substitution, and instead gave undue weight to the fact that the Documentary was exploited commercially even though brief, edited excerpts of the Funeral Video could not substitute for the original.  In light of the foregoing, the Court should hold that because the highly transformative nature of Appellees' preamble use outweighs any element of commerciality, the first factor weighs in favor of fair use.

## CONCLUSION

On rebalancing the four factors, the district court's order should be affirmed in its entirety. As discussed in the amicus briefs supporting the petition for rehearing, a contrary decision would upset a legal framework that *Warhol* did not overturn and work a chilling effect on documentarians, filmmakers, and scholars, to the consuming public's detriment.

DATED: June 3, 2024

Respectfully submitted,

By: /s/ Robert H. Rotstein
    Robert H. Rotstein (CA Bar # 72452)
    Emily F. Evitt (CA Bar # 261491)
    MITCHELL SILBERBERG & KNUPP LLP
    2049 Century Park East, 18th Floor
    Los Angeles, CA  90067-3120
    (310) 312-2000 – Telephone
    (310) 312-3100 – Facsimile
    rxr@msk.com
    efe@msk.com

    Mack J. Morgan, III (OBA #6397)
    MJMLAW PLLC
    6618 N. Hillcrest Ave.
    Nichols Hills, OK 73116
    (405) 343-7454 - Telephone
    mack@mjmlaw.biz

    *Attorneys for Defendants-Appellees*
    *Netflix, Inc. and Royal Goode*
    *Productions LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 15 pages and 4,510 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(A), and the typestyle requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Times New Roman 13-point.

I hereby certify, pursuant to 10th Cir. R. 25.5, that all required privacy redactions have been made. I further certify, pursuant to 10th Cir. R. 27.2 and ECF User Manual, Section II, Part J(b), that the hard copies of this Supplemental Brief of Appellees to be submitted to the Clerk's Office are exact copies of the electronic filing. I further certify that the electronic submission was scanned for viruses with the most recent version of Windows Defender and is free of viruses.

Dated: June 3, 2024                                  /s/ Robert H. Rotstein
                                                     Robert H. Rotstein

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 3, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that counsel for all parties are registered CM/ECF users and that service to Plaintiffs-Appellants will be accomplished by the CM/ECF system.

/s/ Robert H. Rotstein
Robert H. Rotstein