No. 22-6086
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**
_____


WHYTE MONKEE PRODUCTIONS LLC, TIMOTHY SEPI,

*Plaintiff-Appellant-Respondents*,

v.

NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,

*Defendant-Appellee-Petitioners*.

On Appeal from the United States District Court
for the Western District of Oklahoma
No. 5:20-cv-00933-D
Hon. Timothy D. DeGiusti, United States District Judge
_____

**APPELLANTS' (SECOND) SUPPLEMENTAL BRIEF**
_____


[Supplemental Argument set for Wednesday, July 10, 2024]

Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew@DigitalJusticeFoundation.org

Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
Gregory@DigitalJusticeFoundation.org

*Attorneys for Appellants*

INTRODUCTION & BRIEF SUMMARY ........................................................................ 1

ANSWERS TO THE COURT'S QUESTIONS ................................................................. 3

I.    DECISIONS INVOLVING DOCUMENTARIES HAVE MADE CLEAR THAT
      FAIR-USE JURISPRUDENCE TURNS ON THE SPECIFIC USES AT ISSUE,
      NOT TALISMANIC CLASSIFICATION OF THE INFRINGING WORK'S
      GENRE. ............................................................................................................... 3

      A.    The Supreme Court is clear that fair-use jurisprudence attends
            to the *use* at issue—not just the genre of the infringing work. .......... 3

      B.    Documentary cases confirm the same principle when stating
            that fair use turns on the *use*—not the label of "documentary." ........ 5

      C.    There are possible and important documentary-specific fair-use
            concerns, but those concerns are wholly inapposite here. ................. 8

II.   WARHOL CLARIFIED THAT CERTAIN USES OF AN INFRINGING WORK
      CAN BE FAIR WHILE OTHER USES ARE UNFAIR, EVEN PREAMBLE
      USES, DEPENDING UPON THE USE'S COMMERCIALITY AND
      TARGETING. ..................................................................................................... 10

III.  THE PANEL OPINION CORRECTLY APPLIED THE FAIR-USE PRINCIPLES
      OF TARGETING AND COMMERCIALITY BUT COULD ADD CAVEATS AND
      LIMITING STATEMENTS TO ASSUAGE POSSIBLE CONCERNS OR
      MISREADINGS. ................................................................................................. 12

      A.    The Court could add an express caveat limiting this case to
            nationwide commercial streaming use, similar to what the
            Supreme Court and other courts have done. ................................... 13

      B.    The Court could add express clarifications that other types of
            uses are not at issue in this appeal—*i.e.*, film creation, film
            festivals, in-person screening, physical distribution. ...................... 14

      C.    The Court could distinguish a typical YouTube reaction video
            because such videos are quite different with respect to targeting,
            commerciality, and market impact. ................................................ 15

DECLARATION OF COUNSEL ..................................................................................... 17

CERTIFICATE OF COMPLIANCE ............................................................................... 19

CERTIFICATE OF SERVICE........................................................................................ 19

## INTRODUCTION & BRIEF SUMMARY

In response to the Court's inquiries on Panel rehearing, Appellants Whyte Monkee Productions LLC and Mr. Timothy Sepi (collectively "WMP"), through nonprofit counsel, respectfully respond as follows:

1.      The key First Factor principles of commerciality, targeting, and justification—that this Court correctly applied—are the apposite principles applied for all manner of genres and to all manner of works, including documentaries and including for preambular uses.  <u>See</u> Section I, *infra*.

2.      <u>Warhol</u> clarified, *inter alia*, what was arguably implicit before: that these principles are applied to the specific use of the infringing work (here only streaming via Netflix's massive, for-profit, paywalled platform)—not to other uses not at issue (*i.e.*, creation of "Tiger King").  <u>See</u> Section II, *infra*.

3.      This Court correctly applied the apposite First Factor principles, but the Court could add several types of clarificatory statements to assuage concerns and avoid misreading of the breadth of its Opinion as ruling on other uses that simply aren't at issue in this appeal.  <u>See</u> Section III, *infra*.

\* \* \* \* \*

Moreover, it's worthwhile to reiterate that, zooming out beyond the specific inquiries raised by the Court on rehearing, remand is warranted here.  Whatever one concludes on the documentary concerns raised on rehearing, there are key facts here.  The following truths simply won't change:

1.    ***Doesn't Target***.    Defendant's work makes no commentary upon the Funeral Video itself.  In <u>Warhol</u>'s parlance, it does not "target" Mr. Sepi's work.  <u>See</u> <u>Warhol</u>, 598 U.S. at 547 ("does not target an original work"); 531 ("no critical bearing on the substance or style of the original composition" such that "the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish)").

2.    ***Extreme Commerciality.***    The only use at issue here—Defendants' streaming use—is highly commercial.  Indeed, streaming to millions of paying users on Netflix's for-profit, pay-walled Platform is as commercial as it gets.  <u>See</u> <u>id.</u> at 537 ("undisputed commercial character of [Netflix's] use" (quoting <u>Harper</u>, 471 U.S. at 562)).

3.    ***Existing Licenses***.    There *are* licenses for these types of uses—even in this this context.  9.App.87 ("Clip License Agreement"); 9.App.90 ("Materials License").  Defendants just didn't pay (or offer to pay) Mr. Sepi the customary licensing fee.  <u>See</u> <u>Harper & Row, Publrs. v. Nation Enters.</u>, 471 U.S. 539, 562 (1985) ("exploitation of the copyrighted  material without paying the customary price.").

4.    ***Defendant's Evidentiary Vacuum***.    Defendants did not submit *any* evidence on market harm to the original *or* to the market for derivative works.  That justifies remand.  <u>Campbell</u>, 510 U.S. at 594 ("[I]t is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense, [the petitioners], to summary judgment.  The evidentiary hole will doubtless be plugged on remand.").

These truths won't change. They merit remand.  Defendant's evidentiary failing on factor four alone justifies a <u>Campbell</u> remand.  <u>See</u> <u>id.</u>

# ANSWERS TO THE COURT'S QUESTIONS

**I.**   **DECISIONS INVOLVING DOCUMENTARIES HAVE MADE CLEAR THAT FAIR-USE JURISPRUDENCE TURNS ON THE SPECIFIC USES AT ISSUE, NOT TALISMANIC CLASSIFICATION OF THE INFRINGING WORK'S GENRE.**

**A.   The Supreme Court is clear that fair-use jurisprudence attends to the _use_ at issue—not just the genre of the infringing work.**

_**First**_, a fair-_use_ analysis centrally focuses on the very specific _use_—not broad labels or the genre of the infringing work.  For example, <u>Harper</u> involved Presidential memoirs (the type of work you'd expect lots of fair uses to be taken from) and a preamble use—news reporting—by Nation Magazine.  <u>Harper</u>, 471 U.S. at 542.  Yet, it was _not_ a fair use _because_ of the Supreme Court's precision focus on the specific _use_—a journalistic "scoop" that eviscerated a licensing market.

_**Second**_, the statute itself focuses on use—not genre.  §107; <u>McGucken,</u> 42 F.4th 1149, 1160 (9th Cir.  2022) ("fine-grained analysis of each _**use**_").  The preamble focuses on "use." §107 ("such use"); ("classroom use"); ("the use made of a work"). The factors focus on use.  §107(1) ("the use"); §107(3) ("the effect of the use").  Indeed, only the second factor talks about the nature of a _work_—specifically the _**protected**_ work, not the _infringing_ work.  §107(2) ("nature of the copyright**ed** work").  Nothing in the statute indicates that _genre_ (like documentary) rather than _use_ should be the focus.  §107; <u>McGucken,</u> 42 F.4th at 1160 ("not based on a blanket conclusion about the documentary […] Rather, we made a fine-grained analysis of each _**use**_[.]").

_**Third**_, <u>Warhol</u> re-emphasized the statute's focus on the infringer's _**use**_.  <u>Warhol</u> at 549 ("[dissent] ignores the statute's focus on the _**specific**_ _**use**_ alleged to be infringing.").

Warhol repeatedly stresses that the gravamen of fair *use* is the *use*. Id. at 526 ("***the specific use*** […] alleged to infringe"); 545 ("must be evaluated in the context of **the specific *use*** at issue"); 545 ("objective inquiry into what ***use*** was made"); Id. ("***The use*** is AWF's commercial licensing[.]").  Here, the only *use* at issue is nationwide streaming via Netflix's private, paywalled, for-profit platform.  The genre of the infringing work— documentary or not—isn't the apposite focus.  E.g., McGucken, 42 F.4th at 1160 (not "blanket conclusion" but rather "fine-grained analysis of each ***use***").  That's *why* different ***uses*** of the same infringing work will come out differently.  Warhol, 598 U.S. at 557-558 (Gorsuch, J., concurring) (display in "nonprofit museum" is "fair use" but commercial licensing not); id. at 528 n.4 ("must consider each use").

Here, Defendants are not being sued for *making* a documentary.  Nor is this a suit involving the *showing* "Tiger King" to a film class or film festival or other educational or nonprofit use.  §107 ("classroom use").  Rather, the "specific use" at issue here is Netflix's highly commercial streaming of Mr. Sepi's video to millions of paying customers on Netflix's for-profit, pay-walled platform.  Netflix has no "specific justification" for *that* specific use without paying the customary license.  See Elvis, 349 F.3d at 629; 9.App.84; 9.App.87.

***Third***, there's pragmatic wisdom in resisting a genre-centric approach: such an approach would invite endless line-drawing exercises.  Is Keeping up with the Kardashians a documentary series, or reality TV?  What about "docu-fiction" such as Martin Scorcese's Rolling Thunder Revue: a Bob Dylan Story, which seamlessly and imperceptibly blends real documentary footage with fabricated, apocryphal fictions?

Such questions might make for interesting philosophical or metaphysical questions of film and art theory. Neither the statute nor the caselaw asks judges to make such artistic classification. Instead, the focus is on the use—not the debatable genre. See Warhol at 549 ("the statute's focus"); 545 ("objective inquiry"); McGucken, 42 F.4th at 1160 ("not based on a blanket conclusion about the documentary[.]").[1]

***Fourth***, to the degree that classification of genre does matter, that presents a disputed question of fact not ripe for resolution on this procedural posture of summary judgment: "***the proper copyright classification of a work is a question of fact***" See Leicester, 232 F.3d at 1216 (collecting cases).

As its name suggests fair *use* is about a careful evaluation about specific *use* and its specific justification—an analysis not reducible to affixing some contested genre label. E.g., McGucken., 42 F.4th at 1160; Warhol, 598 U.S. at 545.

### B. Documentary cases confirm the same principle when stating that fair use turns on the *use*—not the label of "documentary."

***First***, even documentary cases make clear that a fair-use analysis is not reducible to whether or not an infringing work is a documentary. E.g., McGucken, 42 F.4th at 1160 ("determination was *not* based on a blanket conclusion about the documentary as a

---

[1] Indeed, Warhol reiterated a time-tested caution against judges making these kinds of artistic judgments. 598 U.S. at 544 ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits") (quoting Bleistein v. Donaldson Lithographing Co., 188 U. S. 239, 251 (1903) (Holmes, J.). So too with asking lawyers to engage in subjective line drawing exercises about the metaphysical boundaries between documentary and reality TV when looking at unauthorized uses.

whole, as [Defendant] would have it. Rather, we made *a fine-grained analysis of each use*[.]"); <u>Elvis.</u> At 628 ("not dispositive"); <u>Bill Graham</u>, 448 F.3d 605, 609 ("there are no categories of presumptively fair use"); <u>Bouchat</u>, 619 F.3d at 309 (4th Cir. 2010) ("Merely labeling a use as historical does not create a presumption of fair use."). Thus, merely labeling or classifying a work as a documentary isn't a talisman. <u>Cf.</u> <u>Warhol</u> at 528 n.4.

*<u>Second</u>*, historical/newsworthy/documentary cases still make clear that whether the customary licensing price for the specific use was paid, remains an important consideration. <u>E.g.</u>, <u>Harper</u>, 471 U.S. at 562 ("without paying the customary price"); <u>Bill Graham</u>, 448 F.3d at 612 (same); <u>Elvis</u>, 349 F.3d at 627-628 (9th Cir. 2003) (same); <u>id.</u> at 628 ("without a license"); <u>Bouchat</u>, 619 F.3d at 311 ("did not receive the customary price"); <u>Brammer</u>, 922 F.3d at 265 ("failure to pay the customary fee was exploitative"). Critically, clip licenses are customary—even for arguable documentaries like "Tiger King." 9.App.87 ("Clip License Agreement"); 9.App.90; 9.App.87 ¶3 (licensing specific clips). Yet, here, Defendants did **<u>not</u>** pay (or even offer to pay) Mr. Sepi the customary licensing price for use of his video. Just because an arguable documentary was involved, that doesn't eliminate the pertinent question: could *this* steaming use have been made by "paying the customary price"? <u>Harper</u>, 471 U.S. at 562.

*<u>Third</u>*, even documentary cases still apply the doctrine and still look for targeting and commenting on the copyrighted work. Lack of targeting weighs against fair use–even in historical/documentary cases. E.g., <u>Brammer</u>, 922 F.3d at 264 ("have scholarly, biographical, or journalistic value, and are frequently accompanied by ***commentary on the copyrighted work <u>itself</u>***."); <u>Elvis</u>, 349 F.3d at 628 ("interviewees ***<u>explain</u>***"); <u>Bouchat</u>,

6

619 F.3d 301, 309 ("never comments on"). Use for entertainment value instead of targeting the work doesn't pass muster. E.g., Elvis, 349 F.3d at 628 ("seeks to profit at least in part from the inherent entertainment value").

Here, Defendants did not comment on—or in Warhol's parlance "target"—Mr. Sepi's work. It did not comment on Mr. Sepi's video and its creative decisions or its intended meaning. That lack of targeting the work itself weighs strongly against fair use, even if "Tiger King" is an arguable documentary. See Warhol, 598 U.S. at 530 ("no critical bearing on the substance or style of the original composition").

***Fourth***, the "specific use" here readily distinguishes this case from prior historical/documentary cases. Here, that specific use is Netflix's highly commercial streaming of Mr. Sepi's video clip to millions of paying subscribers on a private, for-profit, paywalled platform. *That* specific use, vigorously pressed by Mr. Sepi here, has not been addressed by other cases. See, e.g., Brown v. Netflix, Inc., 855 F. App'x at 61 n.1 ("[W]e need not address each theory [of infringing use] separately" because the parties didn't distinguish the uses). After all, Mr. Sepi is complaining about Netflix's ***streaming*** use—not the others, including not just a filmmaker's initial inclusion when *making* a documentary. Compare Elvis, 349 F.3d 622, 624 ("To what extent may a film maker […] ***incorporate*** video clips"). That specific use—highly commercial streaming—remains the focus. And that general principle remains true for historical/documentary films just like it is for all manner of cases. McGucken, 42 F.4th at 1160 ("fine-grained analysis of each use[.]"); Warhol, 598 U.S. at 528 n.4 ("each use").

**C.    There are possible and important documentary-specific fair-use concerns, but those concerns are wholly inapposite here.**

A central concern in fair use is justification.  <u>Warhol</u>, 598 U.S. at 549 ("this Court's repeated emphasis on justification."). For parody, copying a specific work is essential—or the whole genre of parody would be largely impossible.  <u>Campbell</u>, 510 U.S. at 580-581 ("Parody needs to mimic an original[.]");<u>Warhol</u>, 598 U.S. at 549 ("<em>Campbell</em>'s nuance.").   Justification in the documentary context is different—though also nuanced. After all, making a documentary, unlike parody, doesn't typically require use of a specific work.   As such, documentary-uses require "specific justification[,]" <u>Elvis</u>, 349 F.3d at 629, a "fine-grained analysis of each" specific use for that use's specific justification, <u>McGucken</u>, 42 F.4th at 1160.

In ***certain*** circumstances, a historical/documentary filmmaker may have an important justification to use a work without permission.  That's true in cases involving (1) orphan works/unknown rightsholers, (2) incidental uses; and (3) the impossibility of independent creation in cases of historical artifacts. Such circumstances can provide "*specific* justification[.]"<u>Elvis</u>, 349 F.3d at 629.  Critically, such "specific justification[s]" are entirely absent here. <u>See</u> <u>Id.</u>

***First***, there's no orphan-work problem here.[2]  Defendants were in contact with Mr. Sepi himself.

---

[2] <u>See</u> <u>Authors Guild</u>, 755 F.3d at 92 (2d Cir. 2014) ("An 'orphan work' is an out-of-print work that is still in copyright, but whose copyright holder cannot be readily identified or located.'"). Historical documentary filmmakers might have "specific justification" to use orphan works because the author simply cannot be found.

***Second***, this isn't an incidental-use case.  See, e.g. Brown v. Netflix, Inc., 855 Fed. Appx. 61, 63 ("incidental use"); Bouchat, 737 F.3d 932, 949 ("incidental").  Mr. Sepi's video was centrally featured. Sometimes incidental use provides "specific justification" for a particular documentary-use. In such cases, Courts recognize unique concerns where a documentary incidentally captures background material. Suppose for example, that Ken Burn's Vietnam War documentary employed historical footage of several Marines sitting around a campfire. And, suppose the footage incidentally captures in the background, a "fleeting, incidental" snippet of a Jimi Hendrix song. Or captures a Mickey Mouse cartoon on a t-shirt of a Marine walking in the background. Incidental use justification means that Ken Burn's doesn't need to negotiate a license with Jimi Hendrix for Disney to make use of such historical footage, just because of incidentally captured background content.

But here, Mr. Sepi's video is not incidentally-captured background matter. It's prominently and recognizably featured in the infringing scene. Unlike incidental use cases, here there's no specific justification for the unlicensed commercial exploitation of Mr. Sepi's video without "paying the customary price." Harper, 471 U.S. at 562; 9.App.87 ("Clip License Agreement").

**Third**, sometimes the specific-justification is the impossibility of independent creation, such as in cases involving the use of historical artifacts. See Bill Graham, 448 F.3d 605, 609 ("historical artifacts"); Brammer, 922 F.3d 255, 264 ("historical preservation").  In Bill Graham, defendants couldn't independently create historical artifacts.  Or, suppose again, that Ken Burns is making historical artifact use of a

historically-significant, one-of-a-kind photograph of the Fall of Saigon in his Vietnam documentary. Such historical artifact uses might have a specific-justification because independent creation of the historical artifact would be impossible.

Here, by stark contrast, Defendants were contemporary filmmakers merely "avoid[ing] the drudgery" of independent creation. See Campbell, 510 U.S. 569, 580 ("avoid the drudgery"); Brammer, 922 F.3d 255, 263 ("avoid the drudgery"). Fair use does not excuse the "drudgery" of independent creation or the paying of a customary license. Defendants could have created their own film of the funeral if they wanted to. Or, if they wanted to avoid the drudgery then they could've licensed their use of Mr. Sepsi's. 9.App.87. Regardless, there is no historical artifact use justification here.

***Finally***, and critically, none of these rationales (orphan works, incidental use, historical artifact usage) justify the specific use here. After all**,** such concerns speak to a documentary *filmmaker's* justification for incorporating materials when *making* a documentary. The specific use here is Netflix's sweeping use of unlicensed, highly commercial *streaming* to millions of paying subscribers on its pay-walled platform. Those justifications do not speak to Netflix's subsequent highly commercial streaming to millions of paying customers without the customary "clip licensing" fees.

## II.  WARHOL CLARIFIED THAT CERTAIN USES OF AN INFRINGING WORK CAN BE FAIR WHILE OTHER USES ARE UNFAIR, EVEN PREAMBLE USES, DEPENDING UPON THE USE'S COMMERCIALITY AND TARGETING.

Warhol made key clarifications about generally applicable fair use principles that apply to all manner of works. Documentaries are governed by the same basic fair-use principles that apply to all other works. See, e.g., Bill Graham, 448 F.3d at 609 ("no

categories of presumptively fair use"); <u>McGucken</u>, 42 F.4th at 1160 ("determination was not based on a blanket conclusion about the documentary); <u>Elvis</u>, 349 F.3d at 629 ("specific justification"). As such, documentaries are not somehow exempt from <u>Warhol</u>'s clarifications about generally applicable principles of fair use.

*__First__*, <u>Warhol</u> made clear a fair use analysis is precisely focused on the **specific use** alleged to be infringing. <u>Id.</u> at 526 ("*the specific use* […] alleged to infringe [.]"); <u>Id.</u> at 545 ("must be evaluated in the context of the *specific use* at issue."); <u>Id.</u> ("an objective inquiry into what use was made[.]"); <u>Id.</u> ("*The use* is AWF's commercial licensing[.]"); <u>Id.</u> at 549 ("statute's focus on the *specific* <u>use</u> alleged to be infringing."). Here, that specific use is Netflix's *highly commercial streaming* of Mr. Sepi's video to millions of paying subscribers on Netflix's pay-walled platform. *__Second__*, <u>Warhol</u> made clear that failure to target–or comment on–the copyrighted content itself weighs heavily against fair use. <u>Id.</u> At 530 ("targets an author or work"); <u>Id.</u> At 532 ("targets an original work"); <u>Id.</u> At 540 ("does not target the photograph"). And, <u>Warhol</u> further clarified that the mere targeting of a character (like Joe Exotic) as opposed to targeting the copyrighted work *itself* isn't enough. Here, Defendants did not comment on–or "target" Mr Sepi's work at all–not his video *itself*, its creative decisions or its intended meaning. *__Third__*, <u>Warhol</u> reiterated that commerciality weighs against fair use. See <u>Id.</u> at 531 ("commerciality, loom[s] larger"); <u>Id.</u> ("commercial nature"); <u>Id.</u> 532 ("must be balanced against the commercial nature of the use."). Here, Netflix's streaming use is about as commercial as it gets. *__Fourth__*, <u>Warhol</u> indicates that lack of attribution matters. See <u>id.</u> at 520

("received neither a fee nor a source credit."). Here, Defendant's did not credit Mr. Sepi when using his video.

In light of <u>Warhol</u>, Factor One weighs heavily against Defendants' specific use here: highly commercial streaming use here. That's because the use was (1) highly commercial; (2) did not target the work itself; and (3) uncredited. These <u>Warhol</u> principles apply as readily to documentaries as all manner of infringing works.

**III.** **THE PANEL OPINION CORRECTLY APPLIED THE FAIR-USE PRINCIPLES OF TARGETING AND COMMERCIALITY BUT COULD ADD CAVEATS AND LIMITING STATEMENTS TO ASSUAGE POSSIBLE CONCERNS OR MISREADINGS.**

As discussed above, the fair-use principles of targeting, commerciality, and justification are the principles used for applying the First Factor in all manner of genres and to all manner of works, <u>see</u> Section I.A, *supra*, including fair-use cases (***unlike*** this case's dispute over nationwide streaming via Netflix's paywalled platform) where the specific use that's argued to be infringing is mere inclusion of a copyrighted work in a documentary film, <u>see</u> Section I.B-C, *supra*.

Thus, the answer is **yes**, these key principles of targeting, commerciality, and justification are apposite in all manner of fair-use cases and, **yes**, the Panel correctly applied them to the *only* specific use at issue here: nationwide *streaming* via Netflix's paywalled platform—*not* the beforehand creation of "Tiger King" itself. Indeed, <u>Warhol</u> made clear what was arguably implicit before, but a point Appellants have pressed throughout: that fair-use analysis is attuned to the specific use at issue (nationwide, paywalled streaming here), <u>see</u> Section II.A, *supra*, and the attendant extreme

commerciality, lack of targeting, lack of justification for not paying (or offering) a reasonable license fee, see Section II.B-E, *supra*.

Nonetheless, to assuage concerns here, there are three basic ways this Court might expressly cabin its Opinion while reaching the same correct result it reached before: **(1)** expressly make clear the *only* use at issue here is the *nationwide paywalled streaming use*, see Section III.A, *infra*; **(2)** expressly list illustrative examples of other uses *not* being decided or even litigated in this appeal—such as filming or editing a film, screening a film at a film festival or film school, or distributing physical copies to a select audience; see Section III.B, *infra*; and **(3)** expressly distinguish a prototypical YouTube reaction-commentary video, see Section III.C, *infra*.

### A. The Court could add an express caveat limiting this case to nationwide commercial streaming use, similar to what the Supreme Court and other courts have done.

The Supreme Court has been repeatedly clear that fair use is a fact-specific and case-by-case analysis. E.g., Google, 141 S. Ct. at 1198 ("particular situations on a case-by-case basis"); Campbell, 510 U.S. at 577 ("case-by-case analysis"); Harper, 471 U.S. at 549 ("case-by-case determination whether a particular use is fair"); Warhol, 598 U.S. at 534 n.10, 545, 549 (2023) (rejecting "false equivalence between AWF's commercial licensing and Warhol's original creation" and requiring analysis attuned to the "specific use at issue" and "specific use alleged to be infringing").

Accordingly, courts can in a principled manner expressly cabin their opinions and holdings to the particular kinds of uses at issue—and distinguish other uses. Doing just

this, courts have expressly limited individual holdings and ruled narrowly—leaving for another day different uses arising in different cases.

Courts do this with some frequency. E.g., Google, 141 S. Ct. at 1206 ("**We do not say that these questions are always relevant to the application of fair use**, not even in the world of computer programs."); Campbell, 510 U.S. at 580-581 (distinguishing in-case "Parody" use from "satire" use not at issue); Brammer, 922 F.3d at 269 ("Many social media platforms like Twitter, Facebook, and Instagram are specifically designed for the participatory 'sharing' — or copying — of content. **We express no opinion as to whether such sharing constitutes fair use**. We note, however, that Violent Hues' use is not of this kind."). This Court Court could add statements expressly limiting the Opinion to the only use at issue here: nationwide streaming use via Netflix's paywalled platform. The opinion could affirmatively state that it's "express[ing] no opinion" as to other uses of "Tiger King" itself or on non-streaming uses of works.

**B.    The Court could add express clarifications that other types of uses are not at issue in this appeal—*i.e.*, film creation, film festivals, in-person screening, physical distribution.**

Courts will also sometimes further cabin their fair-use decisions by discussing other types of issues that haven't been litigated on appeal and aren't being decided. E.g., Campbell, 510 U.S. at 580-581 (distinguishing in-case "Parody" use from "satire" use not at issue); Warhol, 598 U.S. at 557-558 (Gorsuch, J., concurring) (suggesting that a "nonprofit museum" display or "for-profit book" commentary would be fair use: "**But**

**those cases are not this case**.").The Opinion might give an illustrative list of other types of uses that are simply not at issue here[3]: *creating* a film of any kind (*i.e.*, the mere inclusion of the Funeral Video in "Tiger King"); *screening* a film (such as at a film festival or to a film class); or any *non-streaming distributions of copies* (such as via physical DVDs to select audiences).  None of these uses are at issue here.  Likewise, the Court could also expressly emphasize that some documentary-specific justification aren't at issue: no inability to locate the rightsholder, no inability to film the funeral themselves, and not incidental use.  See Section I.C, *supra*.

### C.  The Court could distinguish a typical YouTube reaction video because such videos are quite different with respect to targeting, commerciality, and market impact.

At argument, CIRCUIT JUDGE CARSON referenced the example a YouTube reaction -commentary video.  That too could be distinguished because it's not at issue here.[4]

---

[3] WMP's *nonprofit* advocates didn't argue that these uses were infringing in the precisely because we don't want filmmakers getting sued for *creating* a film or for *screening* a film.  Yet, once Netflix puts a work into broadscale commercial distribution and, as here, where there's a known rightsholder, then, yes, it's only *fair* to pay for a license.  Of course, Netflix has all the market power to simply excise the scene—meaning it can get the prices it wants from WMP, as the modest license fees here show.  Take-it-or-leave license offers are commonplace See, e.g., Matthew Zeitlin, "Terrence Malick Sends Emails By Having An Assistant Scan His Typed Letters," Buzzfeed News (Dec. 17, 2014) (letter with director insisting upon getting "Most Favored Nations fee" or threatening to "cut the scene").  Starving artists take the  money.  They have to.

[4] Indeed, YouTube citizen-journalists' prototypical commentary videos are quite different: **(1)** they often *target* their *commentary* to the *contents* of the other YouTuber being reacted to; **(2)** they are far *less commercial*, and (3) they *attribute* which affects *market impact* because viewers can go watch that video with a click or two.

Date: June 13, 2024                    Respectfully submitted,

**DIGITAL JUSTICE FOUNDATION**
A NONPROFIT, PUBLIC-INTEREST FIRM

By    */s/ Gregory Keenan*
      Gregory Keenan
      DIGITAL JUSTICE FOUNDATION
      81 Stewart Street
      Floral Park, New York 110001
      (516) 633-2633
      Gregory@DigitalJusticeFoundation.org

      Andrew Grimm
      DIGITAL JUSTICE FOUNDATION
      15287 Pepperwood Drive
      Omaha, Nebraska 68154
      (510) 210-2381
      Andrew@DigitalJusticeFoundation.org

      *Attorneys for Appellants*

# DECLARATION OF COUNSEL

I, Gregory Keenan, counsel for Appellants in the above-captioned matter, declare as follows:

1. The Court ordered simultaneous supplemental briefs on Panel rehearing.  My co-counsel, Andrew Grimm, and I committed that we would _not_ read Appellees' supplemental brief on rehearing prior to filing Appellants' supplemental brief if Appellees' counsel chose to file it earlier than we did.  Ext. Req. 3 n.1.  I submit this declaration to expressly confirm that we have made good on our commitment to the Court.

2. Specifically, no person who worked in any fashion on this supplemental brief has read, reviewed, _etc._, Appellees' supplemental rehearing brief prior to this submission.  Likewise, no person who worked on this supplemental brief has communicated about Appellees' supplemental rehearing brief or its contents with any other person.  We have made good on the commitment we made to the Court in our extension request.

3. Furthermore, no person who has worked in any fashion on this supplemental brief has read, reviewed, _etc._, the Defendant-aligned amicus briefs filed in response to the Court's rehearing order.  No person who worked on this supplemental brief has communicated about those amicus briefs or their contents with any other person.  We have made good on our commitment to the Court made in our extension request.

4. Finally, I would note that my co-counsel, Andrew Grimm, and I have dedicated our lives to nonprofit advocacy. We do not believe that the Panel Opinion would harm documentary filmmakers, as distinguished from simply creating strong incentives for Netflix to treat more vulnerable creators—*including* documentary filmmakers—fairly and to reasonably compensate them. If Andrew or I were believed that our advocacy would *harm* documentary filmmakers' ability to create new documentaries, we would decline such advocacy. If we believed that challenging the fairness of free, nationwide *streaming* use on a paywalled platform would truly harm documentary filmmakers, we would not have undertaken this appeal.

On this day (Thursday, June 13, 2024), I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Gregory Keenan*
Gregory Keenan
DIGITAL JUSTICE FOUNDATION

## CERTIFICATE OF COMPLIANCE

This filing contains **4,903** words.

This filing was prepared in Times New Roman 13-point font.

Date: June 13, 2024                    Respectfully submitted,

*/s/ Gregory Keenan*
Gregory Keenan

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via the Court's electronic filing system.

Date: June 13, 2024                    Respectfully submitted,

*/s/ Gregory Keenan*
Gregory Keenan