No. 22-6086

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

WHYTE MONKEE PRODUCTIONS LLC, TIMOTHY SEPI,

*Plaintiffs-Appellants*,

v.

NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,

*Defendants-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA,
HON. TIMOTHY D. DEGIUSTI
NO. 5:20-CV-00933-D

---

## BRIEF OF APPELLEES NETFLIX, INC. AND
## ROYAL GOODE PRODUCTIONS LLC

---

## [ORAL ARGUMENT NOT REQUESTED]

Robert H. Rotstein
Emily F. Evitt
MITCHELL, SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, California 90067
Telephone: (310) 312-2000
Email: rxr@msk.com; efe@msk.com

Mack J. Morgan, III
MJMLAW PLLC
6618 N. Hillcrest Ave.
Nichols Hills, Oklahoma 73116
Telephone: (405) 343-7454
Email: mack@mjmlaw.biz

*Attorneys for Defendants-Appellees*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1:

1.    Netflix, Inc. discloses that it has no parent company, and no public company owns ten percent (10%) or more of Netflix, Inc.

2.    Royal Goode Productions LLC discloses that it has no parent company and no public company owns ten percent (10%) or more of Royal Goode Productions LLC.

Dated: December 1, 2022                    /s/ Robert H. Rotstein

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT** ............................... ii

**STATEMENT OF RELATED CASES** .................................................. x

**INTRODUCTION** ................................................................... 1

**COUNTERSTATEMENT OF ISSUES** ................................................. 4

**STATEMENT OF THE CASE** ........................................................ 5

    **A.**    **Factual Background** ...................................................... 5

        1.    The Garold Wayne Zoological Park and the Business of Filming Videos at the Park. ........................................5

        2.    Sepi Meets Exotic in 2015 and Begins Working for the Park. ...............................................................5

        3.    The March 2015 Fire and the Stoppage and Recommencement of Joe Exotic TV. ...........................6

        4.    Exotic's Dispute with Carole Baskin.........................................7

        5.    Sepi's Work at the Park. ................................................8

        6.    New Park Ownership and Sepi's Departure. ............................10

        7.    Sepi's 2016 Deposition ................................................10

        8.    Sepi's Sham Deposition Testimony in 2021. ...........................11

        9.    Royal Goode and the Documentary.....................................12

        10.    The Eight Videos at Issue in This Action. ..............................13

    **B.**    **Procedural History** ..................................................... 16

**STANDARD OF REVIEW** .......................................................... 18

**SUMMARY OF ARGUMENT** ....................................................... 18

**ARGUMENT** ....................................................................... 20

    **I.**    **Plaintiffs Cannot Establish the Requisite Copyright Ownership of Seven Videos Because They Were Works Made for Hire.** ........................................................ 20

        A.    Sepi Acted Within the Scope of His Employment. ................ 21

## TABLE OF CONTENTS
<u>(continued)</u>

**<u>Page</u>**

    B.    Sepi Filmed the Videos Substantially Within the Authorized Time and Space Limits of His Job. .......................................... 28

    C.    Sepi's Videography Was Actuated, At Least In Part, By a Purpose to Serve the Park. ....................................................... 29

**II.    Defendants' Use of the Videos in the Documentary Was Fair Use.**...................................................................................... 30

    A.    The District Properly Held that the Documentary's Use of the Funeral Video Was Fair Use. ........................................... 31

        1.    Factor 1: The Purpose and Character of the Use. ...........31

        2.    Factor 2: The Funeral Video Is Primarily Factual and Published. .......................................................................38

        3.    Factor 3: The Amount of Use Weighs in Favor of Defendants. ....................................................................40

        4.    Factor 4: There Is No Genuine Issue of Fact as to Market Harm. ..................................................................42

        5.    The So-called Additional Factors Weigh in Favor of Fair Use. ........................................................................45

    B.    Summary Judgment on the Basis of Fair Use Is Independently Merited for the Other Seven Videos. ............... 47

**CONCLUSION**................................................................................ 51

**CERTIFICATE OF COMPLIANCE** ................................................ 53

**CERTIFICATE OF SERVICE** ....................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Geophysical Union v. Texaco Inc*.,
  60 F.3d 913 (2d Cir. 1994) ............................................................42

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
  11 F.4th 26 (2d Cir. 2021) ..............................................................36

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) ...........................................................44

*Autoskill v. Nat'l Educ. Support Sys.*,
  994 F.2d 1476 ...........................................................................20, 21

*Avtec Sys., Inc. v. Peiffer*,
  21 F.3d 568 (4th Cir. 1994) ........................................................21, 22

*Bancamerica Comm. Corp. v. Mosher Steel of Kan., Inc.*,
  100 F.3d 792 (10th Cir. 1996) ........................................................25

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ......................................31, 33, 36, 39, 41

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ...........................................................32

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
  737 F.3d 932 (4th Cir. 2013) ..........................................................33

*Brammer v. Violent Hues Production, LLC*,
  922 F.3d 255 (4th Cir. 2019) ..........................................................45

*Brown v. Netflix, Inc.*,
  462 F. Supp. 3d 453 (S.D.N.Y. 2020) ..............................................33

*Brown v. Netflix, Inc.*,
  855 F. App'x 61 (2d Cir. 2021) ........................................32, 33, 34, 41

*Calkins v. Playboy Enters. Int'l, Inc*.,
  561 F. Supp. 2d 1136 (E.D. Cal. 2008) ............................................43

*Cambridge Univ. Press v. Patton*,
   769 F.3d 1232 (11th Cir. 2014) ...........................................................................31

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)........................................................ 31, 37, 38, 41, 43, 44, 46

*Cariou v. Prince*,
   714 F.3d 694 (2d. Cir. 2013) .......................................................................32, 35

*Carol Wilson Fine Arts, Inc. v. Zifen Qian*,
   71 F. Supp. 3d 1151 (D. Ore. 2014) ...........................................................23, 27

*City of Colo. Springs v. Solis*,
   589 F.3d 1121 (10th Cir. 2009) ...........................................................................30

*Cmty. for Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989)...............................................................................20, 21

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
   983 F.3d 443 (9th Cir. 2020) ...........................................................................36

*Equals Three, LLC v. Jukin Media, Inc.*,
   139 F. Supp. 3d 1094 (C.D. Cal. 2015) ...........................................................46

*Fleurimond v. New York Univ.*,
   876 F. Supp. 2d 190 (E.D.N.Y. 2012) ...........................................22, 23, 26, 27

*Frey v. Town of Jackson, Wyoming*,
   41 F.4th 1223 (10th Cir. 2022) ...........................................................3, 19, 47

*Genzmer v. Pub. Health Trust of Miami-Dade Cnty.*,
   219 F. Supp. 2d 1275 (S.D. Fla. 2002) ...........................................................23

*Gladwell Gov't Servs., Inc. v. Cnty. of Marin*,
   265 F. App'x 624 (9th Cir. 2008) .......................................................................30

*Golan v. Gonzales*,
   501 F.3d 1179 (10th Cir. 2007) ...........................................................................30

*Google LLC v. Oracle Am., Inc.*,
   141 S. Ct. 1183 (2021)........................................................................31, 38, 45

*Hanagami v. Epic Games Inc.*,
2022 WL 4007874 (C.D. Cal. Aug. 24, 2022) ..................................................39

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985)..........................................................................................39

*Hofheinz v. A & E Television Networks*,
146 F. Supp. 2d 442 (S.D.N.Y. 2001) ...............................................................44

*Huebbe v. Okla. Casting Co.*,
663 F. Supp. 2d 1196 (W.D. Okla. 2009)......................................................20, 21

*Hustler Mag., Inc. v. Moral Majority Inc.*,
796 F.2d 1148 (9th Cir. 1986) ...........................................................................38

*Kelly v. Arriba Soft. Corp.*,
336 F.3d 811 (9th Cir. 2003) ........................................................................31, 41

*Kienitz v. Sconnie Nation LLC*,
965 F. Supp. 2d 1042 (W.D. Wis. 2013) ............................................................35

*Lewis v. Activision Blizzard, Inc.*,
2013 WL 5663103 (N.D. Cal. Oct. 17, 2013) ...............................................23, 27

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
528 F.3d 1258 (10th Cir. 2008) .........................................................................20

*Miller v. CP Chemicals, Inc.*,
808 F. Supp. 1238 (D.S.C. 1992) .............................................................22, 23, 27

*Monbo v. Nathan*,
2022 WL 4591905 (E.D.N.Y. Aug. 26, 2022) ...................................................44

*Muhaisen v. Does 1 Through 100*,
2017 WL 4012132 (D. Colo. Sept. 12, 2017).....................................................40

*Norse v. Henry Holt & Co.*,
847 F. Supp. 142 (N.D. Cal. 1994)....................................................................43

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004) ..............................................................................32

*Red Label Publ'g, Inc. v. Chila Prods.*,
388 F. Supp. 3d 975 (N.D. Ill. 2019)............................................................33, 42

*Rouse v. Walter & Assocs., LLC*,
513 F. Supp. 2d 1041 (S.D. Iowa 2007) ........................................................23, 27

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
969 F.2d 410 (7th Cir. 1992) ..............................................................................30

*Schrock v. Wyeth, Inc.*,
727 F.3d 1273 (10th Cir. 2013) ...........................................................................24

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) ...................................................32, 38, 40, 41, 42

*SOFA Ent., Inc. v. Dodger Prods., Inc.*,
709 F.3d 1273 (9th Cir. 2013) ...................................................32, 33, 35, 38, 44

*TD Bank N.A. v. Hill*,
928 F.3d 259 (3d Cir. 2019) ................................................................................22

*Threshold Media v Corp. v. Relativity Media, LLC*,
2013 WL 12331550 (C.D. Cal. Mar. 19, 2013)...................................................42

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
692 F.3d 1009 (9th Cir. 2012) ............................................................................22

*U.S. v. Leffler*,
942 F.3d 1192 (10th Cir. 2019) .........................................................................25

*U.S. v. Maldonado-Passage*,
4 F.4th 1097 (10th Cir. 2021) .............................................................................50

*United States v. Gonzalez*,
905 F.3d 165 (3d Cir. 2018) ...............................................................................40

*Vanderhurst v. Colo. Mountain Coll. Dist.*,
16 F. Supp. 2d 1297 (D. Colo. 1998)............................................................22, 27

*Weinberg v. Dirty World, LLC*,
2017 WL 5665023 (C.D. Cal. July 27, 2017).....................................................42

*Whatever It Takes Transmission & Parts, Inc. v. Cap. Core, Inc.*,
2013 WL 12178585 (S.D. Ohio Mar. 22, 2013)...................................................22

*Zia Shadows, L.L.C. v. City of Las Cruces*,
829 F.3d 1232 (10th Cir. 2016) ..........................................................................18

### STATUTES

18 Okla. Stat.
§§ 2004-2005 .........................................................................................................8

17 U.S.C.
§ 101.............................................................................................................2, 4, 21
§ 107.......................................................... 3, 4, 17, 31, 32, 40, 45, 47, 51
§ 107(2).................................................................................................................38
§ 107(4).................................................................................................................42
§ 201................................................................................................................2, 4
§ 201(a).................................................................................................................20
§ 201(b)...........................................................................................................17, 30
§ 505......................................................................................................................xi
§ 1201...................................................................................................................33

### OTHER AUTHORITIES

37 CFR § 201.40(b) (2021)........................................................................................33

Federal Rule of Civil Procedure 56 ..........................................................................18

Restatement (Second) of Agency
§ 228 (1958).........................................................................................................21
§ 229 cmt..............................................................................................................22

Restatement (Third) of Agency
§ 7.07 (2006).........................................................................................................21

## STATEMENT OF RELATED CASES

Plaintiffs/Appellants in the instant appeal filed a notice of appeal from the district court's order granting in part and denying in part Defendants/Appellees' motion for attorney's fees under 17 U.S.C. § 505, as the prevailing party below. *Sepi et al. v. Netflix, Inc., et al.*, Case No. 22-6177 (filed October 25, 2022). On November 24, 2022, following a district court order awarding costs to Defendants/Appellees, Plaintiffs/Appellants in the instant appeal filed an amended notice of appeal in the district court as to "Judgment, Order on Motion for Summary Judgment, Order on Motion to Review Taxation of Costs, and Order on Motion for Attorney Fees" (ECF 94). On November 30, 2022, a new case number was issued in connection with that amended notice, Case No. 22-6199, and the case was consolidated with Case No. 22-6177. (*See* Docket Nos. 10958632, 10958758.)

## INTRODUCTION

In this meritless copyright infringement lawsuit, Plaintiffs/Appellants Timothy Sepi ("Sepi") and Whyte Monkee Productions, LLC ("Whyte Monkee") (collectively, "Plaintiffs") sued over eight videos (the "Videos"), short excerpts from which appear in Defendants/Appellees' popular documentary series *Tiger King: Murder, Mayhem and Madness* (the "Documentary"). The Documentary, featuring several notable characters, focused on Joseph Allen Schreibvogel, aka Joseph Maldonado-Passage, aka Joe Exotic ("Exotic")—a controversial figure, known to this Court, who founded the Garold Wayne Zoological Park (the "Park"), raised tigers and other exotic animals, ran for Oklahoma Governor and U.S. President, and later went to prison.

Whyte Monkee is a sham LLC created to shield assets. Sepi is a former Park employee who worked as a cameraperson taking videos for Exotic's web series and photographs for Park tours. Sepi claims that he or Whyte Monkee owns the copyright in the Videos. The lynchpin of his argument below was that he shot the Videos outside the scope of his employment at the Park and on behalf of his own LLC, Whyte Monkee. This was a lie. In an earlier garnishment action relating to Exotic's assets and the Park's financial dealings, Sepi, under oath, completely contradicted that claim by confirming that he worked for the Park as a videographer, and disclaiming any involvement in Whyte Monkee.

To try to avoid summary judgment, Sepi brazenly asserted that he committed "perjury" in that prior garnishment proceeding—even though he proffered no coherent reason why he would have done so. It is beyond reasonable dispute that Sepi lied in **this** proceeding, in which he has a clear financial motivation to prevaricate. On appeal, Plaintiffs no longer contend that Sepi's original testimony was untruthful. *See* Appellants' Brief ("App.Br.") 63.

The district court properly granted Defendants' motion for summary judgment for two reasons:

***First***, under the Copyright Act's work-made-for-hire doctrine (17 U.S.C. §§ 101, 201), Plaintiffs failed to raise a genuine issue of disputed fact as to their copyright ownership in seven of the eight Videos. As Sepi's employer, the Park was the author, and therefore the owner, of those Videos. While Plaintiffs claimed that Sepi filmed the Videos outside the scope of his employment, his sworn 2016 testimony directly refuted this contention. The district court held that the sham affidavit doctrine precluded Sepi from repudiating that former testimony. Moreover, the court held that, even crediting Sepi's sham testimony, the undisputed facts ***still*** established that Sepi filmed seven of the Videos in the scope of his employment.

On appeal, Plaintiffs have invented a new theory—that, yes, Sepi was hired as a videographer, but only to record visitors during Park tours. Plaintiffs failed to raise this argument below, such that it is waived. Moreover, the argument lacks a

shred of evidentiary support and has no legal relevance: even if true, the seven Videos remain works made for hire in which Plaintiffs have no ownership interest.

**Second**, as a matter of law, the Documentary made fair use of the eighth Video, which Sepi shot after leaving the Park's employ. Applying the four factors set forth in Copyright Act of 1976, 17 U.S.C. § 107, governing determinations of fair use: (i) Defendants interspersed the Video with critical comment and wove it into a larger narrative, thus imbuing the original with a different character and altering its message, such that the use of the Video was highly transformative; (ii) the Video was factual and had been published; (iii) Defendants used a relatively small portion of the Video; and (iv) Plaintiffs failed to raise a genuine issue of fact as to market harm. Because all four factors as a matter of law weighed strongly in favor of fair use, the district court properly granted summary judgment on the eighth Video.[1]

On appeal, Plaintiffs disregard the long line of cases holding that use of short video clips in documentaries and similar works of commentary and criticism constitutes fair use. Instead, Plaintiffs merely argue that Defendants acted in bad

---

[1] Because the district court held that Plaintiffs failed to raise a disputed fact as to ownership of the seven other Videos, it did not reach Defendants' argument that that use of those videos in the Documentary was fair use. Because this Court may affirm on any grounds supported in the record, *Frey v. Town of Jackson, Wyoming,* 41 F.4th 1223, 1240 (10th Cir. 2022), Defendants establish herein that, as a matter of law, they made fair use of ***all*** the Videos.

faith because they neither offered Sepi a license fee nor gave him attribution for the Videos—factors irrelevant to the fair use determination. And in fact, Defendants as a courtesy *did* offer to compensate Sepi for his efforts, and Sepi never claimed entitlement to compensation or credit. The district court's order granting summary judgment should be affirmed.

## COUNTERSTATEMENT OF ISSUES

I.    Where an employee hired as a videographer shot videos during the employer's normal operating hours, on the employer's premises, and for the benefit of the employer, whether the district court properly granted summary judgment on the ground that those videos were "works made for hire," thus vesting copyright ownership in the employer under the Copyright Act of 1976, 17 U.S.C. §§ 101, 201.

II.    Where a documentary used brief clips from videos for commentary and criticism; altered the purpose and character of the clips by interspersing them with commentary, criticism, and voiceovers; and caused no harm to any actual or potential market for the clips, whether the use of the video clips was "fair use" as a matter of law under 17 U.S.C. §107.

## STATEMENT OF THE CASE

A.    **Factual Background**

1.    **The Garold Wayne Zoological Park and the Business of Filming Videos at the Park.**

Exotic, born Joseph Allen Schreibvogel and aka Joseph Maldonado-Passage, founded what later became the Garold Wayne Interactive Zoological Park or "Garold Wayne Zoo" years before Plaintiff/Appellant Timothy Sepi started working there in 2015. 1App.154-55; 4App.18 (admission of Defendants' Undisputed Material Fact ["UMF"] ¶1).[2] Also, before Sepi began his job, the Park maintained a studio that was used to produce a web series called *Joe Exotic TV*—a program that focused on Exotic and the Park. 1App.155; 4App.18 (UMF ¶2). In this studio, Exotic made videos that appeared on *Joe Exotic TV* or its YouTube channel. *Id.* (UMF ¶¶2-3). Exotic sold some of these videos on a CD/DVD combo pack in the Park's gift shop. *Id.* During early 2015, producer Rick Kirkham oversaw studio operations—including a "video team" of approximately four people—and produced *Joe Exotic TV. Id.* (UMF ¶4). Before Sepi's employment, therefore, Exotic and the Park had made the type of videos that are at issue in this appeal.

2.    **Sepi Meets Exotic in 2015 and Begins Working for the Park.**

In or about March 2015, Sepi traveled to the Park, met Kirkham and Exotic,

---

[2] Citations to Appellants' Appendix Vols. 1-9 appear as "[vol. no.]App.[page]." Multimedia appendix materials are denoted "M.M.[number]."

and began working as a cameraperson for *Joe Exotic TV*. 1App.155-56; 4App.18 (UMF ¶5); 2App.19; 3App.42-49, 54-56, 63-64; *see also* 1App.185-86 (regarding Mr. Sepi's 2016 and 2021 depositions). Sepi acknowledged under oath that the term "cameraman" or "cameraperson" can refer to someone who takes still pictures, video, or both. 1App.156; 4App.19 (UMF ¶7); *see also* 2App.23-24, 101; 3App.55-56. Indeed, Sepi's job was both to make videos at the Park and to take still pictures— as Plaintiffs now concede. 3App.42-49, 54-56, 62-64, 69, 92-94, 131; *see also, e.g.,* App.Br. at 63 ("For the purposes of this appeal, the Court should assume Mr. Sepi was involved in *both* videography and photography.") (emphasis in original). Further, there is no written agreement between Sepi and the Park granting either of the Plaintiffs a copyright interest in any Video. 1App.156; 4App.19 (UMF ¶8).

During Sepi's employment at the Park, he had access to and used the Park's equipment and tools. 2App.31-36, 133; 3App.62-63, 104-106, 121-28. He received as compensation $150 a week plus benefits (including a room in a trailer and utilities such as electricity and water). 1App.156; 4App.19 (UMF ¶9); *see also* 2App.42-43; 3App.154-73. Aside from any tips, he considered his $150-a-week salary to be full compensation for all his activities. 3App.69-70, 76, 80-81, 120, 138-140.

### 3. The March 2015 Fire and the Stoppage and Recommencement of *Joe Exotic TV*.

Within a week after Sepi started working at the Park, a fire destroyed the studio and its contents. 1App.156-57; 4App.19 (UMF ¶10). Kirkham and his team

quit. *Id.* Because the fire destroyed the video equipment, Sepi's job as a cameraperson for a time solely entailed taking photographs for Park tours; he also performed other Park duties. 1App.157; 4App.19 (UMF ¶11).

Soon after the fire, a new studio was built on Park premises, and Michael Sandlin ("Sandlin"), a sponsor of *Joe Exotic TV* who operated a facility in Louisiana called the Tiger Truck Stop, agreed to purchase new equipment for the Park, including video cameras and computers that Sepi used to edit videos. 2App.31-36, 115-16, 133, 212-14; 3App.62-63, 104-106, 121-28; 218; 2App.78-79, 82-83 & M.M.16 at timestamp 16:35-17:14. Sepi had no involvement in making these arrangements. *Id.*; *see* 2App.34, 3App.104-106. Using the new video equipment that Sandlin provided, *Joe Exotic TV* resumed in or about May 2015. 1App.157; 4App.19 (UMF ¶13). For a time, Sepi was the sole videographer employed at the Park. *Id.*; 3App.63, 65, 93-94. On or about May 7, 2015, the first post-fire episode of *Joe Exotic TV* aired. 1App.157; 4App.19 (UMF ¶14).

### 4. Exotic's Dispute with Carole Baskin.

As of May 2015, Exotic was in an ongoing dispute with a rival zookeeper named Carole Baskin ("Baskin"), who sought to collect an approximately $1 million judgment against him. Baskin's business entity had initiated garnishment proceedings (the "Baskin Garnishment Action") in Oklahoma against Exotic in or about 2013. 1App.157-58; 4App.19 (UMF ¶15).

On May 5, 2015, Articles of Organization for a new entity, "Whyte Monkee Productions, LLC," were filed with Oklahoma's Secretary of State. 1App.158; 4App.19 (UMF ¶16). Sepi was not the contact for the LLC. The Articles of Organization list *Exotic's* email address (joe_exotic@yahoo.com) and the Park's street address. *Id*. "Tim Sepi" only appears as the signature name.[3] *Id*. Sepi did not prepare or approve the LLC paperwork for Whyte Monkee Productions, LLC. If he had, he would have used "Timothy" as his signature name, not "Tim." 2App.60-61; 3App.82-84, 87-89, 95, 101, 175-76.

### 5.    Sepi's Work at the Park.

Sepi started his day at the Park around 8:00 a.m. and worked until late at night. 1App.158; 4App.19 (UMF ¶17). He split the time during his workday among taking tour photographs, filming and editing for *Joe Exotic TV*, and filming campaign videos for Exotic. *Id*.; *see also* 2App.52-53, 113-15, 143-44, 161, 184-85; 3App.111. Sepi spent more than 20 hours per week following and filming Exotic and taking video of "everything that was going on, the day-to-day operations" on Park premises, as well as editing, publishing, producing, or broadcasting *Joe Exotic TV*. 1App.158-

---

[3] Oklahoma law does not require that a signature on Articles of Organization for a limited liability company designate a member or owner of the company. 18 Okla. Stat. §§ 2004-05; *see also* "Procedures for Organizing an Oklahoma Limited Liability Company," available at https://www.sos.ok.gov/forms/Fm0074.PDF (last accessed November 21, 2022) at p. 2, ¶ 6 ("The person who signs is not required to be a member of the limited liability company . . .").

59; 4App.19 (UMF ¶17); 2App.52-53. In working on videos for *Joe Exotic TV*, Sepi performed his job in the studio (located on Park premises) and used the Park's camera, editing equipment, and computer (all of which Sandlin had loaned to the Park). 2App.31-34, 37-40, 212-14; 3App.102-06, 121-127, 218. Sepi's responsibilities for *Joe Exotic TV* remained constant during the entire time the Park employed him. 2App.47.

 *Joe Exotic TV* was a mostly unscripted series. 1App.159; 4App.20 (UMF ¶19). Each episode typically featured footage from around the Park. The show would sometimes include unwritten "skits" that Exotic invented. *Id*. Another key feature was that the show depicted Exotic talking about whatever was on his mind. Sepi could not "really tell Joe what to say." Rather, Exotic did "whatever he want[ed]." *Id.* (UMF ¶¶19-20).

 While working as a Park employee, Sepi shot footage for Exotic's presidential and gubernatorial campaigns. *Id.* (UMF ¶22). Sepi filmed the campaign videos during regular work hours, and many were filmed at the Park. *Id.*

 Sepi's $150 weekly salary served as compensation for his work on the *Joe Exotic TV* videos and campaign videos. 1App.160; 4App.20 (UMF ¶27); *see also* 3App.69-70, 118-120, 138-40. Sepi filmed videos "to basically promote what the cause of the foundation of the nonprofit [that operated the Park] was doing, and that was to care for animals that were a species that were dying in the wild…." 1App.160;

4App.20 (UMF ¶24). The videos were intended to "provide publicity for the Zoo" and to make Exotic "look good," whether what Sepi was filming "was a presidential video, a music video, a PSA, or just around the park." *Id.* (UMF ¶¶25-26). It is undisputed that, in filming the videos, Sepi wanted to benefit Exotic and the Park. *Id.*

### 6.    New Park Ownership and Sepi's Departure.

In or around February 2016, Park ownership was transferred to Big Cat Institute, an entity owned and controlled by Jeffrey Lowe ("Lowe"). 1App.160; 4App.20 (UMF ¶28). The Park was renamed the Greater Wynnewood Exotic Animal Park. *Id.* After the transfer of the Park's ownership, Exotic continued to serve as its Entertainment Director. 1App.161; 4App.20 (UMF ¶29). Sepi stopped working for the Park in or around August 2016. *Id.* (UMF ¶30).

### 7.    Sepi's 2016 Deposition

In September 2016, Sepi gave a deposition in the Baskin Garnishment Action, in which Baskin sought assets that Exotic had diverted to other entities. *Id.* (UMF ¶31); *see* 1App.185-86; 9App.14-79. During the course of his 2016 deposition, Sepi admitted: (a) he had been hired by and worked for the Park as a ***videographer***; (b) he had no involvement in the creation of the entity known as Whyte Monkee Productions, LLC, nor any knowledge of that entity's activities, if any, and did not believe himself to be an officer, director, or member of any entity; (c) he did not

10

prepare the LLC paperwork for Whyte Monkee and was not involved in the LLC's formation with the Secretary of State; (d) he had no actual role in the operation, ownership or management of Whyte Monkee Productions, LLC; and (e) he had no entitlement to any funds being held in the name of Whyte Monkee Productions, LLC. 2App.20-21, 60-61; 3App.42-52, 54-56, 63-64, 82-101, 138; 3App.174-76; *see also* App.Br. at 63.

### 8.    Sepi's Sham Deposition Testimony in 2021.

At a May 13, 2021 deposition in the instant lawsuit, Sepi initially testified that his testimony in the 2016 deposition was true. 1App.162; 4App.21 (UMF ¶33); 2App.16, 20-21. But when confronted with statements from his 2016 deposition that decimated his claims in *this* case, Sepi asserted that he had "perjured" himself at that earlier deposition. 1App.162; 4App.21 (UMF ¶33); 2App.71, 165-67.

In an attempt explain why he would perjure himself in 2016, Sepi first claimed that he feared Joe Exotic. 2App.68-69. However, Sepi's 2016 testimony **harmed** Exotic's position in the Baskin Garnishment Action by demonstrating that Whyte Monkee was a company created under false pretenses, in which Sepi had no actual role. *See, e.g.*, 3App.18-20 (reviewing purpose of Sepi's testimony). Later in the 2021 deposition, Sepi changed his story and said he perjured himself in 2016 because he wanted to have access to equipment and video footage when he left the Park— likewise illogical given his 2016 testimony against Exotic's interests. *See* 2App.72-

75. Plaintiffs now "stipulate" key elements of Sepi's 2016 testimony were true. App.Br. at 63.

### 9. Royal Goode and the Documentary.

In March 2020, Defendant Netflix, Inc. ("Netflix") released the documentary series *Tiger King: Murder, Mayhem and Madness* (the "Documentary"), which tells the story of Exotic, Baskin, the Park, and the attendant controversies that ultimately led to Exotic's arrest, criminal prosecution, and trial. 1App.162; 4App.21 (UMF ¶34); *see* M.M.1-7. Defendant Royal Goode Productions LLC ("Royal Goode") created the Documentary. 1App.162; 4App.21 (UMF ¶35); *see* 3App.233-43. Royal Goode licensed video footage from, among others, Exotic and Lowe (each of whom owned the Park at one point or another), who each warranted their ownership of the footage. *Id*. (UMF ¶35); 3App.238-239; 9App.80-93. The footage that Royal Goode licensed from the Park's owners (*i.e.*, Exotic and Lowe) includes the Videos at issue in this lawsuit. *Id.*

While creating the Documentary, Royal Goode asked Sepi for his help in locating video clips, which they understood had been created in the course of Sepi's employment at the Park. 1App.163; 4App.21 (UMF ¶36); 3App.239-40, 249-255. Royal Goode, without conceding any obligation to pay Sepi, offered to compensate him for his efforts. 1App.163; 4App.21 (UMF ¶37), 3App.239-40, 254. When Sepi responded to Royal Goode's emails, he did not assert any interest (much less

copyright ownership) in any video. On the contrary, he replied, "Your [sic] gonna have to contact joe, I don't ***work there*** anymore." 1App.162; 4App.21 (UMF ¶38); *see* 3App.240, 253 (emphasis added).

### 10. The Eight Videos at Issue in This Action.

The Videos at issue, brief excerpts of which appeared in the Documentary, are as follows:[4]

**"Disrespectful Tomato Thrower Trouble"** is an approximately four-minute-and-43-second video published on or about December 4, 2015, which depicts Exotic lecturing Park employees at a Park staff meeting. The Video was filmed on Park premises during the course of a workday, at a staff meeting of the sort Sepi regularly attended as an employee. The Video was made using at least one Canon camera that Sandlin lent to the Park, was edited in the studio, and was used as content for "Joe Exotic TV Live" and uploaded to the *Joe Exotic TV* YouTube channel. 1App.163-64; 4App.21 (UMF ¶40); 2App.33-36, 173, 175-76; M.M.12.

**"Joe-Getting Dragged By Lion"** is an approximately three-minute-and-56-second video filmed in 2016, which begins with Exotic delivering a message for his presidential campaign in an animal cage at the Park. Joe is then dragged by a lion, and he fires his gun. The Video was filmed during the Park's regular operating hours,

---

[4] Defendants submitted a summary chart below, and Plaintiffs neither disputed the contents of, nor objected to, this chart. 3App.242, 256-61; *see* 1App.163-67, 186-88; 4App.21-22 (UMF ¶¶39-49), 34-40.

at the Park, using a Canon camera lent to the Park by Sandlin. 1App.164; 4App.21 (UMF ¶41); 2App.33-36, 183-85; M.M.13.

**"Joe – Presidential PSA"** is an approximately four-minute-and-five-second video featuring Exotic that was filmed in 2015 for Exotic's presidential campaign. Sepi filmed during the daytime, outside the studio at the Park, on a day when he was working at the Park. A resulting video using part of the footage was made available on the *Joe Exotic TV* YouTube channel. 1App.164; 4App.21 (UMF ¶42); M.M.11.

**"Mobile Trailer Inspections For Volunteers"** is an approximately ten-minute-and-50-second video filmed in 2016 of inspections of employee trailers conducted on the Park premises. Sepi appears in the Video wearing his green Park shirt and carrying his Park walkie-talkie. The Video was filmed during daytime working hours at the Park, using a Canon camera that Sandlin had lent to the Park. Sepi showed such footage to Exotic when it revealed employee drug or alcohol use so that Exotic could address the drug and alcohol issue. 1App.164-65; 4App.21 (UMF ¶43); 1App.133; 2App.33-36, 133, 160-61, 187-90; M.M.14.

**"Country Music Artist Joe Exotic – Bring It On (Please Unite)"** is an approximately four-minute-and-41-second music video published on or about October 1, 2015 about the controversies surrounding Exotic and the Park. The Video was filmed during the Park's regular operating hours, at the Park, using several cameras, including a Canon that Sandlin lent to the Park; was edited in the studio;

and was made available on YouTube and for purchase on a CD/DVD combo pack sold at the Park's gift shop. 1App.165; 4App.22 (UMF ¶44); 2App.127-28, 131-33; M.M.9.

**"Joe Exotic Country Music 'Here Kitty Kitty'"** is an approximately four-minute-and-48-second music video published on or about September 17, 2015 about the disappearance of Baskin's husband, featuring Exotic and a Baskin look-alike. The Video was filmed during the Park's regular operating hours, was edited in the studio, and also was made available on YouTube and for purchase on a CD/DVD combo pack sold at the Park's gift shop. 1App.165; 4App.22 (UMF ¶45), 2App.110-15; M.M.8.

**"Joe Exotic TV – Tornado on the Ground"** is an approximately 21-minute-and-56-second video published on or about May 9, 2016 of a tornado occurring outside the Park's grounds, which was live-streamed as an episode of *Joe Exotic TV* on the *Joe Exotic TV* YouTube channel, where it remained afterward. Exotic appears in the Video, whose caption reads "Tornado touching down just 3 miles way [sic] from The Greater Wynnewood Exotic Animal Park and its [sic] all caught on camera. Joe Exotic reporting on scene." The Video was filmed during the Park's normal operating hours, using a Canon camera that Sandlin lent to the Park. 1App.166; 4App.22 (UMF ¶46); 2App.33-36, 151-53, 155-59; M.M.10.

**"Travis MM Funeral Ceremony"** (the "Funeral Video"), is an approximately 23-minute-and-52-second video published on or about October 14, 2017 of the funeral of Exotic's spouse Travis Maldonado, which took place on the Park's premises. After quitting his job in 2016, Sepi returned to the Park to attend the funeral and filmed it because he believed that is what Travis would have wanted. The unedited footage, which Sepi took by merely putting a camera on a tripod, was livestreamed through the *Joe Exotic TV* YouTube page, where it remained afterward. 1App.166; 4App.22 (UMF ¶47); 2App.194-95; M.M.15.

Six of the eight Videos each appear for fewer than 30 seconds in the Documentary. 1App.167; 4App.22 (UMF ¶49). The Funeral Video appears in a one-minute-and-six-second segment, over half of which is actually other material not derived from the Videos at issue here. *Id.*

Whyte Monkee claims ownership of five Videos, and Sepi claims ownership of three Videos. 1App.166; 4App.22 (UMF ¶48). The Videos were registered with the U.S. Copyright Office in 2020, after the Documentary had debuted on Netflix. 1App.167; 4App.22 (UMF ¶50). Sepi has never licensed, sold, or otherwise commercially exploited any of his work (including the Videos). *Id.* (UMF ¶51).

**B.   Procedural History**

On September 14, 2020, Plaintiffs sued Netflix—and later also Royal Goode—for copyright infringement, contending that they owned the copyrights in

the Videos and that Defendants had used clips of those Videos without permission. 1App.21, 30, 126. On January 27, 2022, Defendants moved for summary judgment on the grounds that (1) Sepi had shot seven of the Videos within the scope of his employment such that those Videos were works made for hire; and (2) Defendants made fair use of all eight Videos. 1App.146.[5]

On April 27, 2022, the district court granted Defendants' motion for summary judgment, holding that seven Videos were works made for hire under section 201(b) of the Copyright Act, and thus Sepi did not own the copyrights in those Videos. 8App.245, 269, 278. The court concluded Defendants' use of the eighth Video (the Funeral Video) in the Documentary was fair use under section 107 of the Copyright Act. 8App.277-78. The court also held that, in repudiating Sepi's 2016 sworn testimony, Sepi's 2021's deposition was sham testimony. 8App.259-64. The same day, the district court entered judgment in favor of Defendants. 8App.279.

On May 26, 2022, Plaintiffs filed a timely notice of appeal from the district court's order granting summary judgment. 8App.280.

---

[5] Defendants also moved for summary judgment on the ground that the Funeral Video was not original and thus not protectable by copyright.

## STANDARD OF REVIEW

This Court reviews *de novo* a grant of summary judgment under Federal Rule of Civil Procedure 56, "applying the same standard as the district court." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

## SUMMARY OF ARGUMENT

I.    To prevail, Plaintiffs must show that (1) they own a valid copyright, and (2) Defendants copied constituent elements of their work that are original. In the case of a work made for hire, the employer owns all of the rights comprised in the copyright. A work is "for hire" if it is prepared by an employee within the scope of his or her employment. Moreover, a work falls within an employee's scope of employment if: (a) it is of the kind the employee was hired to perform; (b) it occurs substantially within the authorized time and space limits of the job; and (c) it is actuated, at least in part, by a purpose to serve the employer.

Sepi without question filmed the seven Videos within the scope of his employment. He was hired as a videographer for *Joe Exotic TV*. He shot the Videos during the Park's normal operating hours, on Park grounds, and edited them in the Park studio. And his objective was to serve his employer. While Plaintiffs argue on appeal that Sepi was hired only to film videos ***during Park tours***, this argument was not raised below and is therefore waived. Nor does the argument have evidentiary support. And, regardless of these deficiencies in Sepi's new claim, the filming of the

seven Videos at issue here would be reasonably incidental to videography on a Park tour and thus *still* within the scope of Sepi's employment. Because Plaintiffs do not own the copyright in the seven Videos shot during Sepi's employment at the Park, the district court properly granted summary judgment for Defendants as to those Videos.

II.      This Court may affirm "on any ground supported by the record, even one not addressed by the district court or presented on appeal." *Frey,* 41 F.4th at 1240. While the district court reached the fair use issue only regarding the Funeral Video, Defendants made fair use of all eight Videos in suit. A court determines whether a use is fair based on a four-factor test, which applies separately to each of the Videos at issue: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the market for or the value of the original. Under the first factor, the key determination is whether a secondary user transforms the original work. Here, as the weight of authority holds, use of film clips interspersed as part of a larger documentary—especially where, as here, the clips are the subject of commentary, criticism, and voiceover—is highly transformative. Under the second factor, most of the Videos are factual, weighing in favor of fair use. As to factor number three, Defendants used a very small portion of any of the Videos relative to its entire length. Under the fourth factor, as a matter of law, Plaintiffs cannot show

market harm: Plaintiffs had no existing market for the Videos, and the short, transformed clips could not serve as a substitute for the Videos. The district court's order should be affirmed on these grounds as well.

## ARGUMENT

### I.    Plaintiffs Cannot Establish the Requisite Copyright Ownership of Seven Videos Because They Were Works Made for Hire.

To prevail, Plaintiffs must show (1) they own a valid copyright, and (2) Defendants copied constituent elements of the work that are original to Plaintiffs. *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008). Because copyright ownership "vests initially in the author or authors of the work," 17 U.S.C. § 201(a), proof of copyright ownership typically requires that a plaintiff be the "author." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).

"As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Id.* (citing 17 U.S.C. § 102); *Autoskill v. Nat'l Educ. Support Sys.*, 994 F.2d 1476, 1488 n.12 (quoting *Reid*); *Huebbe v. Okla. Casting Co.*, 663 F. Supp. 2d 1196, 1201 (W.D. Okla. 2009) (same). However, "in the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights

20

comprised in the copyright." *Huebbe*, 663 F. Supp. 2d at 1202 (quoting 17 U.S.C. § 201(b)); *see also Autoskill*, 994 F.2d at 1488 n.12.

As defined in 17 U.S.C. § 101, a work is "for hire" if it constitutes "a work prepared by an employee within the scope of his or her employment[.]" The undisputed evidence establishes that Sepi was a Park employee when he filmed the Videos (except the Funeral Video, which is discussed *infra* at pp. 31-47), and that he filmed the Videos in the scope of his employment. Plaintiffs thus cannot show copyright ownership.

### A.    Sepi Acted Within the Scope of His Employment.

Common law agency principles govern whether a work was created within the scope of employment. *See Reid*, 490 U.S. at 740 (citing Restatement (Second) of Agency § 228 (1958)); *Autoskill*, 994 F.2d at 1488-89; *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994).[6] "As expressed in Section 228 of the Restatement [of

---

[6] Section 7.07 of the Restatement (Third) of Agency (2006) restated the test, providing that "[a]n employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." *Restatement (Third) of Agency* § 7.07(2) (2006). As the district court noted, the comments to that section "indicate that, as compared to the definition used in the Restatement (Second) of Agency, this formulation is 'phrased in more general terms' and designed to accommodate 'contemporary workforces' where employees may not be 'situated on the employer's premises nor continuously or exclusively engaged in performing assigned work.'" 8App.258 (quoting *id.* at cmt. b).    [*continued next page*]

Agency], the key principle is that a servant's conduct is within the scope of employment 'only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master.'" *Avtec*, 21 F.3d at 571. To qualify as the kind of work an employee was employed to perform, a task need only be "fairly and reasonably incidental to his employment[.]" *Vanderhurst v. Colo. Mountain Coll. Dist.*, 16 F. Supp. 2d 1297, 1307 (D. Colo. 1998); *see also Fleurimond*, 876 F. Supp. 2d at 204 ("acts incidental to authorized acts may be authorized as within the scope of employment") (citing Restatement (Second) of Agency § 229 cmt. b); *Miller v. CP Chemicals, Inc.*, 808 F. Supp. 1238, 1243 (D.S.C. 1992) (same).

Courts in copyright infringement cases frequently grant summary judgment where no factual issue exists that a plaintiff acted within the scope of employment such that the work was a work made for hire. *See, e.g., Vanderhurst*, 16 F. Supp. 2d

---

Because Defendants' research revealed no Tenth Circuit case addressing the work for hire doctrine that has adopted the more recent formulation, Defendants believe the Second Restatement test remains controlling. Other opinions post-dating the publication of the *Restatement (Third) of Agency* have continued to rely on the Second Restatement's three-part formulation when analyzing whether a work was made for hire under the Copyright Act. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 277 (3d Cir. 2019); *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th Cir. 2012); *Whatever It Takes Transmission & Parts, Inc. v. Cap. Core, Inc.,* 2013 WL 12178585, at *8 n.8 (S.D. Ohio Mar. 22, 2013) ("From a review of case law, it does not appear that federal copyright law has incorporated the Restatement (Third) of Agency. . . ."); *Fleurimond v. New York Univ.*, 876 F. Supp. 2d 190, 199 (E.D.N.Y. 2012). In any event, as the district court noted, 8App.258, the result would not change under the more recent formulation.

at 1307; *Rouse v. Walter & Assocs., LLC*, 513 F. Supp. 2d 1041 (S.D. Iowa 2007); *Fleurimond*, 876 F. Supp. 2d at 191; *Lewis v. Activision Blizzard, Inc.*, 2013 WL 5663103 (N.D. Cal. Oct. 17, 2013), *aff'd*, 634 F. App'x 182 (9th Cir. 2015); *Carol Wilson Fine Arts, Inc. v. Zifen Qian*, 71 F. Supp. 3d 1151 (D. Ore. 2014); *Genzmer v. Pub. Health Trust of Miami-Dade Cnty.*, 219 F. Supp. 2d 1275 (S.D. Fla. 2002); *Miller*, 808 F. Supp. 1238. As the district court held, Sepi filmed the Videos within the scope of his employment.

As an initial matter, Sepi testified during his 2016 deposition that videography was precisely the job he was hired to perform. *See, e.g.,* 3App.45 (2016 Depo. at 74:14-17: "I approached Joe and asked him if he really needed another camera person. . . . So I guess he hired me to do that and that was that."). Furthermore, he was hired to work on *Joe Exotic TV* to shoot precisely the type of videos at issue here—occurrences at the Park and Exotic's antics. After the studio fire and the departure of Kirkham and crew, Sepi became the sole videographer for *Joe Exotic TV*. Although Sepi tried to disclaim this testimony in the current lawsuit, the district court correctly concluded that his 2021 testimony was a sham attempt to avoid summary judgment, and that even crediting it, "no reasonable juror could conclude that the seven videos at issue were created outside the scope of Mr. Sepi's employment for the Park." *See* 8App.259-64, 266-69.

On appeal, Plaintiffs have changed their story yet again. They now concede that Sepi's 2016 deposition was accurate—he *was* hired as a videographer. But they concoct yet *another* version of the facts, namely that Sepi's videography responsibilities as a Park employee extended only to recording "park tours."[7] App.Br. at 67. That belated, disingenuous assertion cannot avail Plaintiffs for several reasons.

*First,* Plaintiffs never made this argument below. Rather, they merely argued that either from inception or after the March 2015 fire, Sepi's job responsibilities included only taking photographs for Park tours, not filming videos. *See* 4App.30-31. Indeed, the whole point of Sepi's perjury excuse was to disclaim that he engaged in *any* type of videography as part of his job. Because Plaintiffs failed to argue below that Sepi worked as a videographer, but only during Park tours, the argument is waived. *See Schrock v. Wyeth, Inc*., 727 F.3d 1273, 1284 (10th Cir. 2013) (citing *Quigley v. Rosenthal*, 327 F.3d 1044, 1069 (10th Cir. 2003)). *See also, e.g.,*

---

[7] Despite Plaintiff's "concession" that Sepi was hired as a videographer, they persist in trying to justify Sepi's conduct by arguing, as they did below, that "Mr. Sepi was scared and he provided a believable and coherent explanation of his fear, including serious threats made against him." App.Br. 64. As the district court held, the rationalization is illogical and inconsistent. 8App.260-63 & n.6. Sepi's 2016 testimony *harmed* Exotic's position in the Baskin Garnishment Action by demonstrating that Whyte Monkee was a company created under false pretenses, in which Sepi had no actual role. And later in his 2021 deposition, Sepi changed his story *again*, claiming that he perjured himself in 2016 because he wanted to retain access to equipment and video footage—also nonsensical given his testimony against Exotic's interests. 2App.74-75.

*Bancamerica Comm. Corp. v. Mosher Steel of Kan., Inc*., 100 F.3d 792, 798-99 (10th Cir. 1996) (This rule applies when a "litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial or presents a theory that was discussed in a vague and ambiguous way.") (quotations omitted); *U.S. v. Leffler,* 942 F.3d 1192, 1196 (10th Cir. 2019) ("When a party fails to raise an argument below, we typically treat the argument as forfeited.") (citing *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011)).

**Second,** even if the Court were to consider Plaintiff's new position, the record is devoid of evidence to support their belated argument. Rather, as Sepi admitted in his 2016 deposition, he was hired as—and worked as—a videographer for ***Joe Exotic TV***. The show did not involve filming Park tours for ***souvenirs***. On the contrary, after the studio fire, Sepi took over Kirkham's job at *Joe Exotic TV*, which entailed producing and streaming precisely the kind of videos at issue in this case. *See, e.g.,* 9App.38-39 (2016 Depo. at 95-99). During his 2016 deposition, Sepi explained that video he filmed during Park tours was part of the material he used as a videographer **for *Joe Exotic TV***. *See* 9 App.61 (2016 Depo. at 185-186). He did ***not*** testify that he filmed tour videos to create "memorabilia" for visitors, much less that doing so was his only job. Finally, as a matter of logic and intelligibility, it is difficult to imagine selling Park visitors a "still frame video" of their tour experience

25

(App.Br. at 67), and Plaintiffs certainly supplied no evidence the Park offered such a thing.

**Third,** even assuming *arguendo* that Sepi's duties as a videographer entailed only Park tours, Defendants would still be entitled to summary judgment. As noted above, to qualify as the kind of work an employee was employed to perform, a task need only be "fairly and reasonably incidental to his employment[.]" Nowhere in their brief do Plaintiffs even address this fundamental, routinely cited principle. As the district court noted, still photography of Park tours is closely related to videography of Exotic and other events at the Park. Sepi even used the same equipment for photography and videography. *See, e.g.,* 2App.101 (2021 Depo. at 212: "Q. And what did you learn in the camera operation class?  A. How to operate a camera and take photos and video. Q. Both still photos and videos?  A. Yeah, camera operation. It's all in one."). It follows that **videography** of Park occurrences and Exotic's activities is reasonably incidental—indeed, closely related—to videography during Park tours, especially when Sepi himself testified that tour videos were used for *Joe Exotic TV.*

Courts in copyright cases have found that a work was made for hire (and thus owned by the employer) where an employee's tasks were far less related to the work's creation than here. In *Fleurimond*, plaintiff, a graphic designer employed to create promotional materials for the NYU Athletic Department, created a caricatured

26

drawing of a cougar mascot that NYU used and sold on various university-branded items. 876 F. Supp. 2d 190. In asserting copyright ownership, plaintiff claimed that the mascot's creation occurred outside the scope of her employment because the drawing was more "artistic" than her "technical" job. *Id*. at 204. Because of the overlapping skills required, the court granted summary judgment, finding the defendant had met its burden of showing that the mascot design project generally, and the creation of the mascot specifically, were within the scope of the plaintiff's employment. *Id*. at 209. *See also Carol Wilson Fine Arts*, 71 F. Supp. 3d at 1156 (where employee's job was to create original artwork for use in greeting cards and stationary, paintings made during the time of employment were works made for hire such that summary judgment was appropriate); *Lewis*, 2013 WL 5663103 at *5 (where plaintiff was employed as a "Game Master," a sort of customer service role in which she answered customers' questions and offered assistance with various aspects of the game, her voicing of a video game character was within the scope of employment such that summary judgment was warranted).[8]

---

[8] *See also Vanderhurst*, 16 F. Supp. 2d at 1307 (granting summary judgment; professor's creation of "Veterinary Technology Outline" using own materials and own time was work made for hire where doing so was "fairly and reasonably incidental to his employment" and could be "regarded fairly as one method of carrying out [its] objectives"); *Miller*, 808 F. Supp. at 1243 (granting summary judgment; where plaintiff employed as a laboratory supervisor wrote computer programs calculating required adjustments to defendant's products, largely on his own time, the programs were works made for hire because their development "was at least incidental to his job responsibilities" at the laboratory); *Rouse*, 513 F. Supp.

**B.      Sepi Filmed the Videos Substantially Within the Authorized Time and Space Limits of His Job.**

Under the second Restatement factor, Sepi filmed the seven Videos substantially within the authorized time and space limits of his job. He admits he filmed all the Videos (except the Funeral Video) during his work hours, while the Park was open to the public, and primarily on Park grounds. Moreover, Sepi edited the Videos on Park grounds, at the Park's studio, using equipment that, after the March 2015 fire, Sandlin (from "Tiger Truck Stop") had lent to the Park. Indeed, Sepi spent 20 hours or more per week creating video content. The Videos themselves show Sepi wearing his Park work shirt and carrying a Park walkie-talkie while filming was taking place. As a matter of law, the second factor supports the district court's conclusion that Sepi acted within the scope of employment while filming the Videos.

Plaintiffs nonetheless argue that the district court erred because Sepi made only $150 per week, a salary purportedly too modest for a videographer for *Joe Exotic TV* and Exotic's activities. As a threshold matter, in addition to the $150 per week, Sepi earned a room in a trailer and utilities. Moreover, that Sepi filmed the Videos substantially during the Park's normal operating hours, on Park grounds, using Park

---

2d at 1057-61, 1070 (granting summary judgment; no genuine issue of fact as to whether computer program created by university professors was work made for hire in which they did not have copyright ownership, and thus did not have standing to assert copyright infringement claim).

equipment, and then edited the Videos in the Park studio, establishes that his compensation covered those tasks. And beyond that, Sepi *himself* testified that his compensation covered all his activities at the Park. 3App.56, 66-70, 76, 80-81, 107, 120, 140.

Neither is there merit to Plaintiffs' contention (App.Br. 70-72)—supported by strained and self-refuting hypotheticals—that, because Sepi lived on Park premises, a disputed issue of material fact exists regarding the second Restatement factor. Sepi did not film the Videos in his trailer; rather, he filmed at locations where he clearly did *not* reside.[9] Likewise, the Videos were edited in the Park's studio, not in Sepi's trailer or any other place of his residence. 2App.37-40, 114-15, 134, 173-76; 3App.102-04, 121-122. The district court properly concluded that no genuine issue of material fact exists as to the second Restatement factor.

### C.    Sepi's Videography Was Actuated, At Least In Part, By a Purpose to Serve the Park.

For the reasons set forth in the district court's order, the third Restatement factor leads to the ineluctable conclusion that Sepi created the seven Videos for the benefit of his employer. On appeal, Plaintiffs concede this point. App.Br. 73.

---

[9] This is so even of the Video titled "Mobile Trailer Inspections for Volunteers," where Sepi is seen in his Park garb, participating in a search for contraband in *other* peoples' living quarters. In any event, Sepi testified that, by sometime early in 2016, he was actually residing in his own apartment outside the Park premises. 9App.17-18, 37 (2016 Depo. at 12-13, 90-91).

\*

All three Restatement factors establish that Sepi filmed seven of the eight Videos within the scope of his employment. Those Videos were works made for hire. Plaintiffs do not own them and had no standing to sue on them. The district court's order granting summary judgment on these Videos should be affirmed.[10]

## II.     Defendants' Use of the Videos in the Documentary Was Fair Use.

Even if Plaintiffs could establish copyright ownership, Defendants' use of the Videos in the Documentary was quintessential fair use. Fair use is one of several "built-in safeguards" included in copyright law, and serves to "protect[] the public's First Amendment interest in an author's original expression by 'afford[ing] considerable latitude for scholarship and comment, and even for parody.'" *Golan v. Gonzales*, 501 F.3d 1179, 1184 (10th Cir. 2007) (quoting *Eldred v. Ashcroft*, 537

---

[10] During discovery—but not in opposition to the motion for summary judgment— Plaintiffs asserted that Exotic or other Park officials orally "consented" that Plaintiffs would own the Videos. *See, e.g.,* 2App.78-80. By failing to raise this argument below and here, they have waived it. *City of Colo. Springs v. Solis*, 589 F.3d 1121, 1135 n.5 (10th Cir. 2009). In any event, to the extent Plaintiffs impermissibly try to resurrect this claim in their reply, where, as here, a work is made for hire, "the employer or other person for whom the work was prepared is considered the author … and, ***unless the parties have expressly agreed otherwise in a written instrument signed by them***, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b) (emphasis added). Moreover, both parties must execute the written agreement ***before*** the creation of the work. *Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 412-13 (7th Cir. 1992); *Gladwell Gov't Servs., Inc. v. Cnty. of Marin,* 265 F. App'x 624, 626 (9th Cir. 2008). As noted above, Plaintiffs admit that no such written agreement exists regarding copyright ownership.

U.S. 186, 220 (2003)). The determination whether a use is fair use under the Copyright Act is a mixed question of fact and law, with the court to determine the ultimate question. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1199 (2021).

A court determines whether a use is fair based on a four-factor test, which should apply separately to each of the Videos at issue: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the market for or the value of the original. 17 U.S.C. § 107; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576-77 (1994); *see also, e.g., Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1259 (11th Cir. 2014) (rejecting attempt to "aggregate" alleged infringements of multiple works: "Fair use must be determined on a case-by-case basis, by applying the four factors to each work at issue.") (citing *Campbell*, 510 U.S. at 577). The four factors are weighed together, in light of the purposes of the Copyright Act (*Campbell*, 510 U.S. at 578); all four factors need not favor the defendant for a finding of fair use, including on summary judgment. *Kelly v. Arriba Soft. Corp.*, 336 F.3d 811, 818 (9th Cir. 2003). A court "may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

**A.  The District Properly Held that the Documentary's Use of the Funeral Video Was Fair Use.**

   **1.  Factor 1: The Purpose and Character of the Use.**

The key inquiry under the first fair use factor is whether the new work is "transformative," *i.e.*, whether it "'add[s] something new' to an existing work, endowing the first with 'new expression, meaning, or message,' rather than 'merely supersed[ing] the objects of the original creation.'" *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (quoting *Campbell*, 510 U.S. at 579). Where "the quoted matter is used as **raw material**, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013) (emphasis added) (quoting Judge Pierre Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)); *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006) (same). "[A]n allegedly infringing work is typically viewed as transformative as long as new expressive content or message is apparent." *Seltzer*, 725 F.3d at 1177. Where a use is transformative, the commercial value of the defendant's work is "of little significance." *SOFA Ent., Inc.*, 709 F.3d at 1278-79; *Cariou v. Prince*, 714 F.3d 694, 708 (2d. Cir. 2013) (similar). Where the defendant's work fits a use identified in Section 107, like criticism or comment, "there is a strong presumption that factor one favors the defendant[.]" *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004); *see Brown v. Netflix, Inc.*, 855 F. App'x 61, 62 (2d Cir. 2021) (documentary).

Courts thus routinely find the use of copyrighted material in documentaries to be transformative.[11] In *Brown v. Netflix*, for example, the Second Circuit affirmed that use of a copyrighted children's song about fish sticks in a documentary film about burlesque (during a performance involving a fish costume) was fair, and that there was a presumption of fair use under the first factor because the film was of a "documentary character[.]" 855 F. App'x at 62-63.[12] Likewise, in *Bill Graham Archives*, use of Grateful Dead event posters in a historical book about the band was transformative because the posters served as "historical artifacts," differing from their original "dual purposes of artistic expression and promotion." 448 F.3d at 609-10.[13]

---

[11] Notably, the U.S. Copyright Office treats use of video clips for purposes of biographical documentary as presumptively fair. Thus, based on the Copyright Office's recommendations, the rules and regulations promulgated under 17 U.S.C. § 1201 provide an exemption from anti-circumvention laws for "use of short portions of . . . motion pictures"—defined to include "television shows and videos"—where the purpose is "criticism or comment . . . [f]or use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature." 37 CFR § 201.40(b) (2021).

[12] The district court in the same case reasoned, "while Defendants do not alter the Song . . . the performance serves a new and different function from the Song, rather than offering merely a substitute for its tale." *Brown v. Netflix, Inc.*, 462 F. Supp. 3d 453, 461 (S.D.N.Y. 2020) (internal quotations omitted).

[13] *See also, e.g., Red Label Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 985 (N.D. Ill. 2019) (use of excerpts of plaintiffs' "Super Bowl Shuffle" video in documentary about the 1985 Chicago Bears was transformative where it served as historical guidepost "within a video[] that construct[s] new narratives about the history of the [Bears] and the NFL") (citing *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 940 (4th Cir. 2013)); *SOFA Ent.*, 709 F.3d at 1278-79 (use of

Like the documentary in *Brown,* the Documentary is "criticism" and "comment." The Documentary's use of brief excerpts from the Funeral Video as reference points is therefore entitled to a presumption of fair use. In total, the Documentary made non-continuous use of the Video in a segment lasting fewer than 70 seconds that contained other footage; the Funeral Video itself ran for nearly ***24 minutes***. *See* 3App.260-61. The Documentary is also highly transformative of these excerpts, which serve as raw material and a historical marker in a way entirely different from the Video's original function. The Funeral Video was physically ***and*** contextually transformed through the Documentary's use of short excerpts, which were interspersed with interviews or accompanied by voiceovers that changed the Video's meaning. As the district court noted:

> Mr. Sepi testified that he created the video "[f]or remembrance" and that it was livestreamed on YouTube without any editing, where it remained afterward. Sepi Depo 2021 at 425:19-21. Defendants' use and purpose is decidedly different – they have excised a relatively small portion of the video, interspersed it with comments from Mr. Maldonado's mother that are critical of Exotic, and woven it into the larger narrative of the series. Thus, whether for entertainment value, cultural commentary, or both, Defendants have imbued the original video with a different character and altered its message. Rather than "merely repackage[ing] or republish[ing]" the Travis MM Funeral Ceremony video, Defendants have used it as "raw

---

a seven-second clip from the band The Four Seasons' appearance on *The Ed Sullivan Show*—a turning point in the band's career—in a musical about The Four Seasons was transformative: "[b]y using [the clip] as a biographical anchor, [defendant] put the clip to its own transformative ends.").

> material" to create "new information, new aesthetics, new insights and understandings."

8App.273-74 (citing *Seltzer*, 725 F.3d at 1176) (quotation omitted).

Plaintiffs' arguments that the first factor weighs in their favor lack merit.

**First**, citing *Campbell*, they assert that for a secondary work to be transformative, it "must 'at least, in part comment on that author's work.'" App.Br. 27. This citation is misleading. In the discussion where that language appears, the Supreme Court was referring to the definition of **parody**. As noted above, *Campbell*'s test of transformation is whether the defendant's works "'add [] something new' to an existing work, endowing the first with 'new expression, meaning, or message,' rather than 'merely supersed[ing] the objects of the original creation.'" *SOFA Ent.*, 709 F.3d at 1278 (quoting *Campbell* 510 U.S. at 579). This broader formulation does **not** require comment on the original. Not surprisingly, Plaintiffs' brief completely ignores the numerous cases, cited above, holding that uses of film clips in documentaries or broader factual works are transformative—and that direct comment on the original work is not required. *See Cariou,* 714 F.3d at 706 ("The law imposes no requirement that a work comment on the original or its author in order to be considered transformative….") (citing cases); *Kienitz v. Sconnie Nation LLC*, 965 F. Supp. 2d 1042, 1051, 1054 (W.D. Wis. 2013), *aff'd*, 766 F.3d 756 (7th Cir. 2014) (citing *Campbell* and *Cariou*, and holding that even without comment on

original, use of photograph on T-shirt had "robust transformative nature" and qualified as fair use).

Nor is this a case where there is a mere "change of purpose" or change of format (*e.g.*, making a book into a movie).[14] Rather, as noted, the Documentary *physically* altered the original Funeral Video by choosing particular excerpts from it, editing them together, and juxtaposing them with other video and audio that *Defendants* created; and *contextually* altered the *meaning and message* of the Funeral Video by using it to illustrate Exotic's megalomania even in the face of tragedy. In any event, by referring to Exotic's behavior at the funeral in voiceover, Travis Maldonado's mother *did* comment on what appeared on the Funeral Video— and, by extension, so did the Documentary.

---

[14] *Dr. Seuss Enters., L.P. v. ComicMix LLC,* 983 F.3d 443 (9th Cir. 2020), on which Plaintiff relies, App.Br. at 28-29, is completely distinguishable. There, the defendants engaged in the wholesale appropriation of plot, characters, and illustrations to create a second literary work, of a sort plaintiff routinely licensed. Here, the brief clips from the Funeral Video serve as raw materials for a multi-part Documentary differing dramatically from the Video's content. Put differently, Defendants did not use the Funeral Video to make a second video about a funeral— the analogous situation to *Dr. Seuss*. Similarly, in *Warhol*, Andy Warhol copied the plaintiff's copyrighted photograph, made relatively few physical changes, and created a series of images based on the photograph. *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021), cert. granted, 142 S. Ct. 1412 (2022) (argued on October 12, 2022). Directly on point in the Second Circuit is *Bill Graham Archives*, 448 F.3d 605, which found fair use where the defendant copied the plaintiff's entire works—concert-tour posters—but used them as historical reference in a history book about a rock band.

***Second***, Plaintiffs make the bizarre argument that, in analyzing fair use, the district court failed to consider the fact that by "streaming" the Documentary, brief excerpts of the Funeral Video were also streamed, and that this "online public performance" merits special consideration and treatment. App.Br. 20-21, 59-60. Plaintiff's argument is far from clear. As a threshold matter, the district court necessarily "considered" streaming. The issue before the court was whether the use of clips from the Funeral Video in a Documentary streamed on Netflix infringed or was, alternatively, fair use.

Perhaps Plaintiffs mean to assert that while Defendants might have engaged in fair use in ***reproducing*** clips from the Funeral Video, they did not engage in fair use in ***streaming*** them. Not surprisingly, Plaintiffs cite no case law supporting the proposition that the manner of exploitation—as opposed to the degree of transformation or other statutorily relevant factors—determines fair use. In fact, the case law leads to the opposite conclusion. In *Campbell*, for example, the defendant exploited the parody of the plaintiff's work via public performance through radio and in live performances, and via reproduction and distribution on sound recordings. The Supreme Court nowhere distinguished among methods of exploitation in its fair use analysis. Nor do the other salient cases. The point of the fair use doctrine is to permit creators like Defendants to create works for dissemination to the public—

whether through streaming, over-the-air broadcast, cable, download, or some other means.

Plaintiffs also seem to invoke the word "streaming" to argue that the Documentary is particularly commercial. App.Br. 23, 26. However, as noted above, where a use is highly transformative, the commerciality of the use carries little weight. Indeed, many, if not most, of the cases finding fair use, or reversing a lower-court finding of its absence, involve commercial use. *E.g.*, *Google,* 141 S. Ct. at 1204 (undisputed commercial use was "not dispositive of the first factor, particularly in light of the inherently transformative role" of Google's "reimplementation" of Oracle's software); *Campbell*, 510 U.S. at 573, 594 (use of 1964 composition "Oh, Pretty Woman" in commercial rap song selling "nearly a quarter of a million copies" not "presumptively unfair"); *Seltzer,* 725 F.3d at 1178 ("undoubtedly commercial" use of photograph by rock group in stage show was fair); *SOFA Ent.*, 709 F.3d at 1278–79 ("[B]ecause [defendant's] use of the clip is transformative, the fact that [the musical] *Jersey Boys* is a commercial production is of little significance.").

The first factor heavily favors Defendant as to the Funeral Video.

### 2.    Factor 2: The Funeral Video Is Primarily Factual and Published.

The second fair use factor focuses on "the nature of the copyrighted work." 17 U.S.C. § 107(2). "The scope of fair use is greater when 'informational' as opposed to more 'creative' works are involved." *Hustler Mag., Inc. v. Moral*

*Majority Inc.*, 796 F.2d 1148, 1153-54 (9th Cir. 1986). Despite Plaintiffs' strained attempt to argue otherwise (*see* App.Br. 35-36), the Funeral Video is indisputably factual, consisting of footage of actual events with little to no creative input. In any event, courts have held that "the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." *Bill Graham Archives*, 448 F.3d at 612.

Plaintiffs make two other arguments in asserting that the second factor weighs in their favor. First, they argue that, technically, the Funeral Video is unpublished because a public performance is not deemed publication for purposes of a certain copyright provision. However, Sepi "livestreamed" the Funeral Video on YouTube as the Maldonado's funeral occurred, and then left the video available to the public on YouTube. 1App.166; 4App.22 (UMF ¶47); 2App.196-97. The second factor focuses on an author's prior ***disclosure*** and ***dissemination*** of the copyrighted work to the public, not the statutory definition of publication, and streaming the Video on YouTube, then leaving it for further performance to the public, clearly satisfies this metric. *See, e.g., Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 564 (1985) (discussing "author's right to control the first public appearance of his expression"). In line with this, courts in other contexts routinely treat YouTube-posted videos as "published." *See, e.g., Hanagami v. Epic Games Inc.,* 2022 WL 4007874, at *1 (C.D. Cal. Aug. 24, 2022) (copyright action;

"Plaintiff published a YouTube video of himself and others dancing to [a] song"); *see also United States v. Gonzalez,* 905 F.3d 165, 175 (3d Cir. 2018) (criminal defendant described as having "published three YouTube videos"); *Muhaisen v. Does 1 Through 100*, 2017 WL 4012132, at *2 (D. Colo. Sept. 12, 2017) (defamation action; "The Court finds that the YouTube videos have been published.").

Plaintiffs also argue that the Video was "highly personal" to Sepi, and of a "private nature." App.Br. 37. Sepi's decision to stream the Funeral Video on social media—and leave it there—belies this disingenuous argument. The supposed highly personal and private nature did not stop him from transmitting the Video potentially to tens, or even hundreds, of millions of people. This is just the type of intentional disclosure the "publication" element of the second fair use factor concerns.

In any event, section 107 provides: "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." Given the factual nature of the Funeral Video and its wide dissemination to the public, the second factor weighs in favor of fair use.

### 3. Factor 3: The Amount of Use Weighs in Favor of Defendants.

The third fair use factor looks to the "quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Seltzer*, 725 F.3d at 1178. This factor necessarily overlaps somewhat with the first factor— the "extent of permissible copying varies with the purpose and character of the use."

*Campbell*, 510 U.S. at 586-87. "If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *Kelly*, 336 F.3d at 820-21. Moreover, "[t]he fair use doctrine does not obligate the Film to use the shortest possible snippet to convey its message of commentary and criticism." *Brown*, 855 F. App'x at 64. Even where a defendant uses an entire work, the third factor may weigh in its favor. *Seltzer*, 725 F.3d at 1178; *Bill Graham Archives*, 448 F.3d at 613.

The Documentary uses a quantitatively insubstantial amount of the Funeral Video—a total of approximately ***66 seconds*** out of a video lasting nearly 24 minutes. Thus, only about five percent of that Video allegedly appears in the Documentary.

Contrary to Plaintiffs' assertion, the district court properly assessed both the quantitative and qualitative value of the clips used from the Funeral Video, noting:

> The portions of the video used by Defendants show Exotic speaking at the funeral. Qualitatively, these clips are some of the more unusual portions of the video, although they are not necessarily the most important. The comments by Mr. Maldonado's mother, for example, may be just as significant as the comments by Exotic to a person wanting to view the funeral. Quantitatively, only a tiny portion of the Travis MM Funeral Ceremony video is featured in *Tiger King*.

8App.276. The district court's conclusion was correct. Qualitatively, Defendants used no more than necessary—and what they did use was reasonable in light of their purposes of providing historical reference points, commenting on Exotic's

41

showmanship, and creating a captivating viewing experience that would bring his unusual story to life. *See Red Label Music Publ'g*, 388 F. Supp. 3d at 986; *Threshold Media v Corp. v. Relativity Media, LLC*, 2013 WL 12331550 at *12 (C.D. Cal. Mar. 19, 2013) ("Although one might quibble whether the filmmakers could have cut a second or two from their uses of [plaintiff's] song in order to further reduce its overall exposure, the overall amount used was reasonable in light of their purpose."). Courts have recognized that fair use often requires use of an important part of the original work in order to make the point and create a different meaning and message—and a new work. Here, for the Documentary to make the point about Exotic, it had to use clips in which he focused on himself during Travis Maldonado's funeral. Otherwise, the point could not be made. As the district court found, the third factor weighs in favor of fair use.

### 4. Factor 4: There Is No Genuine Issue of Fact as to Market Harm.

The fourth factor asks what effect the allegedly infringing use has on the "potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "[W]here a work is transformative, market harm may not so readily be inferred and there is no presumption of market harm." *Weinberg v. Dirty World, LLC*, 2017 WL 5665023 at *12 (C.D. Cal. July 27, 2017). In evaluating the fourth factor, a court should assess harm to the plaintiff's "traditional, reasonable, or likely to be developed markets." *Seltzer*, 725 F.3d at 1179 (citation omitted); *Am. Geophysical*

*Union v. Texaco Inc*., 60 F.3d 913, 930 (2d Cir. 1994) (same). Where, as here, the allegedly infringing use does not substitute for the original and serves a different market function, the fourth factor weighs in favor of fair use. *See Campbell*, 510 U.S. at 591.

The fourth factor weighs in the defendant's favor when the plaintiff provides no evidence demonstrating a market impact. *Norse v. Henry Holt & Co*., 847 F. Supp. 142, 147 (N.D. Cal. 1994) (where defendant copied only small portions of plaintiff's letters, "plaintiff has provided no evidence of a valuable market, particularly in light of the sparsity and content of the copied material"); *Calkins v. Playboy Enters. Int'l, Inc*., 561 F. Supp. 2d 1136, 1143-44 (E.D. Cal. 2008) (fourth factor favored defendant where "there is no evidence before the Court demonstrating that [defendant]'s use of the Photograph interfered in any way with the marketability of the work").

The Documentary's use of the Funeral Video did not harm any purported market for licensing the Videos. Sepi admitted having never licensed, sold, or otherwise commercially exploited ***any*** of his work (including the Videos). 1App.167; 4App.22 (UMF ¶51). As the district court found, moreover, to the extent Plaintiffs intend to license the Funeral Video or certain clips, the portions featured in the Documentary are "too few, too short, and too small in relation to the whole" to undercut any market for this material. 8App.277 (quoting *Monster Commc'ns,*

*Inc. v. Turner Broad. Sys., Inc*., 935 F. Supp. 490, 495 (S.D.N.Y. 1996)). *See also Hofheinz v. A & E Television Networks*, 146 F. Supp. 2d 442, 449 (S.D.N.Y. 2001) (quoting *Hofheinz v. AMC Productions, Inc.*, 147 F. Supp. 2d 127, 140 (E.D.N.Y. 2001)) (same).

In attacking the district court's order, Plaintiffs merely assert—without a shred of evidence—that the Documentary is an unfair "derivative use" of Plaintiffs' work. App.Br. at 43. However, as noted, where the allegedly infringing use does not substitute for the original and serves a "different market function[]," this weighs in favor of fair use. *Campbell*, 510 U.S. at 591; *SOFA Ent.*, 709 F.3d at 1280. Here, Defendants' use of the clips "advances [their] own original creation without any reasonable threat" to Sepi's business model." *SOFA Ent.*, 709 F.3d at 1280 (seven-second clip of plaintiff's work not reproduced separately resulted in no market harm as a matter of law, even though plaintiff owned film library that it licensed for a fee); *Monbo v. Nathan*, 2022 WL 4591905, at *25 (E.D.N.Y. Aug. 26, 2022) (finding fair use where use was not as "market substitute": "It is unlikely that potential purchasers of [plaintiff's documentary film] would opt to acquire [defendants' documentary film] in order to see the seventy-five seconds of clips from [plaintiffs' film] in preference to the original.") (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015)).

In any event, Sepi's admission that he has never commercialized his work in any fashion goes equally for derivative uses and cannot be rebutted by speculation that a derivative opportunity may arise. The fourth factor, too, weighs in favor of fair use.

### 5. The So-called Additional Factors Weigh in Favor of Fair Use.

Plaintiffs assert that two additional factors not listed in Section 107 require reversal of the district court's order granting summary judgment regarding the Funeral Video. Even if these factors were properly considered, they establish just the opposite.

First, Plaintiffs contend that Defendants' failure to credit Sepi with filming the Funeral Video weighs against fair use. App.Br. 50. The issue of attribution relates to whether a secondary user acted in bad faith by using the original work. *See Brammer v. Violent Hues Production, LLC*, 922 F.3d 255, 266 (4th Cir. 2019). The Supreme Court has cast grave doubt on whether bad faith is relevant to the fair use inquiry. Recently, the Court stated:

> As for bad faith, our decision in *Campbell* expressed some skepticism about whether bad faith has any role in a fair use analysis. 510 U.S. at 585, n. 18, 114 S.Ct. 1164. We find this skepticism justifiable, as "[c]opyright is not a privilege reserved for the well-behaved."

*Google,* 141 S. Ct. at 1203 (quoting Leval, 103 Harv. L. Rev. at 1126). The cases on which Plaintiffs rely all predate *Google*.

Regardless, despite Plaintiffs' unsupported, bombastic charges that Defendants failed to credit Sepi, the undisputed evidence is that Defendants *did* offer to compensate him in some form. As discussed above, Defendant Royal Goode licensed the clips from Exotic and Lowe, both of whom purported to own all the videos taken at the Park. Later, Royal Goode sought Sepi's help in locating clips. Although Royal Goode understood that others owned the clips, it nonetheless offered to compensate Sepi for his efforts. How did Sepi respond? Not by claiming copyright ownership and asking for compensation or attribution, or even by asserting authorship, but by replying that he could not help with clips because he no longer worked for the Park. Indeed, Sepi referred Royal Goode to his former boss, Exotic— implying that the employer owned the clips and could provide them to Royal Goode. The undisputed evidence of Defendants' good faith could not be stronger.

In a similar vein, Plaintiffs argue that Defendants acted in bad faith because they did not offer to pay him a license fee for use of the Funeral Video. The argument again begs the question: if a use is fair, the creator of the original work has no right to a license fee. *See Campbell*, 510 U.S. at 585 n.18 ("If the use is otherwise fair, then no permission need be sought or granted."); *Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1106 (C.D. Cal. 2015) (defendant failed to credit or pay license fee; discussing *Campbell*, the court stated, "[i]f using a song after requesting and being denied a license does not show bad faith, then neither does failing to obtain

46

a license and continuing to use footage after being sent a demand letter."). Moreover, as noted above, the undisputed facts establish that Royal Goode *did* offer to compensate Sepi, and that Sepi implicitly disclaimed any right to compensation by referring Royal Goode to Exotic.

*

For the reasons discussed above, the district court's order granting summary judgment regarding the Funeral Video should be affirmed.

### B. Summary Judgment on the Basis of Fair Use Is Independently Merited for the Other Seven Videos.

For the reasons discussed above, the district court's order granting summary judgment should be affirmed without further inquiry. However, as previously noted, the Court may affirm for any reason supported by the record. *Frey,* 41 F.4th at 1240. If the Court for some reason decides that the seven Videos created during the term of Sepi's employment at the Park were not works made for hire, it should nevertheless find that Defendants' brief uses of those Videos in the Documentary also were fair uses under section 107.

The relevant law has been set forth above. The foregoing discussion of the fourth factor—market harm—and the so-called additional factors applies equally to the remaining seven Videos. Below, Defendants discuss application of the remaining three factors to each of the other seven Videos.

### 1.  "Disrespectful Tomato Thrower Trouble."

The clip from this Video depicts a Park employee meeting during which Exotic screamed at employees. Under the first factor, the use is highly transformative: the clip is juxtaposed in the Documentary with voiceovers from Rick Kirkham commenting on the lengths to which Exotic would go to seek fame and perform for cameras, thus commenting on Exotic's theatrical nature. The clip also shows Exotic temperament. Under the second factor, the Video is factual and was originally published on *Joe Exotic TV*. As to the third factor, only approximately **13 seconds** of this four-minute-and-43-second Video (5%) was used in the Documentary. *See* 3App.259; M.M.4; M.M.12.

### 2.  "Joe-Getting Dragged By Lion."

This Video shows Exotic, in a Park animal cage, nearly mauled by a tiger while undertaking to film a presidential campaign message. M.M.13. The brief clips of this Video had an obvious transformative purpose: the clips function not as a campaign message, but as commentary on the dangers to which Exotic subjected himself. The clips also illustrate Exotic's theory that he was the victim of foul play. Under the second factor, the Video was factual rather than creative. As to the third factor, the Documentary used a total of no more than **28 seconds** of a nearly 4-minute video (12%). M.M.1; *see* 3App.259.

### 3. "Joe – Presidential PSA":

A clip from this Video shows Exotic verbally stumbling during the filming of a campaign video and the folly of his U.S. presidential campaign. In light of such commentary, under the first factor, the Documentary's use is highly transformative. The clip is combined with a separate voiceover of John Reinke, Park manager, commenting on Exotic. Under the second factor, the Video is a factual record of Exotic's political activity, not a creative work, and parts of the Video were published on *Joe Exotic TV*. As to the third factor, the clip consists of **17 seconds** out of 4:05 minutes total (7%). *See* 3App.258; M.M.5; M.M.11.

### 4. "Mobile Trailer Inspections For Volunteers":

In this Video, Exotic is inspecting Park trailers, searching for contraband and other problems. M.M.14. Under the first factor, the Video is highly transformative. Juxtaposed with music, the clip shows the dark, dismal conditions for those Park employees who lived in the trailers. Under the second factor, the Video is factual. As to the third factor, the clip uses only **12 seconds** of a 10:50-minute video (2%). M.M.2; *see* 3App.260.

### 5. "Country Music Artist Joe Exotic – Bring It On (Please Unite)":

This Video, filmed at the Park, depicts Exotic as a professional country music recording artist and addresses the controversies and forces he sees as aligned against him. M.M.9. In the Documentary, an excerpt from the Video is juxtaposed with

Exotic singing along to "his" voice on a car radio, implying that, actually, Exotic cannot sing, thereby undercutting his persona in the Video. The Video was long made available on YouTube and also was released on DVD. *See* 2App.95-96, 138-41, 3App.189-191. As to the third factor, the Documentary used only **23 seconds** out of a 4:41 music video (8%). M.M.4; *see* 3App.258.

### 6. "Joe Exotic Country Music 'Here Kitty Kitty'":

The Video, created with a Carole Baskin lookalike, lampoons Baskin by suggesting she murdered her former husband, who mysteriously disappeared a number of years ago. M.M.8. The Documentary juxtaposes the Video with commentary from a number of people, using the Video to examine Exotic's fixation with Baskin. The brief clips used in the Documentary do not lampoon Baskin. Instead, they develop the portrait of ***Exotic's*** outrageous and over-the-top behavior, including making this very Video. Exotic was ultimately convicted of plotting to murder Baskin. *See U.S. v. Maldonado-Passage*, 4 F.4th 1097 (10th Cir. 2021). This is a quintessentially transformative use under the first fair use factor. Under the second factor, the Video was long made available on YouTube and was released on DVD. 2App.95-96, 116-117; 3App.189-191. As to the third fair use factor, the Documentary used only a total of 47 seconds out of a 4:43 music video (16%), and the use was divided into brief segments ranging from 4 to 28 seconds. M.M.3; *see* 3App.257.

### 7. "Joe Exotic TV – Tornado on the Ground":

The Video was originally filmed to document the actions of Exotic and other Park employees when faced with a tornado. M.M.10. The Documentary transformed the clip, under the first factor, into a depiction of how the Park posed a danger to surrounding communities because of the possibility that exotic cats could escape. Applying the second factor, the Video was published on the *Joe Exotic TV* YouTube channel. Under factor three, the Documentary used only **26 seconds** out of a 21:56 video (2%). M.M.1; *see* 3App.258.

\*

In sum, even if the Court were to reject the district court's conclusion that these seven Videos were works for hire, the Court should affirm on the alternate grounds of fair use.

### CONCLUSION

The undisputed facts establish that (i) because Sepi filmed seven of the eight Videos within the scope of his employment, Plaintiffs do not own the copyright in those Videos; and (ii) in any event, under 17 U.S.C. §107, the Documentary made fair use of all the Videos at issue here. The trial court's order granting summary judgment should be affirmed.

DATED: December 1, 2022

Respectfully submitted,

By: /s/ Robert H. Rotstein

    Robert H. Rotstein (CA Bar # 72452)
      Admitted *Pro Hac Vice*
    Emily F. Evitt (CA Bar # 261491)
      Admitted *Pro Hac Vice*
    MITCHELL SILBERBERG & KNUPP LLP
    2049 Century Park East, 18th Floor
    Los Angeles, CA  90067-3120
    (310) 312-2000 – Telephone
    (310) 312-3100 – Facsimile
    rxr@msk.com
    efe@msk.com

    Mack J. Morgan, III (OBA #6397)
    MJMLAW PLLC
    6618 N. Hillcrest Ave.
    Nichols Hills, OK 73116
    (405) 343-7454 - Telephone
    mack@mjmlaw.biz

    *Attorneys for Defendants-Appellees*
    *Netflix, Inc. and Royal Goode*
    *Productions LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,902 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(A), and the typestyle requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Times New Roman 14-point.

I hereby certify, pursuant to 10th Cir. R. 25.5, that all required privacy redactions have been made. I further certify, pursuant to 10th Cir. R. 27.2 and ECF User Manual, Section II, Part J(b), that the hard copies of this Brief of Appellee to be submitted to Clerk's Office are exact copies of the electronic filing. I further certify that the electronic submission was scanned for viruses with the most recent version of Windows Defender and is free of viruses.

Dated: December 1, 2022                    /s/ Robert H. Rotstein

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that counsel for all parties are registered CM/ECF users and that service to Plaintiffs-Appellants will be accomplished by the CM/ECF system.

/s/ Robert H. Rotstein