No. 22-6086
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

WHYTE MONKEE PRODUCTIONS LLC, TIMOTHY SEPI,

*Plaintiff-Appellants*,

v.

NETFLIX, INC., ROYAL GOODE PRODUCTIONS LLC,

*Defendant-Appellees*.

On Appeal from the United States District Court
for the Western District of Oklahoma
No. 5:20-cv-00933-D
Hon. Timothy D. DeGiusti, United States District Judge

_____

## APPELLANTS' REPLY BRIEF

_____

[Oral Argument Scheduled for Mar. 22, 2023]

Andrew Grimm                    Gregory Keenan
DIGITAL JUSTICE FOUNDATION       DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive           81 Stewart Street
Omaha, Nebraska 68154            Floral Park, New York 11001
(531) 210-2381                   (516) 633-2633
Andrew@DigitalJusticeFoundation.org   Gregory@DigitalJusticeFoundation.org

*Attorney for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................3

SUMMARY OF ARGUMENT ...............................................................5

ARGUMENT ...........................................................................................7

    I.    THE ANSWERING BRIEF IS INCORRECT ON FAIR USE............................7

        A.    Defendants take three deeply flawed positions in support of their fair-use arguments. ...............................................7

        B.    Under the statutory fair-use factors, the streaming use overlooked by the District Court is unfair and contrary to the purposes of copyright...............................................13

            i.    Factor 1: The Answering Brief concedes commerciality and never meaningfully articulates a transformation that isn't there.........................................13

            i.    Factor 2: The Answering Brief doesn't engage the authorities showing that this is an unpublished, creative, personal work.................................................22

            ii.    Factor 3: The Answering Brief's emphasis on quantity overlooks qualitative significance—a more important question and one favoring Plaintiffs on this posture. .....25

            iii.    Factor 4: The Answering Brief makes points on market harm that actually support Plaintiffs' position that their market was eviscerated. ...................................26

        C.    Beyond the statutory fair-use factors, two case-specific factors overlooked by the District Court demonstrate that the uses here were unfair...............................................29

            i.    Attribution: No credit given to known creator ..............29

            ii.    Compensation: No offer of licensing fee to creator .......31

II.    THE DISTRICT COURT ERRED ON AUTHORSHIP. ....................................32

    A.    Defendants' contentions mean this authorship appeal boils down to a close examination of the 2016 deposition...............32

    B.    Defendants' scope-of-employment cases are inapposite..........34

    C.    Defendants' issue-waiver authorities are inapposite. ...............35

CONCLUSION ....................................................................................37

CERTIFICATE OF COMPLIANCE.....................................................38

CERTIFICATE OF SERVICE .............................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Bancamerica Commer. Corp. v. Mosher Steel,
   100 F.3d 792 (10th Cir. 1995). .................................................................36

Bouchat v. Baltimore Ravens Ltd. P'ship,
   737 F.3d 932, (4th Cir. 2013). ...................................................................8

Cambridge Univ. Press v. Patton,
   769 F.3d 1232 (11th Cir. 2014). ...............................................................31

Campbell v. Acuff-Rose Music, Inc.,
   510 U.S. 569 (1994)...............................................................................9, 26

Carol Wilson Fine Arts, Inc. v. Qian,
   71 F. Supp. 3d 1151 (D. Or. 2014). .........................................................34

Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.,
   194 F.3d 1211 (11th Cir. 1999). ...............................................................24

Fleurimond v. New York Univ.,
   876 F. Supp. 2d 190 (S.D.N.Y. 2012). .....................................................34

Foman v. Davis,
   371 U.S. 178 (1962)....................................................................................6

Hanagami v. Epic Games Inc.,
   2022 U.S. Dist. LEXIS 161823 (C.D. Cal. Aug. 24, 2022). ....................23

Harper & Row, Publrs. v. Nation Enters.,
   471 U.S. 539 (1985)................................................................ 11, 12, 25, 30

L.A. News Serv. v. KCAL-TV Channel 9,
   108 F.3d 1119 (9th Cir. 1997). .................................................................31

Lewis v. Activision Blizzard, Inc.,
   2013 U.S. Dist. LEXIS 149784 (N.D. Cal. Oct. 17, 2013) ......................35

Quigley v. Rosenthal,
   327 F.3d 1044 (10th Cir. 2003) ................................................................35

Richison v. Ernest Group, Inc.,
   634 F.3d 1123 (10th Cir. 2011). ...............................................................36

<u>Schrock v. Wyeth, Inc.</u>,
   727 F.3d 1273 (10th Cir. 2013) ........................................................35

<u>States v. Gonzalez</u>, 905 F.3d 165 (3d Cir. 2018)......................................23

<u>Stewart v. Abend</u>,
   495 U.S. 207, 227 (1990). .............................................................10

<u>United States v. Leffler</u>,
   942 F.3d 1192 (10th Cir. 2019). ......................................................36

**Other Authorities**

"Watch the Vietnam War," PBS. ................................................................8

Amanda Levendowski, "Using Copyright to Combat Revenge Porn," 3 N.Y.U. J.
   Intell. Prop. & Ent. L. 422 (2014). ...................................................24

Documentary Filmmakers' Statement of Best Practices in Fair Use, Center for
   Social Media, Washington College of Law (2005). ......................................10

Elizabeth High, "Holding History Hostage: Fair Use in the Context of Historical
   Documentary," 18 Temp. Pol. & Civ. Rts. L. Rev. 753 (2009). .......................8

Google's English Dictionary, Oxford Language  Publishers. .................................8

**Treatises**

G<small>OLDSTEIN ON</small> C<small>OPYRIGH</small>.,....................................................................31

## SUMMARY OF ARGUMENT[1]

**I.**   _Fair Use_: The principal briefs make a lot of legal points, but at core a few facts are key.  The Answering Brief's emphasis on documentary uses is belied by a failure to seek the kinds of materials documentaries usually seek (archival or historical materials), to use the methods of documentary film creation (such as attribution and historical sourcing), and a fundamental failure to indicate any transformation of the work.  On the statutory fair-use factors, commerciality is now conceded by Defendants as to their streaming uses and as to transformation they cannot identify any transformation.  The funeral footage is still funeral footage in Tiger King—just surrounded by Defendants' content.  That's unlike how in Campbell, the use transformed a song into a parody or in Google how the use transformed an API into the Android operating mobile APIs.  On the second factor, Defendants do not meaningfully engage or respond to authorities showing that this is a creative, unpublished, personal work.  The third factor—on qualitative significance— raises disputes of material fact.  The fourth factor weighs against fair use as well given that Defendants bear the burden, that record evidence shows licenses for these types of works, and that record evidence also shows market harms to Mr. Sepi.

---

[1] All emphasis added unless otherwise indicated.

**II.**   _Authorship_: The principal briefs leave the central factual questions focused on the 2016 deposition of Mr. Sepi.  And, there are a number of under-oath statements that demonstrate that Mr. Sepi was _not_ being compensated for the videos he was making—sharply undercutting that they were within the scope of his responsibility.  Indeed, regarding authorship, the record–particularly the 2016 Sepi Deposition–reveals numerous disputes of material fact. That deposition reveals that Mr. Sepi did not receive any compensation for a number of videos he made. And, the 2016 deposition reveals that some videos were made off the job site, i.e. well outside the Park, in other states. And, other record evidence demonstrates that, despite the District Court's holding to the contrary, there are important distinctions between the role of a "photographer", a "videographer" and an "editor." Accordingly, a reasonable juror could determine that not all the works were made within the scope of employment. Thus, regarding summary judgment on authorship, reversal is appropriate.

## ARGUMENT

**I.**    **THE ANSWERING BRIEF IS INCORRECT ON FAIR USE.**

      **A.**    **Defendants take three deeply flawed positions in support of their fair-use arguments.**

In their Answering Brief, Defendants adopt three deeply flawed positions pertaining to fair use:

1. Defendants inaptly characterize their commercial appropriation as a _documentary use_.

2. Defendants argue that they _offered to pay_ for a license—a claim belied by record evidence.

3. Defendants' ultimate fair-use position is in stark tension with <u>Harper Row</u> and with <u>Campbell</u>'s view of transformation.

\* \* \* \* \*

_**First**_, Defendants' central theme as it relates to fair use is that they created and streamed a "documentary series[.]"  Answering Br.  1; <u>see generally</u> <u>id.</u> (characterizing theirs as a "Documentary" throughout).

For strategic reasons, they see doctrinal benefit to cloaking their work in this inapt label.  <u>See</u> <u>id.</u> at 43 n.11 (characterizing documentary uses as "presumptively fair").

7

That's a stretch. Defendants' <u>Tiger King</u> series is more accurately characterized as reality TV. <u>E.g.</u>, "reality TV," Google's English Dictionary, Oxford Language Publishers (last accessed Jan. 30, 2023) (defining "reality TV" as "television programs in which real people are continuously filmed, designed to be entertaining rather than informative").

More importantly, the *reasons* why the law has afforded wider latitude to documentarians are not implicated <u>*here*</u>.

A central reason for allowing documentary filmmakers broader fair-use leeway is a pragmatic concession to necessity—a recognition of the immense efforts and "[c]osts of finding and acquiring <u>*archival*</u> footage [to] make <u>*historical*</u> documentaries[.]" <u>See</u>, <u>e.g.</u>, Elizabeth High, "Holding History Hostage: Fair Use in the Context of Historical Documentary," 18 Temp. Pol. & Civ. Rts. L. Rev. 753, 773 (2009); <u>Bouchat v. Baltimore Ravens Ltd. P'ship</u>, 737 F.3d 932, 944 (4th Cir. 2013) (discussing "historical" and "archival footage" in the context of a historical documentary).

For example, when Ken Burns and Lynn Novick set out to create their 10-part documentary series on the Vietnam War, they couldn't exactly go back in time obtain their own footage firsthand. <u>Cf.</u> "<u>Watch the Vietnam War</u>," PBS (last accessed Jan. 30, 2023).

Likewise, tracking down the rights to archival footage for works made long ago can be cost-prohibitive, if not impossible. Opening Br. 56 (describing copyright's "orphan works' problem").

These time-honored rationales for broad latitude in documentary filmmaking don't apply here. Defendants knew who made the footage. And, Defendants weren't seeking *historical* or *archival* footage. Just the opposite: Defendants were down filming Tiger King on location *by August 2015*. 3 App. 237 ¶ 10 ("first time filmed with Exotic at the park"). The pertinent funeral took place in *October 2017*. 8 App. 63.

Thus, Defendants plainly *could have* independently created their own funeral footage—but chose not to. Instead, they appropriated Mr. Sepi's works because his footage allowed them to "**avoid the drudgery in working up something fresh**"—of being on-site when they didn't want to be. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 580 (1994). This scooping Mr. Sepi's videography wasn't fair but was rather a commercial convenience to them, in disregard of his rights.

Furthermore, Defendants didn't do what documentarians do: they never attributed—*i.e.*, never documented—Mr. Sepi's authorship in their work. They didn't ensure that the "material [wa]s properly attributed, either through an accompanying on-screen identification or a mention in the film's final credit[.]"

[Documentary Filmmakers' Statement of Best Practices in Fair Use, Center for Social Media](#), Washington College of Law, at 4 (2005).  That's part of *documenting* facts.  Defendants didn't bother.

This case doesn't involve historical acts or archival footage.  It's not really a documentary.  Rather, this case involves Defendants scooping a competitor while disregarding documentary-filmmaking practices and giving no attribution, all in order to avoid the drudgery of filming footage for themselves.

***Second***, Defendants never offered to compensate Mr. Sepi *for the use of his footage*—but just took it.

Defendants asked Mr. Sepi to "*share* (& potentially license)" his works.  3 App. 216.  Asking him to "share" his copyrighted material isn't an offer to pay him.

Neither is requesting a license.  A "license" is simply a "grant of rights" in a copyright.  E.g., Stewart v. Abend, 495 U.S. 207, 227 (1990).  Without mention of payment or royalties—the kinds of things that typically get mentioned when payment is offered, see 9 App. 81-93 (agreements from Defendants involving actual payment)—Defendants were just asking Mr. Sepi to "share" his intellectual property for their profit.

Although Defendants offered to pay Mr. Sepi for the *labor* needed to track down the footage, 3 App. 250, that's not the same as offering to pay for a copyright license. Defendants never made *that* offer. Indeed, the Answering Brief chose its words carefully when eliding this distinction: "Defendants as a courtesy *did* offer to compensate Sepi for his *efforts*"—but offering to pay someone for their labor is not a "courtesy." Answering Br. 4.

And offering to pay for *labor* is not the same as offering to pay for a copyright license—an offer Defendants never made. Indeed, offering to pay for one thing (labor) but not the other (IP) would lead a reasonable person to conclude that only the first thing (labor) would be compensated.[2]

In short, no payment for a copyright license was ever offered by Defendants.

***Third***, Defendants think the fair-use doctrine of transformative fair use helps them but they never identify how the copied expression was transformed. Indeed, Harper & Row, Publrs. v. Nation Enters., 471 U.S. 539 (1985), seems quite on point.

---

[2] Moreover, it's perhaps not surprising Mr. Sepi was in no rush to return on site. Mr. Sepi, having escaped from a volatile and dangerous work environment, was in no rush to go back. 3 App. 253. After all, Tiger King is about "**Murder, Mayhem and Madness**," which, while entertaining while it's being streamed at home, was no laughing matter for Mr. Sepi for whom it had been a day-to-day reality.

In Harper & Row, taking "some 300 words of direct quotation" out of a book was unfair. Id. at 569. Even with a journalistic purpose, a factual work, and small amount taken, the use was *unfair*.

That's because nothing was transformed: 300 words of prose in a book became 300 words of prose in a unauthorized news article. See id. Here too, a clip of funeral footage remains a clip of funeral footage even when put in the context of a broader show. Although there is a voiceover, no one would see the funeral footage as anything other than a funeral footage. In that sense, there was no *transformation* in the sense that doctrinally matters.

No transformation occurred—but rather a portion of a work was just taken for commercial advantage and dropped into the context of a different infringing work. Like the 300 words of prose in Harper, the 30 seconds of footage here were simply dropped into the Tiger King. But, at core, they remained the same thing: funeral footage in both contexts, untransformed.

* * * * *

Defendants' fair-use arguments are flawed. They're not documentarians using archival or historical footage here. They didn't attribute. They didn't offer compensation. And, they didn't transform funeral footage into anything other than funeral footage.

That's not fair to Mr. Sepi. It's not fair use.

**B.    Under the statutory fair-use factors, the streaming use overlooked by the District Court is unfair and contrary to the purposes of copyright.**

The Answering Brief is incorrect with respect to each of the statutory fair-use factors.

i.    Factor 1: The Answering Brief concedes commerciality and never meaningfully articulates a transformation that isn't there.

The first factor weighs against fair use because Defendants' use was both deeply commercial and did **not** transform the work.  Opening Br. at 23-30.  Three points are key on appeal:

1.    Defendants do not dispute Plaintiff's position that Defendants' use was *highly commercial*.

2.    Defendants rely on *readily distinguishable documentary-use cases* to argue for transformation not found here.

3.    Defendants' position regarding transformative use is in tension with Harper Row and with Campbell's view of transformation.

In short, commerciality matters—and it matters more the less transformative the use is.

\* \* \* \* \*

13

___*First*___, Defendants commercially exploited Mr. Sepi's work by engaging in nationwide, continuous public performance of his work to millions of paying subscribers on Netflix's paywalled streaming platform. Opening Br. 24-27; 1 App. 128 ¶ 17.

The commerciality isn't disputed on appeal. Defendants don't dispute that this use was heavily commercial. <u>See</u> Answering Br. at 32-38. They can't. There are no reasonable arguments that streaming to millions of paying customers is anything other than a quintessential commercial use.

Below, the District Court thought otherwise, finding no commercial use, Add. 30, but only reached that conclusion by overlooking Defendants' public performance of the works via nationwide streaming. <u>See</u> 17 U.S.C. §106(4); Opening Br. at 59-60.

Defendants call this point "bizarre[.]" Answering Br. 37. They think the District Court "necessarily 'considered' streaming." <u>Id.</u> A careful review of the summary-judgment order, however, gives no such indication and no mention whatsoever of Defendant's streaming. <u>See</u> Add. 27-34. The District Court almost certainly didn't examine whether *that* *use*—the pervasive public performance, 17 U.S.C. §106(4)—was a fair use.

Surely, the District Court's capable-though-flawed analysis wasn't silently making the counterintuitive finding that streaming to millions of paying customers

is somehow <u>non</u>-commercial.  After all, that's not even a position that Defendants are willing to defend on appeal.  In truth, the District Court simply overlooked steaming uses here for us.

And, while Defendants disagree with this use-by-use approach claiming that its not "manner of exploitation" that "determines fair use[,]" Answering Br. 37, their position is at odds with this Court's authority this Court has clarified that a plaintiff's "claim of unauthorized distribution under §106(3) ***must*** **be separately considered**" from its claims of other unauthorized §106 uses, <u>see</u> <u>Diversey v. Schmidly</u>, 738 F.3d 1196, 1202 (10th Cir. 2013). That's because Section 106 enumerates six distinct rights. 17 U.S.C. §106(1)-(6); <u>see also</u> H.R. Rep. No. 94-1476, at 61(1976) (§106 creates a "bundle of rights" comprising a copyright, which "may be subdivided indefinitely"); 17 U.S.C. § 501(a) (making violation of *any*of those rights a copyright infringement).

Simply put, "each act of infringement is a distinct harm." <u>Diversey</u> at 1196. Thus, even if the affirmative defense of fair use applied to *some* but not all of 106's exclusive uses here, there'd still be infringement insofar as the defense did not apply to them.  Here the streaming of the works to millions of paying viewers was a highly commercial use of §106(4)'s exclusive public-display right.  Defendants do not—and cannot—dispute this highly *commercial* exploitation of Mr. Sepi's works.

***Second***, instead, for the first factor, Defendants ask this Court to ignore commerciality arguing their use was "transformative[.]"  Answering Br. 38.  For that point, Defendants rely on documentary-use cases.  Id. at 33-34 ("documentaries [...] transformative.").

Such cases are highly distinguishable—and Defendants give no justification for extending them here.  For example, Bill Graham Archives relied on a biography's use of old concert posters as "**historical artifacts**" when documenting thirty years of Grateful Dead tours. Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 609 (2d. Cir. 2006).  This use—"commerat[ing] historical events" and "historic scholarship"—was markedly different than the original use of the posters 30 years earlier.  Id.  That's textbook archival fair use.

The Bill Graham rationale isn't implicated here where the funeral footage wasn't a historical artifact.  Rather, here, a competing film crew scooped a contemporaneous filming to avoid the drudgery of filming it themselves.  Commercial convenience and profit maximization, not historical documentation, explains Defendants' superseding use.

Or consider Brown v. Netflix.  In Brown, a documentary exploring the resurgence of burlesque dancing "*incidentally* capture[d]" a dancer's use of a "Song as *brief background accompaniment* to the dance."  855 Fed. Appx. 61, 63 (2d. Cir. 2021).

16

That "*incidental* use of the Song" was emblematic of a documentary's exposition and examination of burlesque dancing.   Here, by contrast the funeral footage was not incidental but was rather a focal point where it appeared in <u>Tiger King</u>.

In short, Defendants' use lacked the hallmarks of "historical documentaries" such as "archival footage[.]"   <u>See</u> <u>Bouchat</u>, 737 F.3d at 944.   And, giving Defendants' free use of Mr. Sepi's copyrights doesn't advance the policy aims underlying the broad fair use leeway afforded documentarians.   <u>See</u> Opening Brief at 56 (discussing "orphan works" problem).

Defendant's documentary-use cases are readily distinguishable because they involve a minimal incidental use and the goal of archival materials used decades ago


***Third***, Defendants' use was also **not** transformative.   <u>See</u> Opening Br. 27-31.   Defendants argue that merely taking of expression and adding to it is enough. Answering Br. at 32.   Not so.   That wholly over-expansive view is in tension with <u>Harper</u> and with <u>Campbell</u>.

In <u>Harper & Row</u>, the Nation Magazine scooped 300 words from President Ford's unpublished memoir about the Watergate scandal.   It placed those 300 words into a 2,250 word article. <u>Harper & Row</u>, 471 U.S. at 543.

That was not fair use.  Id.

The unauthorized work didn't transform the 300 words–despite the addition of nearly 2,000 new words around them.  Nor did this addition of new material excuse Defendant's commercial purpose.  Id. at 562 (Defendant stood to "profit from exploitation of the copyrighted material without paying the customary price.").  Nor did the contents "newsworthy" nature excuse the commercial exploitation.  Id. at 557.

Harper is akin to what happened here.  Defendant scooped 30 seconds of Mr. Sepi's funeral footage, added additional footage around it, and then asks this Court to excuse its highly commercial use by calling the funeral footage transformed just because Defendant added new stuff around the stolen work. But as in Harper, the addition of new material did not transform the stolen expression–the funeral footage remained just that, footage of the funeral. Indeed, Defendant never explains how the expression of the funeral footage was transformed.

Consider Campbell.  In Campbell transformative use was found because defendants there started with the same expression but effected a fundamental transformation.  By "juxtapos[ing] the romantic musings" of the original with "degrading taunts" and "a bawdy demand for sex" the additional words revealed "the naivete" of the stolen words.  Campbell, 510 U.S. at 583.

Thus, the taken expression was *transformed* by what was added.[3]  Where once stood a catchy song, that same expression was *transformed* into something else—a parody.

Here, there is no such transformation of the stolen works. Defendant took the funeral film was taken, presented as funeral film, and added new but without transforming the stolen expression.

The Opening Brief observed that Campbell provides an important "limiting principle" for transformative use. Opening Br. at 29; Authors Guild v. Google, Inc., 804 F.3d 202, 214 (2d Cir. 2015) ("The Supreme Court's discussion in *Campbell* gave **important guidance** on assessing when a transformative use tends to support a conclusion of fair use.").

 Defendants disagree.  They rely on Judge Leval's 1990's article on fair use to argue that merely adding new content around the stolen content is enough. Answering Br. at 32 (citing Judge Pierre Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990)).

---

[3] And critically, despite finding the work highly transformative that was not dispositive of fair use in Campbell. 510 U.S. at 594.  Rather, even despite finding transformativeness, the Supreme Court remanded for consideration of market impact.  Thus, even a high degree of transformativeness does not render commerciality insignificant, as Defendants falsely claim.

But Judge Leval has issued subsequent clarification that undermine Defendant's position. As Judge Leval clarified in an *opinion*, twenty five years *after* Defendant's cited article, "the word 'transformative,' if interpreted too broadly, can also seem to authorize copying that should fall within the scope of the author's [§106(2)] derivative rights. <u>Authors Guild v. Google, Inc.</u>, 804 F.3d 202, 216 n.18 (2d Cir. 2015).

The Supreme Court's three fair-use cases provide a helpful study in contrasts. In <u>Google LLC v. Oracle Am., Inc.</u>, 141 S. Ct. 1183 (2021), the original expression was a non-mobile API and *that same expression* became something entirely different in a new context: a mobile API. In <u>Campbell</u>, the original expression was a catchy and popular song and *that same expression* became something entirely different in a new context: a parody of the original.

By contrast, in <u>Harper</u>, there was no transformation despite a new context for the prose. In <u>Harper</u>, the original expression was 300 words of prose from a presidential memoir and it was still just 300 words of prose in the new context of a magazine article. So too here. The funeral footage is still just funeral footage even when placed into what Defendants say is a documentary. Yes, the context is new but the *original expression* has not been fundamentally transformed into a different type of work, ala a song into a parody or a non-mobile API into a mobile API. Here, the funeral footage remains funeral footage.

20

There's no transformation.  And, even if the Court thinks there is some (albeit never articulated Defendant), the massive commerciality strongly outweighs it.  Here, given the limited if any transformation, the "claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." See Campbell, 510 U.S. at 580.

That weighs decidedly against fair use.

i.   Factor 2: The Answering Brief doesn't engage the authorities
     showing that this is an unpublished, creative, personal work.

This dispute pertains to an unpublished, creative, personal work—facts which the Answering Brief does not agree with but to which it does not meaningfully respond.

*First*, Defendants ignore the Opening Brief's cited authorities and then just simply fiat that the work is "indisputably factual." Answering Br. 39. This is entirely unresponsive to the authorities the Opening Brief Cited.

Yes, the funeral footage depicts things that actually happened, via a camera. So do all manner of photography and videography but they remain "generally viewed as creative, aesthetic expressions of a scene or image' and have long received thick copyright protection." Opening Br. 36 (quoting Brammer v. Violent Hues Prods., LLC, 922 F.3d 255, 267 (4th Cir. 2019)). That's because the mere choice where to put the camera, the settings for it, what content to depict, *etc.*, are all *choices* not dictated by reality but by the creator.

Indeed, Campbell—a decision the Answering Brief cited repeatedly—draws the distinction "creative works with bare factual compilations"—like database compilations. Campbell, 510 U.S. at 586 (quoted in Opening Br. 36). On *that* distinction, this footage is indisputably *not* factual in the sense that Defendants want to characterize it and diminish it. This is a creative work.

*Second*, the work wasn't published.

22

Again, Defendants simply ignore the Opening Brief's authorities. Here, the **_statutory_** definition of publication is characterized as a "technical[ity]" that can be discarded. Answering Br. 39.

Yet, whether it's Martin Luther King Jr.'s powerful speech or Mr. Sepi's funeral footage, merely permitting others to observe the work doesn't entail publication: "A public performance or display of a work does not of itself constitute publication." 17 U.S.C. § 101 (defining "Publication").

Harper & Row doesn't say otherwise. Rather, it observes that common-law copyright[4] had an "absolute" right to first publication. Harper & Row, 471 U.S. at 551. This absolute bar was tempered in that certain dissemination "not constituting a technical 'publication' should nevertheless be subject to fair use[.]" Id. In other words, Harper & Row was saying that lack of publication isn't determinative. Lack of publication isn't dispositive, *but*, as Harper & Row demonstrates, lack of publication still weighs quite significantly *against* fair use.

Defendant's other citations—Hanagami v. Epic Games Inc., 2022 U.S. Dist. LEXIS 161823, *15 (C.D. Cal. Aug. 24, 2022); United States v. Gonzalez, 905 F.3d 165 (3d Cir. 2018); Muhaisen v. Does 1 Through 100, 2017 WL 4012132 (D.

---

[4] Common-law copyrights arose under state law and have been almost entirely preempted by Congress' statutory copyrights and a specific section on express preemption. See 17 U.S.C. § 301(a) (preemption of most common-law copyrights))

Colo. Sept. 12, 2017)—do not involve fair use; use publication in a colloquial sense not in a copyright sense; and seem otherwise to implicate claims not at issue here (*i.e.*, rights of personality and defamation).

In copyright, "'publication' is 'a legal word of art,'" with which Defendant's authorities and arguments simply do not engage.  See <u>Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.</u>, 194 F.3d 1211, 1214 n.3 (11th Cir. 1999) (applying 1909 Copyright Act).

*<u>Third</u>*, the funeral film is a personal work.  It may not be *<u>private</u>* or *<u>secret</u>*, but it remains personal.  And, it's important that the courts respect the *<u>personal</u>* nature of a work even after being released online for important societal reasons. <u>See</u>, <u>e.g.</u>, Amanda Levendowski, "Using Copyright to Combat Revenge Porn," 3 N.Y.U. J. Intell. Prop. & Ent. L. 422, 446 (2014).

The funeral footage is an unpublished, creative, personal work—weighing against fair use here.

ii.     <u>Factor 3: The Answering Brief's emphasis on quantity overlooks qualitative significance—a more important question and one favoring Plaintiffs on this posture.</u>

The qualitative significance is a disputed issue of fact between the Parties. A jury could reasonably conclude that Defendants took the heart of the funeral film here.

Moreover, Defendant's emphasis upon the quantitative amount—a "total of approximately ***66 seconds*** out of a video lasting nearly 24 minutes" Answering Br. 41 (emphasis in original)—overlooks that taking the heart of the work still matters even if it's just a small amount.  <u>See</u> <u>Harper</u>, 471 U.S. at 569 ("some 300 words of direct quotation" out an entire book held unfair).

      iii.       <u>Factor 4: The Answering Brief makes points on market harm that actually support Plaintiffs' position that their market was eviscerated.</u>

The Answering Brief does not engage with the Opening Brief's points (1) that <u>*Defendants*</u> have the burden of proof; (2) that <u>*Defendants'*</u> record evidence of licenses demonstrate a market for these works; and (3) that <u>*Defendants'*</u> eviscerated that market—without identifying any other market for the works that wasn't affected.

Thus, the fourth factor weighs decisively against fair use. <u>***First***</u>, Defendant correctly states that "there is no presumption of market harm." That's true. Yet, Defendants overlook that as the movant on an <u>*affirmative*</u> defense, they bear the burden of demonstrative "evidence about relevant markets." <u>Campbell</u>, 510 U.S. at 590. The "Supreme Court and [the Ninth C]ircuit have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use." <u>Dr. Seuss</u>, 983 F.3d at 459.

This makes sense "[s]ince fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." <u>Campbell</u>, 510 U.S. at 590. Thus, any lack of evidence about market harms cuts against their fair use and means they as the movant on an affirmative defense have failed to carry their burden on the fourth factors. <u>See</u> Answering Br. 44 ("without a shred of evidence[.]").

26

___**Second**___, Defendants' strong rhetoric does not mask the fact that there plainly is record evidence of a licensing market for derivative uses. Opening Br. 56; 9 App. 80-93 (licenses).

Indeed, Defendants' own brief explains how they "licensed the clips from Exotic and Lowe[.]" Answering Br. 56; Answering Br. 12 ("The footage that Royal Goode **licensed** from the Park's owners (i.e., Exotic and Lowe) includes **the Videos at issue in this lawsuit**.").

Plaintiffs maintain that Defendants didn't procure these licenses from the proper rights holder. Yet, the fact that Defendants themselves repeatedly explain how they paid (faulty) licensing fees for use of the very clips at dispute plainly demonstrates a licensing market for derivative uses of the works in question. Indeed, the record plainly demonstrates that Defendants paid thousands of dollars to license such works for use in their documentary. 3 App. 238-239; 9 App. 80-93.

That's the licensing market for which Defendants aggressively claim there is not "a shred of evidence." Answering Br. 44. And, the fact that Defendants stiffed Plaintiffs, despite paying others for such derivative uses, does not demonstrate the lack of a market. That'd be like a restaurant patron arguing there's no market for fine dining because they dined and dashed after eating the meal.

Thus, the record plainly contains (as both Plaintiffs' and Defendants' Briefs discuss) that Defendants' routinely pay for licenses of just the sort of use in

dispute. In other words, Defendants are actively participating in that very market they now claim doesn't exist.

**_Third_**, Defendants' failure to identify any other licensing opportunities for the works doesn't help them—to the contrary it decisively weighs against fair use. That merely demonstrates that Defendants' use represented the primary market and its decision to stiff Mr. Sepi, while handing out licenses to *others*, simply foreclosed that market to Mr. Sepi, and without identifying any other market, foreclosed the markets for the work.

\* \* \* \* \* \*

In sum, the fourth factor's "inquiry must take account not only of harm to the original but also of harm to the market for derivative works." Harper, 470 U.S. at 568. And, courts must ask "whether unrestricted and widespread conduct of the sort engaged in" by Defendants would undermine Mr. Sepi's potential market. Dr. Seuss, 983 at 461.

Here, the record reflects just such a licensing market for derivative uses. Defendant have been making highly commercial derivative uses of Mr. Sepi's videos and have been paying licensing fees to *others* for the use of such works. See Section IBi, *supra*; 3App.238-239; 9App.80-93. . Defendants' failure to pay for a license for those uses, foreclosed the primary market for such uses here.

**C.    Beyond the statutory fair-use factors, two case-specific factors overlooked by the District Court demonstrate that the uses here were unfair.**

          i.    <u>Attribution: No credit given to known creator</u>

The Opening Brief explained that the case law reveals that a defendant's failure to attribute credit to the author whose work is being used counts against fair use.  Opening Br. 50-53 (discussing cases); <u>see generally</u> M.M.1-7.

Defendants argue that these cases "all predate Google" and that there's "skepticism about whether bad faith has any role in a fair use analysis." Answering Br. at 45 (citing <u>Google</u>, 141 S. Ct. at 1203)

***First***, Defendants overstate matters. Whatever Google said about "bad faith", it did not say that *attribution* is irrelevant to a fair use analysis. Nor did it dislodge the host of cases holding that a failure to provide attribution counts against fair use. Defendant cites no authority for *that* radical position.

***Second***, Defendants confuse bad faith (i.e. subjective motivation) with fair use's objective considerations—fairness to authors and enrichment of the public. Attribution advances both objective aims.  At core, fair use is an equitable doctrine designed to enrich the public. A self-purported documentarian who fails to attribute its sources deprives the public and treats fellow authors unfairly.  That's not fair use.

Attribution matters under the caselaw.  Opening Br. 50-52.

Consider, for example, the wide fair use latitude afforded scholarship. If some scholar just disregarded all conventions and use of citations in their scholarship, the fair use analysis might turn out differently. That wouldn't be fair to other scholars whose work is being used and it wouldn't yield the same benefit to the public. In short, a scholar must act like a scholar to be treated like a scholar under fair use.

So too here.  Industry practice for documentarians is to provide attribution. Documentary Filmmakers' Statement of Best Practices in Fair Use, Association of Independent Video and Filmmakers, at 4 (2005, last accessed Jan. 30, 2022). Indeed, providing attribution is "what documentary filmmakers currently regard as **reasonable** application of the copyright "fair use" doctrine." Id. at 1.  And, fair use doctrine has historically been "predicated on the author's implied consent to 'reasonable and customary'" Harper & Row, 470 U.S. at 551. In short, a self-purported documentarian must act like a documentarian to be treated like a documentarian under fair use.

Here, Defendant wildly deviated from standard industry practices by failing to provide attribution is a relevant consideration.  Failing to provide attribution is not fair to other filmmakers whose work it used and it does not enrich the public. These case-specific considerations matter to a fair use analysis.

ii.      Compensation: No offer of licensing fee to creator

Defendants repeatedly suggest that Defendants "did offer to compensate Sepi" for use of his IP.  E.g., Answering Br. 47.

That's not true—Defendant never offered a licensing fee.  See 3 App. 253-254.  Instead, Defendants' Brief carefully phrases its offers of compensation for labor to sound like compensation for IP.

But that's not how IP licenses work.

Furthermore, courts have made clear a relevant consideration is whether Defendant commercially "exploited a purloined work for free that could have been obtained for a fee."  L.A. News Serv. v. KCAL-TV Channel 9, 108 F.3d 1119, 1122 (9th Cir. 1997).  Here, Defendants had the ""means to pay for the use" but choose simply chose not to.  Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1276-1277 (11th Cir. 2014).

That counts against fair use.

Moreover, Defendants also try to recast the compensation consideration as a matter of "bad faith." Answering Br. at 46. It's not. The compensation consideration reflects an objective economic and policy consideration undergirding fair use. See Paul Goldstein, GOLDSTEIN ON COPYRIGHT, §12.3.1 at 72 (discussing how fair use often turns on "the transaction costs of negotiating licenses").

## II.    THE DISTRICT COURT ERRED ON AUTHORSHIP.

### A.    Defendants' contentions mean this authorship appeal boils down to a close examination of the 2016 deposition.

Because Defendants challenge the veracity of the 2021 deposition, then a close examination of the 2016 deposition is essential because it shows that Mr. Sepi was not being compensated for the videos, *i.e.*, they were not in his scope of work duties. While not dispositive of his claims, these videos are essential evidence why this case should go to a jury.

* * * * *

Critically, Defendants only prevail on this issue if **<u>all</u>** three **<u>*elements*</u>** of the Restatement's test are met. Opening Br. 66. At this procedural posture, summary judgment was improper because there are numerous disputed issues of material fact, going to the §§ 228(1)'s test of whether Mr. Sepi's works were created within the scope of his employment. Opening Br 63-73. Accordingly, the District Court should be reversed on authorship.

In response, Defendants spend significant time trying to discredit what they view as a "sham" testimony from 2021. See e.g. Answering Br. 23. But that's unresponsive. The Opening Brief made clear even "adopting the deposition testimony most favorable to Defendants to avoid the sham-affidavit concerns, the record still supports reversal." Opening Br. 63.

32

Indeed, simply relying on the 2016 deposition, which Defendants insist is the accurate testimony, there are still a host of disputed issues of material fact regarding authorship. For example,

First, the District Court simply fiated that "'videography' encompasses filming and editing work." Add. 13 n.2; Opening Br. at 67-68; but see Answering Br. at 26. But Tiger King's own credits list separate credits and jobs for "photography"; "cinematography" and "editors." M.M.1-7.

Second, some of the works were made off-site. Indeed, Defendants For example, Mr. Sepi shot the presidential campaign music video while in *Tampa* not on the worksite. See e.g. 9 App. 43 (p. 116: 5-7). That weighs against the works being made within the scope of employment; See §228(1).

Third, Mr. Sepi often received no compensation for his video shoots and creating the works.

- See e.g. 9 App. 47 (p. 131: 6-8) (Q: "Did you receive any additional income for that work? A: No, did not.")

- 9 App. 56 (165: 7-10) ("Q: Did Mr. Maldonado ever show you or give you any income related to Joe Exotic TV? A. No; because they're both no monetary value then.")

- 9 App. 56  (166: 15-21) ("Is it your testimony there is not any compensation or you are simply not aware of compensation? […] A: I never received any of it.").

33

In sum, there is record evidence, from the 2016 deposition, that Mr. Sepi was not being paid for his work on videos and that they were being made off-site. . A reasonable juror could find that element two of the Restatement's test is unsatisfied here. Reversal on authorship is appropriate.

### B.    Defendants' scope-of-employment cases are inapposite.

Defendants scope-of-employment cases are highly inapposite here:

- Fleurimond is relied upon heavily by Defendants but it involved a lack of "any attempt to distinguish her work on Orion from her work on the mascot design project as a whole." Fleurimond v. New York Univ., 876 F. Supp. 2d 190, 201 (S.D.N.Y. 2012).  Here, Plaintiffs' central point is that Mr. Sepi's work for park did *not* overlap and did *not* compensate him for his off-duty video production.

- Carol Wilson involved a *pro se* who "failed to provide any evidence or cite to any precedent in support of these assertions[.]"  Carol Wilson Fine Arts, Inc. v. Qian, 71 F. Supp. 3d 1151, 1156 (D. Or. 2014).   More than conclusory allegations have been made here.

- In <u>Lewis</u>, and unlike here, there *was* a job manual and it *expressly* stated that the relevant creation was part of the job description. <u>Lewis v. Activision Blizzard, Inc.</u>, 2013 U.S. Dist. LEXIS 149784, *10 (N.D. Cal. Oct. 17, 2013) ("Blizzard's training manual states that game masters are responsible for 'assist[ing] with the creation of content during the ever ongoing development of the game.'").

Defendants' other cited authorities are similarly inapposite.

### C.    Defendants' issue-waiver authorities are inapposite.

The Answering Brief asserts appellate issue-and-argument waiver/forfeiture points.    Answering Br. 24-25.    None are meritorious, as each is highly distinguishable from the present appeal:

- In <u>Schrock v. Wyeth, Inc.</u>, 727 F.3d 1273, 1283 (10th Cir. 2013), the appellant had asserted "misrepresentation, fraud, and failure-to-warn claims" below but then tried, unsuccessfully, to reframe them as "traditional" negligence claims on appeal, <u>id.</u> at 1284.

- In <u>Quigley v. Rosenthal</u>, 327 F.3d 1044, 1059 (10th Cir. 2003), the appellant has asserted defenses on First Amendment "free speech" rights below but then tried, unsuccessfully, to raise defenses under the "First Amendment right of association[,]" id. at 1069.

- In <u>Bancamerica Commer. Corp. v. Mosher Steel</u>, 100 F.3d 792, 798 (10th Cir. 1995), the appellant had accepted a threshold CERCLA "presumption of consistency" on an issue and then, after losing, tried unsuccessfully to challenge the threshold presumption on appeal, <u>id.</u>

- Likewise, in <u>Richison v. Ernest Group, Inc.</u>, 634 F.3d 1123, 1127 (10th Cir. 2011), the parties had litigated certain claims ("civil conspiracy, unjust enrichment, and breach of fiduciary duty") for a 2000-based claim then tried unsuccessfully on appeal to reframe them as about a 2007-based claims, <u>id.</u> at 1127.

- Finally, <u>United States v. Leffler</u>, 942 F.3d 1192, 1196 (10th Cir. 2019) pertains to plain-error review in criminal cases.

Suffice it to say that Plaintiffs have not done a bait-and-switch where an uncontroverted issues suddenly became controverted on appeal (like <u>Bancamerica</u>'s threshold presumption or <u>Richison</u>'s reframing toward new claim accrual dates). Nor have they tried to reframe copyright-infringement claims into some other type of claims, such as a free-speech claim into a right-of-associations claim (<u>Quigley</u>) or a products-liability failure-to-warn claim into a negligence claims (<u>Shrock</u>). None of that has happened here.

36

## CONCLUSION

This Court should reverse and remand on fair use and on ownership.

Date: January 30, 2023                    Respectfully submitted,


                                          */s/ Gregory Keenan*
                                          Gregory Keenan
                                          DIGITAL JUSTICE FOUNDATION
                                          81 Stewart Street
                                          Floral Park, New York 11001
                                          (516) 633-2633
                                          Gregory@DigitalJusticeFoundation.org

                                          *Attorney for Appellants*

## CERTIFICATE OF COMPLIANCE

This Brief contains **6,253** words.

This Brief was prepared in Microsoft Word using Times New Roman 14-point font.


Date: January 30, 2023                    Respectfully submitted,


                                          */s/ Gregory Keenan*
                                          Gregory Keenan

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by submitting through the appellate CM/ECF.

Opposing counsel have been served by the notice of docketing activity they will receive through the CM/ECF system.

Date: January 30, 2023                    Respectfully submitted,

*/s/ Gregory Keenan*
Gregory Keenan